```
 1                  UNITED STATES DISTRICT COURT

 2           WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3      _____
                                    )
 4      UNITED STATES OF AMERICA,    ) CR20-00174
                                    )
 5                    Plaintiff,     ) SEATTLE, WASHINGTON
                                    )
 6      v.                           ) November 15, 2021 -
                                    ) 9:00 A.M.
 7      ERIC SHIBLEY,                )
                                    )
 8                    Defendant.     ) TRIAL - DAY 1 -
                                    ) WITH REDACTED JURY
 9                                   ) VOIR DIRE
        _____
10
                      VERBATIM REPORT OF PROCEEDINGS
11            BEFORE THE HONORABLE JOHN C. COUGHENOUR
                    UNITED STATES DISTRICT JUDGE
12      _____

13

14      APPEARANCES:

15      For the Plaintiff:      Brian Werner
                                Assistant United States Attorney
16                              700 Stewart Street, Suite 5220
                                Seattle, WA  98101
17
                                Laura Connelly
18                              U.S. Department of Justice
                                Criminal Division
19                              1400 New York Avenue N.W., RM 10100
                                Washington, D.C. 20530
20

21      For the Defendant:      Michael Nance
                                Attorney at Law
22                              P.O. Box 11278
                                Bainbridge Island, WA 98110
23

24

25

          Proceedings stenographically reported and transcript produced with computer-aided technology
```

EXAMINATION INDEX


EXAMINATION OF                                                      PAGE

KANDACE ZELAYA        DIRECT EXAMINATION                            101
                      BY MS. CONNELLY
                      CROSS-EXAMINATION                             117
                      BY MR. NANCE
                      REDIRECT EXAMINATION                          137
                      BY MS. CONNELLY
                      RECROSS-EXAMINATION                           138
                      BY MR. NANCE
KATHLEEN LITTWIN      DIRECT EXAMINATION                            139
                      MR. WERNER
                      CROSS-EXAMINATION                             166
                      BY MR. NANCE




EXHIBIT INDEX


EXHIBITS ADMITTED                                                   PAGE

A-5                                                                 134
27 - 39                                                            146
40                                                                 107
207                                                                146

 1          THE COURT:  Please be seated.

 2          THE CLERK:  We're here on CR20-174-JCC, United States of

 3  America v. Eric Shibley.  Counsel, please make your appearances

 4  for the record.

 5          MS. CONNELLY:  Good morning, Your Honor, Laura Connelly

 6  for the United States.

 7          THE COURT:  Good morning.

 8          MR. WERNER:  Good morning, Your Honor, Brian Werner on

 9  behalf of the United States.

10          THE COURT:  Good morning.

11          MR. NANCE:  Good morning, Your Honor, Michael Nance for

12  Eric Shibley, seated to my left.  Also I would like to introduce

13  Galina Gedz, my legal assistant.

14          THE COURT:  All right.

15      As I told counsel earlier, there are three of the prospective

16  jurors that are unvaccinated or refuse to indicate whether they

17  were vaccinated or not.  And so we have excused those three,

18  which I believe leaves us with 37 on the panel, which should be

19  plenty.  We're going to do them all together.  If we had more, we

20  might have split them into two groups.  But I think that's a

21  small enough group that we can do them all together this morning.

22      We had sent out your questionnaires, but there's been a

23  problem with correlating all the responses.  So I'm going to have

24  to go through those verbally with the panel this morning.  We

25  couldn't get all of the questionnaires copied and correlated for

1  you this morning.  So I will go through the questionnaires with

2  the prospective jurors this morning.

3       Given the extensive nature of the questionnaires, I'm

4  assuming that there won't be a lot of need for in-person inquiry

5  by counsel.  So I suggest that we limit it to 15 minutes a side

6  for counsel, for direct interrogation of the panel, or individual

7  jurors.  Does that make sense?

8            MR. WERNER:  Yes, Your Honor.

9            THE COURT:  Mr. Nance?

10           MR. NANCE:  We'll try to live with that, Your Honor.

11           THE COURT:  Okay.

12      I'm going to seat one alternate, which means that the

13  defendant will have ten-plus-one peremptories, and the

14  government, six-plus-one peremptories, okay.

15      On the motions in limine.  The government's first was to

16  exclude evidence regarding negligence by and sophistication of

17  alleged victims, that is lenders, loan processors, and the SBA.

18  That motion in limine is granted.  I think the Ninth Circuit is

19  clear on that subject.

20      The government's motion to exclude evidence of the SBA's

21  guarantees to PPP lenders and of any profits available to or

22  earned by victim lenders is granted.  The defendant's motion to

23  exclude details of the underlying crime for which the defendant

24  was on probation is granted.  He's going to have -- the

25  government will have to be permitted to put into evidence that he

1  was on probation, but the nature of the probation is not

2  necessary.  And so I'm granting it to that extent.  Of course, if

3  you want to put that on, to minimize the impact of his being on

4  probation, that's up to you, but...

5          MR. NANCE:  I would just say that if there's going to be

6  a judgment -- I don't know if the court is planning to allow the

7  judgment -- the face of the judgment you are not going to allow.

8          THE COURT:  No, just the fact that he was on probation

9  is the only fact that I will permit.

10          MR. NANCE:  Okay.  We acknowledge that he was on

11  probation.  There is an issue about whether he realized or knew

12  he was on probation.

13          THE COURT:  Well, that's another issue.

14          MR. NANCE:  And I raised it a little late, but I think

15  it's important, and that's the issue of materiality.  We believe

16  it's not material as a matter of law, for the reasons I briefed

17  on it.  But, essentially, the SBA itself acknowledges now that

18  it's not a proper question, and they did that in response to a

19  lawsuit that challenged them on that direct point.

20          THE COURT:  I know.  But your objection is overruled.

21          MR. NANCE:  Thank you.

22          THE COURT:  Okay.  The defendant's motion to exclude

23  evidence of restrictions or disciplinary action related to the

24  defendant's medical license.  I think it's okay to say his

25  business had fallen on hard times, but there's no need to bring

1    up why.  The fact that he had limitations on his license or

2    problems with his license, I don't think is material or relevant.

3    Okay?

4        The defendant's motion to exclude extrinsic impeachment

5    evidence from prior civil litigation and bankruptcy proceedings.

6    The government indicated they don't plan to use any of this

7    information.  But if the issue arises, give me a heads-up before

8    it's brought up in front of the jury.  Okay?

9        The defendant's motion to exclude any information acquired

10   through defendant's court-ordered competency evaluation.  Again,

11   the government indicated they don't intend to use any of that,

12   but give me a heads-up if the issue comes up.

13       The defense motion to exclude any information or argument

14   regarding defendant's probation or status, I think we have dealt

15   with that.

16       Any other questions?

17           MR. NANCE:  Maybe just a clarification --

18           THE COURT:  Sure.

19           MR. NANCE:  -- Your Honor.  You granted the government's

20   motion on industry and profits -- or, I'm sorry, on lender

21   negligence and profits, and you have cited Ninth Circuit

22   authority for that.  And I think you're generally correct on

23   that.  As I read the *Lindsey* case, it qualifies that and says

24   that lending industry practice --

25           THE COURT:  Yes.  I think if that's brought up

 1   correctly, it will be permitted.

 2          MR. NANCE:  Thank you.

 3          THE COURT:  Okay.

 4          MS. CONNELLY:  Your Honor, just to clarify the ruling on

 5   probation.  Can we also not get into the fact that he was

 6   attending classes and attending treatment as part of his

 7   probation?  If defense is going to say he didn't know he was on

 8   probation, I think the government would want to respond by

 9   pointing out the things that he --

10          THE COURT:  If he takes the stand and he says that he

11   didn't realize that he was on probation, then anything that would

12   have alerted him to the fact that he was still on probation is

13   fair game.

14          MS. CONNELLY:  Okay.

15          THE COURT:  But that depends on whether he takes the

16   stand and takes that position.

17          MS. CONNELLY:  All right.  Thank you, Your Honor.

18          THE COURT:  Anything else?

19      All right.  We will bring the jury up at 9:30, then, and get

20   started.

21      All right.  We will be at recess.

22                          (Recessed.)

23                      (Off-the-record sidebar.)

24      (The following occurred in the presence of the jury pool.)

25          THE COURT:  Please be seated.

1    Counsel, if you'll identify yourselves and others at counsel

2    table, please, for the jury.

3         MS. CONNELLY:  Thank you, Your Honor.  Laura Connelly

4    for the government.  I'm joined by Brian Werner, Charles Arnold,

5    and Special Agent Katie Moran.

6         MR. NANCE:  Good morning.  Michael Nance, a private

7    lawyer in Seattle.  Proud to represent Eric Shibley.  And we're

8    assisted at counsel table by Galena Gedz.

9         THE COURT:  All right.  Folks, to put your mind at ease,

10   I have confirmed that all of you are vaccinated against COVID.

11   All of the counsel and parties at counsel table are vaccinated,

12   and all of the court staff are vaccinated.  So I hope that puts

13   your mind at ease.  Now, if you will stand and raise your right

14   hand to be sworn.

15        THE CLERK:  Do you and each of you solemnly swear or

16   affirm that the answers you shall give to the questions asked of

17   you by the court, touching upon your qualifications to act as a

18   juror in the cause now before this court, shall be the truth, the

19   whole truth, and nothing but truth?

20        THE JURY PANEL:  I do.

21        THE COURT:  All right.  Thank you.  Please be seated.

22   The clerk will now call the jury.  By that I mean he will draw

23   your names at random from the box before him.  He will call out

24   your name and a number.  You will be given a number to be

25   referred to by number during the course of the jury selection

1    process.  In addition, as he calls your name and number, take

2    seats in the jury box for jurors 1 through 14, and then

3    continuing on the benches to my far left, in the front row will

4    be No. 15, and then continuing until everybody has been seated.

5         When we get to the benches, it will be necessary for those of

6    you who haven't been called to move out of the way to make those

7    spaces available for the people who have been called.  Juror

8    No. 1 will be seated in the seat nearest me on the front row of

9    the jury box, 1 through 7 on the front row, 8 through 14 on the

10   back row.

11        Call the jury.

12        THE CLERK:  ███████████████████████████

13   ███████████████████████████████████████████████████████

14   ███████████████████████████████████████████████████

15       ████████████████████████████████████████████████

16       █████████████████████████████████████████████████

17   ████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████

20       ████████████████████████████████████

21   ███████████████████████████████████████████████

22       ██████████████████████████████████

23   ██████████████████████████████████

24   ████████████████████████████████████████████

25   ███████████████████████████████████





























November 15, 2021 - 24





















November 15, 2021 - 34





























November 15, 2021 - 48













November 15, 2021 - 54











































 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12         Does the government agree that the court has correctly

13   recognized the challenges?

14              MR. WERNER:  Yes, Your Honor.

15              THE COURT:  Does the defendant agree the court has

16   correctly recognized the challenges?

17              MR. NANCE:  Yes, Your Honor.

18              THE COURT:  Does the government accept the jury as

19   presently constituted?

20              MS. CONNELLY:  Yes, Your Honor.

21              THE COURT:  Does the defendant accept the jury as

22   presently constituted?

23              MR. NANCE:  Yes.

24              THE COURT:  All right.  Ladies and gentlemen, if you

25   will stand and raise your right hand to be sworn.

1          THE CLERK:  Do you and each of you solemnly swear or

2     affirm that you will well and truly try the matter now before the

3     court, and a true verdict therein render, according to the

4     evidence?

5          THE COURT:  Thank you.  Please be seated.

6          Those of you who weren't selected, I'm sure some of you will

7     be relieved, some of you may be disappointed.  But either way, I

8     want you to know that we appreciate your willingness to be here

9     today and participate in this process.

10         You are excused to report to the jury clerk on the first

11    floor.  That will terminate your experience.

12         Ladies and gentlemen, you now are the jury in this case, and

13    I want to take a few minutes to tell you something about your

14    duties as jurors and to give you some instructions.

15         It will be your duty to decide from the evidence what the

16    facts are.  You will hear the evidence, decide what the facts

17    are, and then apply those facts to the law, which I will give to

18    you.   In doing so, you must follow the law as I give it to you,

19    whether you agree with it or not.  The evidence will consist of

20    the testimony of witnesses, documents, and other things received

21    into evidence as exhibits -- excuse me, folks, please be quiet --

22    and any facts on which the lawyers agree or which I may instruct

23    you to accept.

24         You should not take anything I may say or do during the trial

25    as indicating what I think of the evidence, or what your verdict

1    should be.

2         This is a criminal case brought by the United States

3    government.  The charges against the defendant are contained in

4    the indictment.  The indictment is simply the description of the

5    charges made by the government against the defendant.  It is not

6    evidence of anything.  The following things are also not evidence

7    and you must not consider them as evidence in deciding the facts

8    of this case:  Statements and arguments of the attorneys;

9    questions and objections of the attorneys; testimony that I

10   instruct you to disregard; and anything you may have seen or

11   heard when the court was not in session; even if what you see or

12   hear is done or said by one of the parties or by one of the

13   witnesses.

14        Some evidence may be admitted for a limited purpose only.

15   When I instruct you that an item of evidence has been admitted

16   for a limited purpose, you must consider it only for that limited

17   purpose and for no other.  The evidence may be direct or

18   circumstantial.  Direct evidence is testimony by a witness about

19   what that witness personally saw, or heard, or did.

20   Circumstantial evidence is indirect evidence.  That is, it is

21   proof of one or more facts from which one can find another fact.

22   You are to consider both direct and circumstantial evidence.  The

23   law permits you to give equal weight to both.  But it is for you

24   to decide how much weight to give to any evidence.

25        There are rules of evidence which control what can be

1    received into evidence.  When a lawyer asks a question or offers
2    an exhibit into evidence, and a lawyer on the other side thinks
3    that it is not permitted by the rules of evidence, that lawyer
4    may object.  If I overrule an objection, the question may be
5    answered or the exhibit received.  If I sustain an objection, the
6    question cannot be answered or the exhibit cannot be received.
7    Whenever I sustain an objection to a question, you must ignore
8    the question and must not guess what the answer would have been.
9    Sometimes I may order that evidence be stricken from the record
10   and that you disregard or ignore the evidence.  That means that
11   when you are deciding the case, you must not consider the
12   evidence which I told you to disregard.

13       In deciding the facts of this case, you may have to decide
14   which witnesses to believe and which witnesses not to believe or
15   how much of any witness's testimony to believe.  You may believe
16   everything a witness says, or only part of it, or none of it.  In
17   deciding what to believe, you may consider a number of factors,
18   including the following:

19       The witness's ability to see or hear or know the things the
20   witness testified to; the quality of the witness's memory; the
21   witness's manner while testifying; whether the witness had an
22   interest in the outcome of the case, or any motive, bias or
23   prejudice; whether the witness was contradicted by anything the
24   witness said or wrote before trial, or by other evidence; and how
25   reasonable was the witness's testimony when considered in the

1   light of other evidence which you believe.

