1        UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3   _____
                                    )
4   UNITED STATES OF AMERICA,       ) CR20-00174
                                    )
5              Plaintiff,           ) SEATTLE, WASHINGTON
                                    )
6   v.                              ) November 16, 2021 -
                                    ) 9:00 A.M.
7   ERIC SHIBLEY,                   )
                                    )
8              Defendant.           ) TRIAL - DAY 2
                                    )
9   _____)

10           VERBATIM REPORT OF PROCEEDINGS
11       BEFORE THE HONORABLE JOHN C. COUGHENOUR
             UNITED STATES DISTRICT JUDGE
12   _____

13

14   APPEARANCES:

15   For the Plaintiff:      Brian Werner
                             Assistant United States Attorney
16                           700 Stewart Street, Suite 5220
                             Seattle, WA  98101
17
                             Laura Connelly
18                           U.S. Department of Justice
                             Criminal Division
19                           1400 New York Avenue N.W., RM 10100
                             Washington, D.C. 20530
20

21   For the Defendant:      Michael Nance
                             Attorney at Law
22                           P.O. Box 11278
                             Bainbridge Island, WA 98110
23

24

25

Proceedings stenographically reported and transcript produced with computer-aided technology

1                          EXAMINATION INDEX

2

3    EXAMINATION OF                                            PAGE

4    KATHLEEN MORAN        DIRECT EXAMINATION                   175
                           BY MS. CONNELLY
5                          CROSS-EXAMINATION                    252
                           BY MR. NANCE
6    ROMAN HERNANDEZ       DIRECT EXAMINATION                   265
                           BY MS. CONNELLY
7                          CROSS-EXAMINATION                    279
                           BY MR. NANCE
8    GEOFFREY HILLERS      DIRECT EXAMINATION                   285
                           BY MR. WERNER
9                          CROSS-EXAMINATION                    302
                           BY MR. NANCE
10   CYNTHIA COLE          DIRECT EXAMINATION                   306
                           BY MR. WERNER
11                         CROSS-EXAMINATION                    324
                           BY MR. NANCE
12   JOHN MOSHIER          DIRECT EXAMINATION                   326
                           BY MS. CONNELLY
13                         CROSS-EXAMINATION                    339
                           BY MR. NANCE
14   ADAM SEERY            DIRECT EXAMINATION                   351
                           BY MR. WERNER
15                         CROSS-EXAMINATION                    358
                           BY MR. NANCE:
16   NISSEN LIDDIARD       DIRECT EXAMINATION                   362
                           BY MS. CONNELLY
17                         CROSS-EXAMINATION                    369
                           BY MR. NANCE
18   DAVE HAAGSMA          DIRECT EXAMINATION                   372
                           BY MR. WERNER
19                         CROSS-EXAMINATION                    378
                           BY DEFENSE COUNSEL
20

21

22

23

24

25

**Proceedings stenographically reported and transcript produced with computer-aided technology**

1

## EXHIBIT INDEX

2

3    EXHIBITS ADMITTED                                    PAGE

4    1 - 26                                              190
     46                                                  217
5    47                                                  220
     48                                                  239
6    50                                                  238
     62                                                  188
7    63 - 67                                             189
     68                                                  186
8    69                                                  187
     70 - 75                                             179
9    77                                                  289
     78                                                  296
10   79                                                  294
     80                                                  311
11   81                                                  309
     82 - 86                                             312
12   87                                                  319
     88 - 97                                             314
13   Exhibit 100                                         178
     103                                                 246
14   104                                                 202
     105                                                 203
15   106                                                 213
     107                                                 218
16   117, 120, 130, 136,                                 233
     143, 172, 178, 187, 199 and 206
17   205                                                 192
     211 - 213                                           237

18

19

20

21

22

23

24

25

Proceedings stenographically reported and transcript produced with computer-aided technology

 1          THE CLERK:  The next matter on the calendar is

 2   CR20-174-JCC United States of America v. Eric Shibley.

 3          THE COURT:  Counsel, are you ready for the jury?

 4          MS. CONNELLY:  Yes, Your Honor.

 5          THE COURT:  All right.  Let's bring them in.

 6        (The following occurred in the presence of the jury.)

 7          THE COURT:  Please be seated, folks.  All right.

 8          MS. CONNELLY:  The government calls Kathleen Moran.

 9                        KATHLEEN MORAN,

10      having been sworn under oath, testified as follows:

11          THE COURT:  You can take your mask off.

12                     DIRECT EXAMINATION

13   BY MS. CONNELLY:

14   Q   Good morning, Special Agent Moran, can you please state your

15   name and spell your last name for the record?

16   A   My name is Kathleen Moran, M-O-R-A-N.

17   Q   And where do you work?

18   A   I work for the FBI.

19   Q   And what is your position at the FBI?

20   A   I'm a special agent.

21   Q   How long have you been employed at an FBI special agent?

22   A   For 16 years.

23   Q   And what are your duties as a special agent with the FBI?

24   A   I investigate allegations of criminal activity.

25   Q   And what types of cases do you investigate, in particular?

1   A    I'm assigned to our white-collar squad here in Seattle.  So I

2   investigate different types of fraud cases.

3   Q    And how long have you been investigating white-collar cases?

4   A    Sixteen years.

5   Q    Did there come a time when you began investigating cases that

6   involved the Paycheck Protection Program and the Economic Injury

7   Disaster Loan program?

8   A    Yes.

9   Q    And when was that?

10  A    In April of 2020.

11  Q    And as part of those investigations, did you learn about the

12  programs?

13  A    Yes.

14  Q    And as part of those investigations, did you investigate the

15  defendant, Eric Shibley?

16  A    Yes.

17  Q    What did you find during your investigation of Eric Shibley?

18  A    We learned that Mr. Shibley had applied for a number of PPP

19  and EIDL loan applications.  And those applications contained

20  false and untrue statements.

21  Q    And what types of investigative steps did you undertake?

22  A    We conducted surveillance.  We interviewed witnesses.  We

23  obtained bank records, Secretary of State records, other sort of

24  documentation.

25  Q    Okay.  And as part of your investigation, did you look into

 1  where the defendant lived between March 2020 and June 2020?

 2  A   Yes.

 3  Q   And what investigative steps did you take to determine where

 4  the defendant was living?

 5  A   We conducted database checks to confirm the address, we also

 6  obtained a number of records, such as bank account statements,

 7  that showed the address for Mr. Shibley and his businesses.  And

 8  we conducted surveillance on that address.  And we determined

 9  that it was a medical office building.  It had the name of Eric

10  Shibley MD on the outside of the building.

11      And further surveillance determined that Mr. Shibley was also

12  living in his office building.

13  Q   And do you know the address of that building?

14  A   It's 4700 36th Avenue Southwest, in Seattle.

15  Q   And so I'm showing the witness what's been marked as

16  Government's Exhibit 100.

17      Do you recognize this photo?

18  A   Yes.  That is 4700 36th Avenue Southwest.

19  Q   And is it a fair and accurate representation of 4700 36th

20  Avenue Southwest?

21  A   Yes.

22          MS. CONNELLY:  At this time, I would move Government's

23  Exhibit 100 into evidence.

24          MR. NANCE:  No objection.

25          THE COURT:  Admitted.

1                    (Exhibit 100 was admitted.)

2               MS. CONNELLY:  May I publish, Your Honor?

3    Q    Approximately how many times did you visit this address in

4    person?

5    A    Approximately five or six times.

6    Q    And approximately what dates did you visit?

7    A    In May and June of 2020.

8    Q    Did you see the defendant at this address?

9    A    Yes.

10   Q    And what sort of activity did you find happening at the

11   address?

12   A    Over the hours that we were watching this address, we saw

13   probably about one or two patients arrive and depart.  And then

14   we saw Mr. Shibley come and go from this address.

15   Q    And how could you tell that Mr. Shibley was living at the

16   address?

17   A    We conducted surveillance late at night and early in the

18   morning, and it was pretty clear that, from pattern of life

19   activity, that he was living there.

20   Q    And as part of the investigation, did you also review the

21   bank records related to Mr. Shibley?

22   A    Yes.

23   Q    And what did you find as a result of that review?

24   A    We found that this address was on all of the bank records.

25   Q    Great.

1    As part of your investigation, did you learn that Mr. Shibley

2    was the registered agent of certain businesses in the state of

3    Washington?

4    A    Yes.

5    Q    And did you collect evidence related to those businesses from

6    the Washington Secretary of State?

7    A    Yes.

8         MS. CONNELLY:  At this time, I would move into evidence

9    Government's Exhibits 70 through 75, pursuant to a business

10   records certification.

11        MR. NANCE:  No objection.

12        THE COURT:  Admitted.

13             (Exhibit Nos. 70 - 75 admitted.)

14        MS. CONNELLY:  And may I publish those, Your Honor?

15        THE COURT:  Yes.

16   Q    Thank you.

17        So we're looking at Government's Exhibit 70.  What is this

18   exhibit?

19   A    This exhibit are records received from Washington State

20   Secretary of State for Dituri Construction LLC.

21   Q    And the first page, what is this document?

22   A    This is the certificate of formation for Dituri Construction.

23   Q    What does it show?

24   A    It shows that it was filed on January 2nd, 2020.

25   Q    And does that mean that Dituri Construction was formed on

1    January 2nd, 2020?

2    A    Yes.

3    Q    And if we could look at page 4 of Government's Exhibit 70,

4    please.  What is this document?

5    A    This is an initial report for Dituri Construction.

6    Q    And if we could look at page 5 of Government's Exhibit 70.

7    Who was the governor who was listed on the original initial

8    report?

9    A    Thomas Dituri.

10   Q    And turning to page 6 of Government's Exhibit 70, please,

11   what is this document?

12   A    This is a statement of change for Dituri Construction.

13   Q    When was it filed?

14   A    April 30th, 2020.

15   Q    And who was listed as the registered agent on April 30th,

16   2020?

17   A    Eric Shibley.

18   Q    And turning to page 10 of the exhibit, what is this document?

19   A    This is an amended certificate of formation for Dituri

20   Construction.

21   Q    What date was it filed?

22   A    May 5th, 2020.

23   Q    And what is an amended certificate of formation?  What is

24   that doing?

25   A    It is amending the initial certificate of formation.

1  Q   And turning to the attachment, to the amended certificate of

2  formation, which is found on page 13 of Government's Exhibit 70;

3  what is this document?

4  A   The operating agreement for Dituri Construction.

5  Q   And if we look at the signature page, which is found on the

6  last page of the exhibit, what does the signature page of the

7  operating agreement show?

8  A   It's signed by Eric Shibley and Thomas Dituri, and it shows

9  that Eric Shibley owns 90 percent of the LLC, and Thomas Dituri

10 owns 10 percent.

11 Q   What was the date?

12 A   It was May 5th, 2020.

13 Q   I'm sorry, what's the date on the operating agreement,

14 Special Agent?

15 A   I'm sorry, it was January 7th, 2020.

16 Q   Thank you.  And if we could turn to Government's Exhibit 72,

17 which are the documents from the Secretary of State for SS1 LLC.

18 On page 1 of this exhibit, what is this document?

19 A   This is the certificate of formation for SS1 LLC.

20 Q   When was this filed?

21 A   October 3rd, 2017.

22 Q   And moving to page 4 of this exhibit, if we could, what is

23 this document?

24 A   This is a letter from the Secretary of State that's regarding

25 administrative dissolution of SS1.

1    Q    And what is date of this document?

2    A    March 3rd, 2020.

3    Q    What does it mean to be administratively dissolved?

4    A    If the entity is not complying with the annual filing

5    requirements, then they can be administratively dissolved.

6    Q    Does that mean that they're basically no longer in good

7    standing with the state?

8    A    Yes.

9    Q    And looking at page 5 of Government's Exhibit 72, what is

10   this document?

11   A    This is a statement of reinstatement for SS1 LLC.

12   Q    And what date was SS1 LLC reinstated?

13   A    April 6th, 2020.

14   Q    And who was the registered agent?

15   A    Eric Shibley.

16   Q    Turning to Government's Exhibit 75, what is this exhibit?

17   A    This is a certificate of formation for the A Team Holdings

18   LLC.

19   Q    Does Government's Exhibit 75 contain all the documents

20   related to the A Team Holdings, for the Secretary of State?

21   A    Yes, it does.

22   Q    And when was A Team Holdings formed?

23   A    This was filed on December 10th, 2018.

24   Q    And looking at page 6 of this exhibit, what is this document?

25   A    This is a notice from the Secretary of State of a delinquent

 1  annual report.

 2  Q    And what date was that filed?

 3  A    January 1st, 2020.

 4  Q    What is this document informing the A Team Holdings of?

 5  A    That they had not filed their annual report for the year

 6  2019, and if they continued to fail to file, and if they don't

 7  file it by April 30th, 2020, that the LLC will be dissolved or

 8  terminated.

 9  Q    Okay.  And turning to page 7 of this exhibit.  What is this

10  document?

11  A    The annual report for the A Team Holdings.

12  Q    What date was this document filed?

13  A    March 31st, 2020.

14  Q    And what was the nature of the business listed?

15  A    It's real property investment.

16  Q    And turning to the next page of this document, who was the

17  registered agent?

18  A    Eric Shibley.

19  Q    And looking under controlling interest, Question No. 1 asked:

20  Does your entity own real property, such as land or buildings?

21  And what is answered for that?

22  A    The answer to that question was, "No."

23  Q    Moving to Government's Exhibit 74, what is this exhibit?

24  A    These are records provided by the Secretary of State for

25  Seattle's Finest Cannabis LLC.

1    Q    And on page 1, what do we have?

2    A    And this is the certificate of formation for Seattle's Finest

3    Cannabis.

4    Q    What is date of formation for Seattle's Finest Cannabis?

5    A    November 3rd, 2017.

6    Q    And turning to page 7 of the exhibit, if we could.  What is

7    this document?

8    A    This is an amended certificate of formation.

9    Q    And what date is this filed?

10   A    May 13th, 2020.

11   Q    And what does it say?

12   A    It's for SFC LLC.

13   Q    And so is it updating the name to SFC LLC?

14   A    Correct.

15   Q    How can you tell that?

16   A    Seattle's Finest Cannabis and SFC LLC, both have the same UBI

17   number.

18   Q    What is a UBI number?

19   A    It's a number issued by the state of Washington for

20   businesses.

21   Q    And turning to the second page of the amended certificate,

22   who was the registered agent?

23   A    Eric Shibley.

24   Q    And, finally -- or, not finally, I'm sorry, looking at

25   Government's Exhibit 73, what is this exhibit?

1    A    These are documents received from the Secretary of State for

2    ES1 LLC.

3    Q    And on page 1, what is this document?

4    A    This is the certificate of formation for ES1 LLC.

5    Q    When was it filed?

6    A    It was filed October 25th, 2012.

7    Q    Looking at page 5 of this exhibit, what is this document?

8    A    This is the annual report for ES1 LLC.

9    Q    And what is the date of this annual report?

10   A    February 4th, 2020.

11   Q    And who was the registered agent?

12   A    Eric Shibley.

13   Q    And moving on to Government's Exhibit 71, if we could, Mr.

14   Arnold, what is this exhibit?

15   A    These are records received from the Secretary of State for

16   Eric R. Shibley MD, PLLC.

17   Q    And what is page 1?

18   A    It's the certificate of formation.

19   Q    And when was the company formed?

20   A    December 12th, 2012.

21   Q    And turning to page 4 of the exhibit.  What is this document?

22   A    This is the annual report for Eric R. Shibley MD, PLLC.

23   Q    When was it filed?

24   A    March 31st, 2020.

25   Q    Who was the registered agent as of March 31, 2020?

 1   A    Eric Shibley.

 2   Q    Great.  I'm going to unpublish.

 3        As part of your investigation, did you collect and review

 4   phone records?

 5   A    Yes, we did.

 6   Q    So I'm going to show the witness Government's Exhibit 68, if

 7   we can.  Where did this record come from?

 8   A    This record was provided by T-Mobile.

 9   Q    What phone number is it for?

10   A    It's for 206-771-7868.

11        MS. CONNELLY:  At this time, I would move Government's

12   Exhibit 68 into evidence as a business record.

13        MR. NANCE:  No objection.

14        THE COURT:  Admitted.

15                    (Exhibit No. 68 admitted.)

16        MS. CONNELLY:  If we can publish, Your Honor.

17   Q    Whose phone number was this phone number?

18   A    Mr. Shibley's phone number.

19   Q    How can you tell that?

20   A    The billing information.  It says ES1 LLC, and the address is

21   Mr. Shibley's address.

22   Q    Thank you.

23        And now I will take that down.  If we could show the witness

24   Government's Exhibit 69.  Where did this record come from?

25   A    This record was provided by Comcast.

1    Q    And is this a record for one of the phone numbers that you

2    collected?

3    A    Correct.

4    Q    Whose, or what phone number is this?

5    A    It's -- the subscriber is Shibley Medical.

6    Q    What phone number is it?

7    A    I'm sorry, it's 206-938-4291.

8              MS. CONNELLY:  If we could move into evidence as a

9    business record Government's Exhibit 69.

10             MR. NANCE:  No objection.

11             THE COURT:  Admitted.

12                      (Exhibit No. 69 admitted.)

13             MS. CONNELLY:  Permission to publish, Your Honor.

14   Q    And so whose number was this number?

15   A    The subscriber is Shibley Medical.

16   Q    So is that Eric Shibley's phone number?

17   A    Correct.  And his address.

18   Q    Okay.  I will take that down.

19         As part of your investigation, did you also collect and

20   review IP address information related to the defendant?

21   A    Yes.

22   Q    What is an IP address?

23   A    An IP address is an address that identifies a device on an

24   internet.  The address is assigned to the device by the

25   internet-service provider.

1  Q    So I'm showing you Government's Exhibit 62.  What is this

2  document?

3  A    Records provided by Comcast.

4  Q    Are they IP address records from Comcast?

5  A    Correct.

6        MS. CONNELLY:  And so at this time, I would move

7  Government's Exhibit 62 in as a business record.

8        MR. NANCE:  No objection.

9        THE COURT:  Admitted.

10              (Exhibit No. 62 admitted.)

11       MS. CONNELLY:  Permission to publish, Your Honor.

12 Q    So looking at this letter, the bold bulleted points in the

13 middle.  Are those the IP addresses that you sought subscriber

14 information for?

15 A    Yes.

16 Q    And who was the subscriber for these two IP addresses?

17 A    Shibley Medical.

18 Q    What was the subscriber's address?

19 A    It's 4700 36th Avenue Southwest, Seattle, Washington.

20 Q    Is that Mr. Shibley's address?

21 A    Correct.

22 Q    Is that within Washington State?

23 A    Yes.

24 Q    I will take that down.

25      As part of your investigation, did you also collect and

1    review e-mail subscriber records?

2    A    Yes, we did.

3    Q    And have you reviewed Government's Exhibits 63 through 67

4    before your testimony today?

5    A    Yes.

6    Q    Are those the e-mail subscriber records that you collected?

7    A    Correct.

8    Q    What do those exhibits show?

9    A    They showed Mr. Shibley's e-mail addresses.

10            MS. CONNELLY:  Okay.  At this time, I would move in

11   Government's Exhibit 63 through 67 as business records.

12            MR. NANCE:  No objection.

13            THE COURT:  Admitted.

14                (Exhibit Nos. 63 - 67 admitted.)

15   Q    And so again, what are Government's Exhibits 63 through 67?

16   A    They're records we obtained from internet service providers

17   for e-mail addresses belonging to Mr. Shibley.

18   Q    And did Mr. Shibley have five e-mail addresses that he

19   controlled?

20   A    Correct.

21   Q    So now we're going to start talking about the PPP and EIDL

22   applications that were submitted in this case.

23        Have you reviewed Government's Exhibits 1 through 26 before

24   your testimony today?

25   A    Yes.

 1   Q   And what are they?

 2   A   Those are the PPP applications, and the supporting documents

 3   for those applications.

 4           MS. CONNELLY:  At this time, I would move in

 5   Government's Exhibits 1 through 26 as business records.

 6           MR. NANCE:  No objection.

 7           THE COURT:  Admitted.

 8               (Exhibit Nos. 1 - 26 admitted.)

 9           MS. CONNELLY:  And, Your Honor, may I publish them now

10   that they're admitted?

11   Q   So I'm going to show the court and the witness and the jury

12   what's been marked -- or, actually, I apologize.  I'm going to

13   show the witness what's been marked as Government's Exhibit 205.

14       Do you recognize this document?

15   A   Yes.

16   Q   What is it?

17   A   It's a summary of all of Mr. Shibley's PPP applications.

18   Q   And how many pages is the document of Government's

19   Exhibit 205?

20   A   It's two pages.

21   Q   Can we scroll through it for the witness?

22       Do you remember reviewing Government's Exhibit 205?

23   A   Yes.

24   Q   Do you remember how many pages it contains?

25   A   I'm sorry, I don't recall the total number of pages.  But

 1    it's a little more than two.

 2    Q    Okay.  Did you assist in the preparation of Government's

 3    Exhibit 205?

 4    A    Yes.

 5    Q    And how did you assist in the preparation of Government's

 6    Exhibit 205?

 7    A    I reviewed and confirmed all of the information that's

 8    included in the exhibit.

 9    Q    And what exhibits are Government's Exhibit 205 based off of?

10    A    The PPP applications.

11    Q    Are they based on other applications as well?

12    A    The EIDL applications as well.

13    Q    Have you reviewed Government's Exhibits 1 through 39 as part

14    of your investigation?

15    A    Yes.

16    Q    And so is the information found in Government's Exhibit 205

17    accurate?

18    A    Yes.

19    Q    Does Government's Exhibit 205 fairly and accurately summarize

20    the documents in Government's Exhibits 1 through 39?

21    A    Yes.

22         MS. CONNELLY:  At this time, I would move to admit

23    Government's Exhibit 205, pursuant to Rule 1006.

24         MR. NANCE:  Yeah.  Unless the summary contains

25    duplications, if the witness could clarify that, whether there's

1  anything duplicative about the summary.

2        MS. CONNELLY:  Of what?

3        THE COURT:  Counsel, address your comments to me.

4        MS. CONNELLY:  Yes.  I apologize.

5        THE COURT:  Do you understand what he's asking?

6        MS. CONNELLY:  Well, some of the applications themselves

7  were duplicative.  The information was similar, on separate

8  applications.  Is that the question?

9        MR. NANCE:  Well, I'm concerned that the summary might

10 overstate the number of applications.

11       MS. CONNELLY:  No, it does not.

12       MR. NANCE:  Okay.  Thank you.

13       THE COURT:  It will be admitted.

14             (Exhibit No. 205 admitted.)

15       MS. CONNELLY:  Your Honor, may we move to publish?

16       THE COURT:  Yes.

17 Q   So we're looking at Slide 1 of Government's Exhibit 205.

18 What is this chart?

19 A   This chart is a summary of the PPP applications, by entity.

20 Q   And how many pages is it?

21 A   It's two pages.

22 Q   Can you walk us through the information that's represented on

23 this slide?

24     And, Mr. Arnold, if we could just blow up the top part.

25 Thank you.

1   A    It shows the lender, the entity that applied for the PPP

2   loan, the EIN number, the manager, the monthly payroll that was

3   listed, the loan amount that was applied for, the number of

4   employees that was listed, the answer to question No. 5, the

5   application date, and the grand jury exhibit number.

6   Q    By grand jury exhibit number, do you mean government's

7   exhibit number?

8   A    Yes.

9   Q    And just so -- remind the jury what is Question 5 on the PPP

10  application?

11  A    Question 5 asked, among other things, whether the applicant

12  was on probation or parole.

13  Q    Where did the information on this chart come from?

14  A    It came from the PPP applications themselves.

15  Q    So if we could zoom back out, Mr. Arnold.

16       How is this chart organized?

17  A    This chart is organized by entity.

18  Q    And what do the rows in bold red text signify?

19  A    Those are the counts that were charged in indictment.

20  Q    And who is the manager that's listed on every single PPP

21  application?

22  A    Eric Shibley.

23  Q    So we're going to turn back from Government's Exhibit 205 and

24  take some time to focus on certain of these loans, and look at

25  the underlying documents.  If that's okay, Special Agent Moran,

 1    let's focus on line 1 of this chart.

 2        What loan is this for?

 3    A   This is for a loan in the name of A Team Holdings LLC.

 4    Q   During your investigation -- and who was the loan submitted

 5    to?

 6    A   ReadyCap Customer's Bank.

 7    Q   During your investigation, did you learn that Ready Capital

 8    and Customer's Bank had a relationship with respect to the PPP?

 9    A   Yes.

10    Q   And what was it?

11    A   Ready Capital accepted and processed the PPP applications.

12    And then at some point Customer's Bank took over the actual

13    funding of the loans.

14    Q   And so who was the manager listed on this application?

15    A   Eric Shibley.

16    Q   What was the average monthly payroll listed?

17    A   $384,000.

18    Q   And what was the loan request?

19    A   For $960,000.

20    Q   How many employees did he claim on the A Team Holdings?

21    A   Forty-eight.

22    Q   And what was the date of this application?

23    A   It was April 12th, 2020.

24    Q   And what exhibit is the paperwork for the loan found at?

25    A   No. 1.

1    Q    And so if we could turn to Government's Exhibit 1, which has

2    already been entered into evidence.  What is Government's

3    Exhibit 1?

4    A    This is the application form for A Team Holdings LLC.

5    Q    And if we could look at certain portions, what starts on

6    page 1 of Government's Exhibit 1?

7    A    This is the actual application page.

8    Q    And at some point did Dr. Shibley send an updated version of

9    this application to Ready Capital?

10   A    Yes.

11   Q    And if we could turn to page 9 of Government's Exhibit 1.

12   What starts on page 9 of Government's Exhibit 1?

13   A    This is the 941 that Mr. Shibley submitted, along with the

14   application.

15   Q    And just generally speaking, what are 941s?

16   A    They're quarterly forms that the employer files with the IRS

17   that reports wages and payroll taxes.

18   Q    And so why would a business submit them?

19   A    To report to the IRS what they had paid in wages and the

20   payroll taxes.

21   Q    And how often are they filed?

22   A    On a quarterly basis.

23   Q    So does that mean they're filed four times a year?

24   A    Correct.

25   Q    And so if we could look at the top part of this 941, I know

1    it's small, what quarter is this 941 for?

2    A    This is the fourth quarter of 2019.

3    Q    And looking at line 1, how many employees did the 941 claim

4    that A Team Holdings had?

5    A    Forty-eight.

6    Q    And on line 2, how much in wages did it claim to pay those

7    employees?

8    A    $975,000.

9    Q    And how much federal income tax was withheld on those wages,

10   according to the 941, on line 3?

11   A    Zero dollars.

12   Q    And at lines 5A through 5D, towards the bottom.  What does

13   that represent?

14   A    It shows the taxable social security and Medicare that's

15   withheld and what the employer contributes.

16   Q    Are federal income taxes and the social security and Medicare

17   taxes different?

18   A    Yes.

19   Q    If we could pull back out, Mr. Arnold.

20        Looking at line 14.  What is the balance due?

21   A    $149,175.

22   Q    And what does a balance on a 941 represent?

23   A    It represents what the business owes the IRS.

24   Q    Turning to the second page of the 941, if we could look at

25   part two, Mr. Arnold, at the top.

 1       What is part two on a 941 about?

 2  A    This shows whether the business is a monthly depositor or a

 3  semiweekly depositor.

 4  Q    What does it mean to a monthly versus a semiweekly depositor?

 5  A    It's how often the business deposits what they owe with the

 6  IRS, whether it's monthly or semiweekly.

 7  Q    Do businesses pay taxes as they go along?

 8  A    Correct.

 9  Q    And what does Mr. Shibley claim to be on this 941?

10  A    He claims to be a monthly depositor.

11  Q    Okay.  And moving to page 12 of this exhibit.  What is this

12  document?

13       We can zoom in on the top part.

14  A    This is a 941 for A Team Holdings, for the first quarter of

15  2020.

16  Q    And was this also submitted to Ready Capital as part of the A

17  Team Holdings loan?

18  A    Yes.

19  Q    And how much in wages for the first quarter of 2020 is the

20  company claiming?  Yeah, if we could.  Thank you, Mr. Arnold.

21  A    $768,000.

22  Q    And so in Government's Exhibit 1, are there other documents

23  in Government's Exhibit 1 that Mr. Shibley submitted as

24  supporting documentation?