2        I will now say a few words about your conduct as jurors.

3   First, do not talk to each other about this case or about anyone

4   who has anything to do with it until the end of the case when you

5   go to the jury room to decide on your verdict.  Second, do not

6   talk with anyone else about this case or about anyone who has

7   anything to do with it until the trial has ended and you have

8   been discharged as jurors.  Anyone else includes members of your

9   family and your friends.  You may tell them that you are a juror,

10  but do not tell them anything about the case until after you have

11  been discharged by me.

12       Third, do not let anyone talk to you about the case or about

13  anyone who has anything to do with it.  If anyone should attempt

14  to talk to you about the case, immediately identify yourself as a

15  juror and tell them to stop.  If they do not stop, bring it to my

16  attention promptly.

17       Fourth, do not read any news stories or articles or listen to

18  any radio or television reports about the case or about anyone

19  who has anything to do with it.

20       Fifth, do not do any research, such as consulting

21  dictionaries, or other reference materials, or Googling the

22  internet, and do not make any investigation about the case on

23  your own.  For example, you should not go to any location about

24  which there may be testimony or perform any other investigation

25  of any kind.

1        And, sixth, if you need to communicate with me, simply give a

2   signed note to the clerk to give to me.

3        And, lastly, do not make up your mind about what your verdict

4   should be until after you have gone to the jury room to decide

5   the case and you and your fellow jurors have discussed the

6   evidence.  Keep an open mind until then.

7        At the end of the trial you will have to make your decision

8   based on what you recall of the evidence.  You will not have a

9   written transcript to consult.  It is difficult and time

10  consuming for the reporter to read back lengthy testimony.  I

11  urge you, therefore, to pay close attention to the testimony as

12  it is given.  If you wish, you may take notes to help you

13  remember what witnesses said.  If you do take notes, please keep

14  them to yourself until you and your fellow jurors go to the jury

15  room.  If you do not take notes, you should rely upon your own

16  memory of what was said and not be overly influenced by the notes

17  of other jurors.

18       The trial will begin shortly.  First, each side may make an

19  opening statement.  An opening statement is not evidence, it is

20  simply an outline to help understand what that party expects the

21  evidence will show.  A party is not required to make an opening

22  statement.

23       The government will then present its evidence, and counsel

24  for the defendant may cross-examine.  Following the government's

25  case, the defendant may present evidence, and the government's

1    counsel may cross-examine.

2         After all the evidence has been presented, the attorneys will

3    make their closing arguments to summarize and interpret the

4    evidence for you, and I will instruct you on the law.  After

5    that, you will go to the jury room to deliberate on your verdict.

6         We will take a recess for lunch.  We will start up at 1:10.

7    We will be in recess.

8              THE CLERK:  Please rise.  Court is in recess.

9                        (Recessed.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      AFTERNOON SESSION

 2              THE COURT:  Please be seated.

 3         Are you ready for the jury?

 4              MR. WERNER:  Yes, Your Honor.

 5              THE COURT:  All right.  Bring them in.

 6         (The following occurred in the presence of the jury.)

 7              THE COURT:  You may be seated, folks.  All right.  The

 8    government's opening.

 9              MR. WERNER:  May it please the court, counsel, and

10    members of the jury.  In early 2020, as the COVID-19 pandemic

11    spread across the country, as businesses closed, as workers were

12    sent home, there was great economic uncertainty, especially for

13    small businesses.  Congress and the federal government created

14    loan programs and grants like the PPP to help out small

15    businesses, and to help their workers and keep them employed.

16         But the defendant, Eric Shibley, abused these programs and

17    lied repeatedly on applications in order to get millions of

18    dollars that was meant for real small businesses, and real

19    employees.  You will learn, during this trial, that Eric Shibley

20    was a doctor with a small practice, and he owned a couple of

21    residential properties.  But from March 2020 to June 2020, Mr.

22    Shibley submitted 39 different loan applications, including for

23    businesses that didn't exist.