25  A    Yes.

 1    Q    What sorts of things did he submit?

 2    A    He submitted Secretary of State records, copy of his driver's

 3    license, a copy of a voided check, sometimes W-3s.  I'm not sure

 4    if it's in this exhibit or not.

 5    Q    So is that the type of supporting documentation that's found

 6    with most of the loan applications in Government's Exhibits 1

 7    through 26?

 8    A    Yes.

 9    Q    Turning to page 31 of Government's Exhibit 1.  What is this

10    document?

11    A    This is the loan note.

12    Q    And who was it with?

13    A    A Team Holdings LLC.

14    Q    Who is the lender?

15    A    ReadyCap Lending.

16    Q    And so can you just explain for the jury, what is a loan

17    note?

18    A    It lays out the terms of the loan.  And it's the borrower's

19    promise to repay, as well.  And it's signed by the borrower.

20    Q    And what is the date of this loan note?

21    A    April 23rd, 2020.

22    Q    And how much was the loan for?

23    A    $960,000.

24    Q    And was that the amount that was applied for?

25    A    Correct.

1    Q    Looking at page 3 of the loan note, which is page 33 of

2    Government's Exhibit 1.  If we could look at these certifications

3    under paragraph 11.  What are these?

4    A    These are items that -- or things that the borrower certifies

5    or agrees are true and correct when they sign the note.

6    Q    So what sorts of things was Mr. Shibley certifying to?

7    A    That the information -- what the proceeds of the loan are

8    going to be used for, what they aren't going to be used for, that

9    they will correct any errors.

10   Q    Was he also certifying that everything in the application

11   form was true and accurate and remained true and accurate?

12   A    Yes.

13   Q    Turning to page 4 of the loan note.  Did Mr. Shibley sign

14   this loan note?

15   A    Yes.

16   Q    And if we could come back out, Mr. Arnold.

17        And looking at the DocuSign envelope ID that's in corner,

18   what is the DocuSign ID?

19   A    It's a unique identifier for the digital signature.

20   Q    Okay.  And looking at page 37 of this exhibit, what is this

21   document?

22   A    This is the DocuSign document that records the digital

23   signature for which the note was signed.

24   Q    And how can you tell when a DocuSign certificate relates to a

25   document?

1    A    The identifier that is at the top of the document, is also on

2    the certificate of completion here.

3    Q    And where is it on this the certificate of completion, if you

4    can just --

5    A    It's at the top of the envelope ID.

6    Q    And does this envelope ID match the envelope ID we saw on the

7    loan note?

8    A    Yes.

9    Q    If we can come back out, Mr. Arnold, and look into the signer

10   events in the middle.

11        What does this section of the certificate tell you?

12   A    This shows who signed the loan note.

13   Q    And who signed the loan note in this case?

14   A    Eric Shibley.

15   Q    Is shibleymedical@outlook.com one of the e-mail addresses you

16   found was controlled by Mr. Shibley?

17   A    Yes.

18   Q    Does the IP address that you see here correspond with the IP

19   addresses of Mr. Shibley that we looked at earlier?

20   A    Yes.

21   Q    When was this signed?

22   A    April 23rd, 2020.

23   Q    Turning to page 41 of the exhibit, if we could.  What is this

24   document?

25   A    This is a loan note between A Team Holdings and Customer's

 1   Bank.

 2   Q    So why was there a second loan note for this loan?

 3   A    As I mentioned earlier, Customer's Bank took over the funding

 4   of the PPP application to Ready Capital.  So they required a

 5   second note with them.

 6   Q    And so when was the date of this loan note?

 7   A    April 30th, 2020.

 8   Q    And, again, how much was the loan for?

 9   A    $960,000.

10   Q    Was that the same as the ReadyCap loan note?

11   A    Correct.

12   Q    It was the same amount as the loan applied for?

13   A    Correct.

14   Q    Does it have the same SBA loan number?

15   A    Yes.

16   Q    And is that how you can tell they're related loan notes?

17   A    Yes.

18   Q    And looking at page 3 of the Customer's Bank loan note, and

19   looking at paragraph 11, does this loan note also contain

20   certifications?

21   A    Yes.

22   Q    And are they the same certifications as for the ReadyCap loan

23   note?

24   A    Yes.

25   Q    Turning to page 4 of the loan note.  Did Mr. Shibley also

 1  sign the Customer's Bank loan note?

 2  A   Yes.

 3  Q   And moving on to page 45 of the exhibit.  What is this

 4  document?

 5  A   This is the DocuSign document that recorded the digital

 6  signature for that loan note.

 7  Q   And looking at the signer events.  What does this tell you?

 8  A   That Eric Shibley signed this loan note.

 9  Q   When was it signed?

10  A   April 30th, 2020.

11  Q   Okay.  We can come back out.  I'm going to publish.

12      Was this loan funded?

13  A   Yes.

14  Q   I'm going to show the witness Government's Exhibit 104, if we

15  can.  What is this document?

16  A   This is a bank account statement for the A Team Holdings LLC

17  from Wells Fargo.

18          MS. CONNELLY:  And so at this time, I would move in

19  Government's Exhibit 104 as a business record.

20          MR. NANCE:  No objection.

21          THE COURT:  Admitted.

22                  (Exhibit No. 104 admitted.)

23          MS. CONNELLY:  May I publish, Your Honor?

24          THE COURT:  Yes.

25  Q   If we could turn to the next page of Government's

 1   Exhibit 104, Mr. Arnold, and look in this table.

 2       Can you tell, from this bank statement, what date the

 3   Customer's Bank loan was funded?

 4   A   It was funded May 4th, 2020.

 5   Q   And where is that on this?  Is that the third line on this?

 6   A   The third line down, correct.

 7   Q   And how much was sent to Mr. Shibley's A Team Holdings

 8   account?

 9   A   $960,000.

10   Q   And what happened to the money after this?

11   A   It was transferred to another account.

12   Q   I am going to unpublish.  And if we could show the witness

13   Government's Exhibit 105.

14       What is this?

15   A   This is a savings bank account statement from Wells Fargo for

16   the A Team Holdings LLC.

17   Q   Is this the bank account that the $960,000 was transferred

18   into?

19   A   Correct.

20           MS. CONNELLY:  I would move to admit Government's

21   Exhibit 105 as a business record.

22           MR. NANCE:  No objection.

23           THE COURT:  Admitted.

24                   (Exhibit No. 105 admitted.)

25           MS. CONNELLY:  May I publish, Your Honor?

 1              THE COURT:  Yes.

 2   Q   If we could turn to page 2 of Government's Exhibit 105, and

 3   look at the transactions table.

 4       What date was the $960,000 moved into this account?

 5   A   May 4th, 2020.

 6   Q   And did Mr. Shibley use any of the funds, after he

 7   transferred the money?

 8   A   Yes.  He withdrew $150,000 in cash.

 9   Q   And what date did he do that?

10   A   On May 26th, 2020.

11   Q   And looking at the May 27th line.  What happened to the rest

12   of the money?

13   A   We seized the remaining funds.

14   Q   And how did you seize the remaining funds?

15   A   With a seizure warrant.

16   Q   If we could turn back to Government's Exhibit 205, the

17   summary chart that we started with.  If we would move to page 2

18   of the summary chart, and look at line 19 of the chart.

19       What loan is this?

20   A   This is an application by Seattle's Finest Cannabis LLC.

21   Q   And who did the application go to?

22   A   To TCF.

23   Q   And, again, who was the manager?

24   A   Eric Shibley.

25   Q   And what was the average monthly payroll listed?

1    A    $40,000.

2    Q    And what was the loan amount requested?

3    A    $100,000.

4    Q    And how many employees did he claim?

5    A    Six.

6    Q    And what was the answer for Question No. 5?

7    A    It was, "No."

8    Q    What was the date of this application?

9    A    April 25th, 2020.

10   Q    And what exhibit is the paperwork for the loan found at?

11   A    Exhibit 2.

12   Q    And if we could pull up Government's Exhibit 2, which has

13   already been offered into evidence.

14          THE COURT:  Let's take a moment and let the jury stand

15   up and stretch.

16          MS. CONNELLY:  Okay.

17          THE COURT:  All right.  That was as much for me as it

18   was for you.

19   Q    And so if we could pull up Government's Exhibit 2.  What is

20   contained in Government's Exhibit 2?

21   A    This is the loan application and the supporting documents.

22   Q    For the Seattle's Finest Cannabis loan?

23   A    Correct.

24   Q    And so what's on page 1 of this exhibit?

25   A    This is the application form.

1    Q    And does that contain all the same information we just went

2    over in the summary chart?

3    A    Correct.

4    Q    Turning to page 3 of the application.  Did Mr. Shibley sign

5    this application?

6    A    Yes.

7    Q    And what is the date that he signed the application?

8    A    April 25th, 2020.

9    Q    And looking at page 6 of this exhibit.  What is found here?

10   A    This is the 941 that Mr. Shibley submitted with the

11   application.

12   Q    If we could turn to the last page of this exhibit, which is

13   page 30.  What is this document?

14   A    This is a letter from TCF Bank, denying the loan application.

15   Q    And what's the date that this loan application for Seattle's

16   Finest Cannabis was denied?

17   A    May 4th, 2020.

18   Q    And what does that mean?

19   A    It means the loan was not funded.

20   Q    And just looking at the top two logos, do you know why TCF

21   Bank and Chemical Bank are listed at the top?

22   A    Chemical Bank is a division of TCF Bank.

23   Q    And so turning back to the summary chart, at Government's

24   Exhibit 205, if we could look at line 3 of this chart.

25        What loan does this represent?

 1   A    This is an application to Ready Capital, Customer's Bank, by

 2   Dituri Construction LLC.

 3   Q    And what was the average monthly payroll that was listed?

 4   A    $392,000.

 5   Q    And what was the loan amount requested?

 6   A    $980,000.

 7   Q    And how many employees did he claim on this loan?

 8   A    Forty-nine.

 9   Q    And what was the answer for Question No. 5?

10   A    It was, "No."

11   Q    What was the date of the application?

12   A    May 2nd, 2020.

13   Q    And what exhibit is the paperwork for this loan found at?

14   A    Exhibit 3.

15   Q    If we could look at Government's Exhibit 3, please.

16        If we could start at page 1.  What's on page 1 of this

17   exhibit?

18   A    This is the application form.

19   Q    And looking at page 2 of this exhibit, if we could zoom in on

20   the bottom portion, Mr. Arnold.  Did Mr. Shibley sign this

21   exhibit, or sign this application?

22   A    Yes, he did.

23   Q    And looking at page 5 of the exhibit.  What is this?

24   A    This is the DocuSign document that records the digital

25   signature.

1  Q    And if we could just look at the signer events, quickly.

2  What does this show?

3  A    This shows that Mr. Shibley was the one who signed it.

4  Q    And was shibley98126@gmail.com one of the e-mail addresses

5  that you found was associated with Mr. Shibley?

6  A    Yes.

7  Q    Was this IP address one of his e-mail addresses?

8  A    Yes.

9  Q    And what is the date that this document was DocuSigned?

10  A    May 2nd, 2020.

11  Q    If we could turn to page 10 of the exhibit.  What's found at

12  -- what is this document?

13  A    This is the Form 941 for Dituri Construction that was

14  submitted with the application.

15  Q    And if we could move back to the summary chart at

16  Government's Exhibit 205, and focus on line 2.  What loan does

17  this represent?

18  A    This is a loan application from Dituri Construction LLC to

19  Celtic Bank.

20  Q    And what was the average monthly payroll listed on this

21  Dituri Construction application?

22  A    $225,400.

23  Q    And what was the loan request?

24  A    $563,500.

25  Q    And how many employees did he claim?

1    A    Forty-nine.

2    Q    And what was the answer for Question 5?

3    A    It was, "No."

4    Q    And what was the date of this application?

5    A    April 30th, 2020.

6    Q    And if we could just briefly, Mr. Arnold, zoom in on both

7    lines two and three of Government's Exhibit 205.

8         Do lines two and three both represent loans submitted by Mr.

9    Shibley for Dituri Construction?

10   A    Yes.

11   Q    And how do they compare?

12   A    The monthly payroll amount is different.

13   Q    How much is it different by?

14   A    Over $100,000, at least.

15   Q    And how long passed between these two explanations being

16   submitted?

17   A    It was a couple of days.

18   Q    And so turning back to focus on the Celtic Bank Dituri

19   Construction loan, found at line 3, what exhibit is the paperwork

20   for the loan found at?

21   A    Exhibit 4.

22   Q    And so I'm going to show you what's already been entered into

23   evidence as Government's Exhibit 4.  And what is on page 1 of

24   this exhibit?

25   A    This is the application form, for Dituri Construction LLC.

1   Q    And does it have all the same information that was on the

2   summary chart?

3   A    Yes.

4   Q    And if we could turn to page 3 of this application, did Mr.

5   Shibley sign the application?

6   A    Yes.

7   Q    And turning to page 17 of the exhibit, what is found here?

8   A    This is the 941 for Dituri Construction that was submitted

9   with the application.

10  Q    And what quarter is it for?

11  A    The first quarter of 2020.

12  Q    Do you remember that we just looked at a 941 submitted with

13  the Ready Capital application?

14  A    Yes.

15  Q    Do the 941s match?

16  A    No.

17  Q    If we could publish both Government's Exhibit 3, page 10, and

18  Government's Exhibit 4, page 10, or page 17, simultaneously, the

19  two 941s.

20       If we could look at the top portions of both of them, Mr.

21  Arnold, if that's possible.

22       So are these purportedly for the same time period?

23  A    Yes, they're both for the first quarter of 2020.

24  Q    And are they for the same company?

25  A    Yes.

1   Q   Do the companies have the same employer identification

2   number?

3   A   Yes.

4   Q   What's different about them?

5   A   The amount of wages is different.

6   Q   Have they been cut in half?

7   A   Yes.

8   Q   And, again, are these both supposed to be the 941s submitted

9   to the IRS for Dituri Construction in the first quarter of 2020?

10  A   Yes.

11  Q   So if we could just turn back to Government's Exhibit 4 and

12  the Dituri Construction loan submitted to Celtic Bank, Mr.

13  Arnold, and in particular turning to page 6 of this exhibit.

14  What is this document?

15  A   This is the loan note for the loan with Dituri Construction

16  LLC.

17  Q   And what's the date of this loan note?

18  A   May 4th, 2020.

19  Q   Who's the lender on this loan note?

20  A   Celtic Bank.

21  Q   And how much is the loan for?

22  A   $563,500.

23  Q   And if we could look at page 5 of the loan note, which is

24  page 10 of the exhibit.  If we could look at the zoomed text or

25  the bolded text through the signature, please, Mr. Arnold.

```
 1         Did Mr. Shibley sign this note?

 2    A    Yes, he did.

 3    Q    And does this certify that the information provided to get

 4    the loan was accurate?

 5    A    Yes.

 6    Q    And where is that statement on the --

 7    A    Right above the signatures.  "By signing, the borrower agrees

 8    that all the information provided in this application, and all

 9    supporting documents and forms to obtain the loan, are true and

10    accurate in all material respects, and that any known false

11    statements are punishable by fine, imprisonment, or both."

12    Q    And looking at page 11 of Government's Exhibit 4.  What is

13    this document?

14    A    This is the DocuSign record that recorded the digital

15    signature for the note and the application.

16    Q    And looking at the signer events, if we can.  Did Eric

17    Shibley also sign this note?

18    A    Yes, he did.

19    Q    And how can you tell?

20    A    It has his e-mail address and IP address.

21    Q    What was the date that the application and the loan note

22    package were DocuSigned and submitted to Celtic Bank?

23    A    May 4th, 2020.

24    Q    And was this loan funded?

25    A    Yes.
```

1    Q    I am going to unpublish.

2         I'm showing the witness what's been marked as Government's

3    Exhibit 106.  What is this document?

4    A    This is a bank statement from BECU for Dituri Construction

5    LLC.

6              MS. CONNELLY:  And at this time, I would move in

7    Government's Exhibit 106 as a business record.

8              MR. NANCE:  No objection.

9              THE COURT:  It's admitted.

10                   (Exhibit No. 106 admitted.)

11             MS. CONNELLY:  Permission to publish, Your Honor.

12   Q    If we could look at the bottom portion, Mr. Arnold.

13        What was the date that this loan was funded?

14   A    May 6th, 2020.

15   Q    And what did Mr. Shibley do with those funds?

16   A    He transferred them from the checking account to the savings

17   account.

18   Q    What date did he do that?

19   A    May 7th, 2020.

20   Q    And what eventually happened to the money, after Mr.

21   Shibley's transfers?

22   A    It was returned to Celtic Bank.

23   Q    Turning back to Government's Exhibit 205, the summary chart.

24   If we could look at the second page, and look at line 23.  What

25   loan does this represent?

1   A    This is a loan from -- to Harvest Bank from SS1 LLC.

2   Q    And what was the average monthly payroll listed on this loan?

3   A    $328,000.

4   Q    And what was the loan request?

5   A    $820,000.

6   Q    And how many employees did he claim?

7   A    Forty-one.

8   Q    What was the answer for Question 5 on the Harvest loan?

9   A    It was, "No."

10  Q    What was the date of this application?

11  A    April 20th, 2020.

12  Q    What exhibit is the paperwork for the loan found at?

13  A    Five.

14  Q    And if we could show Government's Exhibit 5, which has

15  already been entered into evidence, what's on page 1 of

16  Government's Exhibit 5?

17  A    This is the application form for SS1 LLC.

18  Q    And turning to page 2 of the application, if we could look at

19  the signature, is the application signed?

20  A    Yes.  By Eric Shibley.

21  Q    And if we could look at page 5 of the exhibit, what's found

22  at page 5 of Government's Exhibit 5?

23  A    This is the 941 for SS1 LLC for the first quarter of 2020,

24  and it was submitted with the application.

25  Q    Turning to page 7 of the exhibit, what is this document?

1   A    This is a W-3 form that was submitted with the application.

2   Q    Can you just explain, at a high level, what a W-3 is?

3   A    It summarizes all of the W-2 information, the wages paid to

4   employees, and it's submitted by the employer by an annual basis

5   to Social Security Administration.

6   Q    If we could turn to page 25 of Government's Exhibit 5.

7   Great.  What is this document?

8   A    This is the loan note between SS1 LLC and Harvest Small

9   Business Finance.

10  Q    What was the date of this loan note?

11  A    May 4th, 2020.

12  Q    Who's the lender on the note?

13  A    Harvest Small Business Finance.

14  Q    And how much was the loan for?

15  A    $820,000.

16  Q    Was that the amount that was applied for?

17  A    Yes.

18  Q    If we could just turn to page 7 of the loan note, Mr. Arnold.

19  Apologies, page 32 of the exhibit.  Thank you, Mr. Arnold.

20       If we could look at paragraph 12 and zoom in on that.  Did

21  the loan note contain certifications?

22  A    Yes.

23  Q    What are those certifications?

24  A    These are things that the borrower represents are true and

25  accurate, when they sign the note.

1   Q   And so in this case, did he represent that he was in

2   operation on February 15th, and had employees for whom he paid

3   salaries and payroll taxes?

4   A   Correct.

5   Q   Looking at page 9 of the loan note, which is page 34 of the

6   exhibit.  Did Mr. Shibley sign this loan note?

7   A   Yes, he did.

8   Q   I'm going to unpublish.

9       If we could show the witness Government's Exhibit 46.

10      How is the loan note transmitted to Harvest?

11  A   By e-mail from Mr. Shibley.

12  Q   And what is Government's Exhibit 46?

13  A   It's the e-mail exchange with Harvest, attaching the loan

14  note.

15      MS. CONNELLY:  At this time, I would move Government's

16  Exhibit 46 into evidence, pursuant to 902(11), 803(6) and

17  881(d)(2).

18      MR. NANCE:  I'm sorry, what is the connection, if I

19  could ask?  I mean, I think there's a foundation problem.

20  Objection, foundation.

21      THE COURT:  Lay additional foundation.

22      MS. CONNELLY:  Okay.

23  Q   Did Harvest provide business records, as part of your

24  investigation?

25  A   Yes.

1    Q   Was one of those business records provided in Government's

2    Exhibit 46?

3    A   Yes.

4    Q   Did Harvest provide a business records certification, along

5    with Government's Exhibit 46?

6    A   Yes.

7    Q   And does Government's Exhibit 46 contain an attachment?

8    A   Yes.

9    Q   If we could turn to page 2 of Government's Exhibit 46, and

10   show the witness the attachment.  What was attached to

11   Government's Exhibit 46?

12   A   It's the signed loan note.

13   Q   Was it the same signed loan note that we saw in Government's

14   Exhibit 5?

15   A   Yes.

16          MS. CONNELLY:  Move to admit.

17          THE COURT:  Have you supplied the certification to

18   counsel?

19          MS. CONNELLY:  Yes, Your Honor.

20          THE COURT:  Any objection, Mr. Nance?

21          MR. NANCE:  No, Your Honor.

22          THE COURT:  It will be admitted.

23                 (Exhibit No. 46 admitted.)

24   Q   If we could turn back to page 1 of the e-mail.

25          MS. CONNELLY:  Permission to publish, Your Honor.

1              THE COURT:  Yes.

2    Q    What is the date of this e-mail?

3    A    It's May 5th, 2020.

4    Q    And, again, what was attached to this e-mail?

5    A    The signed loan note.

6    Q    Was it the same loan note that we looked at in Government's

7    Exhibit 5?

8    A    Yes.

9    Q    And who sent this e-mail?

10   A    The e-mail address is Shibley Medical, and it's one of

11   Mr. Shibley's e-mail addresses.

12   Q    And was this phone -- or, was this loan funded?

13   A    Yes.

14   Q    If we can unpublish.

15        I'm showing the witness what's been marked as Government's

16   Exhibit 107, please.  What is this document?

17   A    This is a bank statement from BECU, for a bank account in the

18   name of SS1 LLC.

19             MS. CONNELLY:  At this time, I would move in

20   Government's Exhibit 107 as a business record.

21             MR. NANCE:  No objection.

22             THE COURT:  Admitted.

23                  (Exhibit No. 107 admitted.)

24             MS. CONNELLY:  Permission to publish, Your Honor.

25   Q    If we could look at the bottom-portion tables, please.  What

1   was the date that this loan was funded?

2   A   May 19th, 2020.

3   Q   And what was the amount that the loan was funded?

4   A   $820,000.

5   Q   And what did Mr. Shibley do with these funds?

6   A   He transferred it from the checking account, to the savings

7   account.

8   Q   What is the date that he transferred the money?

9   A   May 19th, 2020.

10  Q   And what happened to the money after these transfers?

11  A   It was returned to Harvest.

12  Q   Did Mr. Shibley communicate with Harvest, after the money was

13  returned to Harvest?

14  A   Yes.

15  Q   We can unpublish and take that down.

16      Showing the witness what's been marked as Government's

17  Exhibit 47.  What is Government's Exhibit 47?

18  A   These are e-mails exchanged between Harvest and Mr. Shibley.

19  Q   And was this e-mail provided by Harvest, during your

20  investigation?

21  A   Yes.

22      MS. CONNELLY:  I'd move Government's Exhibit 47 into

23  evidence.  Again, as a business record.

24      MR. NANCE:  Hearsay, Your Honor.  Just because it's a

25  business record, it's still someone else, someone else sending an

```
 1   e-mail.
 2            THE COURT:  Overruled.  It will be admitted.
 3                     (Exhibit No. 47 admitted.)
 4            MS. CONNELLY:  Thank you, Your Honor.  May I publish?
 5            THE COURT:  Yes.
 6   Q   If we could look at page 2 of this thread, to start.  And if
 7   we could look at the top portion, Mr. Arnold.
 8       What is the date of this portion of the thread?
 9   A   May 27th, 2020.
10   Q   And what is Mr. Shibley stating has happened?
11   A   He is talking about the money being returned to Harvest.
12   He's asking them to send it to another bank instead.
13   Q   Is shibleymedical@outlook.com one of Mr. Shibley's e-mail
14   addresses that you found?
15   A   Yes.
16   Q   If we would move back to page 1, Mr. Arnold.  And if we could
17   look at the top portion of this thread.
18       What does Mr. Shibley tell the Harvest representative?
19   A   He provides a cell phone number.  And then he says they
20   started a federal case.  And he provides a number.  It says,
21   "That's crazy.  I am dumbfounded."
22   Q   What was the date of this e-mail?
23   A   May 27th, 2020.
24   Q   Was that the day that you seized PPP money in Dr. Shibley's
25   accounts?
```

 1   A    Yes.

 2   Q    Was 20SZ33, the number of your seizure case?

 3   A    Correct.

 4   Q    So with both the Celtic Bank and the Harvest loans that were

 5   returned to the bank, did Mr. Shibley return that money himself?

 6   A    No.

 7   Q    Did the bank actually recall the money?

 8   A    Yes.

 9   Q    So if we could turn back to the summary exhibit found at

10   Government's Exhibit 205.

11        How many PPP loans were submitted by Mr. Shibley that are

12   found on this slide?

13   A    There's 26.

14   Q    And we have looked through Exhibits 1 through 5, and are not

15   going to look through all of the PPP loan documents that are the

16   basis for this slide, but have you reviewed Government's

17   Exhibits 6 through 26?

18   A    Yes.

19   Q    And can you just describe for the jury what is contained in

20   them?

21   A    They contain the information that is summarized here in this

22   chart.

23   Q    And do they all have paperwork supporting that information?

24   A    Yes.

25   Q    Do they all have a 941?

 1    A    I'm not sure if they all have the 941.

 2    Q    Is there a binder in front of you that contains those?

 3    A    Yes.

 4    Q    Do you want to look through that real quickly --

 5              MS. CONNELLY:  If that's okay, Your Honor.

 6    A    Yes, I see 941s for these applications in here.

 7    Q    Okay.  And do all of the exhibits also contain a loan

 8    application?

 9    A    Yes.

10    Q    Do all of the exhibits contain a loan note or a declination

11    letter?

12    A    No.

13    Q    And why wouldn't -- why isn't that?

14    A    Not all of the applications were processed to the point where

15    they received that.

16    Q    If we could turn to Slide 3 of the summary chart.  What is

17    found on Slide 3?

18    A    These are the EIDL applications, by entity.

19    Q    How many pages is it?

20    A    It's one page.

21    Q    And if you could just walk us through the information that's

22    represented on this slide.

23    A    It shows the entity that applied for the EIDL loan, the EIN,

24    or social security number, the manager, the loan amount that was

25    approved, the advance amount, the number of employees, the gross

1    revenues, the application number, the application date, and the

2    exhibit number.

3    Q    And why is there no lender listed on this chart?

4    A    Because the lender is the Small Business Administration.

5    Q    Why is there not a loan amount approved for every loan on

6    this chart?

7    A    Because the SBA is the one that calculates the loan amount

8    approved.

9    Q    Where did the information on this chart come from?

10   A    The information came from the applications and supporting

11   documents.

12   Q    And if we could zoom back out, Mr. Arnold.

13        What do the lines in bold red text signify?

14   A    Those are the counts that were charged in the indictment.

15   Q    If we could just briefly look at line one of this chart.

16   What application does this represent?

17   A    An application in the name of Dituri Construction LLC.

18   Q    And what was the date of this application?

19   A    June 7th, 2020.

20   Q    What exhibit is the paperwork for the loan found at?

21   A    Twenty-seven.

22   Q    If we could show what's already been entered into evidence as

23   Government's Exhibit 27.

24        Looking at page one of the exhibit.  What is this?

25   A    This is the application form.

1  Q   And just looking at the top, what IP address was used to

2  submit this application?

3  A   It's the IP address that starts with 2603.

4  Q   Was that one of the IP addresses associated with Mr. Shibley?

5  A   Correct.

6  Q   And was this loan funded?

7  A   Yes.

8  Q   If we could look at page 27 of the exhibit.  What is page 27

9  of the exhibit?

10 A   This shows the loan being funded, the funds being sent to the

11 Dituri Construction bank account at Verity Credit Union.

12 Q   Once it was funded, did Mr. Shibley try to withdraw money?

13 A   Yes.

14 Q   If we could turn back to the summary chart on the EIDL loans,

15 at page 3 of Government's Exhibit 205, please.

16     Looking at line 11 of this chart, what application does this

17 represent?