24         And on these loan applications, Mr. Shibley lied about the

25    most critical things.  He lied when he said he had more than 150
```

1    employees working for him.  He lied when he said he was paying

2    those employees more than a million dollars a month.  And he lied

3    when he said he was paying payroll taxes for these employees.  He

4    submitted these loan applications and he got loans based on those

5    false numbers.  He received more than $2.8 million in federal --

6    in PPP and other loan grant money.  This money was meant for real

7    businesses, real workers, not for Mr. Shibley.

8         During this trial, you are going to hear about loan programs

9    that are run by the Small Business Administration, or the SBA.

10   The SBA is the part of the federal government that's in charge of

11   helping out small businesses.  And you will hear that in March of

12   2020, Congress passed something called the CARES Act, to respond

13   to the pandemic.  And the CARES Act did a couple of things.  It

14   created a new loan program, called the PPP.  And it expanded an

15   existing small business loan program called the EIDL.

16        So the PPP, a term you are going to hear, that stands for

17   Paycheck Protection Program.  PPP loans, Paycheck Protection

18   Program loans were designed to keep small businesses operating,

19   and small business employees getting their salary.

20        So that's -- because they were so tied to employees and

21   keeping their salaries, that's what you needed to report to the

22   SBA, and the banks, to get a PPP loan.  You had to tell how many

23   employees you had, what your average monthly payroll was.  And

24   you had to affirm that you were paying payroll taxes for these

25   employees.

1      To make sure that these were real employees, from a real

2   business, the PPP also required that you submit a form, a simple

3   IRS form called a Form 941, which shows how much money you paid

4   your employees over a quarter.  And that's it.

5      The PPP was designed to get money to businesses quickly.  You

6   had to say your employees, you had to say your payroll for a

7   month, your average monthly payroll, and you had to give a

8   payroll tax form.

9      Now, the PPP, you will hear, was a -- this is an example of a

10  941 -- the PPP was a government program.  So the application form

11  was created and the guidelines were created by the SBA.  But in

12  order to make sure money got to businesses quickly, the PPP

13  worked with banks and lenders, like BECU.  So the way it would

14  work is, the SBA form would be submitted to a bank like BECU, and

15  then the bank would review and process that application.  And

16  then the bank would lend the money, would send the money to the

17  small business, if the small business qualified.

18     Now, again, this was a government program.  And those loans

19  were, in fact, forgivable, if a PPP was used for the right -- for

20  the reasons as explained in the loan guidelines.

21     So, again, PPP is one loan you are going to hear about.  You

22  are also going to hear about something called an EIDL.  EIDL

23  stands for Economic Injury Disaster Loan.  That's another SBA

24  program to get money to small businesses.  Now, while the PPP was

25  a brand-new program, that was just created for the pandemic, an

1  EIDL, an Economic Injury Disaster Loan had been around for years,

2  in response to other disasters.  But this was an expanded program

3  to be a response to the COVID-19 pandemic.

4      You will see that the PPP and EIDL are different in another

5  way.  While the PPP asks:  How many employees do you have?  What

6  is your payroll?  The EIDL asks other questions:  What is your

7  gross revenue?  What are your cost-of-goods sold?  The EIDL is

8  different in one other way.  So, the SBA application is sent to

9  the SBA directly, so, again, when the PPP goes to a bank, an EIDL

10  goes to the SBA, and then the SBA approves it and sends out the

11  money.

12      Both of these programs, the PPP and the EIDL, were designed

13  in early 2020, to get money out to businesses, fast.  To help

14  with that economic uncertainty.  And they were both simple forms.

15  They required just a little bit of information and verification.

16  So what was important in these forms is that borrowers had to

17  tell the truth, about their employees, about their revenue, about

18  their payroll.

19      And the defendant, Mr. Shibley, did not tell the truth.  You

20  will see during this trial that Mr. Shibley applied for 39

21  different -- applied 39 different times for these PPP and EIDL

22  loans.  These are the names of some of the businesses that he

23  applied in:  Dituri Construction, SS1, Seattle's Finest Cannabis,

24  A-Team Holdings, ES1.  It will be clear during this trial that it

25  was, in fact, the defendant, Mr. Shibley, who applied for these

1  loans.  The loan applications contained Mr. Shibley's personal

2  information.  His address.  The loan applications included his

3  driver's license.  They were sent from his phone, his computer.

4  And the money, when it was granted, went into his bank accounts.

5  And for each of these applications, every single one, Mr. Shibley

6  had to tell the PPP application, or tell the EIDL application,

7  how many employees did he have for these companies.  And he told

8  various stories and gave various numbers in various applications.

9  As low as five for some companies, as low as 49 for other

10  companies.

11      But in total, across all the companies, pre-pandemic, Mr.

12  Shibley said he had 154 employees.  In each of these companies,

13  for each of these companies, Mr. Shibley also had to say what he

14  was paying these employees.  And, again, the amount ranges per

15  month of $40,000 a month to almost $400,000 a month.  When you

16  total up all the monthly salaries that Mr. Shibley was claiming

17  to pay, prior to the pandemic, it's more than $1.2 million.

18      154 employees, $1.2 million in salary.  That got Mr. Shibley

19  loans.  He received PPP.  He got EIDL.  More than $2.8 million.

20  When he got this money, he withdrew some in cash, he withdrew

21  some in cashier's checks made out to himself.  He even tried to

22  withdraw a half million dollars in cash from BECU.

23      During this time, BECU wouldn't let him do it.  And then the

24  banks and the government caught on to Mr. Shibley, and they

25  started pulling some of these loans back.  The banks pulled them

 1  back.  Some of it was seized.  But in total, Mr. Shibley still

 2  walked away with more than $200,000 of these proceeds, from lying

 3  on these loan applications.

 4      During this trial, you will see these applications, you will

 5  see these particular lies that Mr. Shibley told in order to get

 6  this much money.  And you will see that these businesses did not

 7  exist.  There are lies about the employees, there are lies about

 8  the salaries, and there are lies about payroll taxes.  Here is an

 9  example of one of these applications.  This is a PPP application

10  Mr. Shibley submitted to a lender called Harvest Small Business

11  Finance.

12      This is what the PPP application looks like.  It's only a

13  couple of pages.  And this is the front page.  You will see on

14  this form Mr. Shibley says SS1 LLC has 41 employees -- wrong

15  way -- it has an average monthly payroll of $328,000.  And based

16  on these numbers, Harvest Small Business Finance gave a loan of

17  $820,000 in the name of SS1, to Mr. Shibley.

18      And on this PPP application, like he did on all of them, Mr.

19  Shibley made some certifications.  He said that SS1 LLC was in

20  business on February 15th, 2020.  It had employees.  He paid

21  salaries and payroll taxes.  He also certified on every

22  application that this is the truth.  "I'm making truthful and

23  accurate representations."  But Mr. Shibley lied.

24      You will see in this trial that a business, a real business,

25  leaves a paper trail.  A real business shows you -- shows how

1   much money they're receiving, how much money they're paying out.

2   It has records with the government.  It has records with banks.

3   SS1 LLC has none of these records.

4       Starting with the banks.  SS1 LLC did not even have a bank

5   account, prior to the pandemic.  The only bank account that

6   exists for SS1 LLC was created for that PPP loan.  The IRS.

7   That's the place where payroll taxes are paid.  That's the place

8   where the records would be, if you were paying payroll taxes,

9   paying into Social Security, the IRS has those records.  The IRS

10  will tell you that SS1 LLC did not pay payroll taxes in 2019 or

11  2020.  The IRS will tell you that SS1 LLC did not issue W-2s to

12  its employees.

13      A real business, at least in this state, reports its wages to

14  the Washington State Employment Security Department.  Here,

15  again, you will see SS1 LLC reported no wages to the ESD, the

16  Employment Security Department.  No payroll records from banks,

17  IRS, Employment Security.  And, finally, you will see that Mr.

18  Shibley himself had no payroll records for SS1 LLC.

19      You will hear during this trial that Mr. Shibley was served

20  with a subpoena, a court document that requires you to produce

21  certain things.  The subpoena asked for payroll records for SS1

22  LLC.  Mr. Shibley responded to that subpoena, and provided no

23  payroll records for SS1 LLC. He didn't have them.  They didn't

24  exist.  The business didn't exist.

25      Mr. Shibley was asked point-blank the same question:  Who are

1   the employees for SS1 LLC?  And you will see he sent an e-mail to

2   Harvest Small Business Finance and said:  Hey, here are ten of

3   the employees I have for Harvest Small Business Finance.

4       And then you will see, in connection with trying to scheme

5   loans from another bank, he sent the same names to another bank,

6   just shortly after that, the same names, pretending to be

7   employees of a different company.  These names weren't employees

8   of SS1 LLC.  SS1 LLC didn't have employees.

9       One of the names on that list, that person died in the 1980s.

10  Another name on that list is a local woman you will hear from

11  during this trial named Lisa Velotta.  She will come in and tell

12  you that she didn't work for Mr. Shibley.  She doesn't know

13  Mr. Shibley.  Again, lies told to get loans from the banks, from

14  the SBA.

15      This is an EIDL application.  Mr. Shibley also applied,

16  besides applying for a PPP, he applied for an EIDL directly with

17  the SBA, and in the name of SS1 LLC.  On that form he reported

18  SS1 LLC in the year, in 2019 into 2020, the gross revenue of

19  $850,000, costs of good sold of $600,000.  But again, this is

20  another lie; the Washington Department of Revenue, the place

21  where you report revenue in the State of Washington, does not get

22  a report of revenue from SS1 LLC.

23      In fact, the Department of Revenue has no records of SS1 LLC.

24  SS1 LLC didn't even have a license.  Now, you will hear evidence

25  that it's okay for a company to apply multiple times for a PPP

1  loan.  They can only get one PPP loan.  But you will see, with

2  Eric Shibley's applications to PPP, when the application changes,

3  when the bank changes, his story changes too.  Another company

4  that he applied for a PPP is called Dituri Construction.

5       And he applied for a couple of different -- a couple of

6  different times for PPP for Dituri Construction.  He sent in an

7  application in May of 2020 to a lender named ReadyCap at a bank

8  called Customers Bank.  On this first application, he said he had

9  49 employees for Dituri Construction, payroll of $392,000 a

10 month, and so he asked for a loan of almost a million dollars.

11 But just days later, Mr. Shibley sent in another PPP application,

12 this time to a bank called Celtic Bank, where he said Dituri

13 Construction has 49 employees, but $225,000 in monthly payroll.

14 Same company, Dituri Construction.  Same employer identification

15 number.  Same address.  But a different amount of monthly

16 payroll, claimed monthly payroll.

17      And as the bank changed, the payroll amount changed, and so

18 did the false forms that Mr. Shibley submitted with these loan

19 applications.  Mr. Shibley created fake 941 forms to make it look

20 like he really had employees, and that he was paying payroll

21 taxes for these employees.

22      So this is what he gave ReadyCap for the first loan for

23 Dituri Construction.  He submitted an IRS Form 941 that said

24 Dituri Construction had paid wages of $784,000, in first three

25 months of 2020.  Signed by Eric Shibley.  Signed under penalty of

1   perjury.  Dated April 22nd, 2020.  Just days later, in the Celtic

2   Bank loan, he submitted a different Form 941 for the same

3   business, now claiming that Dituri Construction paid its

4   employees $392,000 in the first three months of 2020.  Signed by

5   Eric Shibley under penalty of perjury.  Dated April 28th, 2020.

6   So which one is true?  The $784,000?  The $392,000?  Neither.

7   Neither is true.

8       Dituri Construction LLC did not exist.  It had no employees.

9   It paid no payroll.  There are no bank records.  Just like SS1

10  LLC, for Dituri Construction, the first bank account was opened

11  in connection with this PPP loan.  The IRS will tell you Dituri

12  Construction paid no payroll taxes, that Dituri Construction

13  issued no W2s to its employees.  And Employment Security will

14  tell you they did not -- there was no wages reported for Dituri

15  Construction.  And, again, there were no payroll records, when

16  Mr. Shibley responded to that subpoena.

17      That did not deter Mr. Shibley.  He applied for an EIDL in

18  the name Dituri Construction, as well.  And he said that Dituri

19  Construction, in the past year, had revenue of $850,000, and

20  costs of goods sold of $600,000.  Those numbers might seem

21  familiar to you.  Because for SS1 LLC, those are the exact same

22  numbers he reported to SS1 LLC.  Again, why?  Because the

23  businesses are imaginary.  They're made up.  Mr. Shibley did have

24  some bank accounts opened in his own name, in the name of his

25  medical business, in the name of a company called A-Team

1    Holdings.  But what you will see during this trial is those bank

2    accounts had a fraction, a fraction of the amount of money that

3    he was claiming to pay his so-called employees.

4         Mr. Shibley submitted another PPP application for a company

5    called A-Team Holdings.  On this application, he now he says he

6    has 48 employees.  So, again, Mr. Shibley has now claimed, across

7    these three applications, just the ones we have looked at so far,

8    he's claimed to have more than 130 employees, across SS1, Dituri

9    Construction, A-Team Holdings.  He says this business has monthly

10   payroll of almost $400,000.  And he applied for a loan of

11   $960,000; and he was granted this loan.

12        What you will see about this application is, just like the

13   other ones, there's a fake IRS tax form attached to it.  This is,

14   again, a Form 941, that Mr. Shibley submitted for A-Team

15   Holdings.  They say that A-Team Holdings paid its employees

16   almost a million dollars in the last three months of 2019 and

17   $768,000 in the first three months of 2020.  $1.7 million from

18   October 2019 to March 2020, right before the pandemic.

19        You will see the bank accounts, A-Team Holdings had a bank

20   account.  Less than $50,000 went through the bank account at that

21   time.  Again, remember, across all businesses, Mr. Shibley is

22   claiming on these applications that he's paying more than a

23   million dollars in payroll a month.  He's paying out millions and

24   millions of dollars, prior to the pandemic.  But, again, across

25   all of his bank accounts, during this time period, just a couple

 1  hundred thousand dollars flowed through it; that's because all of

 2  these numbers, all of these forms, are filled with lies.

 3      Finally, you will hear that Mr. Shibley made another

 4  misrepresentation on his PPP applications.  When asked whether or

 5  not he was on probation, Mr. Shibley said, no.  He was on

 6  misdemeanor probation at the time he filled out these

 7  applications.

 8      Now, Mr. Shibley is charged with 15 counts, each count

 9  relates to a different transaction.  Counts 1 through 10 charge

10  him with wire fraud and bank fraud.  Each count relates to a

11  different application, PPP, or EIDL application or loan note that

12  he sent in to either a lender, the SBA, or a federally insured

13  bank.

14      Counts 11 through 15 relate to money laundering.  Different

15  monetary transactions.  Money he used from his scheme.  Money

16  that he get from these false PPP and EIDL loans.  Each one deals

17  with a different transaction.  Moving that money from account to

18  account.  Taking that money out in cashier's checks.  Withdrawing

19  that money, in cash.

20      During this trial, the government will prove that Mr. Shibley

21  submitted PPP and EIDL applications, to banks, to lenders, to the

22  SBA.  And in those applications, he made repeated false

23  statements in order to get millions of dollars that was meant for

24  real small businesses, real employees, not him.  Mr. Shibley

25  committed fraud.  And at the end of this trial, we will ask you

1    to find him guilty on all counts.  Thank you.

2         THE COURT:  Mr. Nance, do you wish to give an opening

3    statement?

4         MR. NANCE:  Yes.

5      May it please the court, ladies and gentlemen, this is a case

6    about sloppy, chaotic business practices, including a lack of

7    proper recordkeeping and documentation.  And, frankly, a profound

8    lack of business savvy that the government has confused for a

9    case of bank fraud.

10     The evidence won't show fraud, it won't show money

11   laundering.  What it will show is an unconventional maverick,

12   Eric Shibley, obsessed with building a holistic real estate model

13   in the local Seattle housing market, a man who lacked the

14   background and the knowledge and the proper guidance to do it the

15   proper way, the conventional way.

16     Now, Eric Shibley is headstrong.  He's determined.  And he's

17   unconventional.  And he's overcome many personal obstacles in his

18   life.  He's been stymied by a few as well.  He was educated and

19   trained as a medical doctor, but he was quickly disillusioned by

20   the medical culture, and its apparent lack of concern for the

21   downtrodden, who he felt needed medical care as much as anybody.

22     For several years now he's been trying to de-emphasize his

23   medical practice, and reinvent himself as a real estate

24   entrepreneur who renovates property, buys and builds rental

25   housing, and then rents it out to people who no one else wants to

1    rent to.

2        The PPP money that he borrowed, or was trying to borrow in

3    this case, was intended to address some of the many financial

4    shortfalls his businesses were experiencing, shortfalls that were

5    aggravated severely by the COVID-19 pandemic.  This was loan

6    money that the law, itself, provided could be forgiven if certain

7    conditions were met.  He made some mistakes in how he conducted

8    his businesses; no question about that.  And he made mistakes in

9    how he applied for the loans.  But he never intended to cheat the

10   banks or the government.

11       Eric Shibley has a vivid, compelling personal story, that

12   shapes him as a person.  It began 42 years ago, in Bangladesh, in

13   southeast Asia.  Bangladesh is a very poor country with a tragic

14   history of poverty and hardship for the people there.  Eric

15   Shibley was very fortunate to be from a better-situated family.

16   In fact, his father was a dedicated high-ranking public servant

17   in the country.  That pushed him to succeed.  But the family's

18   elevated status could not shield him from the realities on the

19   ground.

20       While he was still a very young child, the country

21   experienced one of the worst natural disasters of the last

22   century, when massive flooding destroyed the food crops, and over

23   a million people died of starvation.  It was called the Great

24   Famine of 1974.  Shibley, as he was known, that's his given name,

25   with his family, as he was known to his family, he grew up in the

1   aftermath of that disaster.  He observed the egregious upheaval,

2   the untreated trauma that haunted the survivors, it seemed like

3   forever.  The living patterns, he observed there, stuck with him.

4   And they have never really gone away.

5        Sometimes unexpected things, bad things happen to make people

6   homeless.  Once you are homeless, other problems crop up.  You

7   have no place to stay, obviously, by definition.  It's hard to

8   stay clean.  It's hard to stay healthy.  If you get sick, it's

9   harder to get medical attention.  You're at risk from the

10  elements.  You're at risk from other people, who could victimize

11  you.  And if you do get sick, it's -- you self-medicate, or you

12  try to self-medicate.  It's very common that drug addiction

13  follows, if you are self medicating.

14       There's mental illness that's rampant.  It aggravates the

15  situation.  Family relationships disintegrate.  It's a sad,

16  downward spiral, and Eric Shibley saw the pattern over and over

17  again.  He was socially aware.  And he was ambitious, and he was

18  bright.  He wanted to fix the broken world that he saw around

19  him.  He wanted to develop his interest in the healing arts.

20  Yeah, and he wanted to have some material success, too.

21       So, while he was still in Bangladesh, he went off to medical

22  school, and earned his medical degree, there in the country.

23  When he got out, he took on a very major challenge, he uprooted

24  and moved to the United States; the land of opportunity.  Left

25  behind all that he knew.  Once here, he had to learn English,

1    which he didn't know before he came.  He had to learn to navigate

2    American culture.  He had to gain acceptable credentials to

3    practice medicine here, that weren't immediately transferrable.

4    He did all of those things.  He took additional courses to get an

5    American medical degree.

6        He worked very hard on learning and mastering English.  He

7    became a naturalized American citizen.  He even became a licensed

8    practicing physician.  He practiced in several states,

9    specializing in internal medicine.  Eventually he came to

10   Washington State, and initially worked in large hospitals.  In

11   his medical practice, he came into contact with lots of people

12   who were suffering.

13       In the Seattle area alone, he observed some of the same

14   problems he had grown up around in Bangladesh.  A lot of

15   homelessness, mental illness, drug abuse, chronic medical issues

16   people on the street had.  It was hard to know which came first.

17   He knew mainly that a lot of people were suffering with unmet

18   needs.  And this created many additional social problems.

19       Dr. Shibley, as he was by now a doctor, Dr. Shibley was

20   frustrated.  Medicine was supposed to help people.  Not exploit

21   them.  Yet he felt trapped in this bureaucratic, expensive system

22   that didn't seem geared toward helping or taking care of people.

23   It was a system taken over by insurance, and third-party payors.

24   He was put off by the pressure to just treat people that could

25   afford to pay.  He started to think, he could do better outside

1    of the medical profession.  He could make money some other way,

2    maybe helping marginal people in the process.  So he began a

3    transition.  On the side, he bought a couple of fixer-up houses.

4    He hired people to repair them.  He left his hospital job and he

5    began practicing in a small medical partnership based in West

6    Seattle.  It was a practice with a huge patient load.  Many of

7    them pain patients.  Many addicted patients who couldn't get

8    treatment anywhere else.  But it involved long work hours,

9    expensive overhead for salaries, onerous recordkeeping

10   requirements.  It just really wasn't sustainable in the long run.

11       And so Dr. Shibley began scaling back.  He laid off his

12   higher-wage employees.  He transferred most of the patients to

13   private -- to other providers.  He quit collecting from

14   third-party providers.  He avoided Medicaid.

15       He only kept the patients that could pay him directly.  And

16   he took a holistic approach to treatment.  That is, he was very

17   accessible to his patients.  Counseling them.  Trying to take

18   care of all of their problems.  Mental health, pain issues,

19   addiction issues, personal-trauma issues, other personal

20   problems, and they always seemed to have them.

21       By the end of 2018, Eric Shibley had scaled down to just a

22   handful of patients with pain and addiction issues that he

23   continued to treat.  In recent years, Eric Shibley, as a

24   physician, treated over 1,500 patients in a three-county area.

25   King County, Snohomish and Skagit Counties.  And he's well known

1    in the treatment community.  Many of his patients, including

2    addicts, and many with trauma issues, were former construction

3    workers, who had fallen out of the workforce because of their

4    addiction, and because of other medical and social problems

5    relating to addiction.  Many were homeless and living on the

6    street.

7         Dr. Shibley believed that putting an EIDL person to work was

8    good rehabilitation therapy, in and of itself.  There's value in

9    work.  He helped arrange for some of his patients to do work on

10   construction projects.  Since he also had patients who needed

11   construction work done, he acted as a matchmaker.  And he even

12   helped oversee the work.  His patients and former patients had

13   friends, and word spread.  Soon, the word spread that short-term

14   labor was available, with not many questions asked.

15        Mr. Shibley -- you will notice I call him Mr. Shibley,

16   because that's really what he is when he's doing construction

17   work -- he used these workers to repair houses, that he had

18   purchased.  He thought of himself as helping address the

19   homelessness problem.  He placed homeless people in his own

20   rental houses, and he arranged, through the state, for the

21   payment of subsidized rent.

22        This was all happening during the explosion of the Seattle

23   housing market, of the past few years.  Housing costs were

24   escalating.  The demand for new construction was high, which made

25   it expensive.  And this seemed to fuel the homelessness problem,

1  which was worse than ever.  These people oftentimes had been his

2  patients.  These patients were not the sort of people who most

3  people would hire to do much of anything.  They were often

4  unreliable.  They often had untreated issues.  They were

5  generally suspicious of authority.  Some had past criminal

6  records.  Most did not have IDs or bank accounts.  If they were

7  asked to work, they wanted to be paid in cash.

8      Eric Shibley plunged headlong into this, doing multiple

9  projects, using different work crews, always looking to buy

10  property and develop new property, and use labor for that.

11      Now, Eric Shibley marches to his own drummer.  He's an action

12  guy.  He has little patience for bureaucracy.  He's definitely

13  not a detail man.  He envisioned a business model that harnesses

14  the huge untapped potential of disowned and throwaway street

15  people, and applies it toward building equity in an escalating

16  housing market.

17      In the process he thought, in his own way, he could alleviate

18  some of the homelessness problem, and give people more control

19  over their own lives.  He probably acted too hastily, before he

20  put everything in order.  For example, he didn't have a payroll

21  reporting system.  He's guilty of that.  He didn't have a payroll

22  reporting system in place.  And he was way behind on paying his

23  taxes.  He owed money.  These were among the many things he

24  intended to take care of when his life became less chaotic; and

25  there was some chaos in his life.  He thought he could catch up

1    later.

2        Then in March 2020, the COVID-19 pandemic hits.  There's a

3    shutdown.  The economy basically shuts down.  Eric Shibley was

4    deeply affected, like many others.  All of his work projects

5    stopped.  His workers were suddenly idle.  Bills were coming due.

6    He heard about the CARES Act emergency relief, in the form of the

7    PPP loans.  He was encouraged to apply.  And he applied for what

8    he thought he qualified for.  His approach wasn't perfect.  He

9    didn't have the professional guidance he probably needed.  He

10   does not have the payroll records and the documentation that more

11   conventional businesses have.  He was behind on his tax filings.

12   And, again, he probably owes a lot in back taxes.  But he had no

13   intention of defrauding anybody.

14       At the end of the case, when all the evidence is in, we will

15   ask for verdicts of not guilty on all counts.  Thank you.

16            THE COURT:  All right.  Call your first witness.

17            MS. CONNELLY:  Yes.  The government calls Kandace

18   Zelaya.

19       And, Your Honor, may I remove my mask while questioning?

20            THE COURT:  Sure.

21            MS. CONNELLY:  Thank you.

22                    KANDACE ZELAYA,

23        having been sworn under oath, testified as follows:

24            THE COURT:  You can take your mask off.

25   ///

```
 1                        DIRECT EXAMINATION

 2    BY MS. CONNELLY:

 3    Q    Good afternoon.  Can you please state -- state your name and

 4    spell your last name for the record, please?

 5    A    Kandace Zelaya, Z-E-L-A-Y-A.

 6    Q    And, Ms. Zelaya, where do you work?

 7    A    The United States Small Business Administration.

 8    Q    Is that also known as the SBA?

 9    A    Yes, it is.

10    Q    And what is your position with the SBA?

11    A    I'm a senior attorney in the office of general counsel,

12    department of financial law and lender oversight.

13    Q    And how long have you been employed with the SBA?

14    A    Thirty years.

15    Q    And can you just tell the jury, what is the mission of the

16    SBA?

17    A    The mission of the SBA is to aid, counsel and assist small

18    businesses, in offering financial assistance, government

19    contracting opportunities, training, and entrepreneurial

20    development.