18 A   This is an EIDL application in the name of SS1 LLC.

19 Q   And what was the date of this application?

20 A   June 7th, 2020.

21 Q   And if we could just briefly look at both line 11 and line 1,

22 Mr. Arnold.

23     Looking at these together, how do they compare?

24 A   The gross revenues are exactly the same.  And they were

25 applied for on the same date.

1    Q    Did they also receive the same loan amount?

2    A    They received the same loan amount, yes.

3    Q    Turning back to government's -- or line 11.  What exhibit,

4    for the paperwork, is the paperwork for the SS1 loan found at?

5    A    Exhibit 28.

6    Q    If you could pull up what's already been entered into

7    evidence as Government's Exhibit 28, please.

8         What is page 1 of the Government's Exhibit 28?

9    A    This is the loan application for SS1 LLC.

10   Q    And just looking at the top portion, what IP address was used

11   to submit this application?

12   A    The same IP address starting with 2603, that comes back to

13   Mr. Shibley.

14   Q    And was this loan funded?

15   A    Yes.

16   Q    Looking at page 27 of Exhibit 28.  What is this document?

17   A    This document shows the funds being sent to a Verity Credit

18   Union account, in the name of SS1 LLC.

19   Q    And once the loan was funded, did Mr. Shibley try to withdraw

20   money?

21   A    Yes.

22   Q    If we could turn back to Government's Exhibit 205 and look at

23   Slide 4 now, please.

24        What is shown on Slide 4 of Government's Exhibit 205?

25   A    This shows the PPP and EIDL applications for Dituri

1    Construction LLC.

2    Q    And how many pages is it?

3    A    It's one page.

4    Q    Can you walk us through the information that's represented on

5    this slide?

6    A    At the top it shows the applications, the PPP applications.

7    And at the bottom are the EIDL applications.

8    Q    Are there differences in the PPP loans that were submitted?

9    A    Yes.

10   Q    What are those differences?

11   A    The loan amount applied for is different among the PPP loans,

12   and the monthly payroll amount is different.

13   Q    And looking at the EIDL applications, what was the gross

14   revenues for each of these?

15   A    One of them had gross revenues of $850,000, and one had gross

16   revenues of zero.

17   Q    If we could turn to Slide 5 of Government's Exhibit 205.

18   What is this chart?

19   A    These are the PPP and EIDL applications for SS1 LLC.

20   Q    And can you walk us through the information that's

21   represented on this slide?

22   A    Again, at the top are the PPP applications for SS1 LLC, and

23   at the bottom are the EIDL applications.

24   Q    And looking at the EIDL applications at the bottom, what are

25   the differences?

1   A   The gross revenues are different between the two

2   applications.

3   Q   And how far apart in time were these two applications

4   submitted?

5   A   About a week apart.

6   Q   Do the PPP and EIDL applications also contain some different

7   information?

8   A   Yes.

9   Q   What is the difference?  Can you just explain for the jury,

10   what is the difference between monthly payroll and gross

11   revenues?

12   A   The gross revenues are calculated from the -- it's the twelve

13   months' worth of revenues, prior to January 31st.  And monthly

14   payroll is obviously what you are paying to your employees

15   monthly.  So if you annualize that monthly payroll, you are

16   looking at about over $3 million worth of payroll.  And gross

17   revenues of $850,000 would not be sufficient to cover payroll of

18   over $3 million.

19   Q   If we could turn to slide six of the summary chart.  What is

20   this chart?

21   A   These are the PPP and EIDL applications for Seattle's Finest

22   Cannabis LLC, SFC LLC.

23   Q   Can you walk us through the information, again, that's

24   represented?

25   A   At the top are the PPP applications, and at the bottom are

1    the EIDL applications.

2    Q    And what changes with the PPP loans for Seattle's Finest

3    Cannabis and SFC LLC?

4    A    The monthly payroll amount changes.

5    Q    And what about the EIDL applications?

6    A    The gross revenue changes.

7    Q    How much does it change by?

8    A    It's doubled from the first one to the second on.  It more

9    than doubled.

10   Q    And what about how many employees -- how do the employees

11   change between the PPP applications and the EIDL applications?

12   A    The PPP applications are six employees.  And then the EIDL

13   applications, there's either ten or twelve employees listed.

14   Q    And just to remind us, how are EIDL advances calculated?

15   A    It's a thousand dollars per employee, up to $10,000.

16   Q    So if you have more employees when you submit an EIDL

17   advance, would you get -- when you submit for an EIDL advance,

18   would you get more money on an EIDL advance?

19   A    Yes.

20   Q    If we could look at Slide 7 of the summary chart.  What is

21   this chart?

22   A    These are the PPP and EIDL applications for the A Team

23   Holdings LLC.

24   Q    And can you walk us through the information that's

25   represented?

1    A    At the top is the PPP application, and at the bottom is the

2    EIDL application.

3    Q    And so does Dr. Shibley's EIDL application have the same

4    number of employees as his PPP application?

5    A    No.  On the PPP application, he lists 48 employees.  And on

6    the EIDL, he lists four.

7    Q    Which of these applications was filed first?

8    A    The EIDL application was filed first.

9    Q    And, again, can you just walk the jury through how his gross

10   revenue listed on the EIDL application compares with the monthly

11   payroll?

12   A    So if you had a monthly payroll of $384,000, again, you are

13   paying over $4 million a year in payroll.  A gross revenue of

14   $180,000 for the that same year, would just not be sufficient to

15   make your payroll.

16   Q    If we could turn to Slide 8 of the summary chart.  What is

17   this chart?

18   A    These are the PPP and EIDL applications for Eric R. Shibley

19   MD, PLLC.

20   Q    On this chart, does Mr. Shibley's EIDL application list the

21   same number of employees as his PPP application?

22   A    No.  He lists four employees for his EIDL application, and on

23   his PPP, it's five or six employees.

24   Q    And which application was submitted earliest?

25   A    The EIDL application.

 1   Q    So did the employee numbers increase with time?

 2   A    Yes.

 3   Q    And how does his gross revenues listed on the EIDL

 4   application compare with the monthly payroll?

 5   A    Again, you would not be able to make a monthly payroll of

 6   that amount, with gross revenues that are listed there.

 7            MR. NANCE:  Objection.  I think she's testifying

 8   beyond -- she's speculating on this.

 9            THE COURT:  Overruled.

10   Q    If we could turn to Slide 9 of the summary charts.  What is

11   this chart?

12   A    These are the PPP and EIDL applications for ES1 LLC.

13   Q    And if we could look at the EIDL applications, in particular,

14   for ES1 LLC.  And, Mr. Arnold, if we could maybe zoom in on

15   those.

16        How do the two EIDL applications compare?

17   A    The amount listed for gross revenue is different.  And the

18   number of employees is different.

19   Q    How much is the difference in the gross revenues?

20   A    It's more than doubled.

21   Q    And just to remind the jury, was the time period for the

22   gross revenues the same throughout the EIDL application period?

23   A    Yes.  It's the twelve months prior to January 31st, 2020.

24   Q    If we zoom back out, Mr. Arnold.

25        Do Mr. Shibley's EIDL applications list the same number of

 1  employees as are in his PPP?

 2  A    No.  In his EIDL, he lists four or 15 employees.  In his PPP,

 3  it's five or six employees.

 4  Q    If we could look at Slide 10 of the summary charts.  What's

 5  found on Slide 10?

 6  A    These are EIDL applications made in the name of Eric Shibley.

 7  Q    And I note it says "sole proprietorship" on the top.  What

 8  does it mean to have applied in the name of a sole

 9  proprietorship?

10  A    If you have a sole proprietorship, one difference is you

11  don't have to have an EIN number, you can use a social security

12  number.

13  Q    What does this chart show?

14  A    This chart shows the EIDL applications.

15  Q    Okay.  How many many employees did he claim that his sole

16  proprietorship had?

17  A    Five employees.

18  Q    And how much revenue did each claim to have?

19  A    $180,000.

20  Q    If we can unpublish, please.

21       I'm showing the witness what's been marked as Government's

22  Exhibit 206.  Do you recognize Government's Exhibit 206?

23  A    Yes.

24  Q    And what is it?

25  A    It's a summary of all of the PPP loans, EIDL loans and

1  advances, that Mr. Shibley received.

2  Q   How many pages is it?

3  A   It's one page.

4  Q   Did you assist in the preparation of Government's

5  Exhibit 206?

6  A   Yes.

7  Q   How did you do so?

8  A   I confirmed and verified all of the information that's on

9  here.

10 Q   And what types of exhibits is Government's Exhibit 206 based

11 on?

12 A   It's based on the loan application documents and the bank

13 statement documents.

14 Q   And have you reviewed the exhibits listed in the chart, as

15 part of your investigation?

16 A   Yes.

17 Q   Do they include bank records that were provided by various

18 financial institutions during your investigation?

19 A   Yes.

20 Q   Is the information found on the chart accurate?

21 A   Yes.

22 Q   And does Government's Exhibit 206 fairly and accurately

23 summarize the documents in the listed exhibits?

24 A   Yes.

25         MS. CONNELLY:  At this time, I would move to admit

1    Government's Exhibit 206.  And I would also move into evidence

2    certain bank records that it's based off of.  I can give a list.

3    That would be 117, 120, 130, 136, 143, 172, 178, 187, and 199,

4    pursuant to a business records certification.

5              THE COURT:  Any objections, Mr. Nance?

6              MR. NANCE:  No objection.

7              THE COURT:  They will be admitted.

8                   (Exhibit Nos. 117, 120, 130, 136,

9                143, 172, 178, 187, 199 and 206 admitted.)

10             MS. CONNELLY:  Thank you.

11        Permission to publish Government's Exhibit 206.

12             THE COURT:  Yes.

13             MS. CONNELLY:  Thank you.

14   Q    So what is the information that is summarized in Government's

15   Exhibit 206?

16   A    This shows all of the PPP loans, EIDL loans and advances that

17   Mr. Shibley received.

18   Q    So did you look at both the bank accounts and the loan

19   documents to confirm where loans were funded?

20   A    Yes.

21   Q    How many loans received some form of funding for Mr. Shibley?

22   A    Twelve.

23   Q    And how much total money did Mr. Shibley receive in PPP and

24   EIDL funds?

25   A    Approximately $2.8 million.

1   Q   Is that seen at the bottom, on line 13?

2   A   Yes.

3   Q   I would like to briefly return to Government's Exhibit 47,

4   which has previously been entered into evidence and we were

5   looking at earlier.

6       What was the date that Mr. Shibley became aware of the

7   federal case referenced in his e-mail?

8   A   May 27th, 2020.

9   Q   And after that date, did Mr. Shibley take out any of the PPP

10  and EIDL funds that he received in cash?

11  A   Yes.

12  Q   If we could look at Government's Exhibit 130, which has

13  previously been admitted.  And if we could look at page 80 of the

14  exhibit.

15      What is this document?

16  A   This is a bank statement from Navy Federal Credit Union for

17  Eric R. Shibley MD, PLLC.

18  Q   What period does this statement cover?

19  A   It covers the month of May 2020.

20  Q   If we could look at the next page of this statement, Mr.

21  Arnold, and if we could zoom in.  Thank you.

22      Looking at the 5/12 deposit line, the first 5/12 deposit line

23  -- maybe if we could zoom in on that, Mr. Arnold.  Great.

24      What is this?

25  A   It shows the funds being deposited into the account from

1   Chemical Bank.

2   Q    And what is Chemical Bank?

3   A    It's one of the lenders, the PPP lenders.

4   Q    Is it associated with TCF Bank?

5   A    Correct.

6   Q    And how much was funded?

7   A    $100,000.

8   Q    If we could just look a couple -- if you could expand that,

9   Mr. Arnold, a couple of lines down.

10       What happens to the money?

11  A    It gets transferred to another account.

12  Q    And what date was it transferred to another account?

13  A    Also on May 12th, 2020.

14  Q    If we could turn to the next page of the May 2020 statement,

15  found at Government's Exhibit 130.  If we could look in at the

16  bottom under "savings," please.

17       On 5/12, what happens in this account?

18  A    This shows the account -- the funds being transferred into

19  this account.

20  Q    And what happens after that with the money?

21  A    Mr. Shibley withdrew $50,000 on May 28th, 2020.  And the

22  remaining $49,500 was seized by the government on the 29th of

23  May.

24  Q    And so as of May 28th, 2020, had Mr. Shibley become aware of

25  the seizure warrant?

1    A    Yes.

2    Q    And at that time, was the investigative team following

3    Mr. Shibley, as part of the investigation?

4    A    Yes.

5    Q    What did you observe Mr. Shibley doing?

6    A    We observed Mr. Shibley traveling around to various banks to

7    try and withdraw cash.  Also to try and get some further PPP

8    loans.

9    Q    And did Mr. Shibley continue applying for PPP and EIDL funds,

10   after he became aware of the federal case?

11   A    Yes.

12   Q    I'm going to unpublish.

13        I'm showing the witness what's been marked Government's

14   Exhibit 211.  And, actually, if we could show her Government's

15   Exhibits 211, 212 and 213.

16        What are Government's Exhibits 211, 212, and 213?

17   A    These are certificates showing that the deposits at those

18   banks are insured by the FDIC.

19   Q    Which banks are they for?  We can scroll back through, again.

20   A    Celtic Bank, Customer's Bank, and TCF National Bank.

21   Q    Are Government's Exhibits 211 through 213 fair and accurate

22   replications of the FDIC deposit insurance certificates that you

23   obtained during your investigation?

24   A    Yes.

25             MS. CONNELLY:  I move to admit Government's Exhibits 211

 1   through 213, pursuant to 902(2) and 803(8).

 2              MR. NANCE:  No objection.

 3              THE COURT:  Admitted.

 4              (Exhibit Nos. 211 - 213 admitted.)

 5   Q   I'm showing you what's been admitted as Government's

 6   Exhibit 211.  We can publish.

 7       What is this document?

 8   A   This document is a certificate showing that the deposits at

 9   Celtic Bank are FDIC insured.

10   Q   Does this mean they were insured in April and May of 2020?

11   A   Yes.

12   Q   I'm showing you Government's Exhibit 212, which has been

13   admitted.  What is this document?

14   A   The certificate showing that the deposits at Customer's Bank

15   are FDIC insured.

16   Q   And, again, does that remain for April and May of 2020?

17   A   Correct.

18   Q   Finally, I'm showing you Government's Exhibit 213.  What is

19   this document?

20   A   This document is showing that the deposits at TCF National

21   Bank are FDIC insured.

22   Q   And were they insured in April and May of 2020?

23   A   Yes.

24   Q   So we're now going to turn to a few e-mails that Mr. Shibley

25   sent to the lenders.  I'm showing the witness Government's

1    Exhibit 50.

2        Do you recognize this document?

3    A    Yes.

4    Q    What is it?

5    A    E-mails exchanged between Celtic Bank and Mr. Shibley.

6    Q    And was this provided to you as a business record from Celtic

7    Bank during your investigation?

8    A    Yes.

9            MS. CONNELLY:  I would move to admit Government's

10   Exhibit 50.

11           MR. NANCE:  No objection.

12           THE COURT:  It's admitted.

13                    (Exhibit No. 50 admitted.)

14           MS. CONNELLY:  Permission to publish, Your Honor.

15           THE COURT:  Yes.

16   Q    And if we could, Mr. Arnold, if we could scroll between two

17   pages of this, to the e-mail starting on May 28th.  What does

18   Mr. Shibley write to Celtic Bank on May 28th?

19   A    He writes to the Celtic Bank employee that, "Your boss called

20   earlier and asked for five to ten names to verify that they were

21   working on-site."

22   Q    Does he provide five to ten names?

23   A    He provides seven names.

24   Q    And what else did he provide about these seven individuals?

25   A    He provided the last four digits of their social security

1    number, and a phone number for them.

2    Q   And I note, as you have said, Mr. Shibley writes that the

3    Celtic Bank employee's boss called him earlier and asked for five

4    to ten names.  What really happened to prompt Mr. Shibley's

5    e-mail?

6    A   It was actually an undercover agent who called Mr. Shibley,

7    posing as a representative of the bank, and asked for that

8    information.

9    Q   I'm going to unpublish.

10       I'm showing the witness Government's Exhibit 48.  Do you

11   recognize this e-mail?

12   A   Yes.

13   Q   If we could look at page 2 -- or 3, I apologize.  What is

14   this e-mail?

15   A   This e-mail is an e-mail from Mr. Shibley to Harvest Small

16   Business.

17            MS. CONNELLY:  I would introduce it also as a business

18   record.

19            THE COURT:  You offer it?

20            MS. CONNELLY:  Yes.  I offer it.

21            MR. NANCE:  No objection.

22            THE COURT:  It will be admitted.

23                    (Exhibit No. 48 admitted.)

24            THE COURT:  Let's take a 15-minute recess.

25            THE CLERK:  Please rise.  Court is in recess.

1                        (Recessed.)

 1                THE COURT:  Ready for the jury?

 2           MR. NANCE:  Yes.

 3           MS. CONNELLY:  Yes, Your Honor.  We have provided you

 4      with stipulations that Agent Moran will likely get into.  I don't

 5      know if you want to handle them before we start back up, or just

 6      let her handle them.

 7                THE COURT:  Any problem with me just reading them to the

 8      jury?

 9           MR. NANCE:  No problem.

10           MS. CONNELLY:  No problem.

11                THE COURT:  Okay.  Let's bring in the jury.

12      All right.  Please be seated.

13         (The following occurred in the presence of the jury.)

14                THE COURT:  Ladies and gentlemen, the parties have

15      entered into the following stipulations:

16      The United States of America and the defendant Eric Shibley

17      hereby stipulate and agree to the following facts:

18      One, on June 10, 2020, the defendant, Eric Shibley, was

19      served with subpoenas for documents, from a federal grand jury

20      sitting in the District of Columbia.  The subpoenas requested

21      documents related to the business operations of ESI LLC, SS1 LLC,

22      the A Team Holdings LLC, Dituri Construction LLC, and Eric R.

23      Shibley MD, PLLC;

24      Second, working through his attorney, Eric Shibley provided

25      the following documents in response to the subpoena, via e-mail.

1    (A) Certificates of formation for ESI LLC, SS1 LLC, the A Team

2    Holdings LLC, and Eric R. Shibley MD, PLLC.  Operating agreements

3    for -- and, counsel, I'm just going to enter these as a long list

4    of documents.  I don't think we need to read all of them.

5           MS. CONNELLY:  That's fine by the government, Your

6    Honor.

7           THE COURT:  And we will just file this as an exhibit,

8    which will go back to the jury.

9        Secondly, the stipulation of the parties regarding the City

10   of Anacortes v. Eric Shibley.  The United States of America, by

11   and through Laura Connelly, trial attorney for the United States

12   Department of Justice, and Brian Werner, Assistant United States

13   Attorney for the Western District of Washington, and defendant,

14   Eric Shibley, and his counsel, Michael Nance, hereby stipulate to

15   the following:

16       On December 13, 2018, the defendant, Eric Shibley, signed a

17   sentence order that he was sentenced to a 24-month term of

18   probation in Skagit County District Court for a misdemeanor

19   offense.  Mr. Shibley's term of supervision expired in

20   December 2020.

21       The jury may accept the above statement of facts as if they

22   had been proven beyond a reasonable doubt at trial.  Nothing in

23   this stipulation restricts the ability of either party to present

24   additional evidence regarding the transaction described above.

25       These exhibits, then, will be -- or these stipulations will

 1    be marked as exhibits and will be given to the jury with the

 2    other exhibits at the end of the trial.  All right?

 3         MS. CONNELLY:  Thank you, Your Honor.

 4    Q    Special Agent Moran, I believe we ended when you were looking

 5    at Government's Exhibit 48.  And if we could pull that up, again.

 6    And, Mr. Arnold, if we could again get the top header from the

 7    previous page.  With apologies, Mr. Arnold.  If we scroll back

 8    down to page 3, and then just include the header information

 9    from -- if you could scroll back out, please.  If you scroll up

10    to page 2, and look at the bottom portion.

11         What was the date that this portion of the e-mail thread was

12    sent?

13    A    May 29th, 2020.

14    Q    Who was it sent by?

15    A    Mr. Shibley.

16    Q    If we could scroll back down to page 3, Mr. Arnold.  What is

17    this?  What does this e-mail say?

18    A    This e-mail is from Mr. Shibley to Harvest Small Business.

19    He writes, "Your boss called earlier and asked for a couple of

20    names to verify that they are working on-site.  They know me by

21    my name and A Team.  They are..." and he provides a list of

22    names.

23    Q    And what loan had Mr. Shibley applied for at Harvest?  What

24    company had he applied for?

25         If we look at the subject line.  What is the subject line?

 1    A    Thank you.  It's SS1 LLC.

 2    Q    And how many employee names did he provide to Harvest for SS1

 3    LLC?

 4    A    He provided ten names.

 5    Q    And, again, I note that it says, "Jeremy's boss called this

 6    time."  What really happened to prompt Mr. Shibley's e-mail to

 7    Harvest?

 8              THE COURT:  She's already testified to that, counsel.

 9              MS. CONNELLY:  This is a separate e-mail, Your Honor.  I

10    apologize.

11              THE COURT:  All right.

12    A    Again, this was an uncover agent calling Mr. Shibley and

13    asking for this information, posing as a representative of

14    Harvest this time.

15    Q    So was it a second undercover call?

16    A    Yes.

17    Q    If we can now pull up Government's Exhibits 48 and 40

18    together, Mr. Arnold.  If we could scroll down on Government's

19    Exhibit 50.  Thank you.

20         How do the employee names compare between the Celtic and

21    Harvest e-mails?

22    A    They're the same names.  One has a few additional names added

23    to it.

24    Q    And were the Celtic Bank loan and the Harvest loan for the

25    same company?

1    A    No.

2    Q    And were either of them for the A Team Holdings?

3    A    No.

4    Q    During your investigation, did you attempt to find the people

5    listed by Mr. Shibley as his employees in these two e-mails?

6    A    We did.

7    Q    And just looking at the fifth person that's identified on

8    both of these e-mails, Sam Morgan.  Were you able to identify an

9    individual with the name Sam Morgan, with the identifier -- with

10   the social security number ending in 3218?

11   A    Yes.

12   Q    Was there anyone -- were there multiple Sam Morgans with that

13   name and identifier?

14   A    There was only one Sam Morgan, with those last four social

15   security digits.

16   Q    And during your investigation, did you attempt to reach out

17   to that Sam Morgan?

18   A    Yes.

19   Q    And were you able to do so?

20   A    No.

21   Q    Why not?

22   A    Mr. Morgan died in 1987.

23   Q    And so if we can unpublish.

24        I'm showing the witness what's been marked as Government's

25   Exhibit 103.  Do you recognize this document?

1    A    Yes.

2    Q    What is it?

3    A    It's the death certificate for Sam Morgan.

4    Q    And did you receive this death certificate from the

5    Pennsylvania Department of Health, as part of your investigation?

6    A    Yes.

7              MS. CONNELLY:  I would move to admit Government's

8    Exhibit 103.

9              MR. NANCE:  Objection, relevance, Your Honor.

10             THE COURT:  Overruled.  It will be admitted.

11                   (Exhibit No. 103 admitted.)

12             MS. CONNELLY:  Permission to publish, Your Honor.

13             THE COURT:  Yes.

14   Q    Based on your review of the death certificate, when did Sam

15   Morgan, with the last four digits 3218 of his social security

16   number, pass away?

17   A    In 1987.

18   Q    Is that seen as the date of death, on the top right-hand

19   portion?

20   A    Yes.

21   Q    If we could turn back to Government's Exhibit 50, just one

22   more time.  If you could scroll down.  When was Sam Morgan's name

23   used by Eric Shibley, as one of his purported employees to

24   Celtic?

25   A    On May 28th, 2020.

1    Q    And looking back at Government's Exhibit 48, if we can look

2    at page 2, when was Sam Morgan's name used by Eric Shibley as one

3    of his purported employees, to Harvest?

4    A    On May 29th, 2020.

5    Q    As part of the investigation, did A Team Holdings, Dituri

6    Construction, ES1, SS1, Shibley MD, PLLC and SFC, or Seattle's

7    Finest Cannabis LLC, receive grand jury subpoenas for documents?

8    A    Yes.

9    Q    And who was served with those grand jury subpoenas?

10   A    Mr. Shibley was served.

11   Q    What date were those subpoenas served?

12   A    June 10th, 2020.

13   Q    What did those subpoenas ask for?

14   A    We asked for employee information, to include names of

15   employees, payroll records, personnel files, any payments,

16   payroll ledgers.  I think I'm repeating myself.  We asked for

17   W-2s, W-3s, W-4s, 1099s.  I-9 employment eligibility forms.  We

18   asked for communications with certain employees, the employees

19   that he had provided, the names that he had provided.  We asked

20   for bank account information.  We asked for any records related

21   to loans applied for, to include the PPP and EIDL loans.  And we

22   also asked for books and records of any expenditures and receipts

23   for those businesses.

24   Q    So I'm showing the witness Government's Exhibit 225, which is

25   the stipulation that was just read into evidence by the Court.

1    And it includes the documents that the Shibley entities provided

2    in response to the grand jury subpoena.

3         Are all the documents attached to grand jury -- or to

4    Government's Exhibit 225, the documents that the Shibley entities

5    provided in response to the grand jury subpoena?

6    A    Yes.

7              MS. CONNELLY:  And I would move this into evidence now,

8    Your Honor.

9              THE COURT:  It's already in.

10             MS. CONNELLY:  Okay.

11   Q    Did the production contain any --

12             MS. CONNELLY:  Permission to publish.  I'm sorry.

13             THE COURT:  Yes.

14   Q    Did the production from the Shibley entities contain any

15   payroll journals?

16   A    No.

17   Q    Did it contain any payroll ledgers?

18   A    No.

19   Q    Did it contain any employee identification?

20   A    No.

21   Q    Did it contain any employment contracts?

22   A    No.

23   Q    Did it contain any employee files?

24   A    No.

25   Q    Did it contain any records of employee benefits?

1    A    No.

2    Q    Did it contain any issued W-2s?

3    A    No.

4    Q    Did it contain any I-9s, or employment eligibility forms?

5    A    No.

6    Q    Did it contain any books and records of receipts and

7    expenditures?

8    A    No.

9    Q    Did it contain any lists of employees?

10   A    No.

11   Q    Did it contain any records of payments to employees?

12   A    No.

13   Q    Did it contain W-3s and 941s?

14   A    No.

15        I'm sorry, it did.  As part of the loan.

16   Q    Were the --

17        THE COURT REPORTER:  I'm sorry.  Could you repeat your

18   question, please?

19        THE COURT:  One at a time, please.

20        MS. CONNELLY:  I apologize.

21   Q    Go ahead.

22   A    I'm sorry, it did include W-3s and 941s that had been

23   submitted as part of the loan-application process.

24   Q    Did it contain anything that supported the numbers shown in

25   those 941s and W-3s?

1    A    No.

2    Q    If we could just take a moment to look at a few of the items

3    that were produced.  I'm showing you what's at page 110 of

4    Government's Exhibit 225, which is a purchase agreement.

5         What is this document?

6    A    This is a purchase agreement between Thomas Dituri and Eric

7    Shibley, for the sale of Dituri Construction LLC.

8    Q    And what is the effective date of the agreement?

9    A    May 5th, 2020.

10   Q    Who was the buyer?

11   A    Eric Shibley.

12   Q    Who was the seller?

13   A    Thomas Dituri.

14   Q    And just looking at paragraph 1, under "terms."  If we could

15   just get a little bit more of that, Mr. Arnold.  Thank you.

16        What is being sold?

17   A    Dituri Construction LLC.

18   Q    The ownership interest in Dituri Construction LLC?

19   A    Correct.

20   Q    And looking at paragraph 3, which is the purchase price, how

21   much did Mr. Shibley buy ownership interest in Dituri

22   Construction for?

23   A    $10.

24   Q    And I'm showing you the e-mail that's the last record

25   contained in the stipulation, which is at page 273, Government's

1    Exhibit 225.  What is this e-mail?

2    A    This is an e-mail from Eric Shibley to Mario Davis.

3    Q    Who is Mario Davis?

4    A    Mario Davis is an accountant that Mr. Shibley hired.

5    Q    And looking at the header information, what's the date of

6    this e-mail?

7    A    June 25th, 2020.

8    Q    Is that after these loans had been applied for?

9    A    Yes.

10   Q    And just looking at the first paragraph, if we could zoom in,

11   Mr. Arnold.

12        What is Mr. Shibley telling Mr. Davis he's paying his

13   employees annually?