21    Q    What are your duties as a SBA senior attorney?

22    A    As a senior attorney, I provide legal advice and counsel to

23    the agency, specifically to our program offices, and field

24    offices, processing centers, on mainly our financial assistance

25    and disaster assistance programs.
```

1    Q    By financial assistance, and disaster assistance programs,

2    what do you mean by that?

3    A    Our general programs for the business-loan side, or the 7(a)

4    loan program and 504 loan program.  And on the disaster

5    assistance side, it's providing business and home disaster loans

6    after a diaster, to either repair or replace property, or for

7    economic injury.

8    Q    And as part of your duties, are you familiar with the

9    Paycheck Protection Program?

10   A    Yes, I am.

11   Q    And is that also known as the PPP?

12   A    It is.

13   Q    And can you just tell us, what is the PPP?

14   A    The PPP is a temporary program that was added to our 7(a)

15   loan program, which is our general business loan program.  And

16   the Paycheck Protection Program specifically was provided to get

17   money to businesses so they could retain their workers and keep

18   their workers employed.

19   Q    And how was the PPP established?

20   A    It was established in the CARES Act, which is the Coronavirus

21   Aid Relief Economic Security Act.

22   Q    And can you just tell us what is the CARES Act, when was it

23   passed?

24   A    The CARES Act was enacted on March 27th of 2020, and it was a

25   large relief bill that was intended to provide emergency relief

1  to individuals and businesses after the Coronavirus pandemic, to

2  help them get through the economic downfall.

3  Q   And in your role at the SBA, were you involved with the

4  implementation of the Paycheck Protection Program?

5  A   Yes, I was.

6  Q   Can you explain that involvement to the jury, please?

7  A   I worked with our program office which sets the policy and

8  procedures to draft the guidance documents, all of the interim

9  final rules, the application forms, the frequently asked

10  questions, and the other documents; all the notices that were

11  issued to provide information on the requirements of the program.

12  Q   And can you just explain how the PPP worked, at a high level?

13  A   For the PPP loan, an applicant would go to a lender and

14  request a loan.  They would fill out all of the application form,

15  either the SBA's form or the lender's form, and they would submit

16  it to the lender.  The lender would make the decision whether to

17  approve the loan or not, and the lender would then request a

18  guarantee from the SBA, by entering certain information into our

19  system.

20  Q   And I think you mentioned a lender form versus an SBA form.

21  Can you just -- were those -- did they have substantially the

22  same information on them?

23  A   They did.  SBA created an official SBA form that we had a

24  borrower's information form, and a lender's application form.

25  The lender could use our form, or the they could use their own

1    equivalent form, as long as it collected the same information.

2    Q    And so you have mentioned the lenders.  Who actually funded

3    the loans for the PPP?

4    A    The participating lenders funded the loans.

5    Q    And are they in the private sector?

6    A    Yes, they are.

7    Q    And were the funds guaranteed by the SBA?

8    A    Yes, they were.

9    Q    And so what does it mean that the SBA guaranteed the funds?

10   A    As I said, the applicant would approach the bank for a loan.

11   If the bank approved the loan, then the bank would disburse the

12   loan.  If we provide a guarantee, that meant that if the borrower

13   defaults, we would then reimburse the lenders a certain

14   percentage.

15   Q    And are the PPP loans forgivable also?

16   A    Yes, they are.

17   Q    And what does that mean?

18   A    That means if the borrower uses the loan proceeds for the

19   authorized purposes, they would be able to have their loan

20   forgiven.

21   Q    And who would be forgiving the loan?

22   A    The borrower would request forgiveness through their lender.

23   The lender would make the decision as to whether they would

24   forgive all of it, or part of it, or none.  And they would issue

25   that decision to us.  And SBA would make the final decision and

1  remit payment to the lender.

2  Q    And by "remit payment," you mean you would pay the lender the

3  loan amount, if it was forgiven, right?

4  A    Correct.

5  Q    Okay.  How could a business use the proceeds in order to get

6  loan forgiveness?

7  A    There were eligible payroll costs and eligible non-payroll

8  costs.  The bulk of the funds were supposed to be used to provide

9  payroll.  And part of the payroll was salaries, wages,

10 commissions.  But also the employer's contribution for

11 healthcare, medical, family leave, et cetera, could all be

12 calculated into the payroll costs.

13       The eligible non-payroll costs were mortgage interest, rent

14 payments, utility payments; and later on, some payments for PPE,

15 or if they had to make any changes to their business, such as

16 putting up plexiglass for the cashiers.

17 Q    And was there a certain amount that needed to be spent on

18 payroll to get forgiveness?

19 A    Yes.  Initially, 75 percent had to be used for payroll --

20 eligible payroll costs.  And that was later reduced by one of the

21 later statutes to 60 percent had to be used for eligible payroll

22 costs in order for the loan to be forgiven.

23 Q    And why was that in place?

24 A    Because, again, the point of the Paycheck Protection Program

25 was to make sure the workers were retained and paid.

1    Q    And so as part of your duties as an SBA attorney, are you

2    aware of the application process for a PPP loan?

3    A    Yes.

4    Q    Can you just describe that process for the jury?

5    A    The applicant would, again, approach a bank or lender to

6    request a loan.  They would fill out all of the application form,

7    and provide whatever supporting documentation was needed.  And

8    the lender would make the decision to approve the loan.  The

9    lender would then submit information to SBA to obtain the

10   guarantee.

11   Q    And so what role, if any, was SBA employing in the

12   authorization of a loan?

13   A    We did not review any of the applicants' documentation or

14   application forms.  The lender would enter certain information

15   identifying the business, the loan amount, what the proceeds were

16   supposed to be used for.  And they would enter that into our

17   system.  If there weren't any errors, our system would generate a

18   loan number.

19   Q    And so turning to the PPP itself, who was actually eligible

20   to apply for a loan on behalf of a business?

21   A    An authorized representative of the applicant business would

22   be able to complete the application form and submit the

23   information.

24   Q    And you have mentioned the application form.  Are you

25   familiar with that form?

1   A   Yes, I am.

2   Q   So, I'm going to show the witness what's been marked

3   Government's Exhibit 40.  Do you recognize this?

4   A   Yes, I do.

5   Q   Okay.  And what is it?

6   A   That is the Paycheck Protection Program borrower application

7   form.

8   Q   Was this form made in the normal course of the SBA's

9   business?

10  A   Yes, it was.

11  Q   And was this form used in the normal course of the SBA's

12  business?

13  A   Yes, it was.

14          MS. CONNELLY:  And so at this time, I would move to

15  admit Government's Exhibit 40, pursuant to 803(8).

16          MR. NANCE:  No objection.

17          THE COURT:  Admitted.

18                  (Exhibit No. 40 admitted.)

19          MS. CONNELLY:  Permission to publish, if I can get it

20  to.

21  Q   So to apply for a PPP loan, did a business have to answer all

22  of the questions that are found on this form?

23  A   Yes.

24  Q   And did the SBA issue different versions of this form, as the

25  PPP progressed?

1    A    Yes.  It was updated over time.

2    Q    And if we could just zoom in on the bottom left corner, Mr.

3    Arnold.  Thank you.  Can you tell from this, what version of the

4    form this is?

5    A    Yes.  This is the first version that was posted on April 2nd

6    of 2020.

7    Q    And when was this form used, what timeframe?

8    A    The first loan applications were accepted April 3rd of 2020.

9    And the loan was not revised until June -- the loan application

10   form, excuse me, was not revised until June 11th of 2020.

11   Q    If we could call that back, Mr. Arnold.  If we can zoom in on

12   the top part of this loan application, please.

13        What identifying information did this form collect?

14   A    The type of business, whether it was a partnership, a

15   corporation, or different type of business structure.  The

16   business legal name, address, trade name if applicable, the

17   taxpayer identification number, and contact information.

18   Q    And does this form describe the loan amount that is sought by

19   the business?

20   A    Yes.

21   Q    And how is that amount calculated?

22   A    It was calculated based on the average monthly payroll

23   multiplied by 2.5.

24   Q    Is that calculation seen on this form?

25   A    Yes.  On the boxes right underneath the business contact

1    information.

2    Q    And so does this mean that if the average monthly payroll is

3    higher, the business would be eligible to receive more PPP money?

4    A    Yes.

5    Q    Are there any exceptions to the monthly payroll that can be

6    included in that amount?

7    A    Yes.  The annual salaries were capped at $100,000.  So if you

8    had any employees who made over $100,000, you were not able to

9    include any of that excess in the calculation.  And you also

10   couldn't include any salaries paid to employees whose primary

11   residence was outside the U.S.

12   Q    So you have mentioned employees.  Does the PPP application

13   also ask for the number of employees?

14   A    Yes, it does.

15   Q    And why did the application ask for that information?

16   A    Part of the reason was because there were certain size

17   standards.  So you couldn't have more than 500 employees, for

18   certain types of businesses.  You also had to have employees that

19   you were paying, in order to be eligible.  And also, it was part

20   of the way to look at the average monthly payroll and ensure that

21   it was corresponding.

22   Q    So you have mentioned that an applicant had to have employees

23   to receive a PPP loan.  Why was that?

24   A    One of the requirements in the CARES Act was that a business

25   had to have been established on February 15th of 2020, and had to

1    have employees whom it paid salaries and payroll taxes, or paid

2    independent contractors.

3    Q    And so if a business owner had multiple businesses, could it

4    use the same employees to get loans for each business?

5    A    No.  Each business could get a loan, but it would have to be

6    for the employees for that business.

7    Q    And if a business didn't have payroll, was it eligible for a

8    PPP loan?

9    A    No, they had to either have employees whom they were paying

10   salaries and the corresponding payroll taxes for, or they were

11   paying independent contractors.

12   Q    And if a business didn't have employees, was it eligible for

13   a PPP loan?

14   A    No.

15   Q    If someone lied on the application about a company's

16   employees or payroll, should the loan have been funded?

17   A    No.

18   Q    So if we could zoom back out, Mr. Arnold, and look at the

19   bottom portion of this form.

20        There are series of questions that we see here.  What are

21   these questions?

22   A    These questions are getting to the eligibility of the

23   applicant for federal financial assistance.

24   Q    And if you look at Question No. 5, in particular, what is

25   this question?

1   A    This question is asking if the applicant, if an individual,

2   or any individual owning 20 percent or more of the equity of the

3   applicant, presently incarcerated, or for any felony, presently

4   subject to an indictment, criminal information, arraignment or

5   other means by which formal criminal charges are brought, or if

6   they're presently incarcerated, on probation or parole.

7   Q    And if an applicant answered this question yes, what would

8   have happened with the application?

9   A    The loan would not be approved.

10  Q    Is that noted on the application form somewhere?

11  A    Yes, it is.  It's in italics, right above questions 5

12  through 8.

13  Q    Does Question 5 include someone who was on misdemeanor

14  probation?

15  A    Yes, it would.

16  Q    In April and May of 2020, if someone lied on the PPP

17  application about their probationary status, should the loan have

18  been funded?

19  A    No.

20  Q    At some point did that change?

21  A    It changed in June of 2020.

22  Q    Does the application also ask for certifications?

23  A    Yes, it does.

24  Q    Where can they be found on the loan application?

25  A    Page 2.

1    Q    Okay.  If we could move to page 2, Mr. Arnold.

2         What are certifications?

3    A    Certifications are statements that the person signing the

4    application is making, to the effect that everything is true and

5    correct, or other statements that the lender will rely on in

6    making its decision, whether to approve the loan or not.

7    Q    And why are certifications important?

8    A    Certifications are important because they're things that

9    there may not be documentation available to verify that

10   information.  So the lender, again, is relying on the

11   certification made by the person signing the application form.

12   Q    And why were certifications important to the PPP,

13   specifically?

14   A    Because the only supporting documentation being requested was

15   documenting payroll and the numbers of employees, et cetera.  The

16   borrower was making a lot of self-certifications with respect to

17   eligibility, and the lender, again, was relying on those

18   certifications, as opposed to having to independently verify the

19   eligibility for the application.

20   Q    And so was a borrower required to sign or initial next to

21   these certifications, in order to submit a PPP application?

22   A    Yes.  Each one of the certifications on the bottom half of

23   the page was supposed to be initialed.  And then the authorized

24   representative was supposed to sign on the bottom as well.

25   Q    And who was allowed -- well, you have already mentioned, so

1   never mind.  Looking at the certifications at the top of page 2,

2   if we could look at the second one from the bottom.  Thank you.

3   What is this certification?

4   A    Their certification is the applicant stating that they are

5   eligible to receive a loan under the rules in effect at the time

6   the application is submitted.

7   Q    What does that mean?

8   A    That means that at the time they're submitting the

9   application, they are certifying to the lender that they are

10  eligible under the rules governing the program, at the time that

11  they are submitting that application.

12  Q    And why do you have or why did the SBA have the applicant

13  certify to this?

14  A    Again, because the lenders were not independent -- required

15  to independently verify the eligibility as they normally would in

16  our 7(a) program.  This was allowing a borrower's

17  self-certification, to speed up the process.

18  Q    And, in particular, why were they certifying that they were

19  eligible under the rules, at the time of the application?

20  A    Because the applicant was held to what was in effect at the

21  time they were going to submit their application, as opposed to

22  anything later or before.

23  Q    And so if we could just move down the page and look at a few

24  of these certifications.  If we could look at the first

25  certification, please.  What is this certification?

1    A    This certification is stating that the applicant was in

2    operation on February 15th of 2020, and had employees for whom

3    they paid salaries and the corresponding payroll taxes, or they

4    paid independent contractors.

5    Q    And so if a business began operations after February 15th of

6    2020, was it eligible for a PPP?

7    A    No, it was not.

8    Q    What does it mean to have employees for whom the business

9    pays payroll taxes?

10   A    That means that you have employees who are on salary, you are

11   paying their salaries, but you are also paying the requisite

12   taxes that are due, either to the state or federal taxing

13   authority.

14   Q    And why does it matter if a business is paying payroll taxes?

15   A    Well, it's a legal requirement that they pay the payroll

16   taxes that -- for the employees.  And if they're not paying their