14   A    He says he's paying them between $8,000 to $12,000 per year,

15   in 2019 and 2020.

16   Q    And do those numbers match the loan applications that we have

17   been through?

18   A    No.

19   Q    Tell us why not.

20   A    Based on the monthly payroll numbers and the amount of

21   employees that were listed on the applications, that would equal

22   an annual salary of about $75,000 to $96,000 per employee, which

23   is inconsistent with the $8,000 to $12,000 that's listed here.

24   Q    So is he claiming in this e-mail to his accountant that he

25   pays each employee between $8,000 and $12,000 annually?

 1   A    Yes.

 2             THE COURT:  Wait a moment.

 3             MR. NANCE:  Your Honor, objection.  The e-mail speaks

 4   for itself.

 5             THE COURT:  Sustained.

 6   Q    Did Mr. Shibley continue applying for COVID relief loans,

 7   after the receipt of the subpoena on June 10th of 2020?

 8   A    Yes.

 9   Q    And did he receive COVID relief funds after the receipt of

10   the subpoena?

11   A    Yes.

12   Q    And did he try to withdraw COVID relief money, after the

13   receipt of the subpoena?

14   A    Yes.

15   Q    Thank you.

16             MR. CONNELLY:  No further questions.

17             THE COURT:  All right.  Cross.

18                       CROSS-EXAMINATION

19   BY MR. NANCE:

20   Q    Good morning, Agent Moran.

21   A    Good morning.

22   Q    You are one of the case agents in this investigation?

23   A    Correct.

24   Q    Who were the other case agents?

25   A    We had agents from a number of agencies:  Small Business

1    Administration; Office of Inspector General; the IRS; Department

2    of Homeland Security; FDIC OIG; TIGTA; and HHS OIG.

3    Q    Each agency has a case agent, the main agent assigned to the

4    case; is that the way it works?

5    A    Correct.

6    Q    Agent Eric Hunter would have been one of them, with the

7    Office of Inspector General?

8    A    That's correct.

9    Q    Yeah.  And Glen Weisman would be another agent with

10   Department of --

11   A    Correct.

12   Q    -- Homeland Security?

13   A    Yes.

14   Q    So among other things, you've established certainly that

15   Mr. Shibley resided at and had property at 4700 36th Avenue

16   Southwest?

17   A    Yes.

18   Q    Right.  And that he also owned other real estate in the area?

19   A    Yes.

20   Q    In the West Seattle area?

21   A    Correct.

22   Q    At least three different properties, in addition to the 36th

23   Avenue address?

24   A    Yes.

25   Q    Obviously he has a working internet, working phone number.

1    He's easy to find.

2    A    Yes.

3    Q    He was easy to find during this period.  And that he had

4    several LLCs for which he served as the manager?

5    A    Yes.

6    Q    And those were, in fact, registered with the Washington

7    Secretary of State?

8    A    Yes.

9    Q    At least two of them, maybe it was three of them, if I heard

10   your testimony correctly, were registered much earlier, 2017,

11   2018?

12   A    Yes.

13   Q    Is that right?  SS1 was in 2017.  Seattle's Finest Cannabis,

14   2017.  And A Team Holdings, 2018?

15   A    Yes.  Some of them were registered earlier, correct.

16   Q    There was some testimony early on about there being a

17   dissolution of one or more of these by the Secretary of State,

18   and that they were much more recently reinstated?

19   A    Yes.

20   Q    Now, an LLC, that's a limited liability corporation that's

21   created?

22   A    Correct.

23   Q    There's a -- isn't there an annual fee, might be the word, or

24   annual -- there may be another word for it, but there's a fee, a

25   cost that is imposed by the state each year.  A license fee,

1   perhaps?

2   A   I don't know.  I'm assuming.

3   Q   Well, if you are dissolved and then you reinstate with the

4   Secretary of State, wouldn't it normally reflect just bringing

5   your back fee up to par, getting it paid?

6   A   I don't -- I'm not familiar with everything you have to do.

7   I know you have to make sure you get your filings up to date.  I

8   don't know if it also involves a fee as well.

9   Q   Well, it's not unlike anyone just being in business in the

10  state.  They are required to stay current with -- to register

11  with the state authorities and to pay their business, their

12  license fee?

13  A   Yes.

14  Q   Okay.  There was extensive testimony about these PPP

15  applications and the inclusion of a Form 941 with the

16  applications.

17  A   Yes.

18  Q   If we could just take a look at a couple of those.  If I can

19  get the number right here.  Exhibit No. 1, I think page 5.  Could

20  we call that up?

21       MS. CONNELLY:  It would be page 9.

22  Q   Okay.  So this is previously admitted.  941 was part of the A

23  Team Holdings PPP application --

24  A   Yes.

25  Q   -- was that your testimony?

1      This was for -- reflects -- it's a quarterly tax return for

2  the fourth quarter of 2019 for A Team Holdings --

3  A    Yes.

4  Q    -- is that correct?

5      Where it indicates certain number of employees.  I think it

6  says 48 employees and a payroll of around $975,000?

7  A    Correct.

8  Q    Right.  And then if we could come down to the latter half of

9  that.  It indicates that the total taxes -- it's a fairly large

10  amount -- of $149,000?

11  A    Yes.

12  Q    And then if you look at line 13, total deposits for this

13  quarter.  And it's blank.

14  A    Yes.

15  Q    Yes.

16      Presumably, that means zero.  Nothing?

17  A    Yes.

18  Q    Nothing has been paid and/or deposited.

19      Then if you look at 14, there's the balance due for taxes, of

20  $149,175?

21  A    Yes.

22  Q    Correct?

23      And then I will pull up another couple of examples.  But if

24  we could go later into the same exhibit, I think it's several

25  pages down.  Or same company.  It's part of the same exhibit.

 1   First quarter of 2020.  Again, 48 -- if you look at line 1, 48

 2   employees, wages of $768,000.

 3       Then if we could come down to the latter half of that, total

 4   taxes $117,504 is owed?

 5   A   Yes.

 6   Q   It's reflected as that being owed.  Again, line 13 is blank.

 7   So nothing has been paid toward this.  And 14 reflects that

 8   amount $117,504 is owed, is currently owing to the IRS?

 9   A   Yes.

10   Q   Okay.

11   A   Balance due.

12   Q   And then one -- just one more example of this.

13       Exhibit No. 3, page 10.  This is Dituri Construction.

14   There's employees listed, there's wages listed.  Then the latter

15   half, again, of that.  Again, $119,952 is the tax that is

16   reflected as owing.  Nothing has been paid and/or deposited, and

17   it's still outstanding, according to this?

18   A   Yes.

19   Q   Okay.

20       Agent, I'm sure you have gone through all of -- you can take

21   it down -- you have gone through all of the applications.  And

22   for the PPP loans, were 941s generally submitted in connection

23   with those?

24   A   Yes.

25   Q   Did you find any examples of a 941 that reflected that

1    something had actually been paid toward the tax?

2    A    Yes.

3    Q    What was that?

4    A    As we showed earlier, at least one of the 941s showed that

5    monthly deposits were being paid to the IRS.

6    Q    Was there an amount?

7    A    Yes.

8    Q    What was that?

9    A    I would have to see the form again.

10   Q    You would have to look.  It's okay.

11        You testified at some length about the employees, there was

12   testimony about an undercover call made, and Mr. Shibley

13   volunteering a number of names of folks that worked for him.

14   A    Yes.

15   Q    Yeah.  And you did follow-up on some of that, right?

16   A    Correct.

17   Q    In fact, you spoke to several employees, didn't you?

18   A    Yes.

19   Q    You and Agent Hunter actually spoke to an individual named

20   Ronald Reel, who was one of the folks listed?

21   A    Mr. Reel actually chose not to speak to us.

22   Q    I'm sorry?

23   A    He chose not to speak to us.  We did give him a subpoena, but

24   he said Mr. Shibley just wanted him to give the subpoena to

25   Mr. Shibley's attorney.

1    Q    Okay.  But he was identified as an employee of Mr. Shibley,

2    and you approached him and found him?

3    A    We found him.  It was difficult, because he's homeless.  He

4    lives in his van.  So it took some time, but we did find him.

5    Q    Okay.  And you met him in a McDonald's parking lot?

6    A    Correct, yes.

7    Q    You and Agent Hunter and Agent Weisman, I believe?

8    A    Yes.

9    Q    Yes.

10            THE COURT:  Let me see counsel at sidebar.

11         (Sidebar held between court and counsel as follows:)

12            THE COURT:  Did I rule on a missing witness motion in

13   limine?

14            MS. CONNELLY:  You did not.

15            THE COURT:  The law is that if the witnesses are equally

16   available to both sides, you cannot refer to them as missing

17   witnesses, or bring up the fact that the government didn't call

18   them.  It's not appropriate.

19            MR. NANCE:  My --

20            THE COURT:  That's my ruling.

21            MR. NANCE:  I understand that.  My intent was to ask

22   this witness about her interviews or attempts to interview these

23   folks.

24            THE COURT:  Well, let's see how it goes.  Okay.

25            MR. NANCE:  Okay.

 1           MS. CONNELLY:  Your Honor, I would also note we'd object

 2    under hearsay rules.  Obviously, the attempts to interview --

 3           THE COURT:  If it's objectionable, make an objection.

 4           MS. CONNELLY:  Okay.  Thank you.

 5                      (Sidebar concluded.)

 6    Q    Agent Moran, you and Agent Hunter and Agent Weisman actually

 7    approached and spoke with several people in the McDonald's

 8    parking lot that day, that had been identified as employees of

 9    Mr. Shibley?

10    A    Yes.

11    Q    You talked to David Sandoval, who had previously been

12    identified as an employee of Mr. Shibley?

13    A    Correct.

14    Q    Did you confirm with him that he worked for Mr. Shibley

15    during the relevant time period?

16           MS. CONNELLY:  Objection, hearsay.

17           THE COURT:  Sustained.

18    Q    Did Mr. Sandoval appear to be homeless?

19    A    I believe he told us that he couch surfed.

20    Q    Okay.  Did you determine where he received his mail?

21    A    Because --

22           MS. CONNELLY:  Objection, hearsay.

23           THE COURT:  Sustained.

24    Q    Wasn't another individual, Mataese Tela, also identified as

25    an employee of Mr. Shibley?

 1    A    Yes.

 2    Q    Did you or Agent Hunter speak with him --

 3    A    Yes.

 4    Q    -- that day, at that place?

 5    A    Yes.

 6    Q    Did you learn anything from him that furthered your

 7    investigation?

 8              MS. CONNELLY:  Objection.  Hearsay.

 9              THE COURT:  Sustained.

10    Q    Did your investigation team also speak with Ronisha Smith?

11    A    Yes.

12    Q    She had been identified as an employee of Mr. Shibley, during

13    the relevant period?

14    A    Yes.

15    Q    Did you record statements with these folks?

16    A    Yes.

17    Q    Did you speak with Eric Pula, who Mr. Shibley had identified

18    as an employee?

19    A    No.  We tried to.

20    Q    Did you speak with Jerome Muna, who had been identified has

21    an employee?

22    A    No.  We also attempted to interview him.

23    Q    How about Sarieck Butler-Hem?

24    A    No.  We couldn't locate him.

25    Q    How about Carlita Lopez?

 1    A    No.  We also had difficulty locating her.

 2    Q    Did you get leads, during this time, that you were able to

 3    pursue toward locating other employees?

 4    A    I believe we followed every lead that we had to try and find

 5    the people that he had said were his employees.

 6    Q    Did you go to any of the work sites where work had been

 7    performed by employees?

 8    A    We went to -- I went to one of the houses that Mr. Shibley

 9    owns.

10    Q    Were you able to determine that there had been some

11    renovation work done at the house?

12    A    I did not go inside the house.  I noticed that one of the

13    doors was missing to the house.

14    Q    You have indicated that he had at least three properties, in

15    addition to the place that he lived.  Did you go to each of

16    those?

17    A    No.  I only went to one of the properties.

18    Q    Just the one.

19         Did you do any other follow-up, following this meeting with

20    these employees in the parking lot?

21    A    What type of follow-up?  The investigation continued after

22    that.

23    Q    Okay.  Anything that was a direct consequence of meeting in

24    the parking lot with these witnesses, or with these employees?

25    A    I believe we continued, after that date, to try and track

 1   down the employees we haven't been able to find.

 2   Q   You referred to this Sam Morgan person, right?

 3   A   Yes.

 4   Q   Actually, could we call up that Exhibit No. 103?  I'm going

 5   to ask you to take a look at the date of birth that's reflected

 6   on this death certificate.

 7   A   Yes.

 8   Q   What date is that?

 9   A   It's December 13th, '21.

10   Q   That would be 1921?

11   A   Yes.  1921.

12   Q   So this person, if they were still alive, would be almost

13   100 years old?

14   A   Yes.

15   Q   And the only connection -- well, you found this by trying to

16   match the name with the last four digits of a -- what was

17   tendered as the social security number?

18   A   Correct.

19   Q   Okay.  You don't really know the ultimate source of that, do

20   you?

21   A   The source of the social security number?

22   Q   Right.

23   A   Mr. Shibley provided those.

24   Q   That was given to you, but you don't know where he got it?

25   A   I don't know where he got it.

1  Q   Okay.  You would agree that the name Sam Morgan is a fairly

2  common American name?

3  A   Sam Morgan is common.  Sam Morgan with the last four social

4  security digits, is this Sam Morgan.

5  Q   Was there an ID, that you're aware of, associated with this

6  person, that was used at any point?

7  A   Are you referring to the Sam Morgan that died?

8  Q   Yeah.

9  A   I don't know.

10 Q   Okay.  Usually you think of construction workers as being a

11 little a bit younger than that?

12 A   Yes, you would think.

13 Q   He was probably born after 1921?

14 A   You would think, yes.

15 Q   Yes.  You can take it down.  Just one moment.

16     Agent, just to clarify, you're testifying that you did not

17 have contact with Eric Pula?

18 A   I did not, no.

19 Q   You don't -- you have never gone to his -- met with him, or

20 gone to his apartment, anything of that nature?

21 A   I believe I went to several addresses trying to find him.

22 Q   How about any of your fellow investigators in this case?  Are

23 you aware of any contact they might have had with Eric Pula?

24 A   I think there was an undercover call with Mr. Pula.

25 Q   Oh, who was that?  Who did that?

```
 1   A    One of -- an undercover agent did that, posing as a bank

 2   representative.  As a federal agent, none of us spoke to --

 3   interviewed him as a federal agent.

 4   Q    Okay.  Anything about that call that would refute the notion

 5   that he was an employee of Mr. Shibley?

 6              MS. CONNELLY:  Objection, hearsay.

 7              THE COURT:  Sustained.

 8              MR. NANCE:  Nothing further.

 9              THE COURT:  Any redirect?

10              MS. CONNELLY:  Nothing, Your Honor.

11              THE COURT:  You may step down.

12              THE WITNESS:  Thank you.

13              THE COURT:  Put your mask back on, please.

14              MS. CONNELLY:  The government calls Roman Hernandez.

15                         ROMAN HERNANDEZ,

16         having been sworn under oath, testified as follows:

17              THE WITNESS:  I do.

18              THE COURT:  Take your mask off.

19                        DIRECT EXAMINATION

20   BY MS. CONNELLY:

21   Q    Good morning.

22   A    Good morning.

23   Q    Can you please state your name and spell your last name for

24   the record?

25   A    Yes.  Roman Hernandez.
```

1    Q    There's, I think, some water next to you.  If --

2    A    Thank you.

3         H-E-R-N-A-N-D-E-Z.

4    Q    I will give you one moment.  And where do you work,

5    Mr. Hernandez?

6    A    I work for the Internal Revenue Service.

7    Q    Is that also known as the IRS?

8    A    It is, yes.

9    Q    What do you do for the IRS?

10   A    I'm a court-witness coordinator for the IRS.

11   Q    What does a court-witness coordinator do?

12   A    I review income tax returns and other IRS records.  I prepare

13   them to be used as exhibits at trial.  And when I appear at

14   trial, I represent the Commissioner of IRS, in his role as

15   custodian of records.

16   Q    And how long have you been doing that job?

17   A    For ten years now.

18   Q    And how long have you been with the IRS?

19   A    Twenty years.

20   Q    Altogether, what other jobs have you held with the IRS?

21   A    My first job was called a contact representative.  It was one

22   of the people -- you could call into the IRS and speak with them

23   on the phone.  My next job was as an examiner, conducting audits

24   by phone and by correspondence.  And my last job, my job prior to

25   this, was with the taxpayer advocate service.  They're a separate

1   part of the IRS that helps people deal with the IRS, if they're

2   in an economic-hardship situation.

3   Q   And in your time with the IRS, have you become familiar with

4   how taxes are filed?

5   A   I have, yes.

6   Q   Can you just tell the jury, what is an IRS Form 941?

7   A   Sure.

8       A Form 941 -- sorry -- it's a business form.  It's used to

9   file employment taxes.  It's used to compute the amount of

10  employment taxes that are due with the form, and helps you know

11  what to pay for those taxes.

12  Q   And who files a Form 941?

13  A   The employer.  The business does.

14  Q   And why would a business file a Form 941?

15  A   They're required to file it if they have employees.

16  Q   How often does a business file a Form 941?

17  A   It's filed on a quarterly basis.

18  Q   And what does a Form 941 document?

19  A   It documents the number of employees they had that quarter,

20  the amount of wages they paid.  It helps them figure the amount

21  of tax that they need to withhold from the employee's pay.

22  Including FICA tax, which is social security tax, and Medicare

23  tax.

24  Q   And why does the company withhold money from their employees?

25  A   They're required to.  The employee -- they're required to

1    withhold for social security and Medicare tax.  They withhold

2    half of that tax from the employer's pay, and they're required to

3    pay half, the other half of the tax, on the employer's behalf.

4    Q    Would a business, as an independent contractor, use a

5    Form 941, or would it use a different type of IRS form?

6    A    They would not use a 941.

7    Q    What taxes is a business required to pay for its employees?

8    A    They're required to pay or withhold and pay federal income

9    tax, social security tax, and Medicare tax.

10   Q    And what happens if an employer is withholding taxes from its

11   employees, but is not paying the IRS?

12   A    Well, that money really belongs to the employees, so they're,

13   in a sense, keeping the employees' money, when they should not

14   be.

15   Q    When is an employer required to pay the taxes that are noted

16   on a Form 941?  If you want to take a moment, and -- yeah.

17   A    I'm sorry, yeah.  Okay.

18   Q    So when is an employer required to pay the taxes noted on a

19   Form 941?

20   A    Well, there's a couple of different schedules for paying the

21   tax.  It could be a semiweekly payment schedule, or a monthly

22   schedule.

23   Q    Should a business pay the employees' taxes, after filing a

24   Form 941?

25   A    No, they should not.

1    Q    And so turning to a different tax form entirely, can you tell

2    the jury what is a form W-3?

3    A    Yes.  A form W-3 is a transmittal form.  It's the form used

4    to send W-2s to the Social Security Administration.

5    Q    And how often is a W-3 filed?

6    A    It's filed annually.

7    Q    Why is a form W-3 filed?

8    A    Because employers are required to report that W-2 information

9    to the Social Security Administration.

10   Q    And can you just tell us, what is a Form W-2?

11   A    Form W-2 is a wage and -- wage and tax statement.  It's given

12   to you by your employers every year, so you can file your taxes.

13   Q    And so do the employees file their W-2s with the Social

14   Security Administration, or with the IRS?

15   A    The employees?

16   Q    Uh-huh.

17   A    Well, they do when they file their forms 1040, yes.

18   Q    Is the Form 1040 a personal tax return?

19   A    It is yes.

20   Q    Do employers also file the forms W-2?

21   A    Yes, they do.

22   Q    Why is that?

23   A    Well, they're required to give that information over to the

24   Social Security Administration.  But the IRS also receives that

25   same information.  And what we do with it is we have the

 1   dollar-matching program.  So we look to see what the employers

 2   say they paid their employees, as far as wages, and withholding

 3   for taxes.  We also look at the employee's Form 1040 to see what

 4   they reported on their own return.

 5   Q   So is it basically a way to link up the employer with the

 6   employee?

 7   A   Yes, it is.

 8   Q   Does IRS have a recordkeeping system?

 9   A   They do.  Yes.

10   Q   Are you familiar with it?

11   A   I am.

12   Q   Do you work in that system, as a regular part of your job?

13   A   I do.

14   Q   What is that system called?

15   A   It's broadly called the Master File.  But there's a couple

16   pieces to it.  There's the Business Master File and the

17   Individual Master File.

18   Q   But altogether, it's known as the Master File?

19   A   Yes.

20   Q   What does it contain?

21   A   It contains the record of all, like, processed tax returns,

22   information from electronic records, and other sources.  It's the

23   main repository for tax information for the IRS.

24   Q   Does it also contain payment records of payments filed with

25   the IRS?

1    A    It does, yes.

2    Q    And is it used in the regular course of business with the

3    IRS?

4    A    Yes.

5    Q    Are the records kept in the IRS Master File regularly made

6    and preserved as part of the public business of the IRS?

7    A    They are, yes.

8    Q    Can searches be run in the Master File?

9    A    Yes.

10   Q    Do you know how to conduct searches on that system?

11   A    I do, yes.

12   Q    Do you do that as a regular part of your job?

13   A    Yes.

14   Q    Were you asked by the Department of Justice to conduct

15   searches of IRS records related to certain entities in this case?

16   A    Yes, I was.

17   Q    And so did you run searches for the tax records of a company

18   called the A Team Holdings, with an EIN ending in 7088?

19   A    Yes.

20   Q    Did you find any Forms 941 filed for the A Team Holdings for

21   tax years 2019 or 2020?

22   A    I did not, no.

23   Q    Did you find any tax records, at all, filed for A Team

24   Holdings in tax years 2019 and 2020?

25   A    I didn't.

1   Q   And if we could pull up the 941 from Government's Exhibit 1,

2   which is at page 9.

3           MS. CONNELLY:  May I publish, Your Honor?

4           THE COURT:  Yes.

5           MS. CONNELLY:  It has previously been admitted.

6   Q   Was this document filed with the IRS?

7   A   No, it was not.

8   Q   And if we can pull up the second 941 from Government's

9   Exhibit 1, which is the 941 for the A Team Holdings for the

10  second quarter -- or the first quarter of 2020.  Was this

11  document filed with the IRS?

12  A   It was not, no.

13  Q   We can take that down.  Thank you, Mr. Arnold.

14      Did you also run searches for the tax records of Dituri

15  Construction LLC with an EIN ending in 8508?

16  A   I did, yes.

17  Q   Did you find any Form 941 filed for Dituri Construction,

18  filed for tax years 2019 or 2020?

19  A   I did not.

20  Q   Did you find any tax records at all, for Dituri Construction,

21  for tax years 2019 and 2020?

22  A   No.

23  Q   And if we could pull up the 941 from Government's Exhibit 3,

24  which has previously been entered into evidence.

25          MS. CONNELLY:  May I publish, Your Honor?

1    Q    And this is a 941 for the first quarter of 2020 for Dituri

2    Construction LLC.  Was this document filed with the IRS?

3    A    No, it was not.

4    Q    And if we could pull up the second 941 for Dituri

5    Construction LLC, for the first quarter of 2020, and Government's

6    Exhibit 4, which has previously been entered into evidence.

7             MS. CONNELLY:  May I publish, Your Honor?

8    Q    Is this a 941 for the same period?

9    A    Yes.

10   Q    And was this second 941 filed with the IRS?

11   A    No, it was not.

12   Q    I will take that down.  Thank you, Mr. Arnold.

13        Did you run searches for the tax records for Eric R. Shibley

14   MD, PLLC with an EIN ending in 9052?

15   A    I did, yes.

16   Q    Did you find any Forms 941 filed for that business, for the

17   tax years 2019 and 2020?

18   A    I did not.

19   Q    Did you find any tax records at all, filed for that business

20   for the tax years 2019 and 2020?

21   A    I did not, no.

22   Q    If we could pull up the 941 from Government's Exhibit 23,

23   which has previously been entered into evidence, which is at

24   page 5.

25             MS. CONNELLY:  Permission to publish, Your Honor.

1            THE COURT:  Yes.

2   Q    This is a 941 for Eric R. Shibley MD, PLLC, for the first

3   quarter of 2020.  Was this filed with the IRS?

4   A    No, it was not.

5   Q    We can take that down.  Thank you.

6        Did you run searches for the tax records for ES1 LLC with an

7   EIN ending in 5849?

8   A    I did, yes.

9   Q    Did you find any Form 941 filed for ES1 LLC for the tax years

10  2019 and 2020?

11  A    I did not.

12  Q    Did you find any tax records at all for ES1 LLC for the tax

13  years 2019 and 2020?

14  A    No, I didn't.

15  Q    And if we could pull up the 941 from Government's Exhibit 22,

16  which has previously been entered into evidence, page 5.

17            MS. CONNELLY:  Permission to publish, Your Honor?

18            THE COURT:  Yes.

19  Q    This is a 941 for ES1 LLC for the first quarter of 2020.  Was

20  this filed with the IRS?

21  A    No, it was not.

22  Q    We can take that down.  Thank you.

23        Did you run searches for tax records for SFC, or Seattle's

24  Finest Cannibis LLC, with an EIN ending in 3580?

25  A    Yes, I did.

1   Q   And did you find any Forms 941 for Seattle's Finest Cannabis

2   for the tax years 2019 and 2020?

3   A   I did not, no.

4   Q   Did you find any tax records at all for Seattle's Finest

5   Cannabis for the tax years 2019 and 2020?

6   A   No, I didn't.

7   Q   And if we could pull up the 941 from Government's Exhibit 2,

8   which has previously been entered into evidence.  That's at

9   page 6.

10          MS. CONNELLY:  Permission to publish, Your Honor?

11          THE COURT:  Yes.

12  Q   This is a 941 from the first quarter of 2020 for Seattle's

13  Finest Cannabis with an EIN of 3580.  Was this filed with the

14  IRS?

15  A   No, it was not.

16  Q   You can take that down.

17      Did you run searches for the tax records for SS1 with an EIN

18  ending in 7509?

19  A   I did, yes.

20  Q   And did you also run searches for the tax records for SS1

21  with an EIN ending in 2134?

22  A   Yes.

23  Q   Did you find any Forms 941 filed for either of those SS1s for

24  the tax years 2019 and 2020?

25  A   I did not.

1  Q   Did you find any tax records filed for SS1 for the tax years

2  2019 or 2020?

3  A   No.

4  Q   If we could pull up the 941 from Government's Exhibit 5,

5  which has previously been entered into evidence.

6          MS. CONNELLY:  Permission to publish, Your Honor?

7          THE COURT:  Yes.

8  Q   And this is an SS1 941 for the first quarter of 2020, with an

9  EIN ending in 7509.  Was this filed with the IRS?

10  A   No, it was not.

11  Q   We will take that down.  Thank you, Mr. Arnold.

12      You mentioned before that W-3s are actually filed with the

13  Social Security Administration and not the IRS, but in its Master

14  File, is the IRS able to see whether a business has filed W-3s?

15  A   Yes.  When we receive the W-2 information, it includes -- it

16  also includes the W-3 information.

17  Q   And did you run searches for W-3s for the businesses that we

18  have just covered?

19  A   I did, yes.

20  Q   And had any of them filed W-3s for the tax year 2019?

21  A   No.

22  Q   And so if we could pull up the W-3 from Government's

23  Exhibit 5, which has previously been entered into evidence,

24  Mr. Arnold.

25      Thank you.

1              MS. CONNELLY:  Permission to publish, Your Honor?

2    Q   This is a W-3 for the tax year 2019 for SS1 LLC with an EIN

3    ending in 7509.  Was this document filed with the IRS?

4    A   No, it was not.

5    Q   We can take that down.  Thank you.

6        Does the Master File also allow you to search whether a

7    business has made payments?

8    A   Yes.

9    Q   And did any of the companies that we have talked about pay

10   taxes in the tax years 2019 or 2020?

11   A   No, they did not.

12   Q   Thank you.

13             MS. CONNELLY:  No further questions.

14             THE COURT:  All right.  Let's take the noon recess and

15   cross after lunch.  We will be in recess until one o'clock.

16             THE CLERK:  Please rise.  Court is in recess.

17                       (Recessed.)