17   taxes, they -- they pay the salaries; if they're not paying the

18   corresponding taxes, then they're not complying with the law.

19   Q    So would a business claiming to have salaries employed submit

20   certain tax documents as supporting documentation?

21   A    Yes.  There were various types of documents that would have

22   been acceptable to support the amounts of payroll that they were

23   paying and the numbers of employees, either tax documents or

24   payroll-processing documents.

25   Q    So looking at the second part of the certification here -- we

1    can leave this up -- what does it mean to have independent

2    contractors?

3    A    Some -- some workers are paid as independent contractors,

4    which means they pay own their own taxes and their own -- their

5    own taxes and other expenses.

6    Q    And do you know what --

7    A    They're not considered employees.  I'm sorry.

8    Q    No, that's fine.  Go ahead.

9    A    They're not considered employees of that business.  They're

10   hired as independent contractors.

11   Q    And so do you know what type of tax form the business with

12   independent contractors would file with the IRS?

13   A    I believe it's the 1099 MISC.

14   Q    So would a business claiming to have independent contractors

15   submit a 1099, as supporting documentation with their loan?

16   A    They would.  They were not allowed to include independent

17   contractors in their payroll.  The independent contractors were

18   eligible to get loans on their own.

19   Q    If a business had -- actually, let's look at the third

20   certification, please.  What is this certification?

21   A    In this certification, the authorized representative is

22   certifying that the funds will be used to retain workers and

23   maintain payroll, or make mortgage interest payments, lease

24   payments, and utility payments, which are the eligible

25   non-payroll costs.  And it also has an important statement that

1   they understand if the funds are knowingly used for unauthorized

2   purposes the federal government may hold them legally liable,

3   such as for charges of fraud.

4   Q    And why was that included on the application?

5   A    Because, again, the whole intent of the program was to retain

6   workers and make sure that the proceeds were used for that

7   purpose.  We wanted to make sure that they acknowledged that

8   requirement.

9   Q    So if we could call that back out, Mr. Arnold, and look at

10  the fifth certification.  What is this certification stating?

11  A    This certification is stating that they understand that the

12  loan may be forgiven, for the sum of the payroll costs and the

13  eligible non-payroll costs that are paid, and that not more than

14  25 percent could be used for the non-payroll costs.

15  Q    And why was there a cap on the amount that could be used for

16  purposes, other than payroll?

17  A    Because, again, the point of the program is to make sure that

18  the workers are being retained and paid.

19  Q    If we could call that back out and look at the last

20  contractor certification I'm going to have you look at with us,

21  the EP.  What is this certification?

22  A    This certification is stating that the information provided

23  in the application and the supporting documentation is true and

24  accurate in all material respects.  And, again, it acknowledges

25  that knowingly making a false statement to obtain a guaranteed

 1   loan from SBA is punishable under various laws, and either by

 2   certain terms of imprisonment, and/or fines.

 3   Q   We can unpublish now.

 4       Generally speaking, does a business need to have employees to

 5   get PPP funds?

 6   A   Yes.

 7   Q   And was the PPP a popular program with the Small Business

 8   Administration?

 9   A   Yes, it was very high volume.

10   Q   Was there a limited amount of money available for PPP loans?

11   A   Yes.

12   Q   So what happened when the money ran out?

13   A   Once the funds were exhausted, no more loans could be made.

14   Q   Did that mean that legitimate businesses could not receive

15   PPP funds, once the loan money ran out?

16   A   Correct.

17   Q   Thank you.  No further questions.

18                           CROSS-EXAMINATION

19   BY MR. NANCE:

20   Q   Good afternoon, Ms. Zelaya.

21   A   Good afternoon.

22   Q   Is that correct?

23   A   Yes.  That was correct.

24   Q   Zelaya.

25       So you're an associate general counsel and senior attorney

1    for the Small Business Administration?

2    A    Correct.

3    Q    All right.  Your agency, the SBA, administered the PPP

4    program portion of the CARES Act?

5    A    Correct.

6    Q    And, again, the CARES Act was enacted by Congress to deal

7    with an economic emergency?

8    A    Correct.

9    Q    I believe it was in late March 2020 that this occurred?

10   A    Yes.  March 27th of 2020, it was enacted.

11   Q    The PPP is a substantial part of that CARES Act package?

12   A    Yes.

13   Q    The SBA was basically charged with implementing the PPP

14   program?

15   A    Yes.

16   Q    And it would guarantee loans made through private lenders --

17   A    Yes.

18   Q    -- under this program.

19         And I think you went through it, but basically if the

20   borrower meets the conditions, the entire thing can be forgiven?

21   A    Yes.

22   Q    Now, because of the emergency nature of this, wasn't there

23   substantial intent and pressure to get money into the hands of

24   businesses, as soon as possible?

25   A    Yes.

1    Q    This was kind of a rush job, wasn't it?

2    A    Yes.

3    Q    You had businesses that were on the verge of going out of

4    business?

5    A    Yes.

6    Q    And one risk was that their employees would go to other work,

7    or quit and leave.  And you wanted to help prevent that?

8    A    Yes.

9    Q    Right?  And at the time, no one knew how long the COVID

10   crisis would last?

11   A    That's true.

12   Q    It was an unknown.  In fact, this was obviously before the

13   vaccine had been invented, right?

14   A    Yes.

15   Q    Wasn't your mission hampered by the inability of the very

16   people you were trying to help, to meet with representatives of

17   the SBA?

18   A    I'm not sure I understand the question.

19   Q    Well, I mean, we were all kind of under lockdown.  We were

20   basically told:  Stay home.  Don't go out.  You know, call on the

21   phone or do stuff online, but don't meet people in person.

22   A    Okay.

23   Q    Wasn't the SBA part of that as well?

24   A    Well, the borrower didn't approach us directly.

25   Q    But he's got to approach the lenders?

 1    A    Yes.

 2    Q    And isn't that a problem as well; something to be overcome?

 3    A    Yes.  They had electronic, online platforms, though.

 4    Q    Okay.  Electronic.  Online.

 5         Did the SBA -- does the SBA have physical offices in the

 6    Seattle area?

 7    A    I believe there's a field office in Seattle, yes.

 8    Q    Okay.  Was it open or closed during the first part of the

 9    COVID shutdown?

10    A    I'm not entirely certain, but I would believe it was closed,

11    as most of them were.  But I'm not in the Seattle office, so I

12    can't say for certain.

13    Q    But a person wanting to know more about the program, would

14    have to depend on your website, or --

15    A    Yes.

16    Q    -- or the application form itself?

17    A    Yes.  Yes.  They would depend on the website, or where the

18    application form was available, as was all of the other guidance.

19    Q    Did your office have a working telephone with a live person

20    to answer public inquiries during this time?

21         By "your office," I mean the local SBA field office.

22    A    I don't -- I can't speak to the Seattle local district

23    office.  I'm sorry.

24    Q    So this was a new program.  You're in charge, or the SBA is

25    in charge of implementing it.  It sounds like this had to be

1   designed kind of on the fly?

2   A    It was designed quickly, yes.

3   Q    And you needed to market the program, didn't you?

4   A    Yes.

5   Q    What good is a program if nobody knows about it, right?

6   A    Right.

7   Q    You needed to tell the people who could potentially benefit

8   from the program, that the program was available?

9   A    Yes.

10  Q    And to encourage them to apply for loans?

11  A    Yes.

12  Q    And this needed to be done in a very public way, to be

13  effective, didn't it?

14  A    Yes.

15  Q    How did the SBA enlist lenders to fund these loans?

16  A    All of our existing lenders were automatically approved to

17  participate.  And there were other lenders who were -- they would

18  request ability to participate.  And they were reviewed by SBA

19  and Treasury, and admitted to participate, after signing an

20  agreement.

21  Q    Was there any further recruitment beyond normal SBA-approved

22  lenders?

23  A    Yes.  We had quite a few new lenders.  We normally have

24  around 1,900 active lenders, and for the PPP, we extended to over

25  5,500 -- or over 5,000.

1    Q   Were there incentives that the SBA offered to recruit

2    potential lenders?  Incentives?  Why would a lender want to

3    participate in your program?

4    A   Because it was 100 percent guaranteed by the government.  And

5    there was over $800 billion, eventually, that was available

6    through the PPP.

7    Q   Okay.  I guess I'm wondering, what's in it for the lenders.

8    A   The lenders were able to obtain new customers, they were able

9    to help their communities by providing loans to small businesses

10   in need, and the loans were 100 percent guaranteed by the federal

11   government.

12   Q   So the lenders couldn't lose, really, could they?

13   A   The borrower could default, but the loan was guaranteed

14   100 percent by the government, so...

15   Q   Pretty much a risk-free investment, isn't it, by the lenders?

16   A   It could be looked at that way.

17   Q   Well, how could they lose money, if the SBA is guaranteeing

18   it?

19   A   If they don't do everything they're supposed to do, then we

20   may not purchase our guarantee.  But, generally, they're going to

21   comply with their obligations, and we would purchase 100 percent

22   of any outstanding balance.

23   Q   How quickly could these PPP loans be funded?  If a person

24   applied online, answered the questions, how quickly would the

25   money come?

1   A    That, I don't know, because the application goes from the

2   borrower to the lender.  The lender approves the loan.  And then

3   they would enter certain information to SBA.  If the loan number

4   was issued, then it was up to the lender to disburse.  I have no

5   idea how long it would take them.  But I do know they had a

6   ten-day -- they were supposed to disburse within ten days.

7   Q    So the lender is in the position to screen the applicant, and

8   to make the initial funding decision?

9   A    Yes.  The lender made the decision to approve the loan.

10  Q    Then passed that along to SBA, after they have made that

11  decision?

12  A    Yes.  The lender would make the decision to approve the loan,

13  they would enter the identifying information into the system, it

14  would generate a loan number.  SBA never reviewed any of the

15  applicant's information prior to issuing the loan number.

16  Q    Okay.  Basically trusted the lenders to get it right?

17  A    Well, it was a delegated loan program.  So under the CARES

18  Act, the lenders were supposed to be approving these loans under

19  delegated authority; which means SBA doesn't look at it before

20  the loan number is issued, the decision was delegated to the

21  lender.

22  Q    After the ten-day period, the funding is supposed to happen

23  about then, if it's approved?

24  A    Yes.

25  Q    Was there a -- was there a processing fee?

1   A    Yes.  The statute provided that SBA would pay the lenders a

2   processing fee.

3   Q    Did the -- so the lenders are the ones approving the loans,

4   screening and approving the loans.  The lenders are also the ones

5   that are forgiving the loan or making the decision to forgive it;

6   is that right?

7   A    The lenders issue a decision on forgiveness to SBA.

8   Q    Then SBA basically pays the loan at that point, or pays the

9   lender -- pays them back?

10  A    We pay the lender, if -- unless we review the loan and there

11  is some sort of issue, then we may not remit the entire payment.

12  But generally we would remit the payment, based on the lender's

13  decision.

14  Q    And you indicated earlier you didn't review these forms --

15  this form, I forget the number --

16  A    24 --

17  Q    -- 2483?

18  A    2483 is the borrower's application form for the loan.  We did

19  not review those prior to issuing a loan number, no.

20  Q    Okay.  So you're -- for a lot of this, you are largely in the

21  dark.  You are you are just depending on the lender to kind do

22  the right thing?

23  A    The lender has underwriting obligations they are required to

24  comply with, yes.

25  Q    Were there standard due-diligence requirements that SBA

 1    imposed on the lenders?

 2    A    Yes.  We referred to them as "underwriting obligations," yes.

 3    Q    What would those be?

 4    A    They were to make sure that the application was complete, and

 5    that the supporting documentation supported the calculations.

 6    They were not necessarily required to independently calculate

 7    every single calculation, but they were required to do a

 8    good-faith review of the information provided by the borrower,

 9    and make sure that all of the certifications required by the

10    application form were, in fact, made by the borrower.

11              MR. NANCE:  Are you able to call up No. 40, which I

12    think was admitted?

13              MS. CONNELLY:  Do you want us to call it up?

14              MR. NANCE:  Yes.

15              MS. CONNELLY:  Okay.  I have it.

16         May I approach the podium to clear the screen?

17              THE COURT:  Yes.

18              MR. NANCE:  Get the expert over here.

19    Q    So if this were completed, I see -- I see the form has

20    contact information.  You have the name of the business; is that

21    right?  The business legal name?

22    A    Yes.

23    Q    There you go.  You have the business address.  You have got,

24    to the right of the form, you have got the business tax

25    identification number; is that right?

1    A    Yes.

2    Q    This should match up with the number with, I presume, with

3    the Internal Revenue Service or the Washington State taxing

4    authorities?

5    A    The business TIN, I would think so, yes.

6    Q    Yes.  Yes.  There's a place for the primary contact?

7    A    Yes.

8    Q    And there's a place -- there's a business phone number, and

9    an e-mail address.

10   A    Yes.

11   Q    So quite a bit of contact information here.  So if a lender

12   is wanting to do due diligence, it would appear they would know

13   where to start --

14   A    Yes.

15   Q    -- right?

16        If the lender failed to do full due diligence, how would the

17   SBA even know?

18   A    The lender was only required to confirm the calculations.

19   The lender was permitted to rely on the certifications provided

20   by the borrower.  And the lender, again, was only required to do

21   a good-faith review of the calculations presented, and make sure

22   that all of the certifications were made.

23   Q    In the event of a borrower default, would the SBA Honor the

24   guarantee, regardless of the lender's lack of due diligence?

25   A    No.

1    Q    And, again, how would you determine that?

2    A    After a default, if the lender was requesting that SBA Honor

3    the guarantee at that time, we would then request documents and

4    do a review, to ensure that the borrower -- that the lender did

5    comply with their underwriting obligations.

6    Q    Is there any requirement of the participating lenders to

7    monitor how the PPP borrower spends the proceeds?

8    A    No.

9    Q    And, presumably, you are one step removed.  The SBA is not

10   set up to monitor how the proceeds are spent either, are they?

11   A    No.

12   Q    You indicated that, when you were asked about this, that

13   there was a limited amount of money.  And once the money was

14   gone, there would be no more money, and deserving businesses

15   might be deprived.  Was that the gist of your testimony?

16   A    Yes.

17   Q    In fact, this first round of funding -- funding began in

18   April of 2020?

19   A    Correct.

20   Q    And it initially was to go through the end of June 2020, but

21   that was extended through August the 8th of 2020; wasn't it?

22   A    Yes.

23   Q    And at the end of this time, there was still money out there,

24   wasn't there?  There was billions still available?

25   A    There was some money left after August 8th, but it had --

1    there was supplemental appropriations in between.