18

19

20

21

22

23

24

25

```
 1                         AFTERNOON SESSION

 2            THE COURT:  Please be seated.

 3       Counsel, I had a question.  The documents that were listed on

 4   the stipulation as having been produced by the defendant, are you

 5   assuming they are now in evidence?

 6            MS. CONNELLY:  Yes, I was, Your Honor.  We showed them

 7   with Special Agent Moran, and I think I moved the Government's

 8   Exhibit 225 in, which contains all of that.

 9            THE COURT:  Which contains all of those exhibits?

10            MS. CONNELLY:  Yes.

11            THE COURT:  Is that agreed?

12            MR. NANCE:  Yeah.

13            THE COURT:  All right.

14            MR. NANCE:  Just one point.  I just want to alert the

15   court, I'm having a little bit of difficulty being able to

16   consult with Mr. Shibley at any time other than the actual trial

17   itself.  I come in before court and he's not available.  After

18   court, he's whisked away on lunch break.  I finally got in today

19   for a few minutes, after waiting for 20 minutes.

20       And all I'm saying is, at the conclusion of the government's

21   case, we need to make an informed decision or an eloquent

22   decision on whether he testifies or not.  And so I'm -- I would

23   very much appreciate having a little time to consult with him.

24            THE COURT:  Yes.  I'm directing the Marshals now, make

25   it happen.  Okay?
```

1        THE MARSHAL:  Yes, Your Honor.

2        THE COURT:  All right.  Bring in the jury.

3        (The following occurred in the presence of the jury.)

4        THE COURT:  Please be seated.

5     All right.  Mr. Nance.

6                        CROSS-EXAMINATION

7  BY MR. NANCE:

8  Q    Good afternoon, Mr. Hernandez.

9  A    Good afternoon.

10 Q    I believe you have been with the IRS, did you say, 20 years?

11 A    Yes, I did.

12 Q    Did you work as a revenue agent at all?

13 A    No.  I worked as what is called a "correspondence examiner."

14 Q    Okay.  One of the jobs you have described is checking --

15 pulling records, checking records.  It wasn't framed very well.

16 Being able to go back into the IRS databases and pull up the past

17 filings of records or the absence of filings?

18 A    Yes.  In each of my roles I have done that.

19 Q    Okay.  And you testified to doing that in Mr. Shibley's case?

20 A    Yes.

21 Q    How far back did you go?  You went back beyond early to

22 200 -- or did you, earlier than 2008?

23 A    Well, by function I had to.  When I pull up a filing record,

24 it pulls up everything that's still active on our database.

25 Q    Okay.  Did you determine that Mr. Shibley had, in fact, filed

 1  tax returns at an earlier time?

 2  A   I did, for one of the entities.  Eric Shibley MD.  I can't

 3  remember the full proper entity name.

 4  Q   PLCC, maybe?

 5  A   Yes.

 6  Q   He had filed in that entity's name?

 7  A   I did see returns filed prior to 2019 for those -- for that

 8  entity, yes.

 9  Q   Okay.  Let me ask you a little bit about Form 941.  In fact,

10  maybe to help us through it, if we could call up exhibit, I think

11  it's Exhibit 1, page 5, or so.  And if you could maybe -- yeah,

12  highlight or blow up the top half of it.

13       So if a person is preparing a 941, is there enough

14  information on what you see in front of you here, the top half,

15  to be able to automatically fill in the bottom half?

16  A   I'm going to answer no.  I'm not sure I understand your

17  question.  But if all I had -- if I were the preparer and all I

18  had was, like, a business name, address, and EIN, and the tax

19  period, I wouldn't be able to guess at what would go in part one

20  or part two of the form, no.

21  Q   Maybe I didn't ask it very well.

22       If you put in -- plug in the numbers to Question No. 1,

23  number of employees, and you plug in No. 2, wages, tips and other

24  compensation, what necessarily follows from that?  Can you

25  complete the full form?  Could a computer be programmed to

1   automatically fill in the blanks thereafter, or do you need more

2   information?

3   A    No.  I believe those two bits of information, lines one and

4   two, are needed to complete the rest of the form.  Except for, I

5   think, there's a payment section.

6   Q    Okay.  I was asking -- I was going to ask you that next.

7        If we could come down to the second half.  And actually if

8   you can include 5e above that?

9              MR. ARNOLD:  Sure.

10             MR. NANCE:  Yeah.

11  Q    It looks to me like 5e is the sum of the lines above it, and

12  that everything kind of follows from there.  It's identical

13  entries, less any amounts that had been paid or deposited toward

14  paying the obligation.

15  A    Correct.  It's basically a spreadsheet, or a worksheet, like

16  most tax forms.

17  Q    Okay.  And if we could -- maybe I'm asking this awkwardly.

18  But the lines above 5e, if we can get all of 5 in, Section 5.

19             MR. ARNOLD:  And below?

20             MR. NANCE:  Yeah.  Yes.  Try that.

21  Q    So it appears that this 5a and 5c are added to give you 5e,

22  the sum of those two?

23  A    Right.  Column two of 5a and 5c.

24  Q    Maybe one more request, to include all of the numbers, the

25  ones -- lines one through the end of it.  There you go.

1      So it appears to me that the answer on 5a is a function of

2  the amount on line 2.  You take the wages depicted on line 2, and

3  there's a set formula to multiply them by .124, to give you the

4  amount in Column 2.

5  A   Correct.

6  Q   Okay.  And same thing -- not the same thing, but a similar

7  thing in 5c.  It takes the same gross wage amount, and multiples

8  it by a different factor, relating to Medicare wages and tips.

9  And then 5a and 5c are added to give you 5e, which becomes the

10 taxable amount.

11 A   Correct.

12 Q   And then it's that, less any credits or any payments that

13 have been actually made?

14 A   Yes.

15 Q   So to go back to the first part of the question, if you plug

16 in the number of employees and the wages, you basically get the

17 bottom-line number, the balance due, unless there are payments

18 being made in?

19 A   Correct.  Notwithstanding any payments or credits that might

20 be available.

21 Q   Okay.  And this is a quarterly return -- you can take it

22 off -- this being a quarterly return, it should be filed every

23 quarter, if you are doing it the right way?

24 A   Correct.

25 Q   And ideally, or maybe presumptively, the money should be paid

1    in at the same time.  You should pay the money if you owe it?

2    A    Correct.

3    Q    The IRS kind of expects that it would be paid?

4    A    Yes.

5    Q    Now, wouldn't the IRS still accept a 941 filing, without the

6    money?

7    A    They would, yes.

8    Q    Then they would take their own steps to try and collect it?

9    A    Correct.

10   Q    Because it would be immediately due, wouldn't it?

11   A    Right.  It's due upon the due date of the return.

12   Q    Okay.  And if the business is late in making payroll tax

13   deposits, there's a provision in the IRS code for a penalty?

14   A    Correct.

15   Q    To come clean with the IRS?

16   A    Yes.

17   Q    And that penalty is a percentage of the amount that's not

18   properly paid in?

19   A    Yes.

20   Q    It increases over time?

21   A    I believe so, yes.

22   Q    Yeah.  So, it sounds like the tax law contemplates the

23   situation where people are late, or people don't pay when they

24   are supposed to.  And they have got steps in place to deal with

25   it, or a procedure in place to deal with it?

1   A    Right.  It's discouraged.  It should be paid on time and

2   filed on time.

3   Q    You have indicated that the W-3 form and the W-2 forms are

4   both things that are filed annually?

5   A    Yes.

6   Q    And they are retrospective.  They report what has been

7   paid --

8   A    Right.

9   Q    -- and withheld.

10       You would agree that the details of the tax law can sometimes

11   seem complicated and confusing to the layperson?

12   A    I have heard that, yes.

13   Q    You have heard that?

14   A    Yeah.

15   Q    A lot of us have.

16            MR. NANCE:  Thank you.

17            THE WITNESS:  You are welcome.

18            THE COURT:  Redirect?

19            MS. CONNELLY:  Nothing, Your Honor.

20            THE COURT:  You may step down.  Put your mask back on,

21   please.

22            THE WITNESS:  Thank you.

23            MR. NANCE:  Your Honor, I apologize.  There's -- before

24   he leaves, there was one additional question I would like to have

25   been able to ask.

```
 1                THE COURT:  Sure.

 2                MR. NANCE:  If I would be permitted to do so.

 3                THE COURT:  Sure.

 4   Q    (By Mr. Nance)  I'm sorry, Mr. Hernandez.  Are you familiar

 5   with the Form 7200?

 6   A    I don't have any experience with that form.  I've heard it

 7   mentioned, but I have never introduced it in court.  And I have

 8   never seen the form during my work in the previous jobs.

 9   Q    Okay.  Would the name of it be familiar to you, the advance

10   payment of employer credits due to COVID-19?

11   A    To be honest, no.

12   Q    No?

13   A    It's such a new law, it hasn't come up in my work before.

14   Q    Okay.  It obviously would have come up since the pandemic, to

15   have that kind of name?

16   A    I expect to see it, yes.

17   Q    Okay.  All right.  Thank you.

18                THE COURT:  Okay.

19                MR. WERNER:  Government calls Geoffrey Hillers.

20                     GEOFFREY HILLERS,

21        having been sworn under oath, testified as follows:

22                THE WITNESS:  Yes.

23                THE COURT:  Have a seat.  And take off your mask,

24   please.

25   ///
```

1                     DIRECT EXAMINATION

2    BY MR. WERNER:

3    Q    Good afternoon.

4         Please state your name and spell your last name.

5    A    My name is Geoffrey Hillers.  My last name is H-I-L-L-E-R-S.

6    Q    Mr. Hillers, where do you work?

7    A    I work for the Washington State Department of Revenue.

8    Q    What is your position with the State Department of Revenue?

9    A    I am a special agent.

10   Q    How long have you been an agent with the Department of

11   Revenue?

12   A    For approximately six years.

13        THE COURT:  You can pull that mic back, if it's easier

14   for you.

15        THE WITNESS:  Thank you.

16   Q    What does a special agent for the Department of Revenue do

17   for a job?

18   A    A special agent at the Washington State Department of Revenue

19   typically works complex or sensitive tax-collection cases.  And

20   they may serve as a subject-matter expert at a certain area of

21   tax law.

22   Q    And are those your duties, Mr. Hillers?

23   A    Yes, they are.

24   Q    And as part of your job for the Department of Revenue, are

25   you familiar with the records maintained by the Department of

1    Revenue?

2    A    Yes, I am.

3    Q    Are you able to search those records?

4    A    Yes, I can.

5    Q    And generally how are those records kept?

6    A    They're generally kept in an electronic database.

7    Q    Are you familiar with the functions of the Department of --

8    the Washington State Department of Revenue?

9    A    Yes, I am.

10   Q    What are they?

11   A    The Washington State Department of Revenue is the primary

12   state taxing agency for Washington.  It administers the State's

13   tax code, and it works to educate the public regarding the tax

14   code, as well as different registration or licensing

15   requirements.

16   Q    What is a business license in the state of Washington?  What

17   does that mean?

18   A    A business receives a license that's issued by the Department

19   of Revenue for them to engage in different business activities.

20   It also registers that organization with the Department for the

21   purposes of filing tax returns.

22   Q    When is a business required to get a license with the

23   Department of Revenue?

24   A    A business would be required to obtain a license if they deal

25   with any sort of retail activity or retail transactions, or if

1    they have gross annual revenues that are beyond $12,000.

2    Q   You also mentioned state taxes, as part of the function of

3    the Department of Revenue, correct?

4    A   That's right.

5    Q   And what does -- what are the responsibilities of a

6    Washington State business as it relates to reporting, as it

7    relates to revenue -- as it relates to reporting to the

8    Department of Revenue?

9    A   So when a business is registered with the Department of

10   Revenue, typically it has a filing requirement for excise-tax

11   returns, or other types of tax returns.  And, for instance, if

12   they're engaging in business, then they're going to be filing

13   these tax returns on either a monthly, quarterly, or annual

14   basis.

15   Q   And is there a threshold at which the business has to report

16   its revenue?

17   A   So as I mentioned prior, if there's any sort of retail

18   activity, they would have to report that activity immediately.

19   If they're engaged in activity that is not retail-related, then

20   they aren't required to have a license until they reach $12,000

21   in annual revenues.  So at that point they would be required to

22   register and to report their tax information.

23   Q   I'm going to show you on the screen, Mr. Hillers, what's been

24   previously marked as Exhibit 77.  And, Mr. Arnold, could you

25   scroll through the first few pages of Exhibit 77?  The next

1   couple of pages, all the way.  And could you go to the last page?

2       Mr. Hillers, do you recognize -- prior to coming to court did

3   you view --

4               THE COURT:  Counsel, this is not in evidence.

5               MR. WERNER:  That's correct.  Is it published?

6               THE COURT:  Yes.

7               MR. WERNER:  Oh, thank you.

8   Q   Did you review Government's Exhibit 77?

9   A   Yes, I did.

10  Q   What is that, generally?

11  A   That exhibit is the Department of Revenue's records for Eric

12  R. Shibley MD, PLLC.

13  Q   What time period does it cover?

14  A   I believe that it covers the periods of Quarter 3, 2017,

15  through 2020.  I would have to double-check the record.

16  Q   Could we go back to the first page, please, Mr. Arnold?

17      Again, are these the records that are maintained for Eric

18  Shibley MD, PLLC, by the Department of Revenue?

19  A   That's correct.

20  Q   Are they maintained in the normal course of business?

21  A   Yes, they are.

22              MR. WERNER:  Offer Exhibit 77.

23              MR. NANCE:  No objection.

24              THE COURT:  Admitted.

25                      (Exhibit No. 77 admitted.)

1    Q   And let's let the jury see the first page, please.  Thank

2    you.

3        Is Eric Shibley MD, PLLC, was that registered with the

4    Department of Revenue?

5    A   Yes, it was.

6    Q   And I'm going to show page 17.  What is page 17 of

7    Exhibit 77?

8    A   Page 17 of that exhibit is a copy of the business license as

9    it's displayed within our records.

10   Q   Why is there the word "Preview" on it?

11   A   It shows "Preview," as a watermark, essentially, when it's

12   maintained in the electronic system.  If you view it from within

13   the system, it will have a watermark.  However, when it's

14   printed, that's removed.

15   Q   Let's look at the next page, please, page 18.

16       What is page 18 of Exhibit 77?

17   A   Page 18 is a combined excise tax return, for the quarterly

18   period of quarter one, 2017.

19   Q   Can you describe -- what does this record show?  What quarter

20   does this show, and what does this record show for Shibley MD?

21   A   So this would shows business revenues over that quarterly

22   period.  Essentially that's January, February, and March of 2017.

23   Q   And is this a -- does this indicate that this excise tax

24   return was filed with the Department of Revenue?

25   A   Yes, it does.

1  Q   And could we blow out the bottom, additional information,
2  please, Mr. Arnold?
3       And who completed this excise tax return?
4  A   That excise tax return was completed by Eric Shibley.
5  Q   How are these excise tax returns -- how are they filed with
6  the State Department of Revenue?
7  A   They're filed electronically through the state's My-ID web
8  portal.
9  Q   If we can -- And how much was paid for excise taxes on this
10 particular page, this form?
11 A   On that particular tax return, the amount of $160.32 was
12 remitted.
13 Q   Have you reviewed the rest of the exhibit, pages 19
14 through 31?
15 A   Yes, I have.
16 Q   Does that indicate that, for at least a time period, Eric
17 Shibley MD continued to file state tax returns?
18 A   It does.
19 Q   And could we show the last page of the exhibit, page 31?  You
20 can blow up just the top half.
21      What is this page 31?
22 A   Page 31 is a combined excise tax return for the period of
23 Quarter 3, 2019.
24 Q   And what is the business?
25 A   It's for the businesses Eric R. Shibley MD, PLLC.

1    Q    And what does the -- this looks different than the previous

2    page we saw.  Why is that?

3    A    The Department transitioned from an antiquated filing system

4    to a more modern system during this time period.  So that

5    resulted in a change to the filing portal.

6    Q    For the third quarter of 2019, did Eric Shibley MD report

7    revenue?

8    A    Yes, it did.

9    Q    How much?

10   A    $13,000.

11   Q    And did it pay taxes to the state?

12   A    For that period, no.

13   Q    And the previous pages in this exhibit, are they tax returns

14   from 2018 and the earlier quarters of 2019?

15   A    They are.

16   Q    During that timeframe, 2018 and 2019, did Shibley MD pay

17   state excise taxes?

18   A    During that time period, no.

19   Q    And why not?

20   A    The business, during that time period, received a small

21   business credit.  It's a tax credit.  If revenues are below a

22   certain threshold, an organization or a taxpayer wouldn't have to

23   remit excise taxes.

24   Q    So let's just look at page 30, please, to look at the revenue

25   amount.

1        So what is the revenue amount reported for the second quarter

2   of 2019?

3   A    The gross revenue for that quarter was $13,500.

4   Q    And were taxes due?

5   A    There was no tax due, due to the small business credit.

6   Q    And let's go back to page 29, please, Mr. Arnold.

7        Is page 29 the first quarter tax return?

8   A    That's correct.

9   Q    And how much gross revenue was reported?

10  A    The gross revenue of $12,350 was reported.

11  Q    And are taxes due on this amount?

12  A    No, they are not.

13  Q    Why not?

14  A    That's due to the small business credit that was received.

15  Q    All right.  Let's take that down.  Thank you, Mr. Arnold.

16       I'm going to show you now what's been marked as Exhibit 79.

17  And I'm going to ask Mr. Arnold to scan through this document to

18  the last document.

19       Is Exhibit 79 records of the Department of Revenue?

20  A    Yes, they are.

21  Q    What is the -- let's go back to the first page, please.

22       What is the business name?

23  A    The legal entity on this exhibit, or for these records, is

24  SFC LLC.

25  Q    Before we go on, Mr. Hillers, I neglected to ask you a

 1    question about Eric Shibley MD, PLLC.  The last filing we saw

 2    reporting revenue was the third quarter of 2019, correct?

 3    A    That's correct.

 4    Q    Did you check the records to see if Eric Shibley MD filed

 5    state tax returns after the third quarter of 2019?

 6    A    I did, approximately three weeks ago.

 7    Q    What did you find?

 8    A    I found that there were no further records.

 9    Q    Thank you, Mr. Hillers.

10         Back to Exhibit 79.  Are these the business records

11    maintained in the Department of Revenue for a business SFC LLC?

12    A    Yes, they are.

13              MR. WERNER:  Offer Exhibit 79.

14              MR. NANCE:  No objection.

15              THE COURT:  Admitted.

16                    (Exhibit No. 79 admitted.)

17    Q    So we're going to now publish the first page of Exhibit 79.

18    Can we go to the page -- to page 4 of Exhibit 79, please?  Did

19    this business change its name?

20    A    The business did not change its name.

21    Q    What is -- what does this indicate?  What does this page

22    indicate?

23    A    This page would indicate that they registered a tradename or

24    are doing business as Seattle's Finest Cannabis.

25    Q    Okay.  So what is the legal name?

1    A    The legal name is SFC LLC.

2    Q    Okay.  And let's go to page 10, please.

3         Did this business, SFC LLC, file state excise tax returns?

4    A    Yes, it did.

5    Q    And what was the period that it filed state excise tax

6    returns?

7    A    It filed state excise tax periods for the period of July 2018

8    through September of 2019.

9    Q    There are entries here indicating time periods in 2019 and

10   2020, what does that indicate?

11   A    For those periods of 2019 and 2019 -- excuse me, 2019 and

12   2020, they would show that no tax return was filed.

13   Q    So the last tax return was filed approximately -- through the

14   period September 2019?

15   A    That is correct.

16   Q    And did you check the records of the Department of Revenue

17   recently?

18   A    I did, approximately three weeks ago.

19   Q    Any further state excise tax returns for this business?

20   A    No, there were not.

21   Q    Let's go to page 9, please.

22        What does page 9 indicate?

23   A    Page 9 indicates that there were no tax penalties or interest

24   debits which occurred during the filing period range.

25   Q    And did this business ever make payments, SFC LLC?

 1    A    No, it did not.

 2    Q    So can a business be required to file a return, even if money

 3    is not owed?

 4    A    That is correct.

 5    Q    Why would that be?

 6    A    If a business maintains a license and tax registration, it

 7    has a requirement to file and pay excise taxes.  Even if there's

 8    no activity during a taxable period, it has to report that to the

 9    Department.

10    Q    Let's take that down.  Thank you.

11         Showing you now what's been marked as Exhibit 78.  And have

12    you reviewed Exhibit 78 prior to coming to court?

13    A    I have.

14    Q    And what is Exhibit 78?

15    A    Exhibit 78 are the Department of Revenue's records for ES1

16    LLC.

17    Q    Were these records maintained in the regular course of the

18    Department of Revenue's business?

19    A    They were.

20              MR. WERNER:  Offer Exhibit 78.

21              THE COURT:  Any objection, Mr. Nance?

22              MR. NANCE:  No objection.

23              THE COURT:  It will be admitted.

24                        (Exhibit No. 78 admitted.)

25    Q    So a business with the name ES1 LLC was registered with the

1    State Department of Revenue?

2    A    Yes, it was.

3    Q    Let's look at page 10, again, please, Mr. Arnold.

4         Did ES1 LLC file state excise tax returns?

5    A    Yes, it did.

6    Q    Let's go to page 9, please.

7         Did ES1 LLC pay state excise taxes?

8    A    No, it did not.

9    Q    What is the time period that it filed returns?

10   A    It filed returns for the time period of annual 2017 through

11   annual 2019.

12   Q    Did it pay state excise taxes during that time?

13   A    It did not.

14   Q    Why not?

15   A    Those periods were reported as no activity.

16   Q    Let's look at page 15, please.

17        Mr. Hillers, do you recognize page 15?

18   A    I do.

19   Q    What is this?

20   A    This is a copy of correspondence mailed to the taxpayer by

21   the Department, concerning a reseller permit application.

22   Q    Who, according to this letter, who applied for a reseller

23   permit application?

24   A    That application was applied for by ES1 LLC.

25   Q    And where was the letter sent?

1   A    That was sent to 4700 36th Avenue Southwest, in Seattle,

2   Washington.

3   Q    And what is a reseller permit application?

4   A    A reseller permit application allows the business to be

5   considered for reseller permit.  A reseller permit allows a

6   business to purchase goods, without paying sales taxes on those

7   goods, to be resold to the end customer.

8   Q    What types of businesses would want a reseller permit?

9   A    Generally any type of retail establishment or retail

10  business.

11  Q    Why was the reseller permit application denied?

12  A    According to the correspondence, the business was not

13  qualified for a reseller permit application.

14  Q    Are there other notes in the Department of Revenue's file

15  that indicate why this letter was issued and why the permit was

16  denied?

17  A    Yes, there are.

18  Q    Let's look at page 12, please.  Could we call out that top

19  section, please?  What are we seeing here on page 12?

20  A    We are seeing notes that are affiliated with the business.

21  These notes are made by Department of Revenue personnel.

22  Q    And do these notes discuss this reseller permit application?

23  A    Yes, they do.

24  Q    According to these notes, why was the reseller permit

25  application denied for ES1 LLC?

1  A    According to the notes, the application was denied as the

2  business had indicated that they were a speculative builder, and

3  they did not have a contractor's license with the Department of

4  Labor and Industries.

5  Q    And L&I is an abbreviation in these records.  What does that

6  stand for?

7  A    That stands for the Department of Labor and Industries.

8  Q    And so do you need a license with L&I to be a contractor?

9  A    Generally, yes.

10  Q    Why?

11  A    That agency regulates different industries.  One regulated

12  industry that they monitor is the contracting industry.  They

13  have certain licensing, insurance and bonding requirements.

14  Q    For contractors?

15  A    That's correct.

16  Q    In order to get a license, a contractor's license with L&I,

17  must a business first be registered with the Department of

18  Revenue?

19  A    Yes.

20  Q    So if a business doesn't have a business license with the

21  Department of Revenue, it necessarily doesn't have a contractor's

22  license with L&I?

23  A    I would say that's correct.

24  Q    Let's take this down.  Thank you.

25       Did you check Department of Revenue records for registration

1   records for some other businesses?

2   A   Yes, I did.

3   Q   When did you last do that check?

4   A   That check occurred last on October 18th of this year.

5   Q   Did you check the Department of Revenue's records for a

6   business named A Team Holdings LLC, with an employer

7   identification number ending in 7088?

8   A   Yes, I did.

9   Q   What did you find?

10  A   The Department of Revenue had no records for that entity.

11  Q   So there was no business license for A Team Holdings?

12  A   Right.

13  Q   If a business isn't registered with the Department of

14  Revenue, that business wouldn't have a contractor's license with

15  L&I?

16  A   That's correct.

17  Q   What triggers the requirement that a business be registered

18  with the Department of Revenue?

19  A   The triggering requirement for registration with the

20  Department of Revenue would be either a business that's engaged

21  in any sort of retail transaction, or for businesses that are

22  non-retail, annual activity beyond $12,000.

23  Q   So annual revenue.  Does that mean annual revenue beyond

24  $12,000?

25  A   That's correct.

1    Q    If a business had employees, would that business need to be

2    registered with the Department of Revenue?

3    A    Generally, yes.

4    Q    Why?

5    A    If a business is registered with the Employment Security

6    Department, as part of that registration process, the Department

7    of Revenue receives the corresponding application.  The

8    Department of Revenue would register that business as well.  And

9    likely, if they're registering for employee-reporting purposes,

10   they're generating some sort of revenue.

11   Q    So if a business has employees, it's likely generating

12   revenue; is that your testimony?

13   A    Yes.

14   Q    Did you check the Department of Revenue records for a

15   business named Dituri Construction, with an EIN ending in 8508?

16   A    I did.

17   Q    What did you find?

18   A    The Department of Revenue had no records for that entity.

19   Q    No licenses?

20   A    No.

21   Q    No reports of revenue?

22   A    No.

23   Q    Did you check the Department of Revenue records for a

24   business named SS1 LLC with an EIN ending both in 7509 and 2134?

25   A    I did.

1    Q    What did you find?

2    A    The Department of Revenue had no records for that entity as

3    well.

4    Q    And, again, if Dituri Construction and SS1 LLC are not

5    registered with the Department of Revenue, they do not have that

6    business license, they do not have a contractor's license with

7    L&I, correct?

8    A    I think that would generally be correct.  I don't have

9    information concerning L&I.

10   Q    Did SS1 LLC have a business license with the Department of

11   Revenue?

12   A    No, it did not.

13   Q    Did Dituri Construction have a business license with the

14   Department of Revenue?

15   A    No, it did not.

16   Q    Did either entity report revenue to the Department of Revenue

17   at any time?

18   A    No, they did not.

19        MR. WERNER:  Thank you.  Nothing further, Mr. Hillers.

20        THE COURT:  Cross?

21                        CROSS-EXAMINATION

22   BY MR. NANCE:

23   Q    Good afternoon, Mr. Hillers.

24   A    Good afternoon.

25   Q    So is there generally open communication and sharing of

1    information between state departments?

2    A    Yes.  There are data-sharing agreements.

3    Q    The Department of Revenue shares information; it gets

4    information from, say, its Secretary of State?

5    A    Generally, yes.

6    Q    Okay.  So if a business wants to register as an LLC with the

7    Secretary of State, they are assigned a number, right, a UBI

8    number?

9    A    That's correct.

10   Q    Is that the same number that the Department of Revenue uses

11   to identify businesses?

12   A    Yes.  We use the UBI number.

13   Q    That comes from the Secretary of State, then?

14   A    Yes.

15   Q    Okay.  So if a business registers or certifies with the

16   Secretary of State, and they're issued a UBI number, wouldn't the

17   Department of Revenue generally know about it?

18   A    The Department of Revenue system would show that there had

19   been a registration with that entity, and that it's been assigned

20   a UBI number.

21   Q    Okay.  So it's on your radar, at least?

22   A    It would appear, yes.

23   Q    Okay.  Whether or not a formal license is obtained from the

24   Department of Revenue?

25   A    That's correct.

1   Q   So it's very possible, it sounds like, and may even have

2   happened in this case, that there were LLCs out there that had

3   been created and registered with the Secretary of State and

4   issued a UBI number, that Department of Revenue had on its radar,

5   knew about?

6   A   Correct.

7   Q   At least one of them, ES1 LLC, was, in fact, registered with

8   the Revenue Department?