2    Q    But there were no eligible businesses during that period that

3    were denied PPP funding?

4    A    That's not correct.

5    Q    Is that not correct?

6    A    That is not correct.  The first round of money ran out in two

7    weeks, in April.  And we had to stop lending.  And there was an

8    additional Act approved after that to provide additional funding.

9    And then we were able to restart the program.

10   Q    Wasn't there something -- I may be off by some quantum -- but

11   wasn't there $134 million left, maybe it was a billion, I don't

12   know, but some huge amount left at the end of this period, August

13   of 2020?

14   A    At the end of August, yes.  But we did have to -- the initial

15   round of money that was provided in the CARES Act, March 27th of

16   2020, we began accepting applications April 3rd, and that money

17   ran out in two weeks.  And we had to stop for a couple of days,

18   and they had to appropriate additional funds in another Act.  And

19   then that was extended through, ultimately, August 8th.  And at

20   that point, I believe, there was funding left over in August.

21   Q    I think I heard you say that each business could apply for

22   its own PPP fund?

23   A    If there were multiple businesses with separate EIN numbers,

24   they could apply for one loan per business.

25   Q    Okay.  And in the business form, LLC or limited liability

1  corporation, those are relatively common in the business world,

2  aren't they, LLCs?

3  A   Yes.

4  Q   And it's not -- there's nothing unusual about a business

5  being in that form and making a loan application?

6  A   No.

7  Q   You were asked a series of questions about SBA Form 2483.

8  Where did the questions on this form come from?

9  A   The questions on the form were basically taken from our

10  existing 7(a) application form, and then modified.

11         MR. NANCE:  Could we put that back up again, and clear

12  the monitor?

13         MS. CONNELLY:  May I approach the podium, Your Honor?

14         THE COURT:  Yes.

15  Q   You were asked about Question No. 5, I believe.  It appears

16  to be a long, winding question about criminal history.  You see

17  it?

18  A   Yes, I do.

19  Q   I assume your typical loan applicant is probably not a

20  lawyer?

21  A   Some of them are.  But --

22  Q   Many aren't?

23  A   -- many are not.

24  Q   Right.  The question asked if the loan applicant is in jail,

25  pending any criminal charges, or on probation or parole?

1    A    Correct.

2    Q    Yeah.  And then there's a related question, the follow-up,

3    which appears to be even longer, and more winding.  This one asks

4    about felonies within the past five years.

5    A    Yes.

6    Q    Right?  Within the past five years, has -- have there --has

7    the applicant had a felony involving fraud or false statement in

8    a loan application?  That's part of it?

9    A    That's on a later version.

10   Q    I'm sorry?

11   A    That's on a later version.  This one just says for any

12   felony.

13   Q    Okay.  Who wrote these questions?

14   A    The agency wrote them in consultation with the Department of

15   Treasury.

16   Q    Yeah.  I notice Question 6, did the writer ever take a poll

17   of laypeople to see who even knows what a nolo contendere plea

18   is?

19   A    The same language is on our standard application form.

20   Q    That's not the kind of expression people on the street

21   typically use, nolo contendere?

22   A    Not necessarily.  I don't know.

23   Q    But this form was the official PPP application form used

24   beginning in April 2020 --

25   A    Correct.

1   Q   -- is that right?

2       That changed in June 2020, didn't it?

3   A   Yes, it did.

4   Q   Specifically, Question No. 5 was changed.

5   A   Both Questions 5 and 6 were changed.

6   Q   And 6.

7       Wasn't Question 5 changed in response to a lawsuit.  The SBA

8   was sued, wasn't it, in June of 2020, about this very issue?

9   A   Yes.

10  Q   Are you familiar with the lawsuit *Defy Ventures v. U.S.*

11  *Small Business Administration* filed in the District Court in

12  Maryland?

13  A   I am familiar with it generally, not the specifics.

14  Q   You did not work on the lawsuit?

15  A   I did not.

16  Q   Your agency, the SBA, was sued over the language in this

17  part.  It alleged that the SBA, in implementing the PPP program,

18  was arbitrary and capricious in excluding certain potential

19  borrowers, those who were on misdemeanor probation.  Isn't that

20  the gist of what you were sued about?

21  A   I believe so.  I didn't realize it was misdemeanor probation

22  they were suing over specifically, but I was aware that it was

23  probation.

24  Q   And the court in that case found that the plaintiffs would

25  likely -- the plaintiffs would be -- the people that brought the

1  suit, that they would likely prevail on the arbitrary and

2  capricious claim?

3  A    I don't know about that.

4  Q    Basically, the claim was that the SBA acted beyond its

5  authority when it set these restrictions on who could get the

6  loan?

7  A    I believe that was the argument, yes.

8  Q    And the suit was filed around June 16th, 2020?

9  A    That, I don't recall, sir.

10 Q    Okay.  SBA issued its -- Are you familiar with the term,

11 "interim final rule"?

12 A    Yes.

13 Q    Ring a bell?  Yeah.

14      The interim final rule was the rule that set the original

15 restriction in April 2020?

16 A    Yes.

17 Q    And that was revised --

18 A    Yes.

19 Q    -- around June 22nd, June 24th, somewhere in that period, of

20 2020?

21 A    June 24th.

22 Q    And then the court's decision in this case came out just two

23 or three days later, June 29th, didn't it?

24 A    I don't recall a decision being issued.

25 Q    Essentially, the SBA changed the rule because you knew you

1   really didn't have a choice, did you?

2   A   We changed the rule for a couple of reasons.  We were all --

3   we also changed the rule because there had been inquiries from

4   Congress, and there was an Act that was the First Steps Act of

5   2018, or something like that.  And that was part of the reason

6   that we changed to this rule -- these two questions as well.

7   Q   Yeah.  You consulted with whoever you needed to in the

8   Treasury Department, and you consulted with people in Congress, I

9   assume, and then you reformulated your rule?

10  A   We revised the rule, yes.

11  Q   I'm sorry?

12  A   We revised the rule, yes.  The application form and the

13  interim final rule, yes.

14  Q   And you did it to coincide with what you conceded was

15  Congressional intent, on what was intended to be -- to be in the

16  law and on applications that went to implement the law?

17  A   In the interim final rule, when we revised it, we did say

18  that it was in -- it was due to Congressional intent, yes.  To be

19  consistent with Congressional intent.

20  Q   You have since changed the form?

21  A   We changed the form in June of 2020.

22  Q   If I could -- if I could call up the new form, it's Defense

23  Exhibit A-5.

24          MR. NANCE:  Have you seen it?

25          MS. CONNELLY:  I have not seen it yet.  But I'm sure

 1   it's fine.

 2          MR. NANCE:  If we could not publish it yet.  Well, maybe

 3   go back to the first page.  Let me ask her to --

 4   Q   Is this the new form that you are --

 5   A   This is the most recent form.

 6   Q   Okay.

 7   A   This isn't when we made those changes.

 8   Q   Okay.  But does this form reflect the changes, at least the

 9   changes that were made in June of 2020, in response to your

10   conferring with Congress and dealing with this lawsuit?

11   A   I would need to see page 2.

12   Q   All right.  Show her page 2.  If I could ask you to hone in

13   on Paragraph 5, or Question 5 there.

14   A   Yes.  Question 5 does reflect the changes that were made in

15   June of 2020.

16          MR. NANCE:  And I would offer this, Your Honor.

17          MS. CONNELLY:  No objection.

18          THE COURT:  Admitted.

19                   (Exhibit No. A-5 admitted.)

20   Q   Would you read for us Question No. 5 -- yeah, question

21   No. 5 -- what it now says?

22   A   "Is the applicant, if an individual, or any individual owning

23   20 percent or more of the equity of the applicant, presently

24   incarcerated, or for any felony, presently subject to an

25   indictment, criminal information, arraignment or other means by

1  which formal criminal charges are brought in any jurisdiction."

2  Q    Okay.  And the difference between that and the original is,

3  essentially, what?  That it distinguishes -- that this one refers

4  to felony, whereas the one before did not distinguish it; it was

5  any crime?

6  A    That is correct.  This also doesn't have "on parole or

7  probation" at the end.

8  Q    I see that No. 6 there does refer to parole or probation,

9  but, again --

10  A    Correct.

11  Q    -- it relates to any felony; is that right?

12  A    Yes.

13  Q    Okay.  So is it fair to say that the SBA thinks that these

14  are now the relevant material questions that lenders need to get

15  answers to, to make an informed decision about loan applications?

16  A    This is what the policy was changed to, yes.

17  Q    To reflect that, right?

18  A    Yes.

19          THE COURT:  All right.  Let's take a 15-minute recess.

20                      (Recess.)

21      (The following occurred in the presence of the jury.)

22          THE COURT:  Please be seated, folks.

23          MR. NANCE:  Thank you.

24  Q    Ms. Zelaya, just to summarize, in April 2020, the PPP

25  application asked applicants about misdemeanor probation --

1          THE COURT:  Counsel, we have been over this, okay?

2    Let's not summarize.  Once is enough.

3    Q    Ms. Zelaya, after SBA consulted -- after it was sued, after

4    it consulted with Congress about its interventions regarding this

5    issue, after it consulted with the Secretary of the Treasury, the

6    SBA accepted that it had overreached in formulating the question

7    that was posed on the April 2020 application?

8    A    I wouldn't say that.  We revised our form.

9    Q    After doing these consultations?

10   A    Yes.

11   Q    After consulting with Congress about what Congress meant when

12   it passed the CARES Act?

13   A    After receiving Congressional inquiries, yes, we revised our

14   form.

15   Q    Well, yeah, you -- well, strike that.

16         Whether a person is on misdemeanor probation, you have

17   agreed, is not something that a PPP applicant should be asked?

18   A    I didn't agree to that.

19   Q    Well, you didn't, but SBA did?

20   A    No.  We revised that form.

21   Q    To not ask that question anymore?

22   A    Correct.

23   Q    I don't understand.  You talked to -- you have an original

24   form.  You're sued over it.  You consult with Congress.  You

25   consult with higher-ups in the Treasury Department, and you

1    change your form?

2         THE COURT:  We have been through this, Mr. Nance.  Move

3    on.

4    Q   Whether a person is on misdemeanor probation is simply not

5    something that -- that PPP applicants should be asked?

6    A   It is not something that they were asked on the form anymore.

7    Q   Because it's not material to whether they're eligible?

8         THE COURT:  It's been asked and answered, Mr. Nance.

9    Move on.

10        MR. NANCE:  Nothing further.

11        THE COURT:  Any redirect?

12        MS. CONNELLY:  Briefly, Your Honor.

13                        REDIRECT EXAMINATION

14   BY MS. CONNELLY:

15   Q   We have been over a few of these changes, Ms. Zelaya.  But

16   even if Question 5 changed, did it matter to the SBA that

17   applicants answered the questions truthfully, on the original

18   form?

19   A   Yes.

20   Q   And does the fact that Question 5 changed, mean that someone

21   could lie on the question in March, April, or May of 2020?

22   A   No.

23   Q   Did anything else on the application change, did the

24   requirement that a business had to have employees to apply for a

25   PPP, change?

 1    A    No.

 2    Q    Did the requirement that a business had to have payroll,

 3    change?

 4    A    No.

 5    Q    Did the requirement that a business had to have employees for

 6    whom it paid salaries and payroll taxes, change?

 7    A    No.

 8              MS. CONNELLY:  Nothing further.

 9              THE COURT:  Any recross?

10              MR. NANCE:  Just very briefly.

11                        RECROSS-EXAMINATION

12    BY MR. NANCE:

13    Q    The question on the misdemeanor probation, you are suggesting

14    was important back in April of 2020?

15    A    The questions were important.  They were revised later.  And

16    they were not retroactive.

17    Q    Not important enough to ask any longer?

18    A    No.  The decision was made to restrict it to felonies.

19    Q    Essentially, it's the SBA saying it's important, just because

20    you say it's important?  No one agrees with you, correct?

21    A    As I said, we started with our existing application form, and

22    then it was modified it later for PPP.

23    Q    Understood.  Thank you.

24              THE COURT:  All right.  You may step down.

25              MR. WERNER:  The government calls Kathleen Littwin.

1                        KATHLEEN LITTWIN,

2            having been sworn under oath, testified as follows:

3                THE COURT:  You can take your mask off.

4                         DIRECT EXAMINATION

5    MR. WERNER:

6    Q    Good afternoon.  Please state your name, and spell your last

7    name?

8    A    Kathleen Littwin, L-I-T-T-W-I-N.

9    Q    Ms. Littwin, where do you work?

10   A    The United States Small Business Administration.

11   Q    And how long have you worked at the SBA?

12   A    Sixteen years.

13   Q    What is your position at the SBA?

14   A    I'm an attorney adviser, liaison to the Office of Inspector

15   General.

16   Q    And are you familiar with loan programs for the SBA?

17   A    Yes.

18   Q    Are you familiar with a program called EIDL?

19   A    Yes.

20   Q    What is EIDL?

21   A    It's the Economic Injury Disaster Loan Program.

22   Q    How long have you worked for the SBA, Ms. Littwin?

23   A    Sixteen years.

24   Q    During that time, have you become familiar with the records,

25   the business records of the SBA?

1   A   Yes.

2   Q   And you have been there for 16 years.  How long has the EIDL

3   been around?

4   A   Since 1953.

5   Q   And what are some other -- well, can you describe a little

6   bit for the jury what the EIDL program is, for the SBA?

7   A   It is to assist businesses who have suffered from a diaster,

8   to recover from a declared disaster.

9   Q   What are some instances where the SBA has used the EIDL

10  program to lend to small businesses before?

11  A   For stand-alone EIDL programs, it could be something like the

12  BP oil spill, 9/11.  Or it could be incorporated in with a

13  physical disaster, like Hurricane Sandy or Hurricane Harvey.

14  Q   Was the EIDL program used starting in 2020?

15  A   Yes.

16  Q   What was the disaster?

17  A   For COVID-19.

18  Q   And did the CARES Act expand the EIDL?

19  A   Yes, it did.

20  Q   In the first -- in March through June of 2020, how much money

21  was authorized to be lent as an EIDL?

22  A   Two million was the maximum.  And there was a time period

23  where 115 -- $150,000 was the maximum.

24  Q   Who decided to restrict loans to 100 -- did you say $115,000?

25  A   $150,000.  The administrator.

1    Q    Why?

2    A    Based on appropriations and allowing for assistance to a

3    larger number of people, of businesses.

4    Q    So what do you mean, "based on an appropriations," what does

5    that mean?

6    A    So the funding for the program comes from the federal

7    government.  It comes through an appropriation from -- in this

8    instance, the additional funding came from the CARES Act.

9    Q    And that funding was limited?

10   A    It is a limited pool for that funding, correct.

11   Q    What other types of money can be distributed under the EIDL,

12   besides an EIDL loan?  Is there an advance?

13   A    There is.  There's an EIDL advance, or a grant.

14   Q    And in the early months of the pandemic, March through June

15   of 2020, how did the EIDL-advance program work?

16   A    The maximum amount was $10,000.  And it would be based on the

17   number of employees that were listed on the application.  So if

18   you listed one employee, you could receive $1,000, up to $10,000

19   for ten employees.

20   Q    Did these COVID-19 EIDL advances need to be repaid?

21   A    No.

22   Q    What about a COVID-19 EIDL, does that need repaid?

23   A    Yes.  That is a loan.

24   Q    And, generally speaking, what are the terms of the repayment

25   for a COVID-19 EIDL?

1    A    It would be a 30-year term, at a particular interest rate.

2    And there are favorable terms, such as no prepayment penalties.

3    There's no closing costs.  There is a $100 recording fee, for