9   A   That's right.

10  Q   And was -- was it licensed?  Would that make it licensed, the

11  fact that it's registered?

12  A   The fact that it was registered, generally applies to a

13  business license.  So, yes, that entity did have a business

14  license.

15  Q   So ES1 is registered and licensed with the Department of

16  Revenue?

17  A   Correct.

18  Q   And it's filing returns?

19  A   That's correct.

20  Q   Now, isn't it accurate that Washington State does not have a

21  state income tax?

22  A   That is true.

23  Q   Is it also correct that there is no corporate income tax?

24  A   That is true as well.

25  Q   The B&O, or business and occupation tax, is a sort of excise

1    tax?

2    A    Yes.

3    Q    Right?

4    A    Yes, it is.

5    Q    It's typically levied on personal service?

6    A    It can be, yes.

7    Q    Are construction services categorized differently?

8    A    Construction services are categorized differently, depending

9    on the type of activity that the entity is performing.

10   Q    Well, are construction services necessarily subject to the

11   B&O tax?

12   A    Yes.

13   Q    And that's not because they're retail, right?  Retail

14   businesses are automatically subject to excise tax; is that

15   right?

16   A    Correct.  And with construction activities, if a contractor

17   is performing activities directly for the consumer -- so, for

18   instance, you hire a contractor to come to your home and complete

19   a repair, it's categorized as a retail transaction.

20   Q    Where do you draw the line?  Where does -- does it have to be

21   something bigger than just a homeowner having someone come out

22   and do renovation work?

23   A    Where that would differentiate is whether or not a contractor

24   is performing activities for the end customer, or if they're

25   working for another contractor as a subcontractor.  Then it would

 1  differentiate the excise-tax classification.

 2  Q   And if they're working with a different contractor, is there

 3  still an excise tax, or not?

 4  A   Yes.

 5  Q   Thank you.

 6          THE COURT:  Any redirect?

 7          MR. WERNER:  No, Your Honor.

 8          THE COURT:  You may step down.

 9          THE WITNESS:  Thank you, Your Honor.

10          THE COURT:  Put your mask back on, please.

11          MR. WERNER:  The government calls Cynthia Cole.

12          THE COURT:  You folks can stand up and stretch, if you

13  would like.

14                          CYNTHIA COLE,

15      having been sworn under oath, testified as follows:

16          THE COURT:  You can take your mask off.

17          THE WITNESS:  Thank you.

18                      DIRECT EXAMINATION

19  BY MR. WERNER:

20  Q   Please state your name.

21  A   Cynthia Cole.

22  Q   Could you spell your last name?

23  A   C-O-L-E.

24  Q   You can take your mask off your ear, if you want.  It's up to

25  you.  Thank you.

1        Ms. Cole, where do you work?

2    A    Employment Security Department.

3    Q    Ms. Cole, could you maybe bring the microphone a little

4    closer to yourself, or yourself a little closer to the

5    microphone?

6    A    Employment Security Department.

7    Q    Great.  What state Employment Security Department?

8    A    Washington state.

9    Q    How long have you worked at the Employment Security

10   Department?

11   A    Twenty-two years.

12   Q    What is your current position at Employment Security?

13   A    Unemployment insurance, customer services, and integrity

14   manager.

15   Q    What does that mean?  What does that position entail?

16   A    I work with -- I do -- I work with a lot of the appeals,

17   gathering of information.  I work on Employment Security

18   Department claims.

19   Q    And what positions did you hold, if any, prior to that

20   position?

21   A    I started at the Employment Security Department in 1999 as an

22   intake agent.  I have been a trainer.  I was an adjudicator.  I

23   was a disabled veteran's outreach program specialist.  So I

24   worked with veterans to help them get reemployed.  And I was the

25   adjudication manager for about ten years.

1  Q    And in connection with your career at Employment Security,

2  are you familiar with the records maintained by the Employment

3  Security Department?

4  A    Yes.  Employment Security Department has three major

5  branches.  One is tax and wage, who works with mainly the

6  employers and them paying taxes, quarterly taxes.  Then we have

7  the reemployment side of the house, which most people know as

8  Work Source.  And it has a variety of different programs to help

9  the unemployed become reemployed.  And then I have spent most of

10 my career in the unemployment insurance part of the business,

11 which determines eligibility for people to get unemployment

12 insurance.

13 Q    Thank you, Ms. Cole.

14      Let's talk about the first function, the tax-and-wage

15 function.  What sort of information does the Employment Security

16 Department collect from employers in Washington State?

17 A    They collect -- all employers in the state of Washington are

18 required to pay taxes on all their employees that work for them.

19 So they pay quarterly taxes.  They collect the quarterly taxes.

20 They collect wage information, employees' names, their social

21 security number.  And those wages get attached to, you know, when

22 they're ready to file for a claim so that they have money and

23 hours to be able to file a claim.

24 Q    What's the name of the form that an employer files to report

25 this wage information?

1    A    The quarterly wage form.

2    Q    I will show you what's been marked as Exhibit 81.  I'm going

3    to ask Mr. Arnold to go to the second page.

4    A    The quarterly tax report, 5208.

5    Q    And have you reviewed Exhibit 81 before coming to court

6    today, Ms. Cole?

7    A    Yes.

8    Q    Are these employer quarterly reports for a business called

9    Shibley MD?

10   A    Yes.

11   Q    Were they maintained in the records of Employment Security

12   Department?

13   A    Yes.

14            MR. WERNER:  Offer Exhibit 81.

15            MR. NANCE:  No objection.

16            THE COURT:  Admitted.

17                (Exhibit No. 81 admitted.)

18   Q    Let's look at page 8, please, if we can.  If that's -- and

19   perhaps let's call out the top quarter, or top third of the page

20   first.  Thanks, Mr. Arnold.

21        So, again, what is this form that we're looking at here?

22   A    It is a quarterly tax report from March 2017.

23   Q    Is it March 2017, or does that "3" mean the quarter?

24   A    Third quarter.  Sorry, third quarter.

25   Q    And what is the business name that's being -- that this tax

1  report is for?

2  A    Shibley Medical Clinic.

3  Q    What is the address?

4  A    4700 36th Avenue Southwest, Seattle, Washington, 98126-2716.

5  Q    Thank you, Mr. Arnold.  If we could go back and look at the

6  middle section there of the report.

7       Who is the preparer?

8  A    Eric Shibley.

9  Q    Thank you.  If we could go to the next page, please?

10      What does this part of the report indicate?

11 A    He's reporting total gross wages of $2,000.

12 Q    And you indicated when a business reports wages, what does

13 ESD or Employment Security do with that information?

14 A    So every year Employment Security gives all of Washington

15 employers a tax rate.  And so every year, they -- they do an

16 annual tax run.  They get taxed based on how many employees they

17 have, their wages.  And on a quarterly basis, businesses are

18 required to pay their quarterly taxes.

19 Q    And so based on those rates, what is the amount of tax due to

20 Employment Security for this particular business?

21 A    $36.

22 Q    And -- thank you.  Let's go to Exhibit 81.  Show Ms. Cole

23 Exhibit 81, please.  I'm sorry, 80.  Sorry.

24      Do you recognize Exhibit 80?

25 A    Yes.

 1    Q    What is that?

 2    A    It is a letter saying -- from Dituri Construction, with an

 3    employer identification number that doesn't exist in our system,

 4    from January 1st of 2017 through March 31st of 2020.

 5    Q    Is this a certification of no records?

 6    A    Correct.

 7    Q    Offer Exhibit 80.

 8              MR. NANCE:  No objection.

 9              THE COURT:  Admitted.

10                    (Exhibit No. 80 admitted.)

11    Q    Could we call out the middle section, please, again?  Just

12    the text, not the "sincerely," just the text.  Thank you.

13         So, again, now that we all can see this document, what does

14    this document indicate about the records maintained for ESD for

15    Dituri Construction?

16    A    There wasn't any.

17    Q    So were any employer quarterly reports filed for Dituri

18    Construction?

19    A    No.

20    Q    Any wages reported for employees?

21    A    No.

22    Q    Let's look at -- actually, if you look in your binder, have

23    you reviewed documents Exhibits 82 through 86?

24    A    Yes.

25    Q    Are Exhibits 82 through 86 more certifications of no records?

 1    A    Correct.

 2    Q    And is Exhibit 82 for a business called SS1 LLC?

 3    A    SS1 and SS1 LLC.

 4    Q    Is Exhibit 83 ES1, a business named ES1?

 5    A    ES1 LLC.

 6    Q    And 84 is SFC LLC?

 7    A    84 I have as Seattle's Finest Cannabis.

 8    Q    And what is the business for Exhibit 85?

 9    A    The A Team Holdings.

10    Q    Is Exhibit 86 an EIN ending in 8805?

11    A    Yes.

12              MR. WERNER:  Offer Exhibits 82 through 86.

13              MR. NANCE:  No objection.

14              THE COURT:  Admitted.

15                  (Exhibit Nos. 82 - 86 admitted.)

16    Q    Just look at 82, please.  Call out the text of the letter.

17         Ms. Cole, Exhibit 82 is on the screen now.  What does this

18    indicate?  What is the first page of Exhibit 82?

19    A    That this employer identification number does not exist.

20    There were no wages reported, and no quarterly taxes paid on it,

21    from January 1st of 2017 through March 31st of 2020.

22    Q    Is that true for the other businesses that we just mentioned?

23    Is that true for the ES1?

24    A    Yes.

25    Q    Exhibit 83?

 1    A    Uh-huh, correct.

 2    Q    Is that true for Seattle's Finest Cannabis, Exhibit 84?

 3    A    Yes.

 4    Q    Is that true for A Team Holdings, Exhibit 85?

 5    A    Yes.

 6    Q    And for the EIN ending in 8805, Exhibit 86?

 7    A    Yes.

 8    Q    Now, we have talked a little bit about -- you can take that

 9    down, thank you.

10         We talked a little bit about what an employer reports.  Is

11    information also maintained in the records of Employment Security

12    Department by employee?

13    A    Yes.

14    Q    How is that information maintained?

15    A    Social security number.

16    Q    And if you were provided a social security number, are you

17    able to search for reported wages for that employee for that

18    social security number?

19    A    Yes.

20    Q    Did Employment Security Department prepare some records as to

21    wages paid to certain Washington residents in this case?

22    A    Yes.

23    Q    Again, in the binder in front of you, are you familiar with

24    Exhibits 88 through 97?

25    A    Yes.

1   Q   And, generally, what is contained in Exhibits 88 through 97?

2   A   A person's name, their social security number.  That we were

3   not able to find wages for that individual.  Yes, we were.

4   Sorry.  So like, 88, we had -- they had wages from different

5   employers.

6   Q   Let me just ask you, generally, Ms. Cole, are they all

7   searches run by the Employment Security Department for particular

8   names by particular social security numbers?

9   A   Yes.

10  Q   Do they all cover the time period of 2017 through first

11  quarter of 2020?

12  A   Yes.

13  Q   I'm going to show you now what's been admitted as Exhibit 48.

14  Could we go to page 3, please, Mr. Arnold?

15      Do you see the ten names listed on Exhibit 48, page 3?

16  A   Yes.

17  Q   Are those the same names that are in Exhibits 88 through 97?

18  A   Yes.

19          MR. WERNER:  Offer Exhibits 88 through 97.

20          MR. NANCE:  No objection.

21          THE COURT:  Admitted.

22          (Exhibit Nos. 88 - 97 admitted.)

23  Q   Mr. Arnold, could we put Exhibit 91 on the screen, please?

24      Let's look at the second page of Exhibit 91.  What are we

25  looking at with Exhibit 91, Ms. Cole?

1   A    So it's saying first quarter of 2020, this individual worked

2   for Toyko Japanese Steakhouse.

3   Q    And so this page covers multiple quarters, correct?

4   A    Yes.

5   Q    What is the individual's name?

6   A    Muna, Jerome.

7   Q    And, again, what business did Mr. Muna work for in this

8   period time?

9   A    Tokyo Japanese Steakhouse.

10  Q    What does this report indicate about the wages?  Were they

11  reported to ESD?

12  A    Yes.  Let's see.  First quarter of 2017.  Second quarter,

13  third quarter, of 2017 again.  And third and fourth quarter of

14  2018.  And then for the full year of 2019.

15  Q    Let's look at the next page.  What is this page of

16  Exhibit 91?

17  A    This is where the claimant -- well, Mr. Muna, filed for an

18  unemployment claim.

19  Q    Was that claim granted?

20  A    Yes.

21  Q    And what would that claim be based on?  In part -- would it

22  be based, in part, on the wages we saw on the second page?

23  A    Yes.

24  Q    And, again, explain to the jury the connection between wages

25  reported and unemployment compensation?

1    A    Sure.  Any time somebody becomes unemployed, they call us, we

2    ask for their social security number.  So any wages that are

3    attached to that social security number, we have a formula that

4    we look at.  They have to have at least 680 hours for a base

5    year, which is four quarters.  And then we look at their wages to

6    determine their weekly benefit amount.  It's the two highest

7    quarters added together, divided in half, multiplied by .04.

8    That's how they get their weekly benefit amount.

9    Q    For Exhibit 91, did a business named SS1 LLC or Dituri

10   Construction report wages for this individual, Mr. Muna?

11   A    No.

12   Q    Let's look at Exhibit 92, please.  This individual's name is

13   Eric Pula, correct?

14   A    Yes.

15   Q    Did the SS1 LLC or Dituri Construction report wages for Mr.

16   Pula?

17   A    No.

18   Q    Did you review -- what about the business name A Team

19   Holdings, did that business report?

20   A    No.

21   Q    Let's look at Exhibit 97.  Go to the second page of 97,

22   please.

23        What is Exhibit 97, Ms. Cole?

24   A    Reported wages for a Lisa Velotta.

25             THE COURT:  Keep your voice up, if you will, please.

1    A    Sure.  Wages for a Lisa Velotta.

2    Q    Are there wages reported by SS1 LLC or Dituri Construction?

3    A    No.

4    Q    What about the A Team Holdings?

5    A    No.

6    Q    What businesses are reported?

7    A    Pacific Medical Centers in Puyallup, Steeb versus Overlake

8    Hospital Medical, and Pacific Medical Centers of Puyallup.

9    Q    Ms. Cole, did you review all of these records 88 through 97

10   to see if any of these individuals had wages reported from Dituri

11   Construction?

12   A    They do not.

13   Q    I'm sorry.  My question is, did you review them to see if

14   Dituri Construction is contained there?

15   A    Could you say that again?

16   Q    I could.  I will.

17        Is Dituri Construction listed anywhere on Exhibits 88

18   through 97?

19   A    No.

20   Q    SS1 LLC?

21   A    No.

22   Q    A Team Holdings?

23   A    No.

24   Q    Seattle's Finest Cannabis?

25   A    No.

1    Q    ES1 LLC?

2    A    No.

3    Q    So for these individuals, none of them had wages reported by

4    those companies to ESD, correct?

5    A    Correct.

6    Q    So, again, you advised the jury about the second function of

7    Employment Security, and that's the unemployment insurance,

8    correct?

9    A    Yes.

10   Q    How are unemployment insurance payments in the state of

11   Washington, how are they funded?

12   A    Employers only.

13   Q    And could you be a little more specific?  How do employers

14   pay in?

15   A    They send in quarterly reports on all the employees that they

16   have, and their wages.

17   Q    And are they required to pay unemployment taxes?

18   A    Quarterly.

19   Q    Did you review Exhibit 87?

20   A    Yes.

21   Q    And are these records of the Employment Security Department?

22   A    Yes.

23   Q    And did you review Exhibit 98?

24   A    Yes.

25   Q    Is Exhibit 98 also records of the Employment Security

1    Department?

2    A   It is.  This is where --

3              THE COURT:  No, he's going to ask another question.

4    Q   Again, let's go back to Exhibit 87.  Who does Exhibit 87

5    relate to?

6    A   Eric Shibley.

7              MR. WERNER:  Offer Exhibit 87.

8              MR. NANCE:  No objection.

9              THE COURT:  Admitted.

10                  (Exhibit No. 87 admitted.)

11   Q   So we're looking at the first page of Exhibit 87.  What does

12   this show?

13   A   That there were wages reported, third quarter of 2017, for

14   $2,000, and 180 hours.

15   Q   And who is the reported employee?

16   A   Eric Shibley.

17   Q   And the last four of the social security number are listed on

18   this document as well?

19   A   Yes.

20   Q   Does that tie to a document we saw earlier in your testimony?

21   A   Yes.  That's on -- let's see, 98.  We didn't originally have

22   any wages or hours.  And so he -- so he was able to let us know

23   that he did actually report some hours and wages.  And this is

24   what -- this is the form that he did that with.

25   Q   So thank you, Ms. Cole.  Let's take it one step at a time.

1   Did Mr. Shibley apply for unemployment payments with the

2   Employment Security Department?

3   A    Yes.

4   Q    And approximately -- well, what does the first thing the

5   Employment Security Department does when it gets an unemployment

6   insurance request, a claim?

7   A    We look for wages.

8   Q    And what wages did you find for Mr. Shibley?

9   A    We originally didn't find any.

10  Q    And are these wages in the Employment Security Department

11  system?

12  A    They are now.  From 2017, third quarter.

13  Q    Thank you.  And explain why -- was the unemployment claim

14  made in 2020?

15  A    Yes.

16  Q    So why wouldn't 2017 wages show up when you were processing

17  an unemployment claim for 2020?

18  A    So we look at -- everybody's unemployment claim is based on a

19  base year.  So if I file today, it would be current quarter.

20  Then the next four -- three months, next quarter is lag quarter,

21  which all the employers are paying their taxes on.  And then your

22  base year is based on those next four quarters.  And so we look

23  for wages on those four quarters.  If you don't have the

24  680 hours, the person has the opportunity to file an alternate

25  base year, which includes the lag quarter.  And then we would

1   have to request those wages from the employer to report early.

2   Q   Let's look at page 2 of Exhibit 87.  Did Washington State

3   make unemployment payments to Mr. Shibley in 2020?

4   A   Not through a regular unemployment claim.

5   Q   Okay.  Why not through the regular -- why didn't Washington

6   State make regular unemployment payments to Mr. Shibley?

7   A   He didn't have hours or wages.

8   Q   And was there a different type of unemployment that Mr.

9   Shibley applied for in 2020?

10  A   Yes.  In 2020 the federal government -- Employment

11  Security -- I can't even think of the word.  Based on the federal

12  government, we created -- we didn't create it, we just

13  implemented the pandemic unemployment assistance program.  And so

14  the pandemic unemployment assistance program was for a lot of

15  people who didn't meet the 680 hours for regular employment.

16  They were considered underemployed.  Self-employment.  I mean,

17  the pandemic unemployment assistance really opened the doors for

18  many other people who are not normally considered eligible for

19  regular unemployment, to receive this pandemic unemployment

20  assistance.

21  Q   Let's look at page 3, if we could, Mr. Arnold.

22      What does page 3 indicate?

23  A   That he was paid pandemic unemployment assistance.

24  Q   From what time?  And what benefit weeks were covered?

25  A   5/9/2020, through -- oh, it started March 7th of 2020,

1    through May 9th of 2020.

2    Q    What dates were these payments made?

3    A    Let's see.  Some were made -- well, most were made on

4    4/22/20.  Then a couple were made on 4/30/2020.  A couple on

5    5/4.  And then the last two payments were made on 5/12.

6    Q    Can we look at page 4, please, Mr. Arnold?  Can we actually

7    go to page -- let's go to page 6, please.

8         Just closing the loop on this.  What does page 6 indicate,

9    Ms. Cole?

10   A    This is his original determination letter dated April 2nd of

11   2020, stating you may receive up to zero each week.  You are

12   eligible for unemployment benefits.  Your total amount -- I mean,

13   it's telling him he's not eligible for a regular unemployment

14   claim.

15   Q    And so -- but he did receive pandemic unemployment

16   assistance, correct?

17   A    Right.

18   Q    And you indicated that the state Employment Security

19   Department administered the pandemic unemployment assistance?

20   A    Yes.

21   Q    Were applicants required to answer questions with the

22   Employment Security Department in order to get the pandemic

23   unemployment assistance?

24   A    Yes.

25   Q    Could we look at page 12, please?  Is page 12 part of the

1    questions that an applicant -- that Mr. Shibley, as an applicant,

2    was required to answer to obtain pandemic unemployment

3    assistance?

4    A    Yes.

5    Q    Let's go down to page 11, please.  I'm sorry, page 13.

6         Are these more questions?

7    A    Yes.

8    Q    And to the question:  Are you getting paid for any period

9    after you last worked, such as severance pay, pay in lieu of

10   notice, or termination pay?  What's Mr. Shibley's answer?

11   A    No.

12   Q    The question:  Did you work for any employers whether you

13   have been paid or not?  What's Mr. Shibley's answer?

14   A    No.

15   Q    And is that the answers Mr. Shibley gave to qualify for

16   Pandemic Unemployment Assistance, covering the March and April

17   and May time period that we looked at?

18   A    Yes.  We asked them these same questions every single week.

19   Q    Let's look at page 14, please.  What is reported -- Can we

20   call out the top section there?

21        What is reported here in response to the Employment Security

22   Department's questions?

23   A    There's two employers, Eric Shibley MD and ES1 LLC.  No hours

24   worked and no gross earnings.

25   Q    When does he report the last day he worked for those

 1  entities?

 2  A   2/29/2020.

 3  Q   And does Mr. Shibley report working for any other entities?

 4  A   No.

 5          MR. WERNER:  Nothing further.  Thank you, Ms. Cole.

 6          THE COURT:  Cross.

 7                         CROSS-EXAMINATION

 8  BY MR. NANCE:

 9  Q   Hi, Ms. Cole.

10  A   Hello.

11  Q   I don't want to spend a lot of time on it, but I want to make

12  clear.  This payment that you were just talking about was part of

13  the CARES package, wasn't it, CARES Act package that the state

14  was helping implement?

15  A   Yes.

16  Q   To help --

17  A   The CARES Act.

18  Q   To help self-employed people that were in trouble because of

19  the pandemic?

20  A   Correct.

21  Q   Let me call up Exhibit No. 48, page 3.

22      You were questioned at length about this list of individuals.

23  A   Yes.

24  Q   You were asked to run checks on each of them through your

25  system?

1    A    Correct.

2    Q    And as I understand your testimony, there was -- you found no

3    record of wages being reported, paid to any of these people?

4         MR. WERNER:  Objection.  It's mischaracterizes the

5    testimony.

6         THE COURT:  Overruled.

7    A    Could you say that again?

8    Q    Well, I'm not trying to put words in your mouth.

9    A    Yeah.  I understand.

10   Q    You looked at this, you ran a check through your system.  And

11   if you could, just what did you find, and just, you know, ten

12   words or less, did you find there were no -- there was no record

13   of payments or of wages being reported?

14   A    They had wages reported from employers.

15   Q    They did?

16   A    Some of them did, yes.

17   Q    Was it your -- they had wages reported, but none through

18   these various entities?

19   A    Correct.

20   Q    Is that accurate?  I'm not trying to mischaracterize it.

21   A    Yes.  Yes.

22   Q    So you ran through the checklist of LLCs -- ES1, SS1, A Team,

23   et cetera -- and there was no record of these people receiving

24   any money, any wages, from those entities?

25   A    Correct.

```
 1   Q    Okay.

 2        Did any of these people apply for unemployment during this

 3   period?

 4   A    I didn't look for that.

 5   Q    Okay.  If these people, any of them, or all of them, had been

 6   paid by these LLCs associated with Mr. Shibley, if they had been

 7   paid in cash, it would not be surprising that you wouldn't have a

 8   record of it, would it?

 9   A    Correct.

10   Q    All right.  Thank you.

11              THE COURT:  Any redirect?

12              MR. WERNER:  No, Your Honor.

13              THE COURT:  You may step down.

14              MS. CONNELLY:  The plaintiff calls John Moshier.

15                          JOHN MOSHIER,

16        having been sworn under oath, testified as follows:

17              THE COURT:  Go easy on my chair.

18              THE WITNESS:  Yes, sir.

19                       DIRECT EXAMINATION

20   BY MS. CONNELLY:

21   Q    Good afternoon.  Can you please state your name and spell

22   your last name for the record?

23   A    John Moshier.  M-O-S-H-I-E-R.

24   Q    And where do you currently live, Mr. Moshier?

25   A    I live in Westfield, New Jersey.
```

 1    Q    Where do you work?

 2    A    Ready Capital.

 3    Q    What is Ready Capital?

 4    A    Ready Capital is a nonbank lender, commercial lender.

 5    Q    And can you describe your role and responsibilities at Ready

 6    Capital?

 7    A    I am the president and CEO of ReadyCap Lending, which is a

 8    division of Ready Capital.

 9    Q    How long have you worked as the president and CEO of ReadyCap

10    Lending?

11    A    Six and a half years.

12    Q    And so in your role are you familiar with the customers of

13    ReadyCap?

14    A    Yes.

15    Q    And who are they?

16    A    They're small business owners that are defined by the Small

17    Business Administration.

18    Q    What types of services does ReadyCap offer those small

19    businesses?

20    A    We provide access to capital through the 7(a) loan program.

21    Q    What is the 7(a) loan program?

22    A    The 7(a) loan program is a term loan program that is

23    administered by the Small Business Administration.  So businesses

24    can, you know, borrow money to expand their businesses, buy

25    businesses, buy out partners, buy real estate.  Things like that.

1    Q    And so you have mentioned the Small Business Administration.

2    Are you familiar with the term "SBA lender" or "SBA-approved

3    lender"?

4    A    Yes.

5    Q    And what does that mean?

6    A    That you, as an SBA-preferred lender, you're -- you have the

7    ability to interpret the regulations and make determinations on

8    eligibility on behalf of the Small Business Administration.

9    Q    And so is ReadyCap an SBA-approved lender?

10   A    Yes, we are.

11   Q    And so, Mr. Moshier, are you familiar with the Paycheck

12   Protection Program, or the PPP?

13   A    Yes.

14   Q    And what is your understanding of the purpose of that

15   program?

16   A    The PPP program was, you know, obviously passed in law by

17   Congress and the President at the time, and it was for the

18   purpose for employers to, you know, provide a paycheck or, you

19   know, payroll to employees to avoid layoffs.

20   Q    And was that in response to the COVID-19 pandemic?

21   A    Yes.

22   Q    And what role did ReadyCap play, if any, with respect to the

23   PPP?

24   A    Well, we were one of the, you know, preferred lenders in the

25   PPP program.

1    Q    So if a prospective applicant was interested in applying for

2    a PPP loan, could they apply directly with ReadyCap?

3    A    Yes, they could.

4    Q    Did you need to be an existing ReadyCap customer to apply for

5    a PPP loan through ReadyCap?

6    A    No, you did not.

7    Q    So how would a prospective applicant apply for a PPP loan

8    with ReadyCap?

9    A    We did have an online application at the time.  We also

10   worked with some other -- through other sources to refer business

11   our way.

12            THE COURT REPORTER:  Can you repeat the last part of

13   your answer?

14            THE WITNESS:  Other referral sources that would use the

15   online application.

16            THE COURT REPORTER:  Thank you.

17   Q    And so was ReadyCap funding PPP loans?

18   A    Yes, they were.

19   Q    Did there come a time where Ready Capital entered into an

20   agreement with Customer's Bank, related to the PPP?

21   A    Yes, we did.

22   Q    And can you just describe that agreement to the jury?

23   A    We entered into an agreement with Customer's Bank to acquire

24   some of the authorizations that we had acquired for the PPP

25   program.  And they essentially became the funding source for

 1   these PPP loans, and we became the lender service provider.  So

 2   we processed all the loans.

 3   Q    Okay.  So, essentially, Ready Capital would receive the

 4   applications on behalf of Customer's Bank?

 5   A    Yes.

 6   Q    Would Ready Capital approve the applications on behalf of

 7   Customer's Bank?

 8   A    Yes.

 9   Q    And then would Customer's Bank fund the PPP loan?

10   A    Yes.

11   Q    And so at the time that agreement was struck, did

12   Customer's -- I think you have somewhat alluded to this, but I

13   just want to unpack it a little bit -- did Customers also buy PPP

14   loan numbers that Ready Capital had already gotten approved by

15   the SBA?

16   A    Yes.

17   Q    And can you just explain a little bit what it meant that

18   Customer's Bank bought PPP loan numbers?

19   A    So the loan numbers were the authorizations that approved the

20   access to the PPP program for the small businesses.  So we then

21   became the agent for those loans, and processed them on behalf of

22   Customer's Bank.  So Customer's Bank then was the funding source,

23   and the owner of the customer at that point.