4    collateral.  But otherwise, there's no other fees or costs

5    associated.

6    Q    And what is a COVID-19 EIDL?  What was that designated to be

7    used for?

8    A    For working capital, to meet the needs of the business, had

9    the disaster not occurred.

10   Q    For a COVID-19 EIDL, how did a business apply?

11   A    They would go to the SBA web page, and submit an application

12   online.

13   Q    What type of information did a business need to input?

14   A    They would list the name of the business, the identifiers for

15   the business, such as the EIN, the name of the owner, the

16   address, the contact information for the owner, and some details

17   about the business, like financial information, and the dates

18   that the business started.

19   Q    And let me ask you about that financial information.

20   Specifically, what financial information needed to be included on

21   an EIDL application?

22   A    The revenues for twelve months prior to the date of the

23   diaster, so twelve months prior to January 31st of 2020, and the

24   cost of goods sold for that same time period, for a for-profit

25   business.

1   Q    And then how was the size of a COVID-19 EIDL loan determined?

2   A    It's calculated -- at that time, it was calculated based on

3   the information provided on the application.

4   Q    Specifically, what information that was provided?

5   A    The revenues and the cost of goods sold that were listed on

6   the application.

7   Q    What was the calculation that you did to -- or that the SBA

8   did to come up with an amount of an EIDL loan?

9   A    You would take the revenues, minus the cost of goods sold.

10  Then you would divide that by two, which would provide six months

11  of injury, and then subtract any EIDL advance or grant.

12  Q    For the online applications for COVID-19 EIDL, did the small

13  business need to submit supporting documentation along with their

14  application?

15  A    No.

16  Q    Why not?

17  A    It was a streamlined application for COVID.  We needed to

18  provide assistance, as quickly as possible.

19  Q    How did the COVID-19 EIDL application process compare to the

20  EIDL application process for other instances it was used?

21  A    For other disasters, we usually require a tax form, a 4506-T.

22  We would pull tax transcripts.  We would confirm other

23  information about the business.  And we would calculate the

24  amount, instead of using the amount on the application.

25  Q    The SBA would calculate what amount for the business?

1   A    For an EIDL, we would calculate an injury amount, using the

2   tax records instead of the revenues and cost of goods from the

3   application on COVID.

4   Q    But for the COVID-19 EIDLs, those numbers were provided by

5   the applicants, correct?

6   A    Correct.

7   Q    And so is it -- was it important for the COVID-19 EIDL

8   applications, that the information be truthful and accurate?

9   A    Yes.

10  Q    Why was that important?

11  A    We relied on that to determine the loan amount, and to find

12  eligibility for the loan.

13  Q    Specifically, then, is the revenue amount important to be

14  truthful?

15  A    Yes.

16  Q    What about the type of business activity, is that a question

17  that's important?

18  A    Yes.

19  Q    Why is that important?

20  A    It determines eligibility for the program.

21  Q    Does the applicant for an EIDL loan have to make any

22  certifications about truthfulness?

23  A    Yes.

24  Q    What are those?

25  A    They certify that the information they're providing is true

1   and accurate, and that SBA is relying on that information to

2   approve and disburse that loan.

3   Q    Ms. Littwin, before today, did you review exhibits marked 27

4   through 39, the Government's Exhibits 27 through 39?

5   A    Yes.

6   Q    What are Exhibits 27 through 39?

7   A    They are SBA applications and closing documents from COVID

8   applications.

9   Q    What type of COVID SBA loan?

10  A    COVID EIDL applications.

11  Q    And who is the owner listed for each of these applications,

12  27 through 39?

13  A    Eric Shibley.

14  Q    And do these documents, Exhibits 27 through 39, contain the

15  business records of SBA?

16  A    Yes.

17  Q    And do they also contain the business records of another

18  agency?

19  A    Yes.

20  Q    Can you explain that, briefly?

21  A    There is a payment documentation that shows the actual

22  disbursement of the funds from the Treasury, and that is called

23  an ACH-path report, that shows the funding of the loan.

24          MR. WERNER:  Offer Exhibits 27 through 39.

25          MR. NANCE:  No objection.

1                    THE COURT:  Admitted.

2                         (Exhibit Nos. 27 - 39 admitted.)

3     Q    Ms. Littwin, I'm showing you what's been marked as

4     Exhibit 207.  Do you recognize Exhibit 207?

5     A    Yes.

6     Q    What is this exhibit, generally?

7     A    A summary of applications.

8     Q    What type of applications?

9     A    COVID EIDL applications.

10    Q    Who is the manager for each application?

11    A    Eric Shibley.

12    Q    And does it accurately -- did you review this -- have you

13    reviewed this chart before court today?

14    A    Yes.

15    Q    Does it accurately summarize information in Exhibits 27

16    through 39?

17    A    Yes.

18              MR. WERNER:  Offer Exhibit 207.

19              MR. NANCE:  No objection.

20              THE COURT:  Admitted.

21                    (Exhibit No. 207 admitted.)

22    Q    Ms. Littwin, how many EIDL applications were submitted by

23    Eric Shibley?

24    A    Thirteen.

25    Q    And what was the earliest date of an EIDL application?

 1    A    March 31st of 2020.

 2    Q    And what was the last date of an EIDL application?

 3    A    June 16th of 2020.

 4    Q    Were some of these EIDL applications granted?

 5    A    Yes.

 6    Q    And were some of them not granted?

 7    A    Yes.

 8    Q    What about advances?

 9    A    Yes.  Some were granted and some were not.

10    Q    Were some advances issued as well?

11    A    Yes.

12    Q    I will show you a page of what's been admitted as

13   Government's Exhibit 27.  Mr. Arnold, could you maybe blow up the

14   top third of this document, please?

15        So what is this?

16        Mr. Arnold, would you mind calling that out and getting that

17   top information there?  Thank you.

18        What is this, page one of Exhibit 27?  What is this?

19    A    This is an original application, the intake form.

20    Q    And, again, how is this application filled out?

21    A    Online, by submitting information through the SBA web page.

22    Q    And what business is Exhibit 27 for?

23    A    Dituri Construction LLC.

24    Q    And what date was this application completed?

25    A    June 7th of 2020.

1    Q    How could you tell it was June 7th of 2020?

2    A    The timestamp in the far column.

3    Q    And when this application was completed, where was it sent?

4    A    To a server that's located in West Des Moines, Iowa.

5    Q    So it was sent via the internet from wherever it was

6    completed to West Des Moines, Iowa?

7    A    Yes.

8    Q    How can you tell it went to West Des Moines, Iowa?

9    A    By looking at the date of the submission, and the starting

10   prefix of the application number.

11   Q    Mrs. Littwin, can you generally describe what we're seeing on

12   the screen?  What are the first sets of questions?

13   A    These are questions about eligibility, about the type of

14   business operations, generally.

15   Q    And what's the purpose of those questions?

16   A    To determine whether the business is eligible to submit the

17   application, if they are eligible for the assistance.

18   Q    For example, what's Question No. 6?

19   A    Applicant is not in the business of lobbying.

20   Q    Why is that question asked?

21   A    They would not be eligible for assistance if they were a

22   lobbying group.

23   Q    And, Mr. Arnold, could you call out section, Questions 8

24   through 24, please?  So the mid-section.

25        What is this section titled, I guess in the yellow part right

1    above, what is this section of the EIDL application?

2    A    The business information.

3    Q    And what business information is included on this Dituri

4    Construction application?

5    A    It includes the business name, the EIN for the business, the

6    type of business, the revenues and cost of goods sold, and the

7    location.

8    Q    What is the location for this business?

9    A    4700 36th Avenue Southwest, Seattle, Washington, 98126.

10   Q    And what are the revenues reported for Dituri Construction?

11   A    $850,000.

12   Q    And the cost of goods sold?

13   A    $600,000.

14   Q    Could we call out the bottom third, Mr. Arnold, 24

15   through 32, please?

16        And, Ms. Littwin, does this also list the type of business

17   activity?

18   A    Yes.

19   Q    What type of business activity is Dituri Construction,

20   according to this form?

21   A    Construction contractors.

22   Q    What about number of employees?

23   A    Forty-nine.

24   Q    What about date business established?

25   A    January 2nd of 2020.

 1   Q    Then the next question on the EIDL form:  Is the business

 2   owned by a business entity?  What's the answer here?

 3   A    No.

 4   Q    If we can go to page 2, please.

 5        And is that top -- well, is the top section relevant to if

 6   the business is, in fact, owned by a business entity?

 7   A    Yes.

 8   Q    So let's go to the middle section, please, Mr. Arnold.

 9        What is this?  What are these questions about, Ms. Littwin?

10   A    The owner of the business.

11   Q    Who is listed as the owner of Dituri Construction?

12   A    Eric Shibley.

13   Q    What phone number is listed?

14   A    206-771-7868.

15   Q    What's his ownership percentage?

16   A    100 percent.

17   Q    And what's the address for Mr. Shibley?

18   A    4700 36th Avenue Southwest, Seattle, Washington, 98126.

19   Q    And let me show you page 4.  Skip to page 4, please.  Whose

20   driver's license is included with this application packet in the

21   records of the SBA?

22   A    Eric Shibley.

23   Q    And is this the driver's license that was submitted in

24   connection with this application?

25   A    Yes.

 1  Q    Let's go back to page 3, please, Mr. Arnold.

 2       Can you call out, please, the middle questions there in that

 3  middle section?  What are these questions, starting at 62, what

 4  are they asking?

 5  A    If someone assisted you with completing the application.

 6  Q    What's the answer?

 7  A    No.

 8  Q    What about the questions in the next section, starting at 69.

 9  What are those questions about?

10  A    Where the funds should be sent, when SBA disburses the loan.

11  Q    What bank is listed for Dituri Construction?

12  A    Verity Credit Union.

13  Q    If we could go back out, please, Mr. Arnold.

14       Generally, there's some more paragraphs at the bottom.  Do

15  you see them, Ms. Littwin?

16  A    Yes.

17  Q    What is that?

18  A    It includes statements about who we share the information

19  with.  And it also includes certifications about truthful

20  information, and a warning about criminal, civil or

21  administrative penalties.

22  Q    Mr. Arnold, could you pull up, please, the last two

23  paragraphs?

24       Are these the certifications you were just mentioning?

25  A    Yes.

1    Q    And how does this certification, how does that fit into the

2    application, the online application?

3    A    The application would display this text, and then there's a

4    check box that would be selected to certify the information.

5    Q    You can take that down.

6         Was this EIDL application funded?

7    A    Yes.

8    Q    When an EIDL application is funded by the SBA, are there

9    additional documents that are sent to the borrower?

10   A    Yes.

11   Q    What are those documents?

12   A    They are loan closing documents.  So it would include loan

13   authorization and agreement, which is like a contract, that

14   outlines the terms of the loan, promissory note, a security

15   agreement, if collateral is required.

16   Q    Let's take a look at page 7, please.

17        What is page 7?

18   A    This is a loan authorization and agreement.

19   Q    And, again, what does the loan authorization lay out?

20   A    The terms and conditions of the loan.

21   Q    Did you also mention a note, as part of this packet?

22   A    Yes.

23   Q    And what does the note indicate?

24   A    The promise to repay.  The promise to repay the loan.

25   Q    Again, what are the -- what are the terms, generally, of an

1    EIDL loan at this time, June 2020?

2    A    It would be a 30-year term.  The interest rate for this type

3    of business would be set at I believe 3.75 percent.  And then

4    there would be no prepayment penalties, no closing costs, or

5    other fees.  There is a $100 fee if there is collateral to

6    record; a UCC.

7    Q    And when does repayment start?

8    A    At this time, it was twelve months from the date of the note.

9    It has now been extended to 24 months.

10   Q    You also mentioned a security agreement.  Is a security

11   agreement part of the EIDL packet?

12   A    Yes.

13   Q    Explain what that means.

14   A    It is a document that outlines the collateral that SBA is

15   taking for the loan, and the type of interest that we're taking

16   in that collateral.  It would be similar to a mortgage for real

17   property.  In this instance, SBA files a UCC.

18   Q    What if the business doesn't have any collateral or property,

19   does the SBA still make the business sign a security agreement?

20   A    Yes.  We take the best available collateral, and a general

21   security interest in any of the listed items that the business

22   may own or will acquire.

23   Q    So, again, so the SBA doesn't do any investigation to see if

24   the business owns collateral, they just -- the business is

25   required to sign a security agreement, without regard to whether

1   or not there's actual collateral?

2   A    Yes.

3   Q    After these documents are signed, a loan note, a loan

4   authorization, a security agreement, what happens next in the

5   EIDL process?

6   A    Once the closing documents have been signed, SBA would

7   initiate the funding of the loan.

8   Q    And how is that money transferred?

9   A    SBA would send those funds through ACH.  It would actually go

10  through the Treasury and to the bank that was indicated on the

11  application.

12  Q    Can we see page 27, please?

13       What is page 27?

14  A    This shows the loan proceeds, minus the $100 recording fee,

15  going to the Verity Credit Union bank account.

16  Q    And what's the date of this payment?

17  A    June 19 of 2020.

18  Q    And what's the amount of the payment?

19  A    $114,900.

20  Q    Again, how did that -- how did the SBA arrive at that number?

21  A    Based on the information on the application, the revenues and

22  cost of goods sold provided on that application.

23  Q    Let's show you what's been admitted as Exhibit 28, please.

24  Can you please call out the top third of this page, Mr. Arnold?

25  What is Exhibit 28?

1  A    An original intake application.

2  Q    For what business?

3  A    SS1 LLC.

4  Q    And what's the date of this application?

5  A    June 7th of 2020.

6  Q    And how is this application completed?

7  A    Online.

8  Q    And where was it sent after it was completed?

9  A    To a server located in West Des Moines, Iowa.

10  Q    Again, how can you tell?

11  A    Based on the date of the submission and the prefix of the

12  application number.

13  Q    So it was sent from wherever it was completed, to West -- via

14  the internet, to West Des Moines, Iowa?

15  A    Yes.

16  Q    Let's go to the middle, please, Mr. Arnold, 8 through 24.

17  Again, what information is included in 8 through 24?

18  A    The business information.

19  Q    What's the business address?

20  A    4700 36th Avenue Southwest, Seattle, Washington, 98126.

21  Q    Is that the same address that was on the application for

22  Dituri Construction?

23  A    Yes.

24  Q    What is the gross revenue?

25  A    $850,000.

1    Q    And what is the cost of goods sold?

2    A    $600,000.

3    Q    Are those the same amounts that were on the previous

4    application we just looked at?

5    A    Yes.

6    Q    Could we go to the bottom third, please, Mr. Arnold?

7         What is the type of business, or what is the business

8    activity, as reported by this application, for SS1 LLC?

9    A    Construction contractors.

10   Q    And what are the number of employees as of January 31st,

11   2020?

12   A    Forty-one.

13   Q    Let's go to the next page, please.  Please go to the

14   mid-section and pull that out.  Thank you.

15        Who's listed as the owner of SS1 LLC?

16   A    Eric Shibley.