24   Q    And so when was this agreement between Ready Capital and

25   Customer's Bank struck?

1    A    That was April 28th of 2020.

2    Q    Okay.  And so on April 28th, had some applicants who ReadyCap

3    had already approved for PPP loans, but had not funded those

4    loans, already signed loan notes with Ready Capital?

5    A    Yes, they did.

6    Q    And so what happened to those applicants when Customer's Bank

7    bought their loan numbers?

8    A    We issued a loan note in Customer's Bank name, and then

9    funded them through Customer's Bank.

10   Q    Where are ReadyCap servers?

11   A    In Berkeley Heights, New Jersey.

12   Q    Is that where a signed ReadyCap PPP note would go?

13   A    Yes.

14   Q    Does ReadyCap have any servers in Washington State?

15   A    No.

16   Q    So where are ReadyCap servers?

17   A    In Berkeley Heights, New Jersey.

18   Q    Is that where a signed ReadyCap PPP note would go?

19   A    Yes.

20   Q    Does ReadyCap have any servers in Washington State?

21   A    No.

22   Q    So turning a little bit to the process, how would a

23   prospective applicant apply for a ReadyCap loan, or a

24   ReadyCap-approved but Customer's-funded loan?

25   A    I'm sorry.  Can you ask --

1    Q    Yes.  I'm sorry.  That was a terrible question.

2         Turning to just the process, how would a prospective

3    applicant apply for a ReadyCap/Customer's Bank loan?

4    A    It would apply through the website.

5    Q    And that's the Ready Capital website?

6    A    Yes.  The ReadyCap website.

7    Q    Once ReadyCap approves the loan, what happens then?

8    A    Then we did the -- we do the due diligence on that and make

9    sure that it meets all the criteria.

10   Q    And what does due diligence entail?

11   A    Making sure that the applicant answered all the questions and

12   they certified the information as accurate, and true and

13   accurate.

14   Q    And so -- and then after the due diligence is done, what

15   would the next step be?

16   A    Funding.  Signing of the note, and then funding.

17   Q    Okay.  And so would the Customer's Bank note, would ReadyCap

18   send the notes out to applicants, or did Customer's do that

19   themselves?

20   A    No.  Ready Capital sent the notes out to customers -- or,

21   yes, to customers on behalf of the Customer's Bank.

22   Q    It's confusing with "customers" versus Customer's."  Yes.  So

23   would applicants ultimately sign a loan note with Customer's

24   Bank?

25   A    Yes.

1    Q    Can you just tell us, generally speaking, what type of

2    information ReadyCap asked applicants to submit in connection

3    with their PPP applications?

4    A    Depending on the type of business, how they were structured,

5    we filed the guidance that was put out by the Small Business

6    Administration, and the Treasury.  So depending on what type of

7    business it was -- and, actually, can you ask that question

8    again?

9    Q    Yeah.  Can you just tell us, generally speaking, what type of

10   information ReadyCap asked applicants to submit in connection

11   with their PPP applications?

12   A    Yeah.  All the necessary documents were put out in guidance

13   from the Small Business Administration, you know, driver's

14   license, photo.

15   Q    And so who determined what type of information ReadyCap asked

16   for?

17   A    Who determined?

18   Q    Uh-huh.

19   A    Well, we followed the guidance that the SBA put out to us.

20   So the determination was what was put out in guidance.

21   Q    So the SBA was telling you what to ask for?

22   A    Correct.

23   Q    So I'm showing you Government's Exhibit 40, that's already

24   been entered into evidence.  Do you recognize this form?

25   A    Yes.

1  Q    Okay.  And who created this form?

2  A    The Small Business Administration.

3  Q    And so are the questions on this form the types of or the

4  questions that Ready Capital would ask prospective applicants?

5  A    Yes.

6  Q    In the Ready Capital/Customer's Bank relationship, who made

7  the determination to fund a PPP loan?

8  A    Ready Capital did.

9  Q    So was Customer's Bank relying on Ready Capital to do the

10  diligence required for each loan, as part of their agreement?

11  A    Yes.

12  Q    Did Customer's Bank do any of its own diligence?

13  A    No, not on individual loans.

14  Q    When you say "not on individual loans," would they do a

15  sampling of loans?

16  A    Yes.  They did an array of samplings.

17  Q    Was it important to Ready Capital that applicants provide

18  truthful and accurate information in their applications?

19  A    Yes.

20  Q    And why is that important?

21  A    Because we were relying on the certifications that were true

22  and accurate for us, or -- for them to be eligible for the PPP

23  program.

24  Q    Was the program -- strike that.  If we could just look at the

25  top portion of this, Mr. Arnold.

1        Would it matter to ReadyCap if a person applied for a PPP

2    loan using the name of a business that didn't actually exist?

3    A    Yes, it would matter.

4    Q    And why would that matter?

5    A    Because they would not be eligible if the business doesn't

6    exist.

7    Q    Right.  And would it matter to ReadyCap if a business --

8            MR. NANCE:  Those are leading questions, Your Honor.

9    Pardon me.

10           THE COURT:  I'm sorry?

11           MR. NANCE:  Leading questions.

12           THE COURT:  Yes.  Try to refrain from leading, counsel.

13           MS. CONNELLY:  Okay.  Sorry.

14   Q    Would ReadyCap have approved a loan claiming -- if a business

15   claimed to have more payroll expenses than it actually had?

16   A    Would a -- ask that again.

17   Q    Would Ready Capital have approved a PPP loan if a business

18   applied claiming to have more payroll expenses than it actually

19   had?

20   A    If they were certifying it and they provided the necessary

21   documentation, we had to rely on the certification by the

22   business owner.

23   Q    Okay.  Would it have mattered to Ready Capital if a business

24   applied -- Strike that.

25           Would it matter to ReadyCap if a business applied for a PPP?

1         MR. NANCE:  Objection.  Leading.

2         THE COURT:  I haven't heard the question.

3    Q    Would it matter to ReadyCap if a business applied for a PPP

4    loan, claiming to have more employees than it actually had?

5    A    Yes, it would matter.

6         MS. CONNELLY:  Can I continue, Your Honor.  Okay.

7    Q    And why would that have mattered?

8    A    Well, if they were applying -- if they were stating they had

9    more employees, that would be inaccurate information that they

10   were certifying.

11   Q    And was it a requirement of the PPP that a business have

12   employees, to get a PPP loan?

13   A    Yes.

14   Q    Would it matter to ReadyCap if a business applied for a PPP

15   loan, claiming to have more payroll expenses than it actually

16   had?

17   A    Yes.

18   Q    And why would that matter?

19   A    Because they wouldn't have been eligible, based on the

20   certification that they provided.

21   Q    And was the amount of the loan tied to the monthly payroll

22   amount?

23   A    Yes, it should.

24   Q    And so if someone applies claiming to have more monthly

25   payroll, what would that mean for the loan amount?

 1  A    It would mean it would be larger than what they were eligible

 2  for, based on their certification.

 3  Q    If we could blow out, Mr. Arnold, and look on Question 5, in

 4  the italics above it.

 5       Would it matter to Ready Capital if a person who applied for

 6  a PPP loan had lied on Question 5 about being on active

 7  probation?

 8            MR. NANCE:  Objection, leading.

 9            THE COURT:  Overruled.

10  A    Well, yes.

11  Q    I'll answer -- or, I'll tell you the question once more.

12       But would it matter to ReadyCap if a person who applied for a

13  PPP loan had lied on Question 5 about being on active probation

14  at the time of the application?

15  A    Yes.

16  Q    And why would that matter?

17  A    Well, if they would be ineligible, we wouldn't have funded

18  the loan.

19  Q    And why was it ineligible?

20  A    Because they answered incorrectly -- or they answered, yes.

21  And it clearly states if the answer is yes, the loan will not be

22  approved.

23  Q    Would ReadyCap have approved a PPP loan if it learned that a

24  business that lied about its payroll numbers or employees or

25  probation status, had been funded a loan?

1    A    No.

2    Q    What steps, if any, would ReadyCap take if it learned that a

3    business that lied about its payroll numbers or probation status

4    or employees, had been approved for a loan?

5    A    We would have tried to collect the money back, and then

6    notify the necessary authorities.

7    Q    And would it matter to ReadyCap if a person who applied for a

8    PPP loan provided fake tax forms as supporting documentation for

9    the loan?

10   A    Yeah.  It would matter.

11   Q    And why would that matter?

12   A    If they were certifying that these are true and accurate, and

13   if they're not, then they were certifying falsified documents.

14   Q    And was there something in particular about the PPP program

15   that made relying on borrowers so important?

16   A    Yeah.  Well, this -- well, when the program was put out, it

17   would put the onus of the small business owner to certify that

18   these are, you know, accurate and truthful statements.

19   Q    And was there something in particular about the nature of the

20   PPP that made the program have to rely on the borrower so

21   heavily?

22   A    Yeah.  I mean, there was obviously -- and we all remember at

23   the start of the pandemic, there was just a lot of activity going

24   on.  And this was a way for the government to get as much help to

25   small businesses, you know, during this time of shutdown.

 1   Q    Would ReadyCap have approved a PPP loan, if it learned that a

 2   business had provided fake tax forms as supporting documentation?

 3   A    No.

 4   Q    Would ReadyCap fund a PPP loan, if it learned that a business

 5   had lied -- actually, strike that.

 6        What steps, if any, would ReadyCap take if it learned that a

 7   business made false statements on its loan application or

 8   provided fake tax forms, and had actually been approved for a

 9   loan?

10   A    We wouldn't have funded the loan.

11            MS. CONNELLY:  Thank you.  No further questions.

12            THE COURT:  Cross.

13                         CROSS-EXAMINATION

14   BY MR. NANCE:

15   Q    Good afternoon, Mr. Moshier.

16   A    Yes.

17   Q    So you are the CEO of Ready Capital?

18   A    ReadyCap Lending, which is a division of Ready Capital.

19   Q    Okay.

20   A    Uh-huh.

21   Q    You described yourself as a service provider to Customer's

22   Bank or Ready Capital?

23   A    A lender service provider, yes.

24   Q    Was this your -- was this how you would have described your

25   business before COVID?

 1   A    Described my business before --

 2   Q    Well, your business is described as a service provider to

 3   Customer's Bank, was that the case before the COVID pandemic?

 4   A    Well the PPP program didn't exist before COVID.

 5   Q    Well, that's -- and so, what did Ready Capital do before

 6   COVID?

 7   A    We are a licensed SBA nonbank lender.  We are regulated by

 8   the Small Business Administration.

 9   Q    Okay.  So you are lending to small businesses?

10   A    Yes.

11   Q    You've described taking PPP loan applications online?

12   A    Yes.

13   Q    And it sounds like in April of 2020, right after -- not long

14   after the CARES Act actually passed, that your bank -- you don't

15   call yourself a bank -- but your business, your lending service,

16   ended up with more loan applications than it could fund; is that

17   accurate?

18   A    Correct.

19   Q    And so you made a deal with Customer's Bank to sell them the

20   right to fund the loans?

21   A    Yes.

22   Q    And you cleared this with the SBA?

23   A    Yes.

24   Q    I assume you cleared -- you worked out something on the

25   fee-sharing arrangement on the lending fee that you would get

1   from SBA?

2   A   Yes.  Yes.

3   Q   Was the surplus of the loan applicants and your inability to

4   fully fund them, something that you anticipated?

5   A   No.

6   Q   Well, Ready Capital is not a non-profit, it's a for-profit

7   organization?

8   A   Yes.

9   Q   You're a business.  You are looking to do business out there?

10  A   Yes.

11  Q   And this was an opportunity?

12  A   Yes.

13  Q   So Ready Capital, you didn't ultimately fund the loans, the

14  ones that you passed on.  But you screened the applicants; is

15  that right?

16  A   Ask that question again.

17  Q   You took the loan applications from the PPP applicants, or

18  PPP loan applicants?

19  A   Yes.

20  Q   And if there was any due diligence, it would have been Ready

21  Capital doing it?

22  A   Correct.

23  Q   Did you require a -- well, what did you require, other than

24  that template that we've seen described, the SBA two-page form

25  that you have testified about.  Was there anything else that you

1   -- that Ready Capital required from applicants for PPP loans?

2   A   Well, we required the documentation that was provided by the

3   Small Business Administration for the applicants to fill out, to

4   include any, you know, proof of payroll, in whatever form that

5   would be, based on the type of business.  And a copy of a

6   driver's license with a picture.  Is that what you're asking me?

7   Q   Yeah.  What did you do to verify or to check on the

8   applicants, essentially?

9   A   Can you ask that question again?

10  Q   Did you contact references?  Did you ask for references?

11  A   We did a Secretary of State's verification.  We also did a

12  KYC KYB check on each customer.

13  Q   Did you visit the worksite of the business or the business

14  office?

15  A   No.

16  Q   Did you require a 941 form?  Did you ask for that?

17  A   If the business was a certain, you know, type of filing yes,

18  we would.

19  Q   If a business were seriously delinquent in its taxes, would

20  that have been a factor in granting or declining the loan, under

21  the PPP program?

22  A   We didn't verify whether anybody was delinquent on their

23  taxes.

24  Q   What if it was obvious, in the material that they provided to

25  you?

 1    A    If it were obvious?

 2    Q    Yeah.

 3    A    I mean, that's kind of a hypothetical question.

 4    Q    Okay.  Let's call up Exhibit No. 1, page 5.

 5              MS. CONNELLY:  Objection, Your Honor.  I think this goes

 6    into the negligence territory.

 7              THE COURT:  Overruled.

 8    Q    Now, this is -- let me just tell you up front, this is not a

 9    form that Ready Capital had anything to do with.  It's a

10    representative sample, is all.

11    A    Correct.  Okay.

12    Q    So page 5.  Yeah, that's fine.  If you could blow that up

13    just a little bit.  So does -- Are you familiar with this form?

14    It's a Form 941?

15    A    Yes.

16    Q    And you'll notice -- and, again, this is just a sample.  This

17    is not something you did.  But if you will notice, lines 1 and 2

18    -- line 1 refers to the number of employees, and line 2 refers to

19    wages and tips within that particular quarter.

20         Is this the kind of document that Ready Capital would request

21    from an applicant and scrutinize when it came in with the

22    application?

23    A    Yes.

24    Q    Okay.  Let me take you down to the lower part of this.  In

25    fact, you could keep -- sort of just blow up the first -- from

 1    lines 1 through the bottom there.
 2        So if you look at line 2, which shows a wages and tips for
 3    the quarter, paid by this particular business, and then you look
 4    down at the line 10, total taxes due.  You see that?
 5    A   Yes.
 6    Q   And wouldn't that appear to be simply derived by a formula?
 7    You take the wages and multiply it by a couple of numbers in 5a
 8    and 5c, and then subtract that to get the taxes that would be
 9    normally due?
10    A   I'm not an accountant.
11    Q   I understand.
12    A   Yeah.
13    Q   I'm not holding you to that, to that standard.
14    A   Yeah.  It appears that's what that --
15    Q   Well, if you look on it, at line 13, which indicates -- it's
16    a blank line referring to total deposits in payment toward that
17    obligation.
18    A   Uh-huh.
19    Q   Then you see line 14, a tax balance due of $149,175.  Do you
20    see that?
21    A   Yes.
22    Q   Yeah.  So if Ready Capital got a PPP loan application with
23    something roughly similar to this filing, with the application,
24    is that something that would trigger a rejection, or is it
25    something that you would just follow up on?  Or it's something

 1   that you wouldn't -- is there anything about this that you feel

 2   would be a factor in evaluating a PPP loan applicant to Ready

 3   Capital?

 4           MS. CONNELLY:  Objection, Your Honor.

 5           THE COURT:  I will permit a limited amount of this.

 6           MR. NANCE:  Okay.

 7   A   This is a borrower's certification loan process.  So if the

 8   applicant submitted this 941 as proof of payroll, and certified

 9   that this payroll matches what they are eligible for, they're

10   certifying this.  And we would look at the fact that they had

11   verification, that they had payroll.

12   Q   Okay.

13   A   I don't know the authenticity of whether this is valid or

14   not.

15   Q   I understand that.

16           THE COURT:  One at a time, please.

17   Q   I guess what I'm curious about is whether the fact that there

18   appears to be a significant tax delinquency on the face of this

19   document, right?  They owe $149,000 in taxes that they haven't

20   paid yet.  Would that be a factor in considering whether an

21   applicant was properly eligible for the funds?

22   A   I don't know.

23   Q   You don't know?  Okay.

24           THE COURT:  All right.  Let's take 15 minutes.

25           THE CLERK:  Please rise.  Court is in recess.

 1                        (Recessed.)

 2              THE COURT:  So Mr. Moshier, I assume you have noted the

 3     sunshine outside.  When you go back to New Jersey, you tell them

 4     that the sun always shines in Seattle.

 5              THE WITNESS:  Will do, sir.

 6              THE COURT:  Let's bring in the jury.

 7              MR. WERNER:  Your Honor, just briefly.  We wanted to let

 8     the court know, and we let Mr. Nance know, we're ahead of

 9     schedule.  And we believe, at this point we believe the

10     government will rest perhaps early Thursday, we could be done as

11     early as tomorrow afternoon.  But I just want to make sure the

12     court knows.  Hopefully I'm not speaking too soon.

13              THE COURT:  We will get the instructions to you probably

14     first thing tomorrow morning.

15              MR. WERNER:  Thank you, Your Honor.

16              THE COURT:  All right.  Let's bring in the jury.

17         (The following occurred in the presence of the jury.)

18              THE COURT:  Please be seated.  Any objection to

19     informing the jury of what we just discussed?

20              MR. WERNER:  No, Your Honor.

21              MR. NANCE:  No.

22              THE COURT:  It appears the case is moving faster than we

23     had thought it might.  And there's a real good shot at the case

24     being submitted to you before the end of this week.

25              All right, Mr. Nance.

 1                MR. NANCE:  Yes.
 2    Q   (By Mr. Nance)  Mr. Moshier, wouldn't it be that qualifying
 3    for a PPP loan was easier than for a traditional loan, SBA-type
 4    of loan?
 5    A   Yes.
 6    Q   And this is in large part because the PPP applicants make
 7    their own representations on the applications?
 8    A   Yes.
 9    Q   A traditional loan would be subject to greater scrutiny by
10    the bank, wouldn't it?
11    A   Or the lender.
12    Q   Or the lender.
13        Verification procedures might be easier, or a little -- not
14    as strict, certainly for a PPP?
15    A   Yes.
16    Q   And the loan process would be considerably shorter than for a
17    traditional loan?
18    A   Yes.
19    Q   Of course, this surely mattered a little less to you, or to
20    your business -- I'm sorry, you are not a bank.  What, you're a
21    service -- lending-service business, is that it?
22    A   We are a licensed SBA nonbank lender, which is regulated by
23    the Small Business Administration.
24    Q   Okay.  Operative word is "lender."
25    A   Yes.

 1   Q    These considerations, credit considerations that you would

 2   normally apply toward a borrower, probably mattered less with the

 3   PPP, because ultimately the loan is guaranteed, right?

 4             MS. CONNELLY:  Objection, Your Honor.

 5             THE COURT:  Overruled.

 6   Q    This is a guaranteed loan.  You, as the lender, cannot lose,

 7   right?

 8   A    The guarantee, that is full faith by the Small Business

 9   Administration and the United States Government, yes.

10   Q    Your marketing, you know -- your marketing lending service

11   for the PPP, you know it's ultimately going to be, if it's

12   funded, it's going to be guaranteed.  And you and Customer's Bank

13   share a lending fee, a funding fee?

14   A    Correct.

15   Q    Right.

16        This is a golden goose; isn't it?

17   A    A golden goose?

18   Q    This is a golden goose.  You have got to pursue this one.

19   This is a lucrative situation, isn't it, for the bank, for the

20   lender?

21   A    It's not how I saw it at the time.

22   Q    You didn't see it that way?

23   A    Not at the time.  We were in a pandemic.

24   Q    Sure.  What percentage of your lending business was comprised

25   of PPP loans in 2000, would you estimate?

1          THE COURT:  In 2000?

2          MR. NANCE:  I'm sorry, in 2020.

3     A    In 2020?

4     Q    Yes.

5     A    I could point you to our annual review.  I mean, we do -- we

6     are a publicly traded entity.  You can take a look at that stuff.

7     Q    How many PPP loans did Ready Capital process?

8     A    100,000, give or take.

9     Q    Aren't you really largely earning a fee in the neighborhood

10    of three or four percent, right off the top?

11    A    In some cases, yes.

12    Q    Well, it sounds like a lot of money to me.  It sounds like a

13    lot -- a lucrative business opportunity that you would pursue

14    with all diligence and energy.

15    A    Is that a question?

16    Q    Yes.

17    A    What's the question?

18    Q    Didn't you actively pursue this?  Wasn't this something that

19    you were in enthusiastic pursuit of?  You marketed these PPP

20    loans aggressively, right?

21    A    We marketed them, yes.

22    Q    Well, to the point where you ended up with a big surplus of

23    potential borrowers, beyond your ability to fund?

24    A    We processed over 100,000 PPP applications.  We answered the

25    call that was put out by the United States Congress to get money

 1   out the door, in the hands of small business owners, to keep

 2   their employees employed.

 3   Q   Well, it mattered to you what was on the applications,

 4   because you believed it mattered to the SBA, right?

 5   A   I'm not following.

 6   Q   You were asked a string of questions about whether it

 7   mattered -- would it matter if the person, you know, was on

 8   misdemeanor probation.  Would it matter if they overstated their

 9   number of employees.  And you agreed that it would have mattered?

10   A   Yes.

11   Q   Because it mattered to the SBA?

12   A   Not just the SBA, the United States Congress, Senate, the

13   President of the United States.

14   Q   Mr. Moshier, you have got a really good thing going through

15   the SBA, don't you?  And you don't want to mess that up.

16   A   Excuse me?

17   Q   I will withdraw the question.

18           THE COURT:  Any redirect?

19           MS. CONNELLY:  Nothing, Your Honor.

20           THE COURT:  You may step down.  Put your mask on,

21   please.

22           MR. WERNER:  The government calls Adam Seery.

23                        ADAM SEERY,

24       having been sworn under oath, testified as follows:

25           MR. WERNER:  You may remove your mask.

1          THE WITNESS:  Thanks.

2                    DIRECT EXAMINATION

3     BY MR. WERNER:

4     Q    Please state your name and spell your last name.

5     A    Adam Seery.  S-E-E-R-Y.

6     Q    Mr. Seery, what city and state do you currently live in?

7     A    I live in Encinitas, California.

8     Q    Mr. Seery, have you spent any time in Seattle?

9     A    Yeah.  I used to go to school at the University of

10    Washington.

11    Q    Mr. Seery, where do you currently work?

12    A    I work at Harvest Small Business Finance.

13    Q    How long have you worked at Harvest Small Business Finance?

14    A    Six years.

15    Q    What is your role there?

16    A    I'm a chief operating officer.

17    Q    And how long have you been the chief operating officer?

18    A    Three years now.

19    Q    What is your job duty?  What is your job description as the

20    chief operating officer?

21    A    I oversee all of operations.

22    Q    Well, what are the operations of Harvest?

23    A    So Harvest is a nationwide nonbank SBA lender.  So we hold --

24    there's 14 nonbank SB -- they're called SBLC licenses.  What that

25    does is it affords us to lend on behalf of the government without

1    being a bank.  So typically we make SBA 7(a) loans, mostly

2    commercial real estate driven.

3    Q    Okay.  And what's an SBA 7(a) loan?

4    A    A SBA 7(a) loan is one of the two loans that are backed by

5    the federal government, in terms of the government-guaranteed

6    program.

7    Q    Again, what type -- who is your typical customer?  Are we

8    going too fast?  We're going way too fast.  Sorry.

9    A    I can go fast.  Sorry.

10   Q    And what is Harvest's typical customer?

11   A    Harvest's typical customer is mom-and-pop shops across the

12   country.  Anywhere from one to couple of hundred employees.  Loan

13   amounts up to $5 million.

14   Q    And what type of loans do you typically extend these

15   businesses?

16   A    For us, for Harvest -- you know, SBA is, you know, you can do

17   it for any various business purposes.  Harvest focuses on

18   commercial real estate.  So, you know, if a borrower wanted to,

19   you know, a restaurant owner want to buy or refinance their

20   building they currently occupy, that would be a loan that we

21   could consider for them.

22   Q    Does Harvest manage the loans that they make?

23   A    We do.  We fund and service all of our loans that we book.

24   Q    Mr. Seery, are you familiar with the Paycheck Protection

25   Program?

1   A    Yes.

2   Q    And what was Harvest's involvement in the Paycheck Protection

3   Program or PPP?

4   A    Having one of the fourteen licenses that allows us to lend on

5   behalf of the government, we were instantly eligible to make

6   loans under the PPP program.

7   Q    And what was the purpose of the PPP, to your understanding?

8   A    The purpose of the PPP program was to get money out to

9   much-needed small business owners, as soon as possible, to help

10  them keep people employed, employees employed, through the

11  program.

12  Q    And did Harvest offer PPP loans in 2020?

13  A    Yes.

14  Q    Did they offer in the time period of April to June of 2020?

15  A    Yes.

16  Q    Did the PPP applicant need to be an existing Harvest

17  customer?

18  A    At the beginning, our biggest objective was to get money to

19  our existing customers, to help them.  It was, as you could

20  imagine, everyone was drinking from the fire hose at the very

21  beginning of this program.  As we were getting through our

22  existing clientele, we saw the need to help outside customers

23  obtain loans as well, just due to the overflow from the big

24  banks.  Wells Fargo, B of A, Chase.

25  Q    So did there come a time where Harvest offered or accepted

 1   PPP applications from non-Harvest customers?

 2   A   Yes.

 3   Q   And, Mr. Seery, how would an applicant apply for a PPP loan

 4   with Harvest?

 5   A   We had an online portal that you could get through our

 6   website.

 7   Q   And who reviewed the information, once it was input into the

 8   website?

 9   A   So once the required information was input into the website,

10   we transformed our team of, you know, credit officers and loan

11   closers to essentially PPP underwriters.  And after a loan was

12   submitted, one of those individuals would take down the loan and

13   start to work on it.

14   Q   So did this become -- did this become a big part of Harvest's

15   business in the spring of 2020 timeframe?

16   A   We fully shut down all of our core operations to help get

17   these loans out as soon as possible.

18   Q   Where are the Harvest employees located that reviewed these

19   PPP applications?

20   A   Laguna Hills, California.

21   Q   And so would an application being sent from Washington be

22   reviewed by a Harvest employee in California?

23   A   Yes.

24   Q   And that would be sent by the internet?

25   A   Yes.

1    Q    What about e-mails.  Did your loan team e-mail with

2    applicants?

3    A    Yes.  So if the loan application was not complete or we

4    needed additional information, one of our PPP processors would

5    reach out directly to a borrower, either by e-mail or by phone.

6    Q    And, again, to the extent that there was an e-mail sent to a

7    Harvest employee or a loan processor, where would that e-mail be

8    received?

9    A    In Laguna Hills.

10   Q    And, again -- so that would create an interstate wire

11   transmission from the place of the borrower to California; is

12   that correct?

13   A    Yes.

14   Q    In general, what type of information was a PPP applicant

15   required to provide?

16   A    The information that was required was a 2483 application, the

17   PPP application is what it was called.  You know, identification

18   verification.  Payroll documentation, whether that be a 941 or

19   like an ADP statement, or some sort of payroll document.

20   Q    Who prepared -- you said that 2483, is that the form you

21   gave?

22   A    Yep.  Yep.

23   Q    Whose form is a 2483?

24   A    That was the SBA PPP form that was created by Treasury and

25   the SBA.

1    Q    So who created the guidelines for the PPP program?

2    A    The Treasury Department in conjunction with the SBA.

3    Q    So again, you indicated that employee and payroll information

4    needed to be provided; is that correct?

5    A    Yes.

6    Q    And supporting documents.  I think you described two

7    different types of supporting documentation.  What were those?

8    A    The 941 form, which is a tax document, that basically showed

9    your employee, the employee payroll you had.  Or the actual

10   historical payroll documents from a third-party payroll provider,

11   if you used one.