17   Q    Is the address the same as the business address on the front

18   page?

19   A    Yes.

20   Q    So this section, again, is where the owners are listed,

21   correct?

22   A    Yes.

23   Q    For all of the applications, 27 through 39, is Eric Shibley

24   listed as the owner of these businesses?

25   A    Yes.

1    Q    If we could pull back out, again, please.  Could we please go

2    to the third page?

3         What's on the bottom of the page?

4    A    The certifications.

5    Q    Again, remind us, what is the -- what is the -- what does the

6    applicant do with respect to these certifications, to submit this

7    application?

8    A    They would check a box that indicates that they are

9    certifying this information.

10   Q    Certifying that it's truthful?

11   A    Yes.

12   Q    Again, were these certifications made on every application,

13   Exhibits 27 through 39?

14   A    Yes.

15   Q    Is this application, Exhibit 28 for SS1 LLC, was this EIDL

16   granted?

17   A    I would need to look at the --

18   Q    If I showed you page 27 of this exhibit, would that help?

19   A    Yes.

20   Q    Let's look at page 27.

21   A    Yes, it was funded.

22   Q    Again, what were the -- what was the date it was funded?

23   A    June 19th of 2020.

24   Q    What was the amount?

25   A    $114,900.

 1   Q    Where was that money sent?

 2   A    Verity Credit Union.

 3   Q    Let's go back out to Exhibit 207, please, Mr. Arnold.

 4        Did Mr. Shibley apply for an EIDL in the name of a business

 5   called ES1 LLC?

 6   A    Yes.

 7   Q    How many different applications were there for ES1 LLC?

 8   A    Two.

 9   Q    And are those applications in Exhibits 32 and 33?

10   A    Yes.

11   Q    Let's look at Exhibit 33, please, Mr. Arnold.

12        Again, if we look at the top third here, we could tell that

13   Exhibit 33 is for ES1 LLC, correct?

14   A    Yes.

15   Q    What was the date of this application?

16   A    March 31st of 2020.

17   Q    Is this the first ES1 LLC application that Mr. Shibley

18   submitted?

19   A    Yes.

20   Q    If we could call out the bottom third, please.  What is the

21   business activity listed for this application, Exhibit 33?

22   A    Real estate, and real estate developers.

23   Q    How many employees does ES1 report?

24   A    Four.

25   Q    And what types of businesses would not be allowed an EIDL

 1    loan at this time, March 31st, 2020?

 2    A    Speculative businesses.

 3    Q    And, like, real estate development?

 4    A    Correct.

 5    Q    So let me show you page 6 of this loan.  What does page 6

 6    indicate?

 7    A    The loan was declined, as not being eligible.

 8    Q    And, again, why was it declined?

 9    A    It was not eligible, and it was not an eligible activity.

10    Q    So did the SBA end up sending any money to ES1 LLC?

11    A    I believe an EIDL advance.

12    Q    Could we go to the next page, please?

13         Actually, I'm sorry, the previous page, page 5.  What does

14    page 5 indicate?

15    A    An EIDL advance or grant of $4,000 was sent.

16    Q    On what date?

17    A    April 21st of 2020.

18    Q    So let's look at Exhibit 32, briefly, please.  Generally what

19    is Exhibit 32?

20    A    An original application, intake form.

21    Q    For what business?

22    A    ES1 LLC.

23    Q    Who is the owner?

24    A    Eric Shibley.

25    Q    And what's the date of the application?

1    A    June 7th of 2020.

2    Q    Now, Mr. Arnold, could you please put Exhibit 32 next to

3    Exhibit 33, please?

4         So, Ms. Littwin, we're looking at Exhibits 32 and 33,

5    correct?

6    A    Yes.

7    Q    What is the name of the business on both applications?

8    A    ES1 LLC.

9    Q    Is the EIN number the same for each business?

10   A    Yes.

11   Q    So let's look -- let's just call out, Mr. Arnold, the gross

12   revenue question for -- start with Exhibit 33, on the right here,

13   just the middle section right there.  A little higher up.

14        On the application, Exhibit 33, submitted March 2020, what is

15   the gross revenue of ES1 LLC reported as?

16   A    $210,000.

17   Q    And let's look at Exhibit 32.  The same question, what is the

18   gross revenue reported on the application dated June 7th, 2020?

19   A    $550,000.

20   Q    Is the question different?

21   A    No.

22   Q    What is the question?

23   A    The gross revenues for the twelve months prior to the date of

24   the disaster, January 31st of 2020.

25   Q    Let's look at the business activity question for both

1   applications.  I think it's on the second page of Exhibit 32, and

2   the first page of the exhibit.

3       So, Ms. Littwin, I'm going to ask you about the first ES1 LLC

4   application from March of 2020.  What was the business activity

5   listed for ES1 LLC?

6   A   Real estate.  Real estate developers.

7   Q   What was the business activity listed for the June 2020

8   application?

9   A   Construction contractors.

10  Q   What's the difference to the SBA, between -- for purposes of

11  the EIDL?

12  A   Real estate developers would not be eligible.  And

13  construction contractors would be eligible.

14  Q   Mr. Arnold, I would like to do the same thing with employees,

15  please.  I think it's right below --

16      So for the first ES1 application, how many employees are

17  reported?

18  A   Four.

19  Q   For the second one, how many employees are reported?

20  A   Fifteen.

21  Q   Is the question different?

22  A   No.

23  Q   What's the question?

24  A   Number of employees as of January 31st, 2020.

25  Q   So, again, the first ES1 application was denied, correct?

1   A    Yes.

2   Q    But the SBA still gave ES1 an EIDL advance?

3   A    Yes.

4   Q    Was the second application granted or denied?

5   A    It was duplicated.  It was stopped.

6   Q    So it stopped.  Let's take that down.  Thank you.

7        Let's go back to 207, please.

8        I'm looking at the chart admitted as Exhibit 207.  Calling

9   your attention to No. 13.  What's the name of business, No. 13?

10  A    The A-Team Holdings LLC.

11  Q    What was the date of the A-Team Holdings EIDL?

12  A    March 31st of 2020.

13  Q    And what was the revenue for the A-Team Holdings?

14  A    $180,000.

15  Q    What was the number of employees reported for A-Team

16  Holdings?

17  A    Four.

18  Q    And was a loan amount approved?

19  A    No.

20  Q    Was an advance granted?

21  A    Yes.

22  Q    How much was the advance?

23  A    $4,000.

24  Q    And was the loan not approved because of the same reason for

25  ES1?

1    A    Yes.

2    Q    And that's because of the business activity?

3    A    Yes.

4    Q    If we could go back out and look at exhibit -- or call out

5    lines 8 and 9.  And what are these businesses?

6    A    Seattle's Finest Cannabis and SFC LLC.

7    Q    And what dates were EIDL applications submitted for these

8    businesses?

9    A    April 15th of 2020, and June 7th of 2020.

10   Q    And let's look at exhibit -- are those in Exhibit 31?

11   Actually -- one is 31.  Let's look at Exhibit 31, please.

12        What is Exhibit 31?

13   A    The original application intake form.

14   Q    What's the business -- could we call out the top third,

15   please?  What's the business name?

16   A    Seattle's Finest Cannabis.

17   Q    What's the date of the application?

18   A    April 15th of 2020.

19   Q    And what's the -- if we can go down to the business activity,

20   what's the business activity listed for Seattle's Finest

21   Cannabis?

22   A    Manufacturing.

23   Q    And how many employees are listed?

24   A    Ten.

25   Q    If we could go back to Exhibit 207, please.  And I think I

1  had you look at exhibit, or No. 9 before.  What is No. 10?  What

2  is No. 10?

3  A   It is an application for SFC LLC.

4  Q   And I meant to ask, does the -- do the entities marked as

5  Exhibit 8 and Exhibit 10, both have the same employer

6  identification number?

7  A   Yes.

8  Q   So let's look at Exhibit 30, then, please.

9      So is -- what is Exhibit 30?

10  A   An original application intake form.

11  Q   For what business?

12  A   SFC LLC.

13  Q   Who submitted this application?

14  A   Eric Shibley.

15  Q   And if we scroll down just a little bit, perhaps we can -- or

16  maybe the bottom quarter we can tell -- is the EIN for 30 the

17  same that we just looked at as 31?

18  A   Yes.

19  Q   What is the business activity for this company?  Now the name

20  of SFC LLC.  I think we have to go to the second page for that.

21  A   Construction contractors.

22  Q   And how many employees?

23  A   Twelve.

24  Q   Did Mr. Shibley send an e-mail to the SBA about this business

25  with the EIN, the EIN we have just talked about?

1    A    Yes.

2    Q    I will show you Exhibit 31, page 6, please.  Can you call out

3    the top, I guess, two-thirds of that, please, Mr. Arnold, of the

4    e-mail?

5         Is this the e-mail Mr. Shibley sent?

6    A    Yes.

7    Q    And in this e-mail, how did Mr. Shibley explain the two

8    applications, the two names?

9    A    He said that the business changed operations.  It was

10   converted into a construction contracting business.

11   Q    What does he want the SBA to do?

12   A    To update the name on the application, and to reconsider

13   funding for the Seattle's Finest application.

14   Q    Could we go back to 207, please?  We have talked about many

15   of these applications that are in Exhibit 207.  Were any other

16   loan amounts, beside the Dituri Construction and SS1 LLC, were

17   other loan amounts approved?

18   A    Yes.  For Eric R. Shibley MD, PLLC.

19   Q    So how many in total were approved?

20   A    Three.

21   Q    And how many advances was Mr. Shibley granted?

22   A    Four.

23         MR. WERNER:  No further questions.  Thank you,

24   Ms. Littwin.

25         THE COURT:  All right.  Cross?

 1                    CROSS-EXAMINATION

 2    BY MR. NANCE:

 3    Q    Good afternoon, Ms. Littwin.

 4    A    Good afternoon.

 5    Q    So, the EIDL program that you testified about, it's similar

 6    in some ways to the PPP program, except in that the SBA is making

 7    the loans directly to the borrowers; is that right?

 8    A    That's one distinction, yes.

 9    Q    Okay.  PPP loans are founded by private lenders and

10    guaranteed by the SBA.  These are direct loans, though?

11    A    Correct.

12    Q    Both programs are designed to assist small businesses dealing

13    with this economic emergency, though?

14    A    Yes.

15    Q    Yeah.

16         As to the EIDL loans, what verification process did SBA have?

17    A    When the application was submitted, it would go through some

18    initial verifications of identity, credit would be pulled, and

19    then the application, after acceptance by -- the applicant would

20    be assigned to a loan officer, and the loan officer would review

21    and approve the loan.

22    Q    So in Mr. Shibley's case, he -- I think I saw his driver's

23    license, at some point.  SBA had that, right, his driver's

24    license, with the application?

25    A    It wouldn't have been submitted with the application itself,

 1   but submitted during the application process, yes.

 2   Q    And the applications have obvious contact information.  You

 3   know where to find him if you need to?

 4   A    Yes.  Yes.

 5   Q    You have a phone number for him?

 6   A    Yes.

 7   Q    You have a business office, a business address?

 8   A    Yes.

 9   Q    Nothing really to prevent someone, an SBA rep from going to

10   the site?

11   A    Correct.

12   Q    Or going to the work sites --

13   A    Correct.

14   Q    -- of these businesses.  For the projects.

15        You testified that SBA can take collateral for its loans?

16   A    Yes.

17   Q    But you often don't know what the property is?

18   A    For this particular disaster, we were not taking real

19   property for collateral at this time; we were taking other

20   security interest, and things like inventory, accounts receivable

21   through a UCC.  Not a piece of land or a building.

22   Q    Did anyone ask Mr. Shibley about his personal property that

23   could be collateralized?

24   A    No.

25   Q    Any reason that didn't happen?

1   A    No.

2   Q    How was the EIDL program, particularly during COVID, how was

3   that marketed?

4   A    To assist businesses, to keep them from closing their doors.

5   To help them make it through the pandemic and keep operating.

6   Q    Well, I understand that's why it was marketed, promoted.  But

7   how did you go about promoting it?

8   A    Oh, through the SBA web page.  We made press releases.  The

9   district offices would make announcements.  The administrator,

10  the SBA administrator would make announcements.  It was released

11  through several different avenues.

12  Q    Social media?

13  A    Yes.  Facebook pages.  Twitter.

14  Q    You have a Facebook page?

15  A    Twitter.  I think that's the two, the two sources that we

16  have, through social media.

17  Q    Was your promotion effort different for the PPP loans as

18  opposed to the EIDL loans?

19  A    I don't know the way that they were marketed.  I know that

20  the SBA web page listed both, it listed all of the programs that

21  were available.  And also the Twitter and Facebook pages did as

22  well.

23  Q    Was there any follow-up by SBA, after it disbursed loans

24  under EIDL, under the EIDL program?

25  A    There is a requirement to provide proof of insurance and to

 1   provide a certification document.  If it was a corporation, it

 2   would be a resolution of the board.  We would request those two

 3   items, after funding.

 4   Q   Would you know how the proceeds were being spent?

 5   A   We did not send or request receipts for the use of those

 6   funds.

 7   Q   And when were the first payments on the EIDL loans due?

 8   A   Initially it was twelve months from the date of the note.  It

 9   was extended to 24 months.

10   Q   So, 24 months could pass from the time the money goes out the

11   door, before -- if there was a problem, you might not know it for

12   two years?

13   A   If we were not notified, that's correct.

14   Q   You are not monitoring what's happening?

15   A   They're in deferment status.  So they're in our servicing

16   office under deferment status.  And we would be requesting those

17   two items for compliance.

18   Q   Was there any monitoring of -- I'm switching between programs

19   here -- but the PPP program, was there any oversight regarding

20   the lenders and what they advertised the program to feature?

21         MR. WERNER:  Objection, lack of foundation.

22   Q   If you know.

23         THE COURT:  She can answer, if she knows.

24   A   I do not know.

25   Q   During the, what would be categorized as the first round of

1    PPP funding, it would have run from April 2020 until when?

2    A    I do not know.

3    Q    I asked Ms. Zelaya this, and I'm not sure if she knew, maybe

4    you do.  Was there -- wasn't there money available for PPP

5    applicants, during the bulk of the first-round period?

6    A    I do not know.

7    Q    Wasn't there money left over at the end, a substantial

8    amount?

9    A    Yes, I believe there was.

10   Q    And it was -- let me just give you this figure --

11   $134 billion still available to be loaned?

12   A    That, I don't know -- I don't know the number.

13   Q    Wasn't that the gist of your testimony down in that

14   California case?

15   A    I don't recall the amount, but there was money left.

16   Q    To your knowledge, was any worthy or eligible business denied

17   PPP funding, during the first round, for lack of money?

18   A    I do not know.

19   Q    Okay.  Thank you.

20            MR. NANCE:  That's all I have.

21            THE COURT:  Redirect?

22            MR. WERNER:  No, Your Honor.  Thank you.

23            THE COURT:  All right.  You may step down.

24        Let's recess for the day.  We will start up tomorrow morning

25   at 9:00, not 9:30, 9:00 a.m.

 1    Please remember the court's admonitions not to discuss the

 2    case with anyone, not even amongst yourselves.  Do not permit

 3    anybody to talk to you about the case.  Don't talk to anybody

 4    about the case.  Don't do any research or investigation on your

 5    own.  Don't read, listen, or watch anything about the case.

 6        We will see you tomorrow morning.  Have a nice evening.

 7             THE CLERK:  Please rise.  Court is in recess.

 8                         (Adjourned.)

 9

10

11                  C E R T I F I C A T E

12

13    I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

14    United States District Court in the Western District of

15    Washington at Seattle, do certify that the foregoing is a correct

16    transcript, to the best of my ability, from the record of

17    proceedings in the above-entitled matter.

18

19

20                    /s/ Nickoline Drury

21                    Nickoline Drury

22

23

24

25