12   Q    What's an example of a third-party payroll provider?

13   A    Like an ADP, or someone of that nature.

14   Q    And who made the determination whether or not a loan, a PPP

15   loan, qualified?

16   A    Well, it was a borrower-certified program.  So they would

17   fill out all the information.  And then it was up to us to just

18   make sure that those mirrored one another, ie: the application

19   employee's loan amount mirrored what showed up on their 941 or

20   payroll documentation.

21   Q    And if the two matched, was the loan typically granted?

22   A    Yes.

23   Q    And how was the money transferred, then?  How was the money

24   funded by Harvest?

25   A    We sent out ACH transfers.

1    Q    So for the PPP applications that Harvest received, what was

2    important on those applications?

3    A    Well, all of the certifications were important, along with

4    the -- you know, obviously the amount of employees and the

5    payroll information, the loan amount they were requesting.

6    Q    Why was the number of employees, why was that important to be

7    accurate?

8    A    Because their loan amount was determined by the amount of

9    employees that they had.

10   Q    What about the payroll amount, why was that important to be

11   accurate?

12   A    The payroll amount basically validated how many employees

13   that they had.

14   Q    Did the payroll amount tie to the amount of the PPP loan that

15   was eventually granted?

16   A    Yes.

17   Q    What was the relationship between the monthly payroll and the

18   amount of the PPP loan?

19   A    So the way the payment was calculated was, you took the

20   full-time employees you had, their wages up to $100,000, you, on

21   an annualized basis, divided that by twelve and multiplied by

22   two-and-a-half times.  And that was your overall loan amount that

23   a borrower could qualify for.

24   Q    Was it important that all questions on the form be answered

25   truthfully and accurately?

 1   A   Absolutely.

 2   Q   And what about the supporting documentation?  Was it

 3   important to Harvest that supporting documentation also be

 4   truthful and accurate?

 5   A   Yes.

 6   Q   Why?

 7   A   Because that's all we had to rely on in this program.

 8         MR. WERNER:  Thank you, Mr. Seery.  No further

 9   questions.

10         THE WITNESS:  Thank you.

11                        CROSS-EXAMINATION

12   BY MR. NANCE:

13   Q   Good afternoon, Mr. Seery.

14   A   Good afternoon.

15   Q   You are the CEO of Harvest?

16   A   Chief operating officer of Harvest.

17   Q   Chief operating officer?

18   A   Yep.

19   Q   Excuse me.

20   A   Also a principal.

21   Q   How long have you been with Harvest?

22   A   Six years.

23   Q   And prior to the pandemic, what did Harvest primarily do?

24   A   Commercial real estate SBA loans.

25   Q   With the onset of the pandemic, and the PPP program, I think

 1   I heard you say that you shut down other loan programs to focus

 2   on PPP; is that right?

 3   A   Yes.  So we shut down our core business of funding commercial

 4   real estate loans, to focus on PPP, just due to the fact that it

 5   was a high-volume program.

 6   Q   During the year 2020, how many PPP loans would you estimate

 7   Harvest funded?

 8   A   5,200, approximately.

 9   Q   Do you know how many applications you screened?

10   A   Well over 8,000 or 9,000.

11   Q   And of those you funded, what would be the -- I'm just

12   looking for an estimate here -- gross amount of PPP loan funds

13   funded?

14   A   What was the question?

15   Q   During the year 2020, what was the aggregate amount of the

16   PPP loans that Harvest funded?

17   A   Dollar-wise?

18   Q   Yes.

19   A   1.2 billion.

20   Q   What was the Congressionally mandated funding fee that you

21   would have earned on that?

22   A   Well, there was three different levels of the fee.  It was

23   5 percent up to $350,000, three percent from $350,000 to

24   $2 million.  And then it was 1 percent from $2 million to

25   $10 million.

1   Q   What were the bulk of these 5,200 loans?

2   A   Average loan size was around $200,000.

3   Q   So 5 percent would have been the typical fee you would have

4   made?

5   A   Five percent, correct.

6   Q   Yeah.

7       I'm sure you have done the numbers at some point.  Do you

8   know what you earned in fees, Harvest earned in fees in total?

9   A   In 2020?  I don't.  I don't recall.

10  Q   Well, I mean, I could do some very quick math here.

11  $1.2 billion times 4 percent, which is less than 5, would be, I

12  don't know, have I got this right, $50 million, $60 million?

13  A   Somewhere in there.  It sounds about right.

14  Q   Would you characterize this period as a bit of a funding

15  frenzy among -- and let me clarify it a little bit -- funding

16  frenzy among lenders like Harvest?

17  A   I wouldn't say "frenzy."  What I would say is we had a short

18  period of time to help a lot of customers, just due to the amount

19  of funding and the amount of demand for PPP loans.

20  Q   So a high demand, a relatively short period in which to meet

21  it, and at least, in theory, a finite amount of ultimate money to

22  be accessed?

23  A   Yes.  I mean, getting back to my point before, we screened

24  8,000 or 9,000 loans, but ultimately couldn't make it to the

25  finish line on a majority of those, because we just didn't have

1    the time.

2    Q    Didn't have the time to do it?

3    A    Didn't have the time, before funding ran out.

4    Q    Well, there was money, I believe, at the end of the initial

5    funding period in August 2020, there was still money to be had.

6    Do you know differently?

7    A    I believe that's correct.

8    Q    So was it the program ran out of money, or the time ran out?

9    A    The program time ran out.  The first funding, if you recall,

10   the initial batch went pretty quickly.  And they had to go back

11   to Congress to get an additional funding requirement.  And that

12   was the one that lasted beyond.  But by that time, a lot of the

13   loans that we had screened had gotten done elsewhere.

14   Q    The applicants came to you.  They're probably applying

15   elsewhere as well.  And the other place gets approved and funded

16   before you could get to it?

17   A    Correct.

18   Q    Sounds like it's pretty competitive.  I have used the word

19   "frenzy," but it's a competitive market to be sure?

20   A    Well, again, not competitive.  Borrowers were just searching

21   for the easiest path of resistance to get their money, right?

22   Because if they couldn't get it from B of A, and they went to

23   Harvest and we had a backlog, then they would just go to the next

24   person until they could get the loan, worrying that they were not

25   going to have access to the funds before the program ran out.

1   Q    So you funded 5,200.  But there was as many as 9,000 that

2   applied.  What's the difference there, 40 -- 3,800.  Of those

3   3,800, how many were rejected by Harvest, as opposed to your just

4   not being able to get to them to service them, to fund them?

5   A    I don't have that information.

6   Q    Do you have any estimate of how many would have -- how many

7   loan applicants were just turned down, just --

8   A    Again, don't recall.

9   Q    Okay.  Thank you.

10        MR. WERNER:  Nothing further, Your Honor.  Thank you.

11        THE COURT:  All right.  You may step down.

12        THE WITNESS:  Thank you.

13        THE COURT:  Put your mask back on, please.

14        MS. CONNELLY:  And the government calls Nissen Liddiard.

15                        NISSEN LIDDIARD,

16   having been sworn under oath, testified as follows:

17                      DIRECT EXAMINATION

18   BY MS. CONNELLY:

19   Q    Good afternoon.  Can you please state your name and spell

20   your last name for the record.

21   A    Yes.  Nissen Liddiard.  L-I-D-D-I-A-R-D.

22   Q    And where do you currently live, city and state?

23   A    Stansbury Park, Utah.

24   Q    Where do you work?

25   A    Celtic Bank.

 1   Q   What is Celtic Bank?

 2   A   It's a Utah-chartered industrial bank.

 3   Q   And is Celtic Bank FDIC insured?

 4   A   Yes.

 5   Q   And what is your job at Celtic Bank?

 6   A   I'm the senior vice president, compliance officer.

 7   Q   Can you just tell us what that means?  What is a compliance

 8   officer?

 9   A   I oversee compliance with laws and regulations throughout our

10   entire bank.

11   Q   Can you just describe, what are your roles and

12   responsibilities on a day-to-day basis?

13   A   Sure.  I work heavily in regulation, including bank secrecy

14   act, anti-money laundering.  I oversee our fraud department.

15   Q   And how long have you worked at Celtic Bank?

16   A   Four years.

17   Q   Have you had any other roles in your time there?

18   A   I have been in compliance the entire time.  I have had other

19   positions within compliance.

20   Q   And as part of that role, are you familiar with the customers

21   of Celtic Bank?

22   A   Yes.

23   Q   Who are they, primarily?

24   A   Primarily small business owners.

25   Q   And what types of services does Celtic Bank offer small

1    businesses?

2    A    We offer loans, primarily, to small businesses.

3    Q    And are you familiar with the term "SBA lender" or

4    SBA-approved lender"?

5    A    Yes.

6    Q    Is Celtic Bank an SBA-approved lender?

7    A    Yes.

8    Q    Are you familiar with the Paycheck Protection Program?

9    A    Yes.

10   Q    What was your understanding of the purpose of that program?

11   A    In March 2020 Congress enacted the CARES Act, which allowed

12   for the Paycheck Protection Program, to enable relief to small

13   businesses through SBA-approved lenders.

14   Q    And what role, if any, did Celtic play with respect to the

15   PPP?

16   A    We extended Paycheck Protection Program loans.

17   Q    Was Celtic Bank an approved lender in the PPP, from the

18   beginning of the program?

19   A    Yes.

20   Q    If a Celtic Bank customer was interested in applying for a

21   PPP loan, how would that customer apply through Celtic Bank?

22   A    They would fill out an online application through

23   celticbank.com.

24   Q    And did you need to be an existing Celtic Bank customer to

25   apply for a loan?

1    A    No.

2    Q    And after the customer went to celticbank.com, what would

3    happen next?

4    A    They would provide all the information required in the

5    application, which was substantially the same as the SBA's form.

6    They also had to provide identity verification information and

7    payroll documents, and other supporting documentation for the

8    loan.

9    Q    And who determined what type of information Celtic Bank

10   requested from the borrowers?

11   A    We worked off the SBA's interim final rule that implemented

12   the PPP.

13   Q    And can you tell us, where is Celtic Bank's servers located?

14   A    Salt Lake City, Utah.

15   Q    Is that where a PPP application would be received?

16   A    Yes.

17   Q    And is that where a PPP loan note would go?

18   A    Yes.

19   Q    Did Celtic Bank have any servers in Washington State?

20   A    No.

21   Q    You mentioned that Celtic Bank had its own website that

22   borrowers could fill in their information on.  Was the

23   information that Celtic Bank requested -- strike that.  Did

24   Celtic Bank ask the same questions that were on the SBA form?

25   A    Yes.  Among other questions.

1   Q    And was it important to Celtic Bank that applicants provided

2   truthful and accurate information in their responses?

3   A    Yes.

4   Q    And why was that?

5   A    The lenders were allowed to rely on the borrower's

6   certifications made in the application to extend the loan.

7   Q    Was there something in particular about the circumstances of

8   the PPP that made the SBA establish that rule?

9   A    Yes.  The SBA, along with the U.S. Government, were trying to

10  get funds out quickly, due to the pandemic and the need for

11  relief.

12  Q    And so among the questions that were asked, what sorts of

13  questions would be asked?

14  A    The borrower was to tell us how many employees they had, how

15  much payroll they had, in a given year, an average monthly

16  payroll.  They were also required to certify to certain things,

17  such as, you know, criminal history, their loan history with the

18  U.S. Government, with the SBA.

19  Q    And so you mentioned payroll.  Did Celtic Bank expect

20  truthful answers to the question about monthly payroll?

21  A    Yes.

22  Q    And why was that important?

23  A    The monthly payroll amount determined the max loan that they

24  were eligible for.

25  Q    And you also mentioned asking about the number of employees.

1   Did Celtic Bank expect truthful answers to the question about

2   number of employees?

3   A    Yes.

4   Q    Why was that?

5   A    The loan amount was capped based on annual salary, per

6   employee, at $100,000.  So if the amount of employees was wrong

7   or inflated, then the loan amount could be inflated, and indicate

8   that they were eligible for an amount that they were actually

9   not.

10  Q    And what sort of supporting documentation did Celtic Bank

11  require for these PPP loans?

12  A    Generally we required payroll tax forms, so IRS forms, 941,

13  940s, W-3s, W-2s, Schedule Cs, to support the loan amount.

14  Q    And did Celtic Bank expect that the supporting tax forms that

15  were submitted with these loan applications were accurate and

16  truthful?

17  A    Yes.

18  Q    And why was that important?

19  A    The loan amount was supported by the tax forms that were

20  provided, or the other forms that were provided.  And if they

21  were not accurate, then the loan amount could have been inflated

22  and the borrower would not be eligible for the amount they were

23  requesting.

24  Q    So what did Celtic Bank look for on a tax form to corroborate

25  the application?

1  A   We looked at wages and then the number of employees.  And

2  depending on how -- what period the tax form covered, so we would

3  look at, you know, multiple tax forms, or one, depending on the

4  period.  Usually for a year.

5  Q   And would it matter -- or, did Celtic Bank expect that

6  applicants answered all of the questions that were found on the

7  form truthfully?

8  A   Yes.

9  Q   And why did that matter?

10 A   Because the interim final rule allowed us to rely on the

11 borrower's certifications in the application in order to extend

12 the loan.

13 Q   And would Celtic Bank have funded a PPP loan if it learned

14 that a business lied about its payroll numbers, its employees, or

15 probation status?

16 A   No.

17 Q   Would Celtic Bank fund a PPP loan if it learned that a

18 business had provided fake tax forms --

19 A   No.

20 Q   -- as part of its application.

21     Sorry, go ahead.

22 A   No.  Will you rephrase?  Sorry.

23 Q   Yes.  Would Celtic Bank have funded a PPP loan if it learned

24 that a business had provided fake tax forms as supporting

25 documentation?

```
 1   A    No.
 2   Q    What steps, if any, would Celtic Bank have taken if they
 3   learned that a PPP -- or that a business made false statements or
 4   provided fake tax forms and had actually been approved for a
 5   loan?
 6   A    We would attempt to recover the funds by contacting the
 7   receiving financial institution and asking them to provide the
 8   funds back to us from the borrower's account.  And we would also
 9   report the same to law enforcement.
10             MR. CONNELLY:  Thank you.  Nothing further.
11             THE COURT:  All right.
12                         CROSS-EXAMINATION
13   BY MR. NANCE:
14   Q    Good afternoon, is it Ms. Liddiard?
15   A    Liddiard, yes.
16   Q    Is that right?
17        And, again, your title at Celtic Bank is?
18   A    SBP compliance officer.
19   Q    Okay.  How large is Celtic Bank?
20   A    In terms of dollars?
21   Q    Yeah.
22   A    Right now we have assets of about $2 billion.
23   Q    When you say "assets of," does that include money that's
24   loaned out?
25   A    Assets are the loans that are currently on the books.
```

1   Q   So you have got $2 billion out on loan now?

2   A   Yes.

3   Q   That you hope to get back, right?

4   A   Correct.

5   Q   In your bank, how many -- you are in Utah?

6   A   Yes.

7   Q   And do you have -- are you outside the state at all?

8   A   We have very few employees that are outside the state of

9   Utah.

10  Q   Do you have a marketing department?

11  A   Yes.

12  Q   I mean, they market the banks services, but do they market

13  loans?

14  A   Yes.

15  Q   Loan origination would be the name for that?

16  A   Yes.

17  Q   Of that $2 billion that is loaned out, that's outstanding,

18  how much of that would be PPP loans?

19  A   Currently we have about $1 billion extended.

20  Q   Okay.  So about half of the bank's total business is PPP

21  loans?

22  A   As of today, yes.

23  Q   Was it more this time a year ago, or less?

24  A   More.

25  Q   More.

 1      How many loan, PPP loans, comprise that $1 billion?

 2   A   I wouldn't be able to say.  I don't know as of today.

 3   Q   Well, do you know the average size of the PPP loans that

 4   Celtic extended?

 5   A   We -- yes.  The average size was around $30,000.

 6   Q   So smaller loans?

 7   A   Yes.

 8   Q   Yeah.

 9      So I believe the -- isn't the lending fee structure 5 percent

10   on loans, on smaller loans?

11   A   I can't speak to that.

12   Q   You don't know?

13   A   I wasn't a part of the lending fee.

14   Q   You don't know what the bank made through lending --

15   A   I do not.

16   Q   -- PPP loans?

17           THE COURT:  One at a time, please.

18           MR. NANCE:  Sorry.

19   Q   You testified about the amount of the payroll of a PPP

20   borrower being in direct relation to the amount of money that

21   could be loaned through the program.

22   A   Yes.

23   Q   Right?

24      The larger the payroll, the more that the applicant becomes

25   qualified for?

 1   A    Correct.

 2              MR. NANCE:  That's all I have.  Thank you.

 3              MS. CONNELLY:  Nothing, Your Honor.

 4              THE COURT:  You may step down.  Put your mask back on,

 5   please.

 6              MR. WERNER:  The government calls David Haagsma.

 7                        DAVE HAAGSMA,

 8         having been sworn under oath, testified as follows:

 9              THE COURT:  Take your mask off, please.

10              THE WITNESS:  Thank you.

11                      DIRECT EXAMINATION

12   BY MR. WERNER:

13   Q    Good afternoon.

14   A    Good afternoon.

15   Q    Please state your name and spell your last name?

16   A    Dave Haagsma.  Last name is H-A-A-G-S-M-A.

17   Q    Mr. Haagsma, what city and state do you live in?

18   A    I live in Grand Rapids, Michigan.

19   Q    What do you do for work?

20   A    I work in commercial banking at Huntington Bank.

21   Q    And what is your current position at Huntington Bank?

22   A    I'm a portfolio manager, team lead.

23   Q    And where did you work last year, in 2020?

24   A    TCF Bank.

25   Q    What is the relationship between TCF Bank and Huntington

1   Bank?

2   A    Sure.

3        Huntington acquired TCF Bank, and that transaction closed

4   this year.

5   Q    And so what was your position at TCF Bank in 2020?

6   A    In 2020, I was the director of credit support.

7   Q    And prior to being the director of credit support, did you

8   have any previous positions with TCF Bank?

9   A    I did, yep.

10  Q    What were those positions?

11  A    I was a relationship manager in commercial lending.

12  Q    How long did you work in commercial lending and as a

13  relationship manager in your last position at TCF Bank?  How long

14  did you work for TCF Bank?

15  A    I worked for TCF Bank for technically twelve years, but the

16  bank changed names a couple of times because of mergers and

17  acquisitions.

18  Q    What is TCF Bank?  I'm sorry.  What was TCF Bank?

19  A    Sure.

20       A regional bank, primarily located in Michigan, Ohio,

21  Minnesota, doing commercial lending and also traditional consumer

22  retail.

23  Q    In 2020, were the deposits in TCF Bank federally insured?

24  A    They were.

25  Q    And are you familiar with the term "SBA-approved lender"?

 1   A   I am, yes.

 2   Q   And in 2020, was TCF Bank an SBA-approved lender?

 3   A   Yes, it was.

 4   Q   And, again, what was your position at TCF Bank in 2020?

 5   A   I was a director of credit support.

 6   Q   What were your duties as director of credit support at TCF

 7   Bank in 2020?

 8   A   Yep.

 9       My job was to see the -- oversee the underwriting function

10   and the documentation function.

11   Q   For what types of loans?

12   A   For commercial loans.

13   Q   And, generally, was there a size of those loans?

14   A   They ranged from as little as $50,000 up to $20 million.

15   Q   And did TCF Bank participate in the PPP, or Paycheck

16   Protection Program?

17   A   We did.

18   Q   And what was your role in connection with TCF Bank's

19   participation in the PPP program?

20   A   Yep.

21       I led a team that looked at the applications that came in and

22   looked to see -- test eligibility.  And then the second part was

23   looking at the loan amount that was applied for and making sure

24   that the documentation that was submitted supported that loan

25   amount.

1   Q    And that was you and your team that did that job for TCF

2   Bank?

3   A    It was.

4   Q    And was TCF Bank involved in the Paycheck Protection Program

5   at the very beginning, around April 2020?

6   A    We were.

7   Q    How would an applicant for PPP apply with TCF Bank?

8   A    We had an online application.  So they would go to the TCF

9   website and apply directly through the website -- and we had it

10  set up so it mimicked the SBA application -- and fill out the

11  application, both the loan amount information and then the

12  certifications that an applicant needed to make.

13  Q    When an applicant completed a PPP application, where did TCF

14  Bank receive that information?

15  A    We received that in through our website portal.  And we had

16  people working on those loans in Minnesota, Michigan, and Ohio.

17  Q    So if an application was submitted from Washington State,

18  that application would be transmitted in interstate wire

19  communication to either Minnesota, Michigan or Ohio?

20  A    Correct.

21  Q    Does TCF Bank -- Sorry.  What was the purpose of the PPP, to

22  your understanding?

23  A    The PPP program was set up to help small businesses that were

24  impacted by COVID, whether they had to shut down or did not have

25  the same revenue because customers could not visit the business,

1   or were shut down themselves.  So PPP was there to provide funds

2   to help employers continue to pay their employees, and then also

3   pay utility bills and rent.

4   Q    And who created the form application for PPP?

5   A    The SBA.

6   Q    And is that the form that TCF Bank used -- required its PPP

7   applicants to complete?

8   A    Yes.

9   Q    What information generally was required to be submitted on

10  that form?

11  A    There were really two parts.  The first part was establishing

12  the loan amount.  So it would ask for monthly payroll, number of

13  employees.  And then the second part was certification, various

14  questions to test eligibility.

15  Q    So there are eligibility questions and certifications, as

16  well as employees and payroll?

17  A    Correct.

18  Q    And what types of supporting information did TCF Bank

19  require, to go along with its PPP applications?

20  A    Sure.  It depended on the applicant type.  So, for instance,

21  a business would submit payroll documentation.  In that, there

22  were several acceptable documents that could be provided to

23  support the payroll.  If it was a sole proprietor, so an

24  individual filing their business taxes on their personal return,

25  then we would require a Schedule C from their personal return.

1   Q   Who made the determination whether or not to fund a PPP

2   application that was submitted to TCF Bank?

3   A   The bank did.

4   Q   And, again, what guidelines did the bank use to make that

5   determination?

6   A   We followed the SBA rules.

7           THE COURT:  Counsel, you can generally assume if your

8   question begins with "again," it's not needed.

9           MR. WERNER:  Yes, Your Honor.

10  Q   What was TCF's relationship with Chemical Bank?

11  A   Chemical Bank and TCF Bank merged in 2019.  And that merger

12  was concluded in 2020, when the systems were converted.

13  Q   And what was Chemical -- TCF Bank and Chemical Bank's

14  respective roles in funding PPP loans?

15  A   So both banks took in applications.  We used the Chemical

16  Bank service department to fund the loans.  And that service

17  department was located in Michigan.

18  Q   So an application could be received at TCF Bank and funded

19  through Chemical Bank?

20  A   Correct.

21  Q   That's the same entity?

22  A   Yeah.  Chemical Bank, a division of TCF.

23  Q   Was it important to TCF Bank that the PPP applicants provide

24  truthful and accurate information?

25  A   Yes, it was.

1    Q    Why?

2    A    That was the only thing we had to rely on, was the customer's

3    words, through those certifications.  And then the supporting

4    documentation that they provided.

5    Q    And if an applicant misrepresented employee -- number of

6    employees, payroll amounts, or made false tax filings, would that

7    matter to TCF Bank?

8    A    Yes, it would.  All of those items could affect the loan

9    amount or eligibility.

10            MR. WERNER:  No further questions.  Thank you.

11            THE COURT:  Mr. Nance?

12                         CROSS-EXAMINATION

13   BY DEFENSE COUNSEL:

14   Q    Good afternoon, Mr. Haagsma.

15   A    Good afternoon.  Haagsma.

16   Q    Haagsma, excuse me.

17        I miss your -- you're at TCF Bank now?

18   A    I'm at Huntington Bank now.  Huntington acquired TCF Bank

19   this year.

20   Q    I'm sorry.  Your present position at Huntington is what?

21   A    I'm in the commercial banking group.  I'm a portfolio

22   manager, team lead.

23   Q    Okay.  In the first half of 2020, you were at TCF?

24   A    I was.

25   Q    You were.  Okay.

 1      Did TCF have a -- or does it or did it have a marketing

 2   department?

 3   A    Yes, we had a marketing department.

 4   Q    Okay.  This included the loan origination?

 5   A    Yes.

 6   Q    Okay.  Are loan originators typically paid by commission?

 7   A    Loan originators at TCF Bank were paid a base salary.  But

 8   they did have a bonus potential based on the business that they

 9   brought in.

10   Q    Okay.  Getting loans would be considered getting business?

11   A    Correct.

12   Q    Right.  What -- for the year 2020, what percentage of TCF's

13   lending business was PPP lending as opposed to other types of

14   commercial lending?

15   A    Sure.  I don't know what the percentage was, but it was a

16   large percentage.  Essentially, most conventional lending ceased

17   for the second and third quarter of 2020.

18   Q    Do you have a -- can you estimate the number of PPP loans

19   that TCF funded last year, in 2020?

20   A    Yes.  2020 round one, it was roughly 16,000.

21   Q    And I didn't ask you.  How large of a bank is TCF?

22   A    Yeah.  TCF, pre-Huntington acquisition, was about $60

23   billion.

24   Q    I think we're learning, when that is stated, that's the

25   amount of outstanding loans?

 1   A    That's the asset size.  So loans make up the majority of the

 2   assets, yes.

 3   Q    And you're saying that about 16,000 PPP loans were funded

 4   last year in 2020?

 5   A    Correct.

 6   Q    Do you have an estimate of the aggregate loan value of those

 7   PPP loans?

 8   A    I believe it was right around $2 billion.

 9   Q    And we could do math, but what was the typical size of the

10   PPP loan?

11   A    I can't do math that quickly in my head.  But just going off

12   of the applications and anecdotally, I would say most of the

13   loans were -- a majority were under $100,000.

14   Q    And TCF screened the loan applications and funded them

15   themselves and serviced them afterwards, is that so?

16   A    Correct.

17   Q    And then Huntington took those over when the merger occurred.

18   And they are doing that now?

19   A    They did, those that were not already forgiven.

20   Q    What role did TCF have in the forgiveness process?

21   A    A similar role as taking in the original application.  So we

22   took in the forgiveness applications, reviewed those, based on

23   the requirements of the program, which is based on the size of

24   the loan, and then submitted those forgiveness applications to

25   the SBA.

 1   Q    Okay.  When they're forgiven, the lender -- or, I'm sorry,

 2   the borrower gets forgiven and you, the lender, gets reimbursed,

 3   right?

 4   A    Yes.  Yep.  So the SBA pays off the bank loan, since the bank

 5   funded the PPP.

 6   Q    Okay.  And so there's three ways that such a loan could go.

 7   It could go out to the term of the loan, and be paid.  There

 8   could be a default, in which case the SBA would guarantee it and

 9   pay you, pay TCF.  Or it could be forgiven, in which case the

10   borrower is off the hook, and you, the lender, are reimbursed for

11   what you loaned out?

12   A    Correct.  If there's a default, there's a guarantee.  But the

13   SBA, and from our experience being a preferred lender, the SBA

14   could come back and look at our due diligence process.  And if we

15   didn't follow the rules, that could jeopardize the guarantee.

16   Q    Okay.  That's never happened, though, right?  It hasn't

17   happened yet?

18   A    On PPP?

19   Q    Yes.

20   A    Not that I'm aware of.

21   Q    Okay.  Thank you.

22              THE COURT:  Redirect?

23              MR. WERNER:  No.  Thank you, Your Honor.

24              THE COURT:  All right.  You may step down.  Put your

25   mask back on.

1    Ladies and gentlemen, we will recess until tomorrow morning

2    at 9 a.m.  Please remember the Court's admonitions not to discuss

3    the case with anyone, not even amongst yourselves, not with

4    anybody else.  Don't let anybody talk to you about the case,

5    don't do any research or investigation about the case, and don't

6    read, listen, or watch anything about the case.

7    I will see you tomorrow morning at 9:00.  We will be in

8    recess.

9         THE CLERK:  Please rise.  Court is in recess.

10        (Adjourned.)

11

12          C E R T I F I C A T E

13

14    I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

15   United States District Court in the Western District of

16   Washington at Seattle, do certify that the foregoing is a correct

17   transcript, to the best of my ability, from the record of

18   proceedings in the above-entitled matter.

19

20

21          /s/ Nickoline Drury

22          Nickoline Drury

23

24

25