<pre>
 1                    UNITED STATES DISTRICT COURT

 2            WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3    _____
                                    )
 4    UNITED STATES OF AMERICA,      ) CR20-00174
                                    )
 5                    Plaintiff,     ) SEATTLE, WASHINGTON
                                    )
 6    v.                             ) November 17, 2021 -
                                    ) 9:00 A.M.
 7    ERIC SHIBLEY,                  )
                                    )
 8                    Defendant.     ) TRIAL - DAY 3
                                    )
 9    _____)

10              VERBATIM REPORT OF PROCEEDINGS
11         BEFORE THE HONORABLE JOHN C. COUGHENOUR
               UNITED STATES DISTRICT JUDGE
12    _____

13

14    APPEARANCES:

15     For the Plaintiff:      Brian Werner
                               Assistant United States Attorney
16                             700 Stewart Street, Suite 5220
                               Seattle, WA  98101
17
                               Laura Connelly
18                             U.S. Department of Justice
                               Criminal Division
19                             1400 New York Avenue N.W., RM 10100
                               Washington, D.C. 20530
20

21     For the Defendant:      Michael Nance
                               Attorney at Law
22                             P.O. Box 11278
                               Bainbridge Island, WA 98110
23

24

25
</pre>

Proceedings stenographically reported and transcript produced with computer-aided technology

Nickoline Drury, RMR, CRR - Federal Court Reporter - (206)370-8508 - 700 Stewart Street, Suite 17205, Seattle, WA  98101

```
 1                        EXAMINATION INDEX

 2

 3    EXAMINATION OF                                        PAGE

 4    MITCHELL MONDALA     DIRECT EXAMINATION               385
                           BY MR. WERNER
 5                         CROSS-EXAMINATION                398
                           BY MR. NANCE
 6    DAVID MADRID         DIRECT EXAMINATION               407
                           BY MR. WERNER
 7                         CROSS-EXAMINATION                421
                           BY MR. NANCE
 8    LISA VELOTTA         DIRECT EXAMINATION               428
                           BY MS. CONNELLY
 9                         CROSS-EXAMINATION                433
                           BY MR. NANCE
10                         REDIRECT EXAMINATION             435
                           BY MS. CONNELLY
11    MICHAEL PETRON       DIRECT EXAMINATION               436
                           BY MS. CONNELLY
12                         CROSS-EXAMINATION                468
                           BY MR. NANCE
13    ERIC SHIBLEY         DIRECT EXAMINATION               480
                           BY MR. NANCE
14

15

16                         EXHIBIT INDEX

17
      EXHIBITS ADMITTED                                     PAGE
18
      A-1                                                   523
19    A-2                                                   519
      A-3                                                   513
20    A-4                                                   508
      53                                                    387
21    109 - 111, 113 - 116, 118, 119, 121 - 129,           441
      131 - 135, 137, 142, 144 - 171, 173 - 177, 179 -
22    186,
      188 - 198 and 200 - 203
23    112                                                   391
      204                                                   393
24    208                                                   439
      209                                                   461
25
```

1          THE COURT:  Are you ready for the jury?

2          MS. CONNELLY:  Yes, from the government.

3          MR. NANCE:  Yes.

4          THE COURT:  All right.  Bring them in.

5       (The following occurred in the presence of the jury.)

6          THE COURT:  Good morning folks, please be seated.  Did

7    any of you lose power during the windstorm?  We still don't have

8    power up on Whidbey Island.  Yeah, it's long miserable nights.

9       All right.

10          MR. WERNER:  The government calls Mitchell Mondala.

11                          MITCHELL MONDALA,

12       having been sworn under oath, testified as follows:

13          THE COURT:  Please be seated, and take your mask off,

14    please.

15          THE WITNESS:  Thank you.

16                          DIRECT EXAMINATION

17    BY MR. WERNER:

18    Q   Good morning.

19    A   Good morning, sir.

20    Q   Please state your name and spell your last name.

21    A   First is Mitchell, last is Mondala.  And it's spelled:  M as

22    in Mary, O as in ocean, N as in Nora, D as in delta, A as in

23    alpha, L as in lima, A as in alpha.

24    Q   Mr. Mondala, where do you work?

25    A   I work for BECU, Boeing Employees Credit Union.

1    Q    What do you do for BECU?

2    A    I'm one of the investigators in the fraud operations

3    division.

4    Q    How long have you worked for BECU?

5    A    Just over 20 years.

6    Q    And what have been your positions during those 20 years?

7    A    My positions have ranged from being an investigator to also

8    running the day-to-day physical security operations, which

9    consist of monitoring our camera, alarm systems, and guard force.

10   Q    And what are your duties as a fraud investigator?

11   A    Our primary role is to protect the safety and soundness of

12   the credit union and its membership.  And within that framework,

13   identify any unusual behavior or transactions that exploit

14   financially the organization and its membership and minimize

15   those risks.

16   Q    Mr. Mondala, as part of your job at BECU, are you familiar

17   with the business records of BECU?

18   A    Yes, sir.

19   Q    Mr. Mondala, did you review accounts and records at BECU

20   related to Eric Shibley?

21   A    Yes, I did.

22   Q    Did Mr. Shibley apply for PPP or Paycheck Protection Program

23   loans at BECU?

24   A    Yes, he did.

25   Q    Were those loans granted?

 1    A    No, they were not.

 2    Q    Mr. Mondala, I'm going to show you what has been marked as

 3    Exhibit 53.  And Exhibit 53 is an 11-page document.  Are you

 4    familiar with Exhibit 53?

 5    A    Yes, I am.

 6    Q    What is Exhibit 53?

 7    A    This is an e-mail correspondence between a BECU employee and

 8    Mr. Shibley regarding the PPP loan applications.

 9    Q    And is this e-mail maintained in the regular course of BECU's

10    business?

11    A    Yes, it is.

12         MR. WERNER:  Your Honor, I offer Exhibit 53.

13         MR. NANCE:  No objection.

14         THE COURT:  Admitted.

15              (Exhibit No. 53 admitted.)

16         MR. WERNER:  Can we publish?  Or I will publish.

17    Q    Mr. Arnold, can we go to the bottom of page 3 of Exhibit 53,

18    please?

19         And Mr. Mondala, is this the first page in the e-mail

20    exchange between the BECU employee and Mr. Shibley?

21    A    Yes, sir, it is.

22    Q    Who is the BECU employee you referenced?

23    A    John Garcia.

24    Q    What is Mr. Garcia's position?

25    A    He works in our small business department.

1    Q    And what is the date of this e-mail?

2    A    Saturday, April 25th.

3    Q    And what was -- I'm sorry, what year?

4    A    I'm sorry.  Saturday, April 25th, 2020.

5    Q    And in April of 2020, what, if anything, was Mr. Garcia's

6    role in PPP loans at BECU?

7    A    He was helping the funding and processing of PPP loans for

8    our business members.

9    Q    In general, what is -- what is this e-mail about?  Why is

10   Mr. Garcia sending ers98126 an e-mail?

11   A    Because of the information in the packet and the application

12   that needed to be resolved.  He had some questions about the

13   packet and the documents that were provided.

14   Q    And I said "ers98126."  Who is the e-mail addressed to in the

15   body of the e-mail?

16   A    Mr. Shibley.  Mr. Eric Shibley.

17   Q    It says, "Hi Eric."

18   A    Yes, it does.

19   Q    And can I go -- if we can go to the page 2 of the e-mail,

20   please.  Actually, let's go to the bottom of page 1.

21        Does Mr. Garcia send another e-mail to Mr. Shibley on

22   April 25th?

23   A    Yes, he does.

24   Q    And what is the second e-mail we're looking at, at the bottom

25   of page 1?  What is that?  Generally, again, what is that e-mail

 1  about?

 2  A   It appears to be a correspondence between Mr. Garcia and

 3  Mr. Shibley, responding to his original e-mail.  And then

 4  Mr. Garcia is asking for additional clarifying information as

 5  well, from the documents that were provided.

 6  Q   And what business is this PPP -- what business is this e-mail

 7  string about?  Can you tell from the subject line?

 8  A   Yeah.  Yes.  Business account for ES1.

 9  Q   And let's look at the e-mail in between here, from ers98126.

10  Could we go down to the top of page 3, please, Mr. Arnold?

11      I'm sorry, I'm looking for the top of page 3.  And is this an

12  e-mail, displayed on the screen now; is this an e-mail from

13  ers98126, or Mr. Shibley, to Mr. Garcia?

14  A   Yes, sir, it is.

15  Q   And, again, generally what is Mr. Shibley saying in response

16  to Mr. Garcia's requests?

17  A   He's responding to the questions of the tax documents that he

18  was asking for, the W-3, and the year, and the lists for the

19  payroll information, specifically.  And the terms, I believe,

20  that -- the timeframe for the payroll.

21  Q   Mr. Shibley represents that the form W-3 for 2019 lists the

22  entire 2019 payroll?

23           MR. NANCE:  The e-mail speaks for itself.

24           THE COURT:  Sustained.

25  A   That's correct, yes, sir.

1        THE COURT:  No, don't answer the question if I sustain

2   the objection.

3        THE WITNESS:  Oh, sorry.

4   Q   And, again, at the bottom of page 1 of the e-mail, we saw a

5   second e-mail, again from Mr. Garcia, correct?

6   A   Yes, sir.

7   Q   And are there additional requests in this e-mail?

8   A   Yes.  He asks for an update, the monthly payroll on the

9   application that reflected the amount.

10  Q   And if we can zoom out, please.

11       And at the top, the top e-mail reflected on page 1 -- if we

12  could call that out, please, Mr. Arnold -- does ers98126, Mr.

13  Shibley, again respond to Mr. Garcia?

14  A   Yes, sir, he does.

15  Q   And is this the response displayed on the screen?

16  A   Yes, sir, it is.

17  Q   And does Mr. Shibley respond, "The tax filings are attached."

18  A   Yes.  Yes, he does.

19  Q   And are there attachments to this e-mail?

20  A   Yes, there is.

21  Q   Can we look at the attachment, please?

22       And is this the attachment to the e-mail?

23  A   Yes, it is.

24  Q   Is this a Form 941 for 2020 for the business ES1 LLC?

25  A   Yes, it is.

1   Q    This is what Mr. Shibley described as tax filings?

2   A    That's correct.  Yes, sir.

3   Q    We can take that down now.  Thank you.

4        I'm going to show you what has been marked as Exhibit 112.

5   Do you recognize Exhibit 112?

6   A    Yes, I do.

7   Q    And generally, what is that document?

8   A    That's a document for a large cash withdrawal request that

9   would be completed by a BECU employee on behalf of one of our

10  members.

11  Q    Who is the member that this request was -- who was the

12  member?

13  A    Mr. Eric Shibley.

14  Q    And I'm going to show you -- is this record created in the

15  normal course of business at BECU?

16  A    Yes, sir, it is.

17  Q    At or about the time of the events reflected in the record?

18  A    That's correct, yes, sir.

19            MR. WERNER:  Offer Exhibit 112.

20            MR. NANCE:  No objection.

21            THE COURT:  Admitted.

22                    (Exhibit No. 112 admitted.)

23            MR. WERNER:  Could we publish?

24            THE COURT:  Yes.

25  Q    And, again, this is a -- what is this document, again, Mr.

1    Mondala?

2    A    It's a large cash withdrawal request.

3    Q    Who is the member?

4    A    Mr. Eric Shibley.

5    Q    And what's the date of the large cash withdrawal request?

6    A    May 13th, 2020.

7    Q    And where was this large cash withdrawal request made?

8    A    In our Tukwila Financial Center.

9    Q    Did you review any footage of the Tukwila Financial Center

10   from May 13, 2020?

11   A    Yes, I did.

12   Q    Can we show Mr. Mondala what's been marked as Exhibit 204?

13        I'm showing you now the first page of Exhibit 204.  And I'm

14   going to ask Mr. Arnold to show you the second page of

15   Exhibit 204.

16        Do you recognize Exhibit 204?

17   A    Yes, sir, I do.

18   Q    What are those?

19   A    They're images of Mr. Eric Shibley and also our BECU

20   employee.

21   Q    What's the date?

22   A    May 13th, 2020.

23             MR. WERNER:  Offer Exhibit 204.

24             MR. NANCE:  No objection.

25             THE COURT:  Admitted.

 1                    (Exhibit No. 204 admitted.)

 2    Q    And what is depicted in the first page of Exhibit 204?

 3    A    This is a camera image of our parking lot and upcoming foot

 4    traffic into our main facility, the main entry.

 5    Q    And where is that facility?

 6    A    Tukwila.

 7    Q    And were you able to identify the individual depicted in the

 8    first -- in Exhibit 204?

 9    A    Yes, sir.

10    Q    Who is that?

11    A    That's Mr. Eric Shibley.

12    Q    And let's look at the second page, please.  What is this

13    image?

14    A    This is also an image of Mr. Eric Shibley and our BECU

15    employee, inside our Tukwila Financial Center.

16    Q    What date?

17    A    May 13th, 2020.

18    Q    How does this -- how do these images relate to what we just

19    saw admitted as Exhibit 212?

20    A    It relates to corresponding that this was the interaction for

21    the request of a large cash withdrawal request.

22    Q    Let's go back to Exhibit 112.  If we could just blow out the

23    top part, please.  And so what is the businesses name -- what is

24    the name on the account for this large cash request?

25    A    Dituri Construction LLC.

1    Q    And what is the date that account was opened?

2    A    May 1st, 2020.

3    Q    And is that depicted -- is that on the "date of membership"

4    line?

5    A    That is correct.  Yes, sir.

6    Q    And what other information is collected by this form?

7    A    The location where the cash is expected to be picked up.  The

8    date that the member would expect the funds.  And there's also

9    information about maybe the source of the funds, the purpose of

10   the funds, and any contact information.  And also the employee

11   name and the date of the original request.

12   Q    Does it also -- does its have a -- a location for how long

13   the funds have been on deposit?

14   A    That is correct.  Yes, it does.

15   Q    Why is that information in there?  Why is where the funds

16   came from, why is that on this request?

17   A    It helps us make a determination as to whether the funds can

18   be released or not.

19   Q    In the course of your duties as a BECU fraud investigator,

20   did you receive this document, Exhibit 112?

21   A    Yes, I did.

22   Q    And what did you do in response to receiving this document?

23   A    When I got the document, and looking at the dollar amount, it

24   triggered what I felt was an analysis that needed to be conducted

25   on Mr. Shibley's business account, Dituri Construction, and his

1    overall profile, to try to determine if the withdrawal can be

2    approved.

3    Q    And did you conduct that analysis?

4    A    Yes, sir, I did.

5    Q    What types of things did you look at?

6    A    First, I did confirm that the account was established on

7    May 1st, 2020, the business account.  I then, in turn, looked

8    over the profile and identified Mr. Shibley also had five other

9    business profiles with BECU, for a total of six.  And three of

10   those accounts were established in 2019, with the following three

11   established in 2020, in April and of May of 2020.

12   Q    And so that's the accounts.  You examined Mr. Shibley's

13   accounts.  Did you examine anything else of Mr. Shibley's

14   interactions with BECU?

15   A    Correct.  And I also then in turn started looking at the

16   account activity for the business accounts, and noticed that

17   there was limited to -- zero activity within the last six months.

18   Q    And these other business accounts, had Mr. Shibley applied

19   for loans in those names?

20   A    Yes, he did.

21   Q    And what business did he apply for loans for?

22   A    It was action ES1 and Shibley -- Eric Shibley M.D.

23   Q    Were those PPP loans?

24   A    These were government PPP loans, yes.

25   Q    Those loans were declined?

1    A    Those loans were declined, yes.

2    Q    After doing this analysis, what did you do next?

3    A    After that, I also -- looking at it, while we were conducting

4    our analysis, we also were able to identify that another PPP loan

5    came into an account, another business account, SS1 LLC, for

6    $820,000.

7    Q    What did you notice about that business account?

8    A    That business account was also opened in 2020, on April of

9    2020.

10   Q    Did you contact Mr. Shibley?

11   A    After that information, we felt it was necessary to contact

12   Mr. Shibley to validate the validity of the large cash withdrawal

13   request.

14   Q    About what date did you contact Mr. Shibley?

15   A    On or about May 20th, 2020.

16   Q    What did you do to contact Mr. Shibley?

17   A    I called his phone number on file.

18   Q    And how did you begin the conversation with the person who

19   answered the phone?

20   A    I identified myself as a BECU representative in the fraud

21   operations division, and I wanted to discuss the request for the

22   withdrawal.

23   Q    Did the person identify himself as Mr. Shibley?

24   A    I'm sorry?

25   Q    Did the person identify himself as Mr. Shibley?

1    A    Yes, he did.

2    Q    What did you ask Mr. Shibley?

3    A    I asked Mr. Shibley to validate the purpose for the request.

4    Q    What did he say?

5    A    He said it was to pay his employees.

6    Q    And what did you say in response to that?

7    A    I let him know our concerns of having that amount of cash,

8    and offered alternatives of official checks to make payable to

9    his employees.

10   Q    What did Mr. Shibley say in response to that?

11   A    He said there would be challenges with that, because some of

12   his employees did not have social security numbers.

13   Q    Did he accept your offer to convert the money to checks?

14   A    He did not.

15   Q    Did Mr. Shibley mention anything else on this phone call?

16   A    Yes, he did.  He did also mention that the $800,000 loan that

17   was supposed to be coming in, or had come in at that time, he

18   would be expecting that also in cash.

19   Q    Did you authorize -- did you tell Mr. Shibley whether or not

20   BECU would authorize this cash withdrawal, on this phone call?

21   A    Yes, I did.  I told him that we would not allow the

22   withdrawal.

23   Q    What were the factors that went into BECU's decision not to

24   allow this withdrawal?

25   A    The factors were specifically that we had multiple accounts,

1   six in total, that had limited to no activity in the last six

2   months.  Two of the business accounts that received these PPP

3   loans were just recently established in at BECU, in April and

4   May.  We felt that those business accounts were established

5   solely to receive these PPP loans.  And the fact that those --

6   the cash was going to be paid for undocumented workers -- or,

7   excuse me --

8              MR. NANCE:  Objection, Your Honor.  This is speculation.

9   He doesn't know.

10             THE COURT:  Overruled.  You can ask another question.

11  Q   What happened to the money from -- the money that's

12  referenced in Exhibit 112, the external deposit from Celtic Bank?

13  A   It was returned to Celtic Bank.

14  Q   After this -- after the attempts to withdraw it?

15  A   That's correct.  It was returned.  Correct.

16  Q   What about the other loan, the approximately $800,000 loan?

17  A   That was also returned.

18  Q   To the original -- to the funding bank?

19  A   Correct, to the -- correct.

20             MR. WERNER:  No further questions.  Thank you.

21             THE COURT:  Cross-examination.

22             MR. NANCE:  Yes.

23                          CROSS-EXAMINATION

24  BY MR. NANCE:

25  Q   Good morning, Mr. Mondala.

 1    A    Good morning, sir.

 2    Q    So you have worked at Boeing Employees Credit Union for

 3    20 years?

 4    A    Yes, sir.

 5    Q    In the security division, right?

 6    A    Nineteen years in the security division.

 7    Q    And you are a senior investigator?

 8    A    Yes, sir.

 9    Q    I assume that -- maybe I will just ask you.  Is the security

10    division of the BECU separate and apart from the marketing

11    division of BECU?

12    A    Yes, sir, it is.

13    Q    I mean, there is a marketing division?

14    A    Yes, there is.

15    Q    That promotes the bank's or the credit union's services?

16    A    Correct.  Yes, sir.

17    Q    That would have been active in promoting the PPP loan

18    program?

19    A    Yes, sir.

20    Q    To prospective borrowers?

21    A    Yes, sir.

22    Q    And obviously that would have been a major revenue-generating

23    area for the credit union, for BECU?

24    A    I'm not sure.  I don't know.  I don't know.  I don't know

25    about that.

1    Q    Okay.  BECU is an approved SBA lender; is that correct?

2    A    Yes, it is.

3    Q    Yeah.  You are not sure?

4    A    Beg your pardon?

5    Q    You are not sure?

6    A    No.  No, they are.  Yes.

7    Q    Okay.  From BECU's perspective, how was a normal business

8    loan different from a PPP loan?  Or from your perspective in the

9    security department, how would it be different?

10   A    I'm not sure that they can be different.  Other than --

11   Q    Do you know how much PPP business BECU did last year?

12   A    I don't.

13   Q    You don't know how much BECU generated in lender fees?

14   A    I do not.

15   Q    On PPP loans?

16   A    I do not, sir, no.

17   Q    Typically when you investigate a PPP application, do you

18   speak directly with the applicant?

19   A    I do not, no.

20   Q    You have contact information.  You could, I suppose, if you

21   chose to?

22   A    I suppose I could, yes, if I wanted.  Yes.

23   Q    You've indicated in the past that you use what you refer to

24   as internet forensics?

25   A    Correct.

 1    Q    What do you mean by that?

 2    A    Open source or Google searches, internet searches.

 3    Q    You were able to confirm that Mr. Shibley's -- Mr. Shibley

 4    and his LLCs had tax IDs, identification numbers, with the state,

 5    weren't you?

 6    A    Yes, I was.

 7    Q    And, in fact, were able to verify there was a company

 8    registration with the Secretary of State?

 9    A    Yes, I was.

10    Q    And you have indicated that he did have several business

11    accounts with BECU?

12    A    Yes, sir.

13    Q    Some that had been open for a couple of years?

14    A    Yes, sir.  Yes, sir.

15    Q    And so you first had contact directly with Mr. Shibley in --

16    was it May 13th, or was it sometime after that?

17    A    It was after that.

18    Q    Do you know when?

19    A    It was May 20th.  May 20th, 2020.

20    Q    This was subsequent to his attempt to withdraw a large cash

21    amount from one of his accounts?

22    A    Yes.

23    Q    This was PPP money that had gone into his account or his

24    LLC's account?

25    A    That's correct.

1   Q   So you talked to him by phone.  He identified himself to you?

2   A   Yes, he did.

3   Q   And you asked him, and he told you that he, in fact, wanted

4   to make this large cash withdrawal?

5   A   Yes, he did.

6   Q   He confirmed essentially what he had already done in person

7   earlier?

8   A   Yes, he did.  Yes, he did.

9   Q   Frankly told you that he wanted to pay his employees in cash?

10  A   Yes, he did.

11  Q   This would be consistent with what was reflected, I think, in

12  Exhibit 204, right?

13      Could we pull that up, 204?  Maybe I have got the wrong one.

14  Maybe it's 112.  Excuse me, 112.  If you could just blow up the

15  top half of that.  Yeah.

16      So what he told you in the phone call would have been

17  generally consistent with what's reflected in this document?

18  A   Yes, sir.

19  Q   He told you he wanted to pay payroll of his workers; is that

20  right?

21  A   Yes, sir.

22  Q   And I see "best contact phone number."  Is that his phone?

23  A   That's -- yes, it is.  That's the phone number he provided.

24  Q   So you had a way to reach him, again, if you needed to?

25  A   Yes, sir.

 1  Q    And who is Tyler Cummings?

 2  A    He's a BECU employee.

 3  Q    Is he the person that met with Mr. Shibley on the 13th?

 4  A    Yes, sir.

 5  Q    Is he the person depicted in the photo we saw?

 6  A    Yes, sir.

 7  Q    Okay.  Okay.  You can take that down.  Thank you.

 8       Well, you asked him a little further -- I mean, you offered,

 9  it sounds like, to cut checks to him for these amounts, or for

10  the employees?

11  A    Yes, sir.

12  Q    And he declined that, saying that it wouldn't really be of

13  much use to his employees because they lacked social security

14  numbers?

15  A    Correct.

16  Q    He was up front about that aspect?

17  A    Yes.  Yes.

18  Q    Did he remark on these employees not having bank accounts?

19  A    No, he did not.

20  Q    In your experience as a financial-security person, does a

21  person who lacks a social security number, are they typically

22  able to have a bank account?

23  A    No.

24  Q    A person walks into BECU and wants to open an account, and

25  they don't have a social security number, the credit union would

 1  probably say:  Sorry, can't do it?

 2  A   Correct.

 3  Q   If a person walked into BECU with a check paid to them, but

 4  didn't have any ID, wouldn't that also present a problem?

 5  A   Yes, it would.

 6  Q   You wouldn't cash it.  The bank wouldn't cash it?

 7  A   Yes.

 8  Q   So he told you he needed cash.  He needed the cash?

 9  A   Yes.

10  Q   He never really backed away from that position.  He needed

11  the cash?

12  A   Correct.

13  Q   In fact, he went further.  He said:  Well, not only do I need

14  this cash, but there's another large sum coming, I'm expecting

15  it, in the neighborhood of $800,000, right?

16  A   Yes, sir.

17  Q   And it's coming to one of these accounts.  And he would like

18  to withdraw a good portion of that?

19  A   Correct.

20  Q   And it sounds like at that point the two of you just kind of

21  agreed to disagree?

22  A   Correct.

23  Q   You couldn't encourage that because you didn't think you

24  would be able to allow it?

25  A   Say that again.

1    Q    Well, you didn't -- obviously you didn't agree that that

2    could happen.  Didn't you tell him that probably that wouldn't be

3    allowed?

4    A    That's correct, yes.

5    Q    In that call, in that first call?

6    A    Yes, I did.  Yes, I did.

7    Q    Then the call ended, essentially?

8    A    Yes, it did.

9    Q    Did you have a second phone call with Mr. Shibley?

10   A    I did, yes.

11   Q    When was that?

12   A    I believe that was on or about the 27th of May, I believe.

13   The 27th of May 2020.

14   Q    Nothing had changed the position of the bank, though, in that

15   call?

16   A    As far as the -- maybe --

17   Q    You didn't change your mind.  You didn't agree to release

18   funds?

19   A    Correct.  We did not.

20   Q    Now, you and Mr. Shibley never actually met in person?

21   A    No, sir.  Never.

22   Q    You have never spoken to him face-to-face?

23   A    Never spoken face-to-face, no.

24   Q    And these calls between you and Mr. Shibley were not

25   recorded?

 1   A    They were not.

 2   Q    You are not that familiar, are you, with his business

 3   operations?

 4   A    No, I'm not.

 5   Q    You didn't visit -- you never met him; but you didn't go to

 6   his business office or talk to anyone at his business office?

 7   A    No, I did not.

 8   Q    Never went to the worksite of any of his businesses?

 9   A    Did not.

10   Q    Or spoke to anyone else at Dituri Construction?

11   A    I did not.

12   Q    Or anyone at SS1?

13   A    I did not.

14   Q    Didn't speak to any of his employees?

15   A    I did not.

16           MR. NANCE:  Thank you, sir.

17           THE WITNESS:  Thank you.

18           MR. WERNER:  No further questions.

19           THE COURT:  All right.  You may step down.  Put your

20   mask back on.

21           THE WITNESS:  Thank you.

22           MR. WERNER:  The government calls David Madrid.

23                       DAVID MADRID,

24       having been sworn under oath, testified as follows:

25           THE COURT:  Be seated and take your mask off, please.

1                        DIRECT EXAMINATION

2     BY MR. WERNER:

3     Q   Good morning.

4     A   Good morning.

5     Q   Please state your name and spell your last name.

6     A   David Madrid, M-A-D-R-I-D.

7     Q   Mr. Madrid, where do you work?

8     A   I work in Tacoma at John S. Realty.

9     Q   Are you -- what's your position at John S. Realty?

10    A   I'm a broker.

11    Q   How long have you been in that position?

12    A   Almost eight years now.

13    Q   Do you know Eric Shibley?

14    A   Yes, I do.

15    Q   About when did you meet Eric Shibley?

16    A   It would have been, like, around March or April of 2018.

17    Q   And did you meet him in your capacity as a real estate agent?

18    A   Yes.

19    Q   And from 2018 until about mid-2020, in that two-year period,

20    how often did you speak with Mr. Shibley?

21    A   It would vary.  Sometimes, depending on what he was working

22    on, and I was doing research, we'd talk a lot.  Other times, it

23    would be sometimes weeks.

24    Q   And generally, what would you talk to Mr. Shibley about?

25    A   Pretty much mostly real estate.

 1   Q   When you met Mr. Shibley in 2018, what was his job?

 2   A   I learned that he was a doctor.

 3   Q   Did you learn that from Mr. Shibley?

 4   A   Yes.  Actually, first of all, he told me he was a real estate

 5   broker.  But that's another story.

 6   Q   And later did he tell you that he was a doctor?

 7   A   Yes.

 8   Q   Did you visit his doctor's office?

 9   A   Yes.

10   Q   Where?

11   A   Everett, Washington.  Up by the Everett Mall.

12   Q   And how big was that office?

13   A   I'd say 2,500 square feet, or so.

14   Q   Did you see anyone working there, besides Mr. Shibley?

15   A   No.

16   Q   Did he ever have a different doctor's office?

17   A   Yes.

18   Q   Where was that?

19   A   In West Seattle.

20   Q   And did you visit that doctor's office?

21   A   Yes.

22   Q   Did you ever see anyone working there in the doctor's office,

23   besides Mr. Shibley?

24   A   No.

25   Q   So again, could you describe -- what would you talk to Mr.

 1  Shibley about?

 2  A   Well, he would purchase properties and try to rehab them and

 3  get them ready for sale and/or rent.

 4  Q   And how did you come across Mr. Shibley?

 5  A   He called me on a property.  I had listed a commercial piece

 6  of property in White Center, Washington.

 7  Q   Did Mr. Shibley ever purchase that property?

 8  A   He made an offer, but it never closed.

 9  Q   Did Mr. -- did you ever help Mr. Shibley sell any properties?

10  A   Yes, I did.

11  Q   Where were those properties?

12  A   One was in Marysville, Washington and one was in Mount

13  Vernon, Washington.

14  Q   And the Marysville property, was it commercial, residential?

15  A   It was residential.

16  Q   And when was that sold?

17  A   That would have been sold right around -- I'm going to say

18  early 2019.

19  Q   Did you visit that property?

20  A   Yes.

21  Q   What did you observe?  Did you ever observe anyone working

22  at -- any construction work being done on the Marysville

23  property?

24  A   I never observed anybody doing any work.

25  Q   Did you notice that work had been done?

 1   A    Minimal work, that I noticed.

 2   Q    Did you visit the Mount Vernon property?

 3   A    Yes.

 4   Q    Was that a residential property or a commercial property?

 5   A    Yes, it was residential.

 6   Q    And did you ever observe anyone working, doing construction

 7   work on the Mount Vernon property?

 8   A    Not construction, no.

 9   Q    Did you observe people doing other types of work on it?

10   A    There was a guy staying in one of the bedrooms, that said he

11   was cleaning up most of the time.

12   Q    Were you ever the real estate agent on a property that Mr.

13   Shibley purchased?

14   A    Yes.  I listed three of his properties that he owned.

15   Q    But did you ever -- did Mr. Shibley own other properties,

16   besides the ones we have talked about, Marysville and Mount

17   Vernon?  Did he own other properties?

18   A    Yes.

19   Q    Were you the real estate agent when he purchased those

20   properties?

21   A    No.

22   Q    As a real estate agent, Mr. Madrid, do you work with

23   contractors?

24   A    Yes.

25   Q    Do you refer your clients to contractors?

 1   A    Yes.

 2   Q    Did you ever refer your clients to Eric Shibley for

 3   contractor work?

 4   A    No.

 5   Q    From the time you knew Mr. Shibley, from 2018 to 2020, was he

 6   a contractor?

 7   A    No.

 8   Q    Did Mr. Shibley have a contractor business?

 9   A    No.

10   Q    Did you ever see --

11   A    Not that I know of.

12        THE COURT:  I'm sorry.

13   Q    Did you ever see him get paid for a contractor job?

14        MR. NANCE:  Objection, foundation.

15        THE COURT:  Overruled.

16   Q    You may answer.  Did you ever see Mr. Shibley get paid for a

17   contractor job?

18   A    No.

19   Q    Had you ever heard of a company, during the time you knew

20   Mr. Shibley, 2018 to 2020, have you ever heard of a company

21   called A Team Holdings?

22   A    No.

23   Q    A company called Dituri Construction?

24   A    No.

25   Q    A company called SS1?

1   A    I knew of one ES1, but not an SS1.

2   Q    What did you know about ES1?

3   A    When he would make offers on properties, he would use ES1

4   LLC.  And that's the name of the purchaser that would be --

5   Q    Did you know Mr. Shibley to have a contractor business in any

6   of those names that we just discussed?

7   A    No.

8   Q    You mentioned that Mr. Shibley owned other properties during

9   the time you knew him from 2018 to 2020.  Where were those

10  properties located?

11  A    The property he owned in West Seattle was his office/home.

12  The property in South Park on Donovan Street.  He also owned one

13  on Memorial Drive -- Des Moines Way South, Memorial Drive.  And

14  then he also owned one on Fifth Avenue South.

15  Q    I'm going to show you what's been marked as Exhibit 100 --

16  what's been admitted as Exhibit 100.  Do you recognize what's

17  depicted in Exhibit 100?

18  A    I sure do.

19  Q    What is that?

20  A    That's Mr. Shibley's office/home.

21  Q    Have you visited this property before?

22  A    Yes.

23  Q    What did you observe inside this property?

24  A    When I went there, it was, you know, kind of like nobody --

25          MR. NANCE:  I would --

 1          THE COURT:  Excuse me.

 2          MR. NANCE:  I would ask that it be -- could we get some

 3  idea of the time different things are happening?

 4          THE COURT:  Yes.

 5  Q   (By Mr. Werner:)  Did you visit this property from 2018 to

 6  2020?

 7  A   Yes.

 8  Q   How many times.

 9  A   Probably five times.  Four or five times.

10  Q   And over that time did it look different, the times you went

11  in there?

12  A   Yes.

13  Q   How did it look the first time you went in there?

14  A   The first time I went in there, it was just dark.  And

15  Mr. Shibley had an office behind the counter.  There was a

16  reception counter.  He had an office back there.  We went in

17  there and we talked.  I never really looked through the whole

18  place.  It was a bit messy, but okay.

19  Q   How did it change over time, if at all?

20  A   The last couple of times I saw it, it had been ransacked and

21  gone through.  It was a disaster.

22  Q   Did you ever see anyone doing construction work inside this

23  building, Exhibit 100?

24  A   No, sir.

25  Q   Did you ever list this property for sale?

1    A    No, sir.

2    Q    The next property -- if you could take that down, please --

3    the next property you mentioned was on Donovan Street in South

4    Park?

5    A    Yes, sir.

6    Q    Did you visit the Donovan Street property from between the

7    times of 2018 to 2020?

8    A    Absolutely.

9    Q    Approximately how many times?

10   A    Probably 15 to 20.

11   Q    And what is the Donovan Street property, is it a residence?

12   A    Residential.

13   Q    Did you see work, construction work being done on the

14   property?

15   A    Yes.

16   Q    How many people were working on the property -- how many

17   people did you observe at any one time when you went to the

18   Donovan Street property?

19   A    At any one time I would see maybe one to three people

20   working.

21   Q    And over 2018 to 2020, over all the times you went there, how

22   many different individuals did you observe doing construction

23   work on the Donovan Street property?

24   A    Ten.  That's a guesstimate.  I never counted them.

25   Q    Did the people there appear to be professional contractors?

 1    A    No.

 2    Q    Were they wearing similar clothing or uniforms?

 3    A    No.

 4    Q    What did you observe about the work that was being done at

 5    Donovan Street?

 6    A    Well, as I said, I have been there many times, so there was

 7    always something going on.  And it was -- it was just kind of a

 8    remodel-type work.  And, you know, they were trying to make it as

 9    best they could.

10    Q    And did Mr. Shibley say anything to you about how he

11    compensated people working on that property?

12    A    Yes.

13    Q    What did he say?

14    A    Well, most of the time he said all he had to do was provide

15    them a place to stay and something to eat.

16    Q    Did you observe people living in the Donovan Street property?

17    A    Yes.

18    Q    Can you describe where individuals were living in that

19    property?

20    A    There was a family living on the main floor, after the

21    remodel was done.  And then there was another guy living

22    downstairs in the basement.  And then there was two sheds out

23    back, and he had individuals living in those.

24    Q    Did you ever see Mr. Shibley pay anyone who was working at

25    the Donovan Street property?

 1    A    No.

 2    Q    Did you list the Donovan Street property for sale?

 3    A    Yes.

 4    Q    What did you list it for?

 5    A    The first time I listed it, I think it was for, like,

 6    $650,000.

 7    Q    When was that?

 8    A    That would have been in '19 -- the year 2019.  The first time

 9    we only listed it for, like, two weeks.  And then he decided to

10    do something else.

11    Q    And did you list it a second time?

12    A    Yes.

13    Q    What year was that?

14    A    2020.

15    Q    What did you list it for?

16    A    550.

17    Q    Did it sell?

18    A    No.

19    Q    And for our record, 550, does that mean $550,000?

20    A    $550,000, I'm sorry.  I might have got mixed up, because we

21    listed three properties all the same day.  But I'm pretty sure

22    Donovan was at 550.

23    Q    If it was a different amount, was it close to 550?

24    A    Absolutely.

25    Q    The next property, the third property you mentioned

 1    Mr. Shibley owning, was in Des Moines.  Is that Des Moines Way?

 2    A    Yes.  Des Moines Way South.

 3    Q    Did you visit the Des Moines Way South property?

 4    A    Yes.

 5    Q    Between 2018 and 2020?

 6    A    Yes.

 7    Q    About how many times?

 8    A    Probably about ten times.

 9    Q    Can you describe this property?

10    A    Well, there's a beginning and there's an end.  At the

11    beginning, you couldn't even see the property, it was completely

12    grown over by shrubs and trees and things.  And so by the end, it

13    was -- the front yard was cleared.  And there was always work

14    being done interior-wise.

15    Q    And who did the clearing of the shrubs?

16    A    There was a number of people that were doing the clearing,

17    that I would see off and on.  And then one of my clients

18    befriended Mr. Shibley, and he owned a little mini tractor.  So

19    he was doing some of the work.  Unfortunately, he's no longer

20    with us and he should have never been on that tractor.  But

21    that's a whole other story.

22    Q    Did your friend work for Mr. -- did your friend -- was your

23    friend an employee of Mr. Shibley's?

24    A    No.

25    Q    He had his own business?

1    A    No.  He just was one of the guys and he was trying to help

2    Eric.  And Eric was paying him for dump runs, and stuff like

3    that.

4    Q    How many different people did you see working on the Des

5    Moines Way property?

6    A    Off and on, probably ten.

7    Q    And, again, at any given time, how many people were there

8    when you visited the property?

9    A    Two or three.

10   Q    So again, that's ten different people over a two-year period?

11   A    Yes.

12   Q    Again, did you observe people living in the Des Moines Way

13   property?

14   A    Most of the people that worked there, lived there.

15   Q    Describe where they lived.

16   A    There was a few people living in the basement.  And then

17   there was another guy that was living in the garage.  And then

18   once in a while I would see, like, blankets or something in,

19   like, a spare room just thrown on the floor.  So I assumed people

20   stayed there.  I never saw them sleeping there or anything like

21   that.

22   Q    Did you ever see Mr. Shibley pay anyone that was doing work

23   at the Des Moines Way property?

24   A    No.

25   Q    Did you list the Des Moines Way property for sale?

 1   A    Yes.

 2   Q    When?

 3   A    That was -- I think it was, like, October of 2020.

 4   Q    And how much did you list it for?

 5   A    I think that one, we listed it for $450,000.

 6        MR. NANCE:  This is not relevant.  It's beyond really

 7   the -- October 2020 is beyond the period of --

 8        THE COURT:  Sustained.

 9        MR. NANCE:  Move to strike it.

10        THE COURT:  No.  It's a little late.

11   Q    Did you ever list the property for sale before October 2020?

12   A    No.

13   Q    Lastly, you mentioned a Fifth Avenue South property.  Do you

14   recall that?

15   A    Yes.

16   Q    Did you visit that property?

17   A    Yes.

18   Q    How many times?

19   A    Probably four or five times.

20   Q    How would you describe that property?

21   A    Like a rental property.

22   Q    Is it a residence?

23   A    Yes, sir.

24   Q    Did you ever go inside that property?

25   A    No.

1  Q   Why not?

2  A   They weren't real nice people living inside.

3  Q   What happened when you went there?

4  A   I was threatened.

5  Q   And specifically what happened?

6  A   Well, I went to the property, and there was some --

7          MR. NANCE:  Objection, relevance.

8          THE COURT:  Overruled.

9  Q   Why did you go to the property?

10 A   I had it on the market.  I listed it.  Mr. Shibley and I had

11 listed that property.  And then at that time, I had to, you know,

12 be able to, you know, sell the property.  So I had to get inside.

13 So when I went there, I was screamed at, yelled at by a very

14 large man and a couple of other guys.  And they came out, and --

15 Q   Didn't let you in?

16 A   No.  They did not let me in.  They came out with, like, pipes

17 and stuff like that.  Chasing me.  So I got the heck out of

18 there.

19 Q   And, again, did you list that property in 2020?

20 A   Yes.

21 Q   Did it sell?

22 A   No.

23 Q   What did you list it for?

24 A   I think that one also was $450,000.

25          MR. WERNER:  Just a second, Your Honor.

```
 1        No further questions.  Thank you.
 2             THE COURT:  Cross.
 3        You folks can stand up and stretch, if you want.
 4                      CROSS-EXAMINATION
 5   BY MR. NANCE:
 6   Q   Hi, Mr. Madrid.
 7   A   Hi, Mike.  How are you?
 8   Q   I think we have spoken a couple of times in the past?
 9   A   Yes, we have.
10   Q   It's nice to finally meet you face-to-face.
11   A   It's nice to meet you.
12   Q   You first met Eric Shibley about four years ago?
13   A   In 2018ish.  Early 2018.
14   Q   And you considered this, always considered this a business
15   relationship, didn't you?
16   A   Yes.
17   Q   You were and you still are a licensed real estate agent?
18   A   Yes, sir.
19   Q   Very basically, you earn a commission when you bring together
20   buyers and sellers of a piece of real estate?
21   A   Correct.
22   Q   That's how you make your living?
23   A   That's right.
24   Q   You helped Mr. Shibley sell at least two of his properties in
25   the past; is that right?
```

 1   A    Yes, sir.

 2   Q    Yeah.

 3        And you have described listing three other properties that

 4   you have listed for him, here in West Seattle?

 5   A    Nothing in West Seattle.  In White Center.

 6   Q    Okay.  I'm sorry.

 7   A    South Park area.  Yes, sir.

 8   Q    Okay.  You've -- you've tried to work with Mr. Shibley in the

 9   best way that you can?

10   A    Yes.

11   Q    You've --

12   A    Sometimes I didn't want to work for him, as you know.

13   Q    Okay.  You have loaned him money in the past --

14   A    Yes.

15   Q    -- for example.  You have paid some of his bills in the past?

16   A    No.

17   Q    No?  Okay.

18        Have you -- you have tried to put him in contact, be in touch

19   with lenders that you know?

20   A    Yes.

21   Q    You knew that he was in the rental -- or aspired to be in the

22   rental business --

23   A    Yes.

24   Q    -- buying properties?

25   A    Yes.  I know he was doing that.

1    Q    Renovating it.

2              THE COURT:  One at a time, please.

3    A    Yeah.

4    Q    Did you perceive him as being in the house-flipping business?

5    A    50/50 flipping and renting.

6    Q    Okay.  And obviously you knew that he owned these properties

7    that he was using as rental properties?

8    A    Yes, sir.

9    Q    He was collecting rent?

10   A    Yes, sir.

11   Q    Do you know how the tenants paid the rent?

12   A    I know what Mr. Shibley told me.  Some of his tenants paid.

13   There was a government agency that paid their rent, if he

14   provided them with living quarters.

15   Q    Okay.  Are you familiar with the HEN program?

16   A    The what?

17   Q    The HEN, the HEN program through the State of Washington.

18   Does that ring a bell?

19   A    No, I don't know what that -- specifically of that program.

20   I never heard of it.  But any program Mr. Shibley, he never gave

21   me a name on what he was getting, he just told he how it worked.

22   Q    Are you familiar with other housing-assistance programs,

23   subsidizing --

24   A    The only one that I'm really familiar with is when we get a

25   down payment assistance program for people.

1  Q   Okay.  You were asked about some of these various businesses,

2  these LLCs.  I think you said you knew about ES1?

3  A   Yes, sir.

4  Q   And that was because it was -- that was the entity that was,

5  what, listed as one of the owners of --

6  A   It was when Eric was going to make an offer on a property,

7  which he did quite a bit.  So occasionally he would use that name

8  or some other name.

9  Q   Okay.

10 A   ES1, though, rings a bell.

11 Q   Would there be any other reason you would know about LLCs

12 that he had an interest in, except for his using it to try to

13 purchase a place?

14 A   Yeah, I just know he would use different names.

15 Q   He wasn't consulting you about LLC formations?

16 A   No.

17 Q   What he did or didn't need to do there?

18 A   Not at all.

19 Q   It wasn't part of the relationship?

20 A   No, sir.

21 Q   You have indicated that you did observe people working at

22 some of the houses?

23 A   Yes, sir.

24 Q   You don't know how many employees that he had?

25 A   Absolutely not.  I really don't know that he had employees,

 1  just workers.

 2  Q    Did these properties appear to be rented out at the same time

 3  they were being repaired and fixed up?

 4  A    Yes.

 5  Q    Did you have a sense that the workers that you observed

 6  had -- do you know, did they have identification?

 7  A    I don't know if they had identification.  But if you ask me

 8  if I thought they did, no.

 9  Q    You would say no?

10  A    Absolutely not.

11  Q    Why would you say that?

12  A    Because most of the people that worked there were, by

13  Mr. Shibley's definition, meth heads.

14  Q    So these are -- are these people that, but for their ability

15  to live there, might, in your judgment, have had difficulty

16  living anywhere?

17  A    Absolutely.

18  Q    Might they have been what people often refer to as "street

19  people"?

20  A    Absolutely.

21  Q    People with problems?

22  A    You hit the nail right on the head, Mike.

23  Q    Social problems?

24  A    Every kind of problem you could have in that state of mind,

25  yes, sir.

1    Q    You were asked if you ever observed Mr. Shibley paying his

2    workers.  You never did, right?

3    A    Never saw that.

4    Q    Is there any reason that he would need to involve you in

5    paying the people working on his --

6    A    It was one time he called me and said he was broke and he

7    needed some help to pay.  So I gave him some money.

8    Q    You have never seen his financial statements or bank

9    statements, have you?

10   A    No, sir.

11   Q    Would you agree that he -- Mr. Shibley seemed to be very

12   interested in becoming further involved in real estate?

13            MR. WERNER:  Objection, Your Honor.

14            THE COURT:  Sustained.

15   Q    Well, were you ever -- were you ever assigned by him to look

16   for properties that might be appropriate purchase opportunities?

17   A    It was sometimes every day that Eric would find some kind of

18   property.  That was kind of like his thing to do.  He would

19   research properties constantly.  He had different ways of having

20   me check various types of things in the research.  And he was

21   constantly looking for properties, every day.

22   Q    Would he talk to you on a regular basis about it?

23   A    He talked to me.  He would talk to me and say:  Let's go

24   ahead and -- he would be wanting to make a purchase.  And then

25   all of a sudden I wasn't involved.

1   Q   Again, you -- you were in frequent contact.  But is it

2   accurate that you never -- the nature, as you perceived it, the

3   nature of your relationship with him really never changed?  You

4   were a real estate agent looking to have a business relationship

5   with Mr. Shibley?

6   A   Yes.

7   Q   And you had -- that was your common -- that was the common

8   aspect to the relationship?

9   A   There was -- there was times when I would do things that are

10  outside the world of real estate for Eric.  I could elaborate,

11  but you didn't ask me to.

12  Q   Okay.  You didn't delve into his business filings?

13  A   Oh, no.

14  Q   Or his tax filings?

15  A   Nothing like that.

16  Q   Tax issues, PPP loan applications?

17  A   Nope.

18          MR. NANCE:  That's all I have.  Thank you.

19          MR. WERNER:  No further questions.  Thank you, Your

20  Honor.

21          THE COURT:  You may step down.  Put your mask back on,

22  please.

23          THE WITNESS:  Can I go home?

24          THE COURT:  Yes.

25          THE WITNESS:  Thank you.

1    MS. CONNELLY:  The government calls Lisa Velotta.

2                    LISA VELOTTA,

3        having been sworn under oath, testified as follows:

4        THE COURT:  You can take your mask off.

5        THE WITNESS:  Okay.

6                    DIRECT EXAMINATION

7    BY MS. CONNELLY:

8    Q    Good morning.

9    A    Hi.

10   Q    Can you please state your name and spell your last name for

11   the record?

12   A    Sure.  My first name is Lisa.  Last name is Velotta.  It's

13   V as in Victor, E-L-O-T-T-A.

14   Q    And where do you currently live, Ms. Velotta?

15   A    I live in Renton, Washington.

16   Q    Can you tell us, what is your phone number?

17   A    My phone number is 509-699-0885.

18   Q    And how long have you had that phone number?

19   A    I'd say 10, 15 years at least.

20   Q    So was that your phone number in April, May, and June of

21   2020?

22   A    Yes.

23   Q    What is the last four digits of your social security number,

24   Ms. Velotta?

25   A    It's 0046.

1    Q    And where do you currently work?

2    A    I work for Providence, and my office is in Beacon Hill.  I

3    work for Pacific Medical Centers, USFHP.  We are the credential

4    providers for that group.

5    Q    What does it mean, "credential providers," for those of us

6    who don't know?

7    A    Before we bring physicians or providers into our network for

8    the health plan, I manage the credentialing process of verifying

9    their education and training before we approve them into our

10   network, I guess is a quick way to explain it.

11   Q    And how long have you worked in that job?

12   A    I have been in the credentialing field since 1996, so

13   25 years.

14   Q    How long have you worked for Providence?

15   A    I have worked for Providence just four years.

16   Q    Where did you work before that?

17   A    Before that I worked for Overlake Hospital in Bellevue, for a

18   couple of years.  And prior to that I worked for the Everett

19   Clinic for a couple of years.  That was on this side of the

20   mountains.  And the majority of my career was in Wenatchee, where

21   I lived.  I worked for Wenatchee Valley Medical Center for about

22   18 years.

23   Q    And before this case, were you familiar with Eric Shibley?

24   A    No, I was not.

25   Q    Have you ever been employed by Eric Shibley?

```
 1   A   No, I have not.

 2   Q   Have you ever been employed by the A Team Holdings LLC?

 3   A   No, I have not.

 4   Q   Have you ever been employed by Dituri Construction LLC?

 5   A   No, I have not.

 6   Q   Have you ever been employed by SS1 LLC?

 7   A   No, I have not.

 8   Q   Have you ever been employed by Seattle's Finest Cannabis LLC

 9   or SFC LLC?

10   A   No, I have not.

11   Q   Have you ever been employed by ES1 LLC?

12   A   No, I have not.

13   Q   Have you ever been employed by Eric R. Shibley MD, PLLC?

14   A   No, I have not.

15   Q   And have you ever been paid by Mr. Shibley or any of the

16   entities that we just went through?

17   A   No, I have not.

18   Q   How did you become familiar with Eric Shibley?

19   A   Well, it happened last year when I was working from home.

20   And two men came to my house, identified themselves as FBI

21   agents.  They gave me a subpoena that asked for me to provide my

22   W-2 and my bank statements, my work history, within a month --

23   within a week, I think it was, for this case.  And they left.  I

24   didn't take them seriously, because the document didn't seem

25   serious.
```

1      First of all, I saw the name.  And I looked on my system at

2  work to see if he was in our network, because he was an MD, a

3  physician.  So he was not.  And I was so confused.

4      So then I Googled him, and called him, called the phone

5  number.  And he answered.  And I said, "Is this Eric Shibley?"

6  And he said, 'Yes, who's this?"  And I said, "Well, I just had

7  two FBI agents come to my house, who said that you told them I

8  worked for you.  I don't even know you.  Why would you tell them

9  I worked for you?"  And he said, "Why are you calling me?  Quit

10  harassing me."  And he hung up.

11      So I was very much confused and angry.  I did my own

12  research, as I do for credentialing, to find out how this could

13  -- how my name was connected.  And I couldn't find any way,

14  because I have never credentialed him.  He wasn't in my system.

15  So I was baffled.

16      So that's how I came to know who he was.

17  Q   And so just unpacking that story that you have told us, just

18  a little bit.  Can you just tell us, again, how you found

19  Mr. Shibley's number?

20  A   I Googled his name and it came up.

21  Q   Did it come up on a business website that you had?

22  A   Yes.  It came up at his practice in Arlington.

23  Q   So did you then call the number on that website?

24  A   Yes, I did.

25  Q   And then when you called him, did he identify himself as Eric

1   Shibley?

2   A   Yes.  I asked -- I said, "Is this Eric Shibley?"  And he

3   says, "Yes, who's calling?"  And that's when I said -- yes, yeah.

4   Q   Before he hung up on you, could you tell us what he told you

5   in response to you telling him the FBI had been at your door?

6             MR. NANCE:  Asked and answered.

7             THE COURT:  Pardon me?

8             MR. NANCE:  Asked and answered.

9             THE COURT:  Sustained.

10  Q   Ms. Velotta, about how long was the phone call with

11  Mr. Shibley?

12  A   It wasn't that long.  Probably less than a minute.

13  Q   I'm showing you what's been marked as Exhibit 69, which has

14  already been entered into evidence.

15            MS. CONNELLY:  Permission to publish Your Honor.

16            THE COURT:  Yes.

17  Q   If we could look at the second page, Mr. Arnold.  If we could

18  look at the line in the center.  Thank you.

19      Ms. Velotta, the "from" number on this document, is that your

20  number?

21  A   Yes, it is.

22  Q   And the call date of June 10th, 2020, is that the date you

23  called Mr. Shibley?

24  A   That sounds about right, yes.

25  Q   And the billable time over on the right-hand side, is that

 1  your recollection of about how long you spent on the phone with

 2  him?

 3  A   Yes.

 4  Q   Did you ever speak to Mr. Shibley before this phone call?

 5  A   No.

 6  Q   And did you ever speak to him after this phone call?

 7  A   No.

 8          MR. CONNELLY:  No further questions.

 9          THE COURT:  Cross?

10                       CROSS-EXAMINATION

11  BY MR. NANCE:

12  Q   Good morning, Ms. Velotta.

13  A   Good morning.

14  Q   You don't know Eric Shibley, do you?

15  A   No, I do not.

16  Q   You have never met him face-to-face?

17  A   No.

18  Q   Before this case, you had never heard of him?

19  A   Correct.

20  Q   And other than this 30-second phone call that you initiated,

21  you have never spoken to him?

22  A   Correct.

23  Q   Right.  He's never called you?

24  A   Not that I recall.

25  Q   You have obviously never worked for him?

1    A    Correct, I have not.

2    Q    Wasn't your wallet stolen?

3    A    Yes, it was.

4    Q    A year and a half or two years ago?

5    A    Yes, it was.

6    Q    You were at a Costco and left your purse -- your wallet in

7    the car, and somebody stole it?

8    A    Yes.  It was in my purse.  They took it out of my purse when

9    I was putting my --

10   Q    Okay.  Did your purse -- your wallet contain your driver's

11   license?

12   A    Yes, it did.

13   Q    Did it contain other identifying information about you?

14   A    It did not have my social security, because I don't carry

15   that with me.  But it had credit cards, because they were being

16   rung up, by the time I got home.

17   Q    Was the thief of your property ever apprehended?

18   A    I was not aware.  But I did see on the news that this man

19   that was doing this at Costco's -- because it was in a Costco

20   parking lot -- that he was apprehended.  But I was never returned

21   my --

22   Q    Do you think it was the same person, or do you know?

23   A    I think so.  Because the way it happened, everyone else

24   that -- that put in the police reports of their wallets being

25   taken while they were loading their groceries, it sounded exactly

 1  like what happened to me.  And it was in the Tukwila Costco.

 2  Q   Okay.  But you never got your wallet back or your ID back?

 3  A   Correct.

 4  Q   Yeah.  You wouldn't know if someone used your information and

 5  pretended to be you, right?

 6  A   I have not had anything other than this come up, uh-huh.

 7  Q   Okay.

 8         MR. NANCE:  Thank you.  That's all I have.

 9         THE WITNESS:  Okay.

10         MS. CONNELLY:  Just one follow-up question, Your Honor.

11                     REDIRECT EXAMINATION

12  BY MS. CONNELLY:

13  Q   Did your wallet contain your phone number?

14  A   No, not that I'm aware of.

15  Q   Did your wallet contain your social security?

16  A   No.  I don't carry that with me.

17         MS. CONNELLY:  Nothing further, Your Honor.

18         THE COURT:  All right.  You may step down.  Put your

19  mask back on.

20         THE WITNESS:  Okay.

21         MS. CONNELLY:  The government calls Michael Petron.

22                     MICHAEL PETRON,

23      having been sworn under oath, testified as follows:

24         THE COURT:  Take your mask off.

25         THE WITNESS:  Thank you.

1                          DIRECT EXAMINATION

2    BY MS. CONNELLY:

3    Q    Good morning.

4    A    Good morning.

5    Q    Can you please state your name and spell your last name for

6    the record?

7    A    It is Michael Petron, P-E-T-R-O-N.

8    Q    And can you tell us about your educational background?

9    A    Sure.  I have an undergraduate degree with a double major in

10   economics and statistics.  I have one master's degree in

11   statistics.  And a second master's degree in accounting.

12   Q    And do you have any professional qualifications?

13   A    I do.  I'm a certified public accountant and a certified

14   fraud examiner.

15   Q    What does it mean to be a CPA?

16   A    A CPA is one who has passed a series of exams,

17   accounting-related exams that allows me to sign financial

18   statements.

19   Q    And where do you currently work, Mr. Petron?

20   A    I work at a firm named Stout, S-T-O-U-T.

21   Q    And what is your job at Stout?

22   A    My position is managing director.  I have two main roles.

23   One of them is servicing clients, which is what I'm here today to

24   do.  And the other is more administrative, where I run Stout's

25   entire dispute consulting practice.

1    Q    And how big is Stout's dispute consulting practice?

2    A    I think I have about 110 people that report to me; 22 other

3    partners, and -- 110 total staff.

4    Q    And just for the jury, what is a dispute consulting practice?

5    A    So the dispute consulting practice, we have a variety of

6    practitioners, mainly accountants who specialize in different

7    aspects of the litigation.  So I specialize in white-color crime

8    and fraud and forensic accounting.  But others specialize in

9    damages, intellectual property issues, other litigation-related

10   activities.

11   Q    So did the government ask you to assist in this case that you

12   are here today with?

13   A    They did.

14   Q    And when did that happen?

15   A    I believe it was sometime in September of last year.

16   Q    Is that 2020?

17   A    Correct.

18   Q    Was this matter the first time that you had worked for the

19   DOJ?

20   A    Oh, absolutely not.

21   Q    What percentage of your work do you do for the DOJ at Stout?

22   A    Well, it varies from time-to-time.  It could be anywhere

23   between, call it had 40 percent, all the way up to 75 percent,

24   depending upon what's going on.

25   Q    And approximately how much has Stout billed for its work in

 1   this matter, billed the DOJ for work in this matter?

 2   A   I think it's around $60,000.

 3   Q   And what is your hourly rate to do work for the Department of

 4   Justice?

 5   A   $395.

 6   Q   In this case, were you hired to make any sort of conclusion?

 7   A   I was not.

 8   Q   Were you hired to express any sort of opinion?

 9   A   No, ma'am.

10   Q   So what were you hired to do?

11   A   I was hired to examine financial records, banking

12   transactions, and loan applications.

13   Q   And so I'm going to show the witness what's been marked as

14   Government's Exhibit 208.  And, Mr. Petron, you also have a

15   binder --

16        MS. CONNELLY:  Your Honor, may I approach the witness

17   with a binder?

18        THE COURT:  (Nods affirmatively.)

19        MS. CONNELLY:  Thank you.

20        THE WITNESS:  Thank you.

21        MS. CONNELLY:  You are welcome.

22   Q   And so, Mr. Petron, I'm showing you what's been marked as

23   Government's Exhibit 208.  Exhibit 208 is a 24-page document.

24   Can you just tell us, what is that document?

25   A   So this document is a series of summary exhibits that I

1  created that discuss the PPP applications and a variety of the

2  bank accounts that we analyzed.

3  Q   Is it a summary of the voluminous bank and loan records that

4  you prepared in this matter?

5  A   Yes, ma'am.

6  Q   And how did you create this document?  How were you involved

7  in the creation?

8  A   So I supervise a small team that helped me in creating this.

9  So I would have examined the underlying records.  I examined my

10 team's work product.  And I also reviewed, for quality-control

11 purposes, the accuracy of each of these charts.

12 Q   And so does Government's Exhibit 208 fairly and accurately

13 summarize the bank records and applications that you reviewed?

14 A   It does.

15        MS. CONNELLY:  I would move -- at this time, I would

16 move into evidence Government's Exhibit 208.

17        MR. NANCE:  No objection.

18        THE COURT:  It will be admitted.

19               (Exhibit No. 208 admitted.)

20 Q   And Mr. Petron, you mentioned that you reviewed bank records.

21 About how many bank records did you review in this case?

22 A   Well, there were thousands of records, thousands of pages.  I

23 think I reviewed approximately 60, six-zero, individual bank

24 accounts.

25 Q   And are the bank records that you reviewed identified in this

1   exhibit, or the government's exhibit that they are based on,

2   identified?

3   A   They are.  In every exhibit I strive to make clear the

4   underlying government bank record that I looked at for every

5   piece of information that's on these charts.

6            MS. CONNELLY:  So at this time I would move into

7   evidence the remaining bank records in this case.  It's a lengthy

8   list, Your Honor.  Do you want me to run through them?

9            THE COURT:  Yes.

10           MS. CONNELLY:  It would be Government's Exhibits 109

11  through 111, Government's Exhibits 113 through 116, Government's

12  Exhibits 118, 119, Government's Exhibits 121 through 129,

13  Government's Exhibits 131 through 135, Government's Exhibits 137

14  through 142, Government's Exhibits 144 through 171, Government's

15  Exhibits 173 through 177, Government's Exhibits 179 through 186,

16  Government's Exhibits 188 through 198, and Government's

17  Exhibits 200 through 203.

18           MR. NANCE:  If she's doing it through this witness, I

19  think the witness needs to confirm that he's reviewed all of

20  these records.

21  Q   Mr. Petron, have you reviewed all of those records?

22  A   I have.

23           MR. CONNELLY:  And I would also note that we have

24  902(11) business record certifications for each one of them that

25  the defense has received.

 1              MR. NANCE:  No objection.

 2              THE COURT:  They will be admitted.

 3         (Exhibit Nos. 109 - 111, 113 - 116, 118, 119, 121 - 129,

 4          131 - 135, 137, 142, 144 - 171, 173 - 177, 179 - 186,

 5                    188 - 198 and 200 - 203 admitted.)

 6              MS. CONNELLY:  Okay.  Permission to publish Government's

 7    Exhibit 208?

 8              THE COURT:  Yes.

 9    Q   Okay.  So Mr. Petron, can you tell us what starts on the

10    first five pages of Government's Exhibit 208?

11    A   I can.  So these first five pages are business-related bank

12    accounts.  So you can see the title "business bank accounts

13    reviewed."  And there are approximately 53 individual business

14    bank accounts.

15         I have organized this exhibit so that each business is

16    together, so listed together, and each account represents an

17    individual row of the 1 to 53.

18         I have tried to put what I think is the relevant information

19    about each account.  So the business name, the signatory of that

20    account, so who signs, who has control of that account, what bank

21    the account was at -- that's the third column -- the account

22    number.  So you will hear me say about account numbers.  And I

23    will only talk about the last four digits, it's just the way I do

24    things.  The open date.  And then the entire time period of the

25    account.

 1        And then, finally, if you were to go to the individual

 2   government exhibit, I list those exhibits there that I used.  So

 3   those exhibits will be the underlying physical records from the

 4   banks.

 5   Q    And so if we could go back to the first page, Mr. Arnold.

 6   Did you choose the bank accounts that you reviewed?

 7   A    I wouldn't say I chose them.  I would say that the government

 8   provided them to me.

 9   Q    And can you just tell us, again, what is the significance of

10   the signatory column on this chart?

11   A    This is the person who ultimately would have power over that

12   account, to move money out of the account.

13   Q    And who was the signatory on most of these accounts?

14   A    By far and away it's Eric Shibley.

15   Q    Did you find a signatory for every account that you reviewed?

16   A    I did not.  There were some, you can see in Row 5 and 6,

17   where I couldn't find the underlying signature card of the person

18   who had control of the account.

19   Q    But you have reason to believe that Eric Shibley was in

20   control of those accounts?

21   A    I do.

22   Q    And what is the significance of the accounts that are in red

23   text on this chart?

24   A    So every time you see a red, you know, the red text instead

25   of black, that means that account received PPP loan money or EIDL

1   loan money.

2   Q    And turning to page 6 of Government's Exhibit 208.  Did you

3   look at Mr. Shibley's personal accounts as well, as part of your

4   analysis?

5   A    I did.  So, in addition to the 53 business accounts, I looked

6   at personal accounts.  So accounts in the name of Eric Shibley.

7   These are those seven accounts at the banks.  Again, the same

8   identifying information.

9   Q    And so did you review anything else as part of your work in

10  doing this analysis?

11  A    Well, I reviewed, obviously, the underlying transactions in

12  each of these accounts.  And I also reviewed the loan

13  applications that were made and some of their supporting

14  documentation.

15  Q    And so let's just turn to some of the work that you did

16  perform.  If we could turn to page 11 of Government's

17  Exhibit 208.  What does this chart show?

18  A    So this a summary of one of the businesses, the A Team

19  Holdings.  And at the top, I'm examining a PPP loan application

20  that's represented by Government's Exhibit 1.  So in this loan

21  application there was a representative amount or a claim of

22  monthly payroll expense.  So how much was being spent every month

23  on payroll.  In certain situations, there were more than one

24  application.

25       So here I had one application.  And so I'm capturing the

1    lowest and the highest amount.  It's the same, because there was

2    one application.

3         But as we go through these, you will see these amounts

4    change.  So I was trying to give you all the breadth of

5    information that's available in the loan applications.

6    Q    Then looking down below that, what is this pie chart in the

7    center with "deposit activity"?

8    A    So the top part is the PPP application.  The bottom part is

9    the bank information.  So what I did is I went into all of those

10   A Team Holdings bank accounts, and I summarized all of the money

11   coming into the account; so how much money was coming in.  And

12   then I categorized it, based upon my definition of new money

13   versus not-new money.

14        So the key distinction here is "not new money" would be, if

15   you had account one and account two, and you transferred from one

16   account to the other account, you know, checking to saving, when

17   it arrives in saving it's a deposit, right?  But it's not new

18   money, you had the money.  If you returned something to Target,

19   right?  That would be a deposit into your account.  But it

20   wouldn't be new money, because you had previously spent it.

21        So what I was trying to drive at is how much new money was

22   coming in, in showing you both the totality of how much was

23   deposited, but also how much was new versus how much was not.

24   And that's what is on the bottom box.

25   Q    And so for the A Team Holdings, how much new money did you

1    find was coming into the account?

2    A    For this time period -- this is a six-month time period prior

3    to the application being filed, was $2,106.

4    Q    You mentioned the timeframe.  How did you choose this

5    timeframe of October through March of 2020?

6    A    These are the two preceding quarters leading up to the loan

7    applications.  And so I thought that would be a good

8    representative time period to see what kind of activity was in

9    the accounts.

10   Q    And so the top box, is that the money that's allegedly being

11   paid in payroll every month?

12   A    It is.

13   Q    And is the bottom box the money that's actually coming into

14   the accounts over that six months?

15   A    It is.

16   Q    And so did you do a comparison between the money in and money

17   out, over the entire six-month period?

18   A    I did.

19   Q    And if we could turn to page 12.  Is this your comparison?

20   A    It is.  So what all this is, if I take that monthly payroll

21   amount -- so I think it was $384,000 -- and I said, well, if

22   that's monthly, then to do apples-to-apples, let me multiply it

23   by six.  So I get $2.3 million.  That's how much is going out, or

24   claimed to be going out.  And then versus $2,106 coming in.

25   Q    And so did you see a payroll of $384,000 a month supported by

1    the accounts for the A Team Holdings?

2    A    I did not.

3    Q    And did you see evidence of $2.3 million of payroll being

4    paid over the course of October 2019 through March of 2020?

5    A    I did not.

6    Q    And if we could now look at page 13 of Government's

7    Exhibit 208.  Can you just walk us through what this chart is?

8    A    So here we have the company Dituri Construction.  And here is

9    an example where there are multiple applications.  I have

10   captured the lowest monthly payroll claimed and the highest

11   monthly payroll claimed.  So you see the breadth of the

12   information, $130,000 to $392,000.  That's the top.

13        The bottom, there was no bank activity prior to March 31st,

14   2020, for any of the Dituri Construction accounts.  So there is

15   nothing to capture.

16   Q    During your review, did you actually determine when the first

17   bank accounts were opened for Dituri Construction?

18   A    If memory serves, I think that is in May.  Yeah.  May of

19   2020.

20   Q    So just like with the A Team Holdings, did you also do a

21   comparison for the entire six-month period for Dituri

22   Construction?

23   A    I believe for Dituri, because there was no banking, I only

24   did a three-month comparison.  But the next chart should --

25   Q    Yes.  So let's look at page 14.  And if you can tell us what

1   you did for Dituri Construction.

2   A    So here, I didn't know if the company was in operation for

3   six months, so I said, okay, let me just look at three months.

4   And I took the lowest monthly payroll, the $130,000.  And I said,

5   well, multiple that by three, for the three months.  That creates

6   the $391,000 in payroll out.  And then obviously if there's no

7   banking activity, I had no information about any deposits coming

8   in.

9   Q    And so did you see any bank account activity to support

10  $391,000 over three months being paid out of any of the Dituri

11  Construction accounts?

12  A    No, ma'am.

13  Q    If we could just turn briefly back to the previous slide,

14  Mr. Arnold.

15       How does the three-month implied payroll total for the lowest

16  monthly payroll for Dituri Construction, compare with highest

17  monthly payroll for Dituri Construction?

18  A    So if you take that lowest one, times three, you basically

19  get the highest one.

20  Q    And just putting you on the spot to do some fast math, Mr.

21  Petron, what would the implied total payroll be, using the

22  highest Dituri Construction amount?

23  A    It would be $1.18 million.  Something like that.  Just shy of

24  1.2.

25  Q    Just shy of $1.2 million?

1    A    Yes.

2    Q    If we turn back to the next slide.  How would that compare

3    with the new-money deposits that you saw for Dituri Construction?

4    A    It would make the gray bar a lot higher, and wouldn't change

5    the right-hand one.

6    Q    And so did you see any bank account activity supporting a

7    payroll of $1.2 million being paid out of Dituri accounts,

8    between January and March of 2020?

9    A    I did not.

10   Q    If we could look at page 17, please.

11        Can you describe this chart for us, as well?

12   A    Again, this is another entity named SS1 LLC.  And in this

13   situation, the lowest and the highest payrolls were the same.

14   It's a similar story.  There was no banking activity prior to

15   March 31st, 2020.

16   Q    And in your review, did you determine when the first bank

17   accounts for SS1 were opened?

18   A    I think -- let me check.  I believe they were June of 2020.

19   Let me have one second.  Oh, I take it back.  I'm glad I checked,

20   April 2020.

21   Q    Okay.  And is that -- that can be found on the business bank

22   accounts review slide that we looked at earlier?

23   A    Correct.  That's exactly what I'm look at, on page 4 of the

24   exhibit.

25   Q    So did you also do a comparison for SS1?  Again, the money in

1    and money out for the SS1 accounts?

2    A    I did.

3    Q    If we could look at the next page, please.  Is this your

4    comparison?

5    A    Exactly.  So 328 times the three months.  Again, I limited

6    this to a three-month period, because I wasn't sure of the

7    existence of the company.  That's $984,000, as compared to no

8    banking activity during that same time.

9    Q    And so did you see any bank account activity to support

10   payroll of $328,000 a month, being paid out of the SS1 accounts?

11   A    No, ma'am.

12   Q    And did you see any bank account activity of $984,000 being

13   paid over January through March of 2020?

14   A    I did not.

15   Q    If we could look at page 15 of Government's Exhibit 208.  Can

16   you tell us about this?

17   A    So here is another entity, SFC LLC.  Two different payroll

18   amounts claimed.  $37,600 to $40,000 per month.  But, again, with

19   SFC, there was no bank activity prior to March 31, 2020.  And

20   just to anticipate your question, the first account was opened in

21   May of 2020 for SFC.

22   Q    And so did you also do a comparison, like for the other ones

23   we have seen?

24   A    I have done the same analysis, where I took the lowest

25   amount, multiplied by three.  That equals $112,000 in implied

1   payroll for the three-month time period, compared to no

2   depository activity.

3   Q    Just to remind us, why did you choose the lowest amount for

4   these graphs when you had it?

5   A    Just to be conservative.

6   Q    And so did you see any bank account activity to support

7   payroll of $112,800 a month, being paid out of the -- or $112,800

8   over three months, being paid out of the SFC LLC accounts?

9   A    I did not.

10  Q    And did you see any bank account activity to support payroll

11  of $37,000 a month, being paid out of those accounts?

12  A    I did not.

13  Q    If we could look at page 9 of Government's Exhibit 208.  So

14  can you describe what we're looking at on page 9?

15  A    Sure.  Another entity, I think this is the fifth entity,

16  ES1 LLC.  A very similar range as the last one.  $38,300 to

17  $40,000 a month in monthly payroll, from the PPP loan

18  applications.  The difference here is we have a variety of bank

19  account information available for the six months leading into

20  March 2020.

21       There's about a total of $160,000 in total deposits.  Of that

22  160, about 110 are new money coming in.

23  Q    And, again, just to refresh us, what counts as new money?

24  A    Basically, any transaction whatsoever that is not an

25  inter-account transfer, or a reversal of some type.

1   Q   And did you also do the comparison, the bar chart comparison

2   that we have seen for the other accounts?

3   A   I did.

4   Q   Okay.  And we're looking at it on page 10 of Government's

5   Exhibit 208.  So can you describe what we see here?

6   A   So here the difference is, I have six months of activity.  So

7   I multiplied by six.  And I got $229,800 in implied payroll

8   expenses, as compared to about the $110,000 in new money coming

9   into the account.

10  Q   And so I see there are actually some new deposits coming into

11  this account.  Even with that, do the deposits coming into this

12  account support a payroll figure of $229,000 over that six-month

13  period?

14  A   They do not.

15  Q   And do the deposits -- strike that.

16      I'm showing the witness, or if we could pull up page 7 of

17  Government's Exhibit 208.

18      Can you just tell us what this is?

19  A   So yeah.  This is Mr. Shibley's MD, PLLC account, business

20  account.  Very similar payroll claims here, between $37,560 up to

21  $40,000 a month in claimed payroll.  I have also had the

22  activity, the banking activity for the six-month period

23  available.  So there's, roughly speaking, $53,000 being

24  deposited, in total.  Of that, about $40,000 was new money.

25  Q   And what time period did you choose here?

1    A    This is that six-month period leading up to those loan

2    applications.

3    Q    So did you also do the same bar chart comparison?

4    A    I did.

5    Q    If we can look at that.

6    A    So here I took that lowest monthly payroll, the $37,000,

7    times six in this case.  So $225,000 implied being spent on

8    payroll, as compared to the $40,000 of new money coming into the

9    accounts.

10   Q    And so did you see anything to support $225,000 of payroll

11   being paid out over six months in Mr. Shibley's bank accounts?

12   A    I did not.

13   Q    Did you see anything supporting a payroll figure of about

14   $40,000 a month?

15   A    I did not.

16   Q    And why did you choose the October 2019 through March 2020

17   timeframe for the M.D. account?

18   A    These were the immediate two quarters leading up to the

19   payroll applications.  And in some instances, the applications

20   had supporting information for those time periods.

21   Q    So did you also do an analysis of the entire amounts of

22   deposits across all of the bank accounts and loan applications?

23   A    I did.

24   Q    Okay.  If we could look at page 19 of Government's

25   Exhibit 208.  Can you describe for us what this is?

1   A   So this basically takes every pie chart that we just looked

2   at, and just puts them together.  That's what it does.  So we

3   have got total depository activity of $364,000.  Of that,

4   $151,000 is the new money.

5   Q   Why was the October through March date range chosen?

6   A   That was the period, when available, there was information

7   from the loan applications about when the companies were in

8   operation.

9   Q   And so, Mr. Petron, we have looked at more than just pie

10  charts in these last few slides.  Did you also create a bar graph

11  for the entire date range?

12  A   I did.  So I combined the bar charts, just like I combined

13  the pie charts.  And here is the resulting analysis.  And to be

14  clear, in the implied total payroll, if I only used January to

15  March, three months, that's what is here.  So it's not always

16  October of 2019 to March 2020.  It's for those time periods that

17  I had previously said, three months, that's what's in here.

18  Q   And so how much in implied total payroll did that add up to?

19  A   Over $4.2 million.

20  Q   And how much in new-money deposits did you find in the

21  accounts during that time period?

22  A   Just over $151,000.

23  Q   So did you find anything in the bank accounts to support a

24  payroll figure of $4.2 million over six months prior to March of

25  2020?

 1    A    I did not.

 2    Q    Did you also look for other depository sources, outside of

 3    the October through March date range?

 4    A    I did.  I expanded that date range.

 5    Q    Okay.  And why did you do that?

 6    A    I wanted to determine if there had potentially been a buildup

 7    of money prior to this.

 8    Q    And so if we could look at page 21 of Government's

 9    Exhibit 209.

10    A    So here, I went back all the way to January 1st.  So I went

11    back about nine more months.  And I captured -- I did the same

12    analysis.  So I said, okay, there's a million -- almost

13    $1.1 million of total deposits.  Of that about, $570,000 were new

14    money coming in.

15    Q    And so did you also, then, put this on a bar graph like we

16    have seen?

17    A    Exactly.  I just compared those.  So I believe that's --

18    Q    If we could look at the next page.

19    A    So here is our 4.2 number, as compared to the $571,000 in new

20    money.

21    Q    And just to be clear, the 4.2 number remains for the date

22    ranges October through March of 2020?

23    A    It does.  Except for instances where I didn't have banking;

24    and then I used that smaller, three-month time period.  But all

25    of that I should have footnoted, or have footnoted here at the

1  bottom, about where I got every piece of information.

2  Q   And how much, total, or how much in total were the new-money

3  deposits for the time period, including all of 2019?

4  A   $571,000.

5  Q   And so looking at this, were you able to see any sort of

6  new-money deposits during the -- including the 2019 period, that

7  would support a $4.2 million payroll?

8  A   I did not.

9  Q   Did you also do a calculation of the average monthly payroll,

10 by entity, for Mr. Shibley's applications?

11 A   I did.

12 Q   And if we could look at page 23 of Government's Exhibit 208.

13 And can you just describe what you have done here?

14 A   So all I have done here is -- just like I put the pie charts

15 together, I took the top boxes and I just put them together.  So

16 this is the lowest and the highest monthly payroll, by entity, in

17 one chart.  And then I obviously summed them at the bottom.

18       THE COURT:  All right.  Let's take the morning recess of

19 15 minutes.

20       THE CLERK:  Please rise.  Court is in recess.

21                   (Recessed.)

22       THE COURT:  Before we bring the jury in.  How do you

23 want to handle the forfeiture issue?  There's two ways to do it.

24 One is a rather cumbersome approach, where after the verdict,

25 assuming there's a guilty verdict, then you have to instruct the

 1  jury, again, on forfeiture.  And then send them back out to

 2  deliberate again, which I hate to do.  It's asking a lot of them.

 3      But the other approach is to leave it to me, depending upon

 4  what the verdict is.  It's really your call, Mr. Nance.

 5          MR. NANCE:  It is, and if I could have -- if I could

 6  report back to the Court --

 7          THE COURT:  Of course.

 8          MR. NANCE:  -- this afternoon on that.

 9          THE COURT:  That's fine.

10          MR. NANCE:  That would be preferred.

11          THE COURT:  Okay.

12          MS. CONNELLY:  Your Honor, just so you know, Mr. Petron

13  is our last witness.  It's the government's last witness.

14          THE COURT:  Oh, really?

15          MS. CONNELLY:  Uh-huh.

16          THE COURT:  All right.  Do you need more time to --

17          MR. NANCE:  Yes.

18          THE COURT:  All right.  Well, let's finish this witness,

19  and then we will take a recess.  And you can -- it will probably

20  take you through the lunch hour.  So you can have probably the

21  lunch hour.

22      Can arrangements be made for him to be able to talk to his

23  client during the lunch hour.

24          THE MARSHAL:  (Indicating a thumbs up.)

25          THE COURT:  All right.

 1                    MR. NANCE:  Thank you.

 2                    THE COURT:  Let's bring in the jury.

 3               (The following occurred in the presence of the jury.)

 4                    THE COURT:  Please be seated.

 5          All right.

 6     Q    (By Ms. Connelly:)  So I think where we left off was on

 7     page 23 of Government's Exhibit 208.  And so again, what is this

 8     document?

 9     A    So this is a summary of the top box of each of those

10     individual companies that we examined.  So this is a range of the

11     lowest to the highest monthly payroll, by entity requesting the

12     loan.  And, finally, I summed each of those lowest and highest

13     amounts.

14     Q    The government's exhibit number on the right-hand side, does

15     that correspond with the lowest and the highest monthly payroll?

16     A    It does.

17     Q    Okay.  And what is the total lowest monthly payroll that

18     would be paid across these six entities?

19     A    Approximately $956,000.

20     Q    So these six entities were paying allegedly $956,000 a month

21     in total payroll?

22     A    Correct.

23     Q    And what is the highest monthly payroll?

24     A    Over $1.2 million.

25     Q    And so does that mean that these six entities were paying,

1   again, allegedly $1.2 million a month in total payroll?

2   A   Exactly.

3   Q   And so did you also, taking this information, calculate the

4   average yearly salary, per employee, based on Mr. Shibley's

5   applications?

6   A   I did.

7   Q   And so can we turn to page 24, Mr. Arnold?

8       And is this that calculation?

9   A   It is.  So I found it helpful.  I think about things in the

10  terms of an annual salary.  So I wanted to understand what this

11  meant, in my mind, for an average annual salary.  So I took each

12  of the implied monthly payrolls, I took the number of

13  employees -- so I figured out the average monthly amount paid per

14  employee -- and then I annualized that in the third column.

15      So just take the first row, for example.  Dituri

16  Construction, $130,000 on the low end, at 49 employees, would

17  imply, on average, that each employee was making almost $32,000 a

18  year, if they were employed for the whole year.

19  Q   What about for the highest monthly payroll?

20  A   It would imply $96,000, per employee.

21  Q   If we could zoom back out, Mr. Arnold.  Just looking at the

22  total bottom line, at line 7.  If we could zoom in on that, Mr.

23  Arnold.  Can you explain this line?

24  A   Sure.  So this is across all of the entities.  The payroll

25  would have been, on the low side, again, $965,000 a month.  And

1    annualized across all 156 claimed employees, that would mean, on

2    average, those employees would make, on an annual basis, $73,500.

3    Q    And I notice between the lowest monthly payroll and the

4    highest monthly payroll calculation, the employees change.  Why

5    is that?

6    A    There were a few instances where you can see --

7    Q    We can zoom back out.

8    A    So you can see on Row 2, Row 3, the employee count goes from

9    six to five.

10          MR. NANCE:  Your Honor, I object to anything further.

11    This is utterly hypothetical.

12          THE COURT:  The objection is overruled.

13    Q    You can go ahead and answer, Mr. Petron.

14    A    The employee count on those two rows goes from six to five.

15    So that's why the overall count goes from 156 to 154.

16    Q    And so if we go back to the total row, on line 7.

17          If we look at the highest monthly payroll calculation, what

18    does that come out to annually, per employee?

19    A    That comes out, on average, over $95,000, per employee, for

20    the 154 employees claimed.

21    Q    And I just -- I'm noticing something, looking at this chart.

22    And we could blow back out, Mr. Arnold.

23          Under the average annual payroll, per employee, on the

24    highest monthly payroll, it looks like five out of the six

25    entities are paying an average of $96,000 a year; is that right?

1  A    Exactly.  So in five of the six entities, the average annual

2  payroll amount equated to the same exact amount for five of the

3  six entities.

4  Q    If we can unpublish.  And you can take that down, Mr. Arnold.

5       So as part of your review, Mr. Petron, did you also trace PPP

6  and EIDL money that came into the bank accounts?

7  A    I did.

8  Q    And did you identify Department of Justice seizure warrants,

9  as part of that analysis?

10  A    I did.

11  Q    And so I'm going to show you what's been marked as

12  Government's Exhibit 209.  Just the witness.

13       And Government's Exhibit 209 is a twelve-page document.  Can

14  you tell us what's contained in this document?

15  A    These are a series of summary charts that I prepared that

16  demonstrate the tracing of certain PPP and EIDL loan money.

17  Q    And so did you assist in the preparation of Government's

18  Exhibit 209?

19  A    I did.

20  Q    And is Government's Exhibit 209 a fair and accurate summary

21  of the bank transactions that you traced in this case?

22  A    It is.

23       MS. CONNELLY:  I move to admit Government's Exhibit 209

24  as a summary exhibit.

25       MR. NANCE:  It's cumulative, Your Honor.

1          THE COURT:  It will be admitted.

2                (Exhibit No. 209 admitted.)

3          MS. CONNELLY:  Permission to publish, Your Honor.

4    Q   And so we're looking at page 1 of this document, can you tell

5    us what's on page 1?

6    A   I can.  So it's quite simply a tracing -- a summary of the

7    tracing I did related to Count 11 in the indictment, which is a

8    $960,000 PPP loan that went to A Team Holdings.

9    Q   And so can you tell us what exhibits is government's -- or is

10   this slide based on.  Is that found on the chart?

11   A   It is.  Again, I try to be diligent.  Every document, every

12   one of my documents should have a source, with the government

13   exhibits in the bottom.  So you could go look at those yourself.

14   Q   So is that now been zoomed in on?

15   A   Correct.  So Government's Exhibit 1, 104 and 105.

16   Q   Okay.  If we could zoom back out, Mr. Arnold.

17       What happened to the $906,000 A Team Holdings loan from

18   Customer's Bank?

19   A   So Customer's sent the money to the A Team Holdings account

20   at Wells Fargo 9116.  That money was deposited on May 4th, 2020.

21   On that same day, the money was moved to a second A Team Holdings

22   account at Wells Fargo, 3536.

23   Q   If we wanted to look at the source documentation, is that

24   what's found on the government's exhibit numbers that are on the

25   bottom corner?

1  A   Correct.  The loan application, I believe, is Government's

2  Exhibit 1.  Account 9116, I believe, is Government's 104.  And,

3  finally, the Wells Fargo 3536, I believe, is Government's 105.

4  Q   Based on your review of the accounts, was any of the PPP or

5  EIDL money that came from this loan used to pay payroll?

6  A   It was not.

7  Q   If we could look at page 2.  Again, can you walk us through

8  this document?

9  A   So here we have a Celtic Bank PPP loan for Dituri

10  Construction, on May 6th, 2020, in the amount of $563,500, being

11  deposited into the account 7277.

12      The next day, on May 7th, the full amount was moved to a

13  second Dituri Construction account, 7219.

14  Q   And what exhibits are these -- is this trace based on?

15  A   The PPP application is Government's Exhibit 4.  And both of

16  these bank accounts are located within Government's Exhibit 106.

17  Q   Okay.  And based on your review of the BECU accounts that

18  received these funds, was any of the PPP money that came in used

19  to pay payroll?

20  A   It was not.

21  Q   If we look at page 3, please.  What is this tracing?

22  A   So here this relates to Count 13 and SS1.  Here we have a

23  May 19th PPP loan in the amount of $820,000, being deposited into

24  account 9727.  That money is moved, on that day, to account 9683.

25  Q   And I think I forgot to ask on the first one, but there's

1    this box in upper left-hand corner about transaction amount and

2    the red dots being EIDL/PPP funds.  Can you just describe what

3    that means?

4    A   I can.  So when you are tracing money, there is oftentimes

5    multiple sources of money in a bank account.  So I attempt to

6    identify for you, in black, the amount of the transaction itself.

7    And then in red, the amount that is made up of the PPP or the

8    EIDL funds.  So in all of these situations, it's 100 percent.

9    Because I could trace all of the PPP money within each of these

10   transactions.

11   Q   Based on your review of the accounts, was any of the PPP

12   money that came in used to pay payroll?

13   A   It was not.

14   Q   If we look at page 4, please.  Can you walk us through this?

15   A   Sure.  This relates to Count 14.  I believe it's a follow-on

16   from a previous chart that we looked at, where we had the A Team

17   Holdings money of $960,000 on May 4th, 2020.  About 22 days

18   later, on May 26th, there is a withdrawal made in a branch.  So

19   someone went to the bank and took out $150,000, on May 26th.

20   Q   And is that represented -- have you actually put up the

21   source document on this slide?

22   A   Correct.  So this is the bank statement that I used to find

23   these transactions.

24   Q   And did you also do a transaction log for this particular

25   movement of money?

1    A    I did.

2    Q    And so can we look at page 6 of Government's Exhibit 209?  Is

3    this the transaction log?

4    A    Exactly.  This is my representation of the two bank

5    statements, very simply.  On the top, we have the 9116 account,

6    where you see a beginning balance of $429.  There is two

7    withdrawal amounts, $25 and $25.  Finally, on May 4th, the fourth

8    transaction, the PPP loan is deposited.  $960,000.  You see two

9    other smaller transactions on that day.

10        And, finally, you have the $960,000 being transferred to the

11   second Wells Fargo account, 3536.  And that's the account that's

12   at the bottom.

13        So I then put the reverse side of that transaction, deposited

14   the $960,000.  You see a withdrawal amount of $7,000, a cash

15   withdrawal of $4,000.  And, finally, the cash withdrawal of

16   $150,000 that I just spoke about.

17        The last transaction is related to the Justice Department

18   seizing all of the remaining amounts of money in that account, on

19   May 27th, 2020.

20   Q    And so let's look at page 5, now.  What is this document?

21   A    So here we have an EIDL loan for SS1.  There's a few

22   different things here.  First, we have transactions going into

23   the 5330 account.  That same day, we have the money moving into a

24   different SS1 account, 5320.  Three days later, there were a

25   series of $20,000 cashier's checks.  I believe there were three

1   of them.  One of them ultimately was deposited in an ES1 LLC

2   account at Navy Federal Credit Union.  I have a picture of that

3   cashier's check here for $20,000.

4   Q   And what is the date of these transactions?  What time period

5   are we in?

6   A   We're talking June 19, 2020, is the initial funding of the

7   EIDL loan.  And then the cashier's checks happened three days

8   later.

9   Q   And did you also do a transaction log documenting this?

10  A   I did.

11  Q   And so if we could look at page 10.  Is this the transaction

12  log for this money trace, for the previous money trace?

13  A   It is.  I mean, if we start with the 5330 account, you see

14  the EIDL money coming in, the EIDL money going out.  On the

15  bottom, you see the EIDL money being received.  And then you see

16  that series of three, $20,000 cashier's checks.  Those cashier's

17  checks, about a week later, were canceled.  So those reversals

18  are represented in Row 3 up from the bottom.

19      And I showed the picture of the one, $20,000 cashier's check

20  that ultimately was deposited and then later reversed.  The other

21  two never actually hit the bank account.

22  Q   On the day of the cashier's checks reversal, what else

23  happened in that account?

24  A   The DOJ seized all the remaining funds from that EIDL loan.

25  Q   If we could look at, Mr. Arnold, I believe it's page -- I

1    apologize, page 7.  Clear that.

2        What is this transaction log?

3    A   So here, this is a transaction log of a $100,000 PPP loan for

4    ES1.

5    Q   And does this also show that a DOJ seizure eventually

6    happened on this money?

7    A   It does.  There's a series of transactions that we have gone

8    through before where the $100,000 ultimately is moved to

9    different Wells Fargo accounts, and ultimately the DOJ seizes the

10   money.

11   Q   And if we could look at page 10 -- or page 9, I apologize.

12   Can you walk us through this transaction log?  It looks like

13   there are a series of more cashier's checks.

14   A   Here again, we have an EIDL loan in this case, for Dituri

15   Construction.  The money, again, is moved from the receiving

16   account to a secondary account.  That secondary account has a

17   series of, again, $20,000 -- four of them in this case -- $20,000

18   cashier's checks.  Those cashier's checks get reversed.  And

19   ultimately the DOJ seizes the amount of the EIDL loan that's

20   remaining.

21   Q   And what is the date range of all of these transactions?

22   A   This is all towards the end of June 2020.

23   Q   Finally, if we could look at page 8 of Government's

24   Exhibit 209.

25   A   So here we have a PPP loan.  This is for the Shibley MD, PLLC

 1  business.  It comes in in the amount of $100,000.  It gets moved

 2  to a different Navy Federal Credit Union, 7528.  There is a cash

 3  withdrawal out of that account for $50,000, as well as another

 4  withdrawal for $500.  The remaining amount, the $49,500, that was

 5  seized by the government.

 6  Q   What is the date of the cash withdrawal for $50,000?

 7  A   May 28, 2020.

 8  Q   So we just looked through a series of, I think, five PPP loan

 9  fundings that you traced through.  Did you see any indicia of

10  payroll being paid out of those PPP and EIDL funds?

11  A   I did not.

12  Q   And based on your review of the account, was any of the PPP

13  money that came in used to pay payroll?

14  A   Not that I saw.

15  Q   What would you look for to see if any money was being spent

16  on payroll expenses?

17  A   I would be looking for transactions to payroll-processing

18  companies.  In the event that there was no payroll-processing

19  company, I would be looking for similar amounts to lots and lots

20  of people, the 156 people, that were claimed on the applications.

21  Q   And so based on your review of the accounts before the PPP

22  and EIDL loans came in, starting around April of 2020, was there

23  any indicia of payroll?

24  A   Not that I saw.

25  Q   And based on your review of the accounts after the PPP loans

 1  and the EIDL loans were funded, were any of -- was any of that

 2  money used to pay payroll?

 3  A   Not that I could determine.

 4          MS. CONNELLY:  Nothing further.

 5          THE COURT:  All right.  Cross?

 6                        CROSS-EXAMINATION

 7  BY MR. NANCE:

 8  Q   Good morning, Mr. Petron.

 9  A   Good morning.

10  Q   Hi.  Just to get this out of the way, you testified that you

11  work for $395 an hour?

12  A   I do.

13  Q   And as of August 31st of this year, you and your firm had

14  billed the taxpayers $31,117 for your work in the case?

15  A   I don't remember the precise number as of that date, but I

16  believe it was on the order of $60,000, is what my memory is,

17  that we have billed on this case.

18  Q   Okay.  $60,000.  Is that through today or through --

19  A   It would have been through the end of October, I believe.

20  Q   And up to 75 percent of your firm's business is with the DOJ?

21  A   No.  No.  No.  No.  As a percentage of my firm's business,

22  the DOJ probably is 1 percent.  Of my personal time, it varies

23  between 40 to 45 percent.

24  Q   Got it.  Have you ever testified for the defense in

25  opposition to the DOJ?

 1    A    I have.

 2    Q    Have you?  In this district?

 3    A    Not in this district.

 4    Q    Well -- so you're obviously familiar with the PPP program?

 5    A    I am.

 6    Q    Yep.

 7         Do you know, just taking a grander, sort of a 30,000-foot

 8    view of the program, what percentage of the PPP funds have gone

 9    to banks and other lenders?

10              MS. CONNELLY:  Objection, Your Honor.  Foundation.

11              THE COURT:  If he knows, he can answer.

12    A    So what percentage?  Just so I'm clear, what percentage of

13    the PPP funds went to financial institutions?

14    Q    Yes.  As a fee.

15    A    Oh, I believe their fee was 1 percent.

16    Q    Okay.  Was fee incentives -- or were fee incentives and loan

17    guarantees any part of your consideration in how you approach --

18    let me strike that and start over.

19         Did you consider the banks' verification process in any part

20    of your analysis?

21    A    I did not.  I looked at the applications and I looked at the

22    banking records.

23    Q    Let me pull up Exhibit 1, page 5, again.

24         If you could --

25              MR. ARNOLD:  Is that it?

 1            MR. NANCE:  Actually, leave it where it is.

 2    Q    You are familiar with this general form, a 941?

 3    A    I am.

 4    Q    Yeah.  Let me -- blow up the numbers 1 to 15, if you could.

 5         You will see in this particular example -- this is an

 6    admitted exhibit -- but if you will notice, there's 48 employees

 7    listed on this example, and wages of $975,000.

 8    A    I see that.

 9    Q    You see that?

10    A    Yes.

11    Q    And it appears that the ultimate taxes due -- and, of course,

12    to back up, this is an employer's quarterly return, right,

13    payroll return?

14    A    It is a payroll reporting, yes, to the IRS.

15    Q    Reporting.  There you go.

16         That the taxes due on that payroll, on the wages reported

17    paid out, is a set amount, it's $149,175 in this example.  Yes?

18    A    Yes.  That's what the document says.

19    Q    And there's a blank on 11 -- I'm sorry, let's go down to 13.

20    On line 13, there's a blank there, indicating that nothing has

21    been paid or deposited.  And then on 14, there's a balance due

22    amount.  Do you see that?

23    A    I do.

24    Q    Yeah.

25         Would this be an unusual filing for an employer to make, in

1   the sense that there's no deposit that's reflected?

2   A   You are just asking my opinion --

3   Q   Yeah.  You are a CPA.  Do you see this kind of thing?

4   A   I occasionally look at these things.  I don't find this

5   unusual, no.

6   Q   Withholding taxes are generally due and payable immediately?

7   A   Usually it is quarterly, with true-up at the end of the tax

8   year.

9   Q   Okay.  And is it more typical than not that the payments

10  would be paid either before or at the time of the filing of the

11  941, Form 941?

12  A   I would say it is typical that they are paid on or before the

13  filing.  And I think on this document, there's an inconsistency

14  about that.  If we looked at page 2, I think there's a

15  representation that they were paid.

16  Q   So it would be inconsistent on its face, it sounds like is

17  what you are saying?

18  A   I'm saying that I think there is an inconsistency between

19  this total deposits, on Row 13, with what is claimed on page 2.

20  Q   Let's look at page 2.

21  A   Oh, yeah.  That is what I remember.  So the top box of this

22  page 2 talks about the monthly deposit schedule.

23  Q   Okay.  And so if this were properly filled out, this number

24  should have been reflected on the previous page, or --

25  A   It could be either way.  I don't know what's proper for this

 1  document.  These numbers could be zero, to reflect what's

 2  reflected on the first page.  Or the zero that's on the first

 3  page could reflect $149,000.

 4  Q   I see.  I mean, the document largely speaks for itself.  But

 5  it speaks with an ambiguity, it sounds like.

 6  A   I think -- the documents, as I understand them, can be filled

 7  out.  Anyone can say anything.  It doesn't mean these things

 8  actually happened, as represented by this inconsistency in the

 9  document.

10  Q   Okay.  But if this is being presented as part of the

11  documentation for a loan application, it's something that you

12  would think would prevent -- a loan screener would pick up on and

13  ask about?

14          MS. CONNELLY:  Objection, Your Honor.

15          THE COURT:  Sustained.

16  Q   Now, Mr. Petron, your analysis -- you can take that down --

17  made some assumptions, didn't it?  You assumed that all of the

18  expenses and all of the payroll expenditures would have gone

19  through the accounts that you examined, didn't you?

20  A   I didn't necessarily assume that.  I looked for that.

21  Q   Okay.  You didn't find any reflected in the accounts?

22  A   I did not.

23  Q   Okay.  So if there was some cash payment, if cash payments

24  were part of what actually happened, your analysis wouldn't have

25  detected that?

 1   A    Just so I am clear, you're asking if there were cash payments

 2   for the payroll expenses that were claimed?

 3   Q    Yes.  Yes.

 4   A    Would I have found those levels of cash payments in the bank?

 5   Q    You wouldn't have, right?

 6   A    If there was a million dollars a month in cash payments being

 7   made, there would be some evidence of that, somewhere in the

 8   banking records.

 9   Q    Okay.  I mean, there would be -- because people receiving

10   cash need to spend it somewhere, is that your thought; or need to

11   deposit it somewhere?

12   A    So if your -- if I understand the hypothetical, there's a

13   million dollars, give or take, based upon my analysis, of

14   payroll.  So if the assumption is it's being paid in cash -- I'm

15   assuming that's your question.

16   Q    Yes.

17   A    That means the million dollars has to come from somewhere,

18   right?  So for all of that transaction, month-after-month, to be

19   done outside of the financial institution and have no trace of it

20   whatsoever, just in my opinion, I would find that extremely

21   unlikely.

22   Q    It's -- of course maybe it's obvious, you can't analyze

23   something that isn't -- that is ephemeral.  I mean, cash

24   itself -- cash payments are, by their nature, that way.  They're

25   not -- they don't really leave a paper trail.

1   A    I guess, again, just my opinion, if I run a business, if I

2   was making cash payments to my employees to the tune of a million

3   dollars a month to 156 people, I would sure want a receipt.  I

4   would want there to be almost more documentation available to me,

5   because I would want to make sure I was covered from a claim by

6   one of those employees.

7        So to me, again, just my opinion, at that level of cash, I

8   would expect there to be documentation somewhere to support when

9   the payments were made, how much they were made, who they were

10  made to, what they were made for.  And I didn't see any evidence

11  of that.

12  Q    All right.  I mean, you are a CPA.  You are literally a

13  by-the-book kind of person, correct?

14  A    I literally am a by-the-book person.

15  Q    You document what you do?

16  A    I do.

17  Q    You have receipts for what you -- if you ever spend cash, you

18  would have receipts for it?

19  A    I do not keep receipts for my personal cash expenditures.  I

20  do not.  But I'm not running a business in cash, so...

21  Q    Okay.  And your business probably files quarterly tax, 941s,

22  for employees?

23  A    We do.

24  Q    And you probably file W-3s and W-2s, et cetera?

25  A    Luckily, I have an accounting department that handles a lot

 1    of that for us.  But, yes, we do file all of those.

 2    Q    Did you ever examine Mr. Shibley's prior tax returns?

 3    A    When you say "prior," can you elaborate?

 4    Q    I mean, did you see his 2019 return?

 5    A    I don't recall seeing a filed tax return.  I do recall seeing

 6    something at some point, but I don't believe it was a filed

 7    return.

 8    Q    Okay.  Did you see an unfiled return?

 9    A    That's my memory, that I did see -- there was some

10    correspondence and something about some tax returns.

11    Q    Okay.  How about a 2018 return?

12    A    I'm sorry.  I don't recall.

13    Q    You don't recall.  I mean, if that were -- if it had been

14    filed, is that -- well, I will withdraw that.

15         Let me pull up Exhibit 208, page 24.  I'm actually looking

16    for -- let's try No. -- page 3.  I'm sorry.  It's Exhibit 209.

17    209, page -- is there a page 3 to that?

18         I was looking for one of your fancy charts.

19    A    What was the topic?

20    Q    Well, the topic, you were comparing -- you were doing this

21    implied payroll and you were doing extrapolations.

22    A    So that would be 208 and --

23    Q    Let's do 208, page 8, how about that?

24         Yeah.  Okay.  This is one example.

25         This -- well, again, if there were cash payments going on

 1  outside the money system, the financial system, that would --

 2  would that change your calculation here?

 3  A   No.

 4       And it's that question which is precisely why I have tried to

 5  capture the new money on the right side, right?  Because if there

 6  are cash payments being made to employees outside of the

 7  financial institutions, the cash has to come from somewhere --

 8  Q   Right.

 9  A   -- right?  And so I'm trying to understand and see if cash is

10  coming from somewhere.

11  Q   Okay.

12  A   And in this case, at least based upon my calculations, there

13  is no cash coming in.

14  Q   You didn't find it?

15  A   So that must mean, then -- and this is why I'm saying it's

16  very highly unlikely in my mind, it's just my opinion -- is that

17  the cash doesn't just have to be being paid to employees outside

18  of the financial institution; the cash has to be being

19  received --

20  Q   In cash?

21  A   -- in cash outside of the financial institutions.

22  Q   And if that were happening, you would have found it, right?

23  It wouldn't be part of this?

24  A   It would be -- if that was happening, you're right, I

25  wouldn't find it.  But I would not expect a medical practice to

1   be able to generate cash outside of financial institutions.

2   You're billing insurance companies, stuff is happening in

3   financial institutions.  And if it was happening, I would expect

4   there to be voluminous documentation around that cash.  You would

5   have to understand who you were billing, how you were collecting

6   it, how you were paying taxes on it.  There would be a mountain

7   of paperwork that would be necessary.

8   Q   If you were a conventional record keeper, correct?

9   A   If you were just trying to understand and track what you were

10  doing, anyone would need to do that.

11  Q   If you have a conventional patient caseload, that might be

12  the case?

13  A   I would say not even that, sir.  You have an obligation to

14  pay taxes on money you receive, so you need to be able to track

15  how much money you receive, who you are receiving it from, and

16  ensure that you have proper documentation.  You need to do that

17  on the back end too, when you were paying employees.  So that's

18  why, in the cash world, I would have expected even more

19  documentation than in the non-financial institution world.

20  Q   Well, and if you were involving insurance, that would trigger

21  even more paperwork, wouldn't it?

22  A   Well, the insurance, when a -- insurance carriers, to my

23  knowledge and experience, would not be paying in cash.  There

24  would be --

25  Q   Right.

 1   A    -- financial institutions involved.

 2   Q    Right.

 3        And if you were avoiding insurance, the reverse may well be

 4   true?

 5   A    So if you are avoiding insurance, then you are saying

 6   patients are paying you?

 7   Q    Yes.

 8   A    So if patients are paying you, I would say they pay you in

 9   check, they pay you in credit card.  Both of which would be, you

10   know, records in the financial institutions.  If they were paying

11   you in cash, again, I would think that you would need to be

12   keeping track of that cash for your reporting obligations.

13   Q    Okay.  It sounds like you and Mr. Shibley probably travel in

14   different circles?

15   A    I can't speak to that.

16        MR. NANCE:  No further questions.

17        THE COURT:  Anything further?

18        MS. CONNELLY:  Nothing further, Your Honor.

19        THE COURT:  You may step down.  Put your mask on,

20   please.

21        MS. CONNELLY:  The government rests.

22        THE COURT:  So you want to take this time to consult,

23   Mr. Nance?

24        MR. NANCE:  Yes.

25        THE COURT:  Okay.  We will start up again at one

1    o'clock, folks.  We will take a little bit longer lunch.

2        All right.  We will be in recess.

3            THE CLERK:  Court is in recess.

4                        (Recess.)

1                        AFTERNOON SESSION

2       (The following occurred outside the presence of the jury.)

3             THE COURT:  Please be seated.

4        So Mr. Nance, what's your pleasure?

5             MR. NANCE:  Your Honor, it's our intention to have

6   Mr. Shibley testify.

7             THE COURT:  All right.  So you are ready for the jury?

8        Are you ready for the jury?

9             MR. NANCE:  Yes.  We probably would like him seated

10  before they come in.

11            THE COURT:  That's fine.

12       All right.  Bring in the jury.

13          (The following occurred in the presence of the jury.)

14            THE COURT:  Please be seated, folks.

15       Swear the defendant, please.

16                        ERIC SHIBLEY,

17         having been sworn under oath, testified as follows:

18                      DIRECT EXAMINATION

19  BY MR. NANCE:

20  Q    Would you please introduce yourself to the jury.

21  A    Eric Shibley.

22  Q    Let me start by just asking you, point-blank, did you ever --

23  hello.  You can look at me and then answer to them.

24  A    Okay.  Sorry about that.

25  Q    Okay.  Did you ever intend to defraud any bank?

 1    A    No.

 2    Q    Or any institution?

 3    A    No.

 4    Q    Did you ever intend to launder any ill-gotten gains of any

 5    sort?

 6    A    No.

 7    Q    Why don't you take a few minutes to tell us about your early

 8    background.  Where were you born?

 9    A    I was born in Bangladesh, in a port city called Chittagong.

10    It is about the size of, probably, Seattle.  I grew up the first

11    five years of my life there.  And then we -- our family moved to

12    Dhaka, the capital city, which I would say is maybe one and a

13    half times bigger than New York City.

14    Q    Let me stop you for just a second.  How old are you now?

15    A    Me?  I'm 42.

16    Q    Okay.  So that would put your birth year when?

17    A    1978.

18    Q    Okay.

19    A    Yeah.

20         So I grew up in the city, Dhaka.

21         I had a lot of outdoor activities.  It was late '80s, early

22    '90s, and at that time we still didn't have the internet, or

23    apartments, or high-rise, or we didn't have TV channels, as many

24    as we have now.  Spent lot of time outdoors with people,

25    playmates, buddies, friends.  A lot of soccer games.  All sorts

1    of games, all day.

2        I was top student in my class all along, my entire life.  In

3    fact, when I was in 8th grade, 1990, I was selected as a talent

4    pool.  In the entire city of Dhaka, there was only ten people

5    selected.  I came within that.

6        My education has been free all along in my life.  Up until

7    today, I never had to spend any money for education in the United

8    States and in Bangladesh.  In fact, after 8th grade, I was paid

9    money, in various different forms, for help.

10       I finished my high school with distinctions.  College.  I

11   went to a regular college there, Notre Dame College.  I had

12   science, physics, chemistry, math, biology.  I had very good

13   scores in all of those.  After that, I tried to figure out what I

14   would do.  I had --

15   Q   Let me just ask you.  Will you tell us -- just touch on it,

16   how did your experience growing up in Bangladesh differ from what

17   you think would be the more typical experience of people your

18   age.

19   A   I have seen unspeakable horrors:  Starvation, poverty.  Words

20   can't explain.

21   Q   Why was your situation different?

22   A   Because, see, Bangladesh got liberated in 1971, with the

23   biggest genocide that happened after the Second World War.  And

24   there is no example, even as of today, of any other than Second

25   World War, that big genocide.  And after that followed a famine

1    in 1974, where I still -- You can look it up on YouTube.  A truck

2    full of children, dead children, just thrown like this, into the

3    fields.  They had so many of them.  So it took a long time for

4    the country to recover from that and to come to where it is now.

5        When I was born, average mom in Bangladesh had seven

6    children.  Life expectancy was below 50.  Now it is 76.  Average

7    child is less than two.  Infant mortality at that time in

8    Bangladesh was approaching around 50 percent.  Now it is less

9    than 2.5 percent.

10       So the country has come a long way.  But when I was a child,

11   when I was growing up in that country, it did not happen at that

12   time.  It happened in the last 15 years, mostly.

13       So I have seen starvation.  I have seen -- I can still

14   remember 1991, there was a massive refugee influx in Burma.  And

15   one day, I was sitting in front of a field full of children, less

16   than seven years old; they all had their parents shot by Burmese

17   military.  In 1991, refugees came en masse, like millions at that

18   time.

19       My dad was judicial secretary of relief ministry at that time

20   in Bangladesh.  So we went in to --

21           THE COURT REPORTER:  I'm sorry.  Can you say that again?

22   A   We went in, me and my dad, we went to the United Nations HCR,

23   it is a refugee commission, something like UN branch for

24   refugees.  So those officials and my dad and I have seen a field

25   full of children.  They cross the border -- there's a river in

1  between -- mostly by themselves.  There was very little help.

2  Maybe some adults.  And they just throw them on the other side on

3  the Bangladesh border, and we just picked them up.  This kind of

4  situation.

5      And the problem is still there.  There is probably around

6  10 million of them now living there.  But it's mostly unknown.

7  People don't know about Bangladesh that much, what happens there,

8  what's going on.  The amount of struggle, the amount of trauma,

9  is mostly unknown.  And what I have seen growing up was

10 profoundly enlightening.  It has given me a lot of insight and a

11 lot of inspiration to do a lot of things.

12     I always used to say, I have had 250 million -- 250,000 women

13 got raped, and 3 million people got murdered in a matter of

14 couple of months during the liberation war.  And we still won

15 that war.  And so I came from a background like that.

16     So I always used to think that almost any obstacle I can

17 overcome.

18 Q  To what extent has your exposure to that shaped who you are

19 here today?

20 A  I became who I am at the age of, I would say, twelve or

21 earlier.  I was very much loved by my parents.  And I have seen a

22 lot of poverty, trauma, children without parents.  I have seen

23 people dying for food.  But I have seen amazing social cohesion,

24 people helping each other, people -- sorry -- people doing

25 anything they can in situations, knowing how bad it is.

1      I can gave you an example.  A couple of years ago --

2  Bangladesh is not a rich country.  It has a population around

3  60 percent of the entire United States, and the size of less than

4  Washington State.  So as you understand, it's overpopulated.

5      And then another, around 5 million refugees came into that

6  country within a couple of months.  We did not turn one person

7  out.  We did not even ask for help.  We shared whatever we had

8  with them.

9  Q   Was this experience and this upbringing, a factor in your

10  decision to pursue the study of medicine?

11  A   Yes.

12  Q   How so?

13  A   When I went to medical school -- my medical school was

14  established in Mitford Hospital in 1848, by Mr. Mitford, a

15  captain.  There was -- when I was in medical school, I had to

16  literally step on bricks that is placed on water to reach my

17  patients.  When I was a third-year medical student, in my

18  clinical rotation, and I'm working with the trainee doctors,

19  residents and registers behind them, taking patients' histories,

20  I went from one room to another, came back, after eating

21  something, and said -- passing through the balcony, that whole

22  balcony got full of patients.  There was that much pressure on

23  the hospital.  They didn't have places to keep these patients.

24  They're all in the -- forget about beds, you don't worry about

25  beds, they are all on the floor.

1    And they needed medical attention so bad, I had one of -- I

2    can tell you a story of one of my fellow students with me, he was

3    taking -- he sat down next to me.  I sat down to take vitals for

4    one patient.  I stood up.  He's not standing up.  I asked him,

5    "Hey, what happened?"  He said, "I was checking the pulse, the

6    pulse just left.  I think she died."

7         So I have seen children coming in almost skeletal from

8    cholera and diarrhea, fluid loss.  I myself got the IV line

9    going, fluid going.  They revived.  They survived.  I literally,

10   before I even finished medical school, I don't -- I haven't

11   counted how many lives got saved, just by me, learning how to do

12   IV lines.  And I would put a saline in -- started.

13   Q    When did you finish medical school in Bangladesh?

14   A    The classes and courses, I finished everything by the year

15   2000.  I went into medical school when I was 17.  It was 1996.

16   So, yeah, 17 and a half, almost 18.  So by 2000, I was finished

17   with all of my courses, all the -- one exam left.  I had to wait

18   one year to do that exam, because I was too far ahead of my

19   fellow classmates.

20        So there was a thing that if I'm in the real minority, within

21   like 5 percent in the course, in classes, then they cannot

22   graduate me before there's the certain presentation of people to

23   sit down and exam with me.

24        So I waited 2002, I believe it was September.  And that's

25   when I finished, the final course.  Exam.

1   Q    Did you become a licensed physician in Bangladesh?

2   A    Yes.  I became licensed.  And I had my training in

3   Bangladesh, medical training.  I did six months of surgery.  I

4   did a six-month medicine rotation training.  Massive amount of

5   work.  I almost lived in the hospital.

6   Q    When did you move to the United States?

7   A    Oh, I moved to the United States 2005.  May 26th, I took the

8   flight.  May 28th, I landed.

9   Q    When was --

10  A    L.A. Airport.

11  Q    Why did you decide to leave Bangladesh, your home, and move

12  to the United States?

13  A    Long story short, basically, I thought that I can be more

14  helpful if I have a broader venue, or -- see, the way it happens

15  is, Bangladesh is a small country, I have never been outside that

16  place.  And I haven't seen -- it's a very homogenous population.

17  And the country -- everybody looks the same.  Everybody talks the

18  same.  There's no -- there's nothing different about it.

19       I thought I would be doing better in a bigger mix, and I have

20  more to contribute, if I'm given opportunity.  So I want to give

21  myself a better venue to do more with my life.

22  Q    So what barriers did you face when you came to the United

23  States?

24  A    First barrier is when I landed in LAX Airport, I looked

25  around.  First of all, I never spoke English in my life.  In

1   Bangladesh, yes, medical books are in English, but we don't speak

2   English.  Well, I looked around.  Everybody looks different, and

3   nobody matches with anybody else.  There is six different races

4   of people I saw right away.

5       And, well, I had my fair share of culture shock.  Pretty soon

6   I was -- in a way, I was -- first one and a half years in the

7   United States, I was sheltered.  I didn't have to learn English

8   or anything.  I was within Bangladesh community in New York City,

9   Queens, East Amherst neighborhood.  East Amherst, Jackson

10  Heights, is overwhelmingly, like, Indian, Bangladesh population.

11  I know all of their languages.  I know all if their languages.

12      So, and I have -- I didn't really have to assimilate into the

13  outside at that time.  But one thing I did is that my -- I was

14  staying with one of my uncles.  He said that:  You probably

15  should get your medical license through here right away.  So

16  within a month, I sat for United States Medical Licensing exam.

17  I scored 91 percentile.

18      I didn't even have a book.  I just said just get the fee

19  going, and drop me where the computer is, the exam is.  That's

20  it.

21      So looking at my results, my uncle said that you scored 91

22  out of 100, without one book.  So I'm not going to just let you

23  fall.  So you are going to do this step two as well, and pretty

24  soon.  So I said okay.

25      I do not have any doctor or medical people in my entire New

1    York community that I lived there.  They're all -- they work in

2    restaurants.  They're -- the highest, what is it, correctional

3    officer, one of my uncles.

4        So basically they say that you're good in studies, so you

5    study.  You don't have to go to the restaurant to do this.  And

6    we don't think you are suitable for that.  So let -- they let me

7    get to the second exam, which I think is September -- August, the

8    first one, step one.  September, the step two.  I passed that one

9    flying colors.  Then the clinical side, on my birthday,

10   December 10th, that was the final step, I passed that exam.

11       So I got certified as a medical doctor.  And I stayed by

12   December, third week -- I came in the end of May, so it would be

13   four and a half month, with good scores.  So seeing that my uncle

14   told me that you should have apply for residency, training here.

15   I basically told him that it's too late for that, the season for

16   application is June.  I think you start September 1st, and now

17   it's the end of December.  So I have to wait a year.

18       That turned out really good.  I get to see the country.  I

19   was able to go to many places, Wisconsin.  I had a green

20   backpack.  I would just go and travel around.  I have seen Ohio,

21   Michigan, New York.

22              MR. WERNER:  Your Honor, at this point, I'm going to

23   object to the narrative.

24              THE COURT:  Yes.  Ask another question.

25       Let's pick up the pace.

```
 1   Q    Tell us --

 2           THE COURT:  Mr. Nance.  Mr. Nance, let's pick up the

 3   pace.

 4           MR. NANCE:  Yes, sir.

 5   Q    Tell us how you got to Washington State.

 6   A    Washington State.  I came 2010, after finishing my residency

 7   training in Nashville, Tennessee at Meharry Medical College,

 8   which is a historically black medical school and residency

 9   training program.

10      I was accepted.  I think I got 15 interviews.  And I picked

11   that place as my first choice.  So I got that one.  So I did my

12   residency training there for three years.  We had VA hospital,

13   half the time and Nashville General Hospital the rest of the

14   time.  I have seen the Korean --

15           MR. WERNER:  Objection, Your Honor.  This is not

16   responsive to counsel's question.

17           THE COURT:  Ask another question, please.

18   Q    I'm trying.  I'm still trying to get you to Washington State.

19   If you could summarize, you have kind of largely done that, when

20   did you arrive in Washington State?

21   A    July 2010.

22   Q    Okay.  Did you have a medical job at the time you came?

23   A    Yes.

24   Q    Where was that?

25   A    I accepted a job in Snoqualmie, Washington.
```

1    Q    Okay.

2    A    Yeah.

3    Q    And what was your general field of practice?  What kind of

4    medical work were you doing?

5    A    Essentially it was a nursing home, 25 beds.  Only one

6    medicine/surgery bed and 24 nursing home beds.  And that was my

7    first job.

8    Q    Okay.

9    A    And I did not know a lot of things, that I learned right

10   away.  When I get out of residency, I did not know how the real

11   world in medical practice happens here.  So that job opened my

12   eyes.

13   Q    Did you later work in hospitals?

14   A    I worked in a lot of hospitals, I worked in MultiCare Good

15   Samaritan Hospital in Puyallup.  I was one of their hospitalists.

16   I worked in VA hospitals in Kansas, Montana, Wyoming, as an

17   emergency room physician.  I worked for Life Care Nursing Home, I

18   was their chief doctor in Washington State.  I was in charge of

19   all six of their nursing homes.

20        I worked the -- occasion hospital work, wherever there's

21   needed.  I covered nursing homes for Sound Physicians, in the

22   Puget Sound area.  Probably around 15 nursing homes,

23   approximately.  I worked in Puget Sound area for Sound

24   Physicians.

25        After that, I quite -- by that time, I was quite oriented by

1    working in different settings.  Hospital, inpatient, ICU,

2    emergency room, VA, and nursing home.

3    Q    Let me ask you.  What contact, or what -- what was the

4    nature -- how would you describe your patient base?  This is

5    after the nursing home tenure, what -- did your patients fit into

6    any particular category?

7    A    By the time I worked in these places, I already got

8    disillusioned by the way medicine has been practiced in these

9    places.  Especially my first experience was a bigger cultural

10   shock than coming to this country, where I was ordered to place

11   patients into comfort care because their Medicare days were

12   coming to an end.  They had a chart that lists how many days

13   left.  Social worker working with it and telling me this, this --

14   these people need to go, or put on comfort care, essentially.

15   Q    I'm sorry?

16   A    Put on comfort care.  Start a morphine line, and they added a

17   line, and let them go in 24 hours.

18   Q    You mean die?

19   A    Yes.  Or they have to be discharged.

20   Q    Discharge the patients or kill them, is what you are saying?

21   A    Yes.  It's an order.

22   Q    Okay.

23   A    Because their Medicare days are over.  Nobody will pay for

24   them if they stay and occupy a bed.

25   Q    Okay.

1  A    So what will happen is, you have to come back.  If they keep

2  staying there, they're losing a bed, they're losing revenue.  If

3  you make it alive outside and come back again in that place, they

4  have to keep them for a month or two without getting paid.

5  Q    Were there other frustrations that you had with the medical

6  system?

7  A    Yes.

8  Q    What were those?

9  A    I was -- what I have seen, I couldn't take it, essentially,

10  the power, the power among the doctors, the politics of it.  The

11  lack of -- absolute lack of autonomy for doctors.  Absolute

12  disregard for medical decisions of patient's life or health

13  shocked me.

14  Q    Why didn't you complain to someone, tell someone?

15  A    I did complain.  And that landed me into big trouble, big.  I

16  complained in writing.  I talked with everybody.  I was novice.

17  I didn't know who to go to, who to talk with.  I talked to the

18  other doctors.  They laughed.  Some of them said:  You're just

19  new.

20      And in one particular incident, I had an interaction with

21  another doctor.

22          MS. CONNELLY:  Objection, again.

23          THE COURT:  Sustained.

24          MR. NANCE:  Okay.

25  Q    Did you -- at some point did you decide to leave the more

1   institutional setting and go into a small private practice?

2   A   Yes.  I decided that it's too much.  I'm not going to be part

3   of that.

4   Q   Okay.

5   A   And I met Dr. Douglas Hong in a nursing home in West Seattle,

6   Park West.  And he invited me that he wants to retire as soon as

7   possible, but he could not find a doctor to take over his

8   practice.  Would I be willing to work with him.  That was 2014,

9   early.  So I said:  I am doing other stuff, but maybe a couple of

10  days a week I can work with you.  That had increased to -- keep

11  increasing as he wants me to participate more.

12  Q   I'm sorry, was his practice in West Seattle?

13  A   West Seattle.

14  Q   Was he at the 3600 47th Avenue address?

15  A   Yes.

16  Q   We have seen a photo of that clinic, it's in the exhibits.

17  Is that the location?

18  A   Yes.  There is 15 rooms there.  And it was pretty busy at

19  that time.

20  Q   Okay.

21  A   At the same time, I had -- I was in a transition from

22  hospital practice to outpatient practice.  So I had another

23  office in Arlington, Washington, on Smoky Point Boulevard.  I

24  think the address is 16400 Smoky Point Boulevard.

25      So I start picking up a patient base in Snohomish County and

1   getting transfers from Dr. Hong in West Seattle as well.  So it

2   was kind of like 50/50 in the beginning.  And I was, at the same

3   time, reducing my shifts in the hospital setting.

4   Q    How many patients, approximately, were you serving and

5   treating, once you began associating with Dr. Hong?

6   A    Yeah.  Dr. Hong had 800 patients at that time.  And he

7   intended to gradually hand me over all of them.  And I wanted to

8   have a smooth landing.  So I requested him that I may be able to

9   get going with, like, a couple of hundred in the beginning, and

10  then slowly take over his entire practice.  The whole process

11  took a year.  By July -- June, I think, June 2015, he finished

12  the transition.  He handed me over 800 patients.  They're mostly

13  from Seattle, West Seattle area.

14       By that time, my practice picked up in Arlington, Snohomish

15  County.  And I had a couple of hundred patients there.  And many

16  of them were drug addicts and looking for help for mental health

17  problems.  They're workers, construction workers.  Former

18  construction workers, that got hooked up on pain pills by

19  doctors, then cut off from their prescriptions.  Then they had to

20  rely on heroin.  Got kicked out of their Boeing job.  Became

21  homeless, arrested, court-ordered for getting clean.  Couldn't

22  find a doctor.  Heard my name, came to see me.

23  Q    Why did you gravitate toward this type of patient?

24  A    It's my background.  I am very familiar with mental health

25  problems.  I have extensive education on that.  I read books,

1    and -- volumes of books on that.  And I had, because of my

2    background, experience, and my education, and reading habit, I

3    was very aware of the trauma, the impact of trauma in people's

4    life, especially early-childhood trauma.  What I found out, it is

5    not different in America.  It's the same.  You don't have to be a

6    combat soldier.  You don't have to go to a refugee camp in Syria,

7    Congo, or Sudan, or Bangladesh, to find out that the trauma is

8    around us.  And it happens quite early.  Very soon I found out a

9    massive amount of people get molested by their caregivers.

10            MR. WERNER:  Objection, Your Honor.

11            THE COURT:  Sustained.

12   Q   Sounds like you are saying that you're acutely aware of

13   ongoing suffering by a large --

14   A   And its impact and the suffering especially on children, how

15   childhood neglect and abuse causes people to have a problem down

16   the road when they grow up.  And many of the problem when they

17   grow up, apparently all you have -- we throw levels at them.

18   When they're children, we call them -- half a dozen diagnoses,

19   primarily meaningless.  When they grow up, we throw some more

20   diagnoses:  You have anxiety or depression, you have this, you

21   have that.

22           And then through a polypharmacy, you throw a lot of

23   medication at them, which has no research, has shown all

24   researchers are paid by multibillion-dollar pharmaceuticals, has

25   shown no result better than a placebo.

1   Q    So, in your view, is the medical profession adequately

2   addressing that part of the --

3   A    Absolutely not.  The medical profession is light years away

4   from that in America.

5             THE COURT:  Mr. Nance.  Mr. Nance.

6             MR. NANCE:  Yes, sir.

7             THE COURT:  Let's move on to this case.

8             MR. NANCE:  Yes, sir.

9   Q    Let's do just that.  Thank you.

10       So you're practicing medicine.  And yet the case is largely

11  about, we have heard for two days now, about real estate dealings

12  and PPP applications.  So how did you get from being a doctor,

13  treating these many patients with this caseload, to getting

14  involved in real estate?

15  A    Yes.  So it started with the patients.  Many of my patients,

16  as I mentioned, that they're former chronic-pain patients and

17  mental-health patients, that turn into, what they call, drug

18  dependency, chemical dependency.  And many of the medical

19  problems that I faced, I found out that the real problem is not

20  medication or lack of medication, it's their mental background,

21  mental-health history.  That they have probably grown up in

22  foster care, home-to-home, mother getting beat up, adverse

23  childhood experiences, child abuse.

24  Q    So, again, what --

25  A    And --

1    Q    We're hearing that there's a lot of suffering out there.

2    A    Yes.

3    Q    I think everybody gets that.

4    A    Yeah.

5    Q    It's what -- how is that impacting you in your medical

6    practice and how does that -- how do you transition from that,

7    toward the stuff that we have been talking about in court here?

8    A    Okay.  The transition happened -- I figured out that one of

9    the best ways to rehab somebody is to get them becoming

10   productive.  I have example after example of patients who was

11   living in greenbelt now works in Boeing.  Now, this population

12   has the skill.  They have worked in construction before.  They

13   somehow fell out of their job.  They needed a chance.

14        At the same time, I had another group of patients, because

15   I'm internal medicine, primary care is my specialty.  Whatever I

16   do, I'm certified for a lot of things, but that's still my

17   training.  So I had a broad range of patients, like primary care,

18   addiction, mental health, all of it.

19        So many of my patients are homeowners in Snohomish County, as

20   well as Seattle, at that time.  And me, I personally -- I spend

21   16 to 18 hours a day with my medical practice at that time, and

22   spent a lot of time with the patients.  So I became personal -- I

23   have been told many times that I'm very easy to approach and I'm

24   a personable character.  So they would open up to me, and ask me

25   advice for a lot of other things.  Just -- it's not like giving a

 1  prescription and bye-bye.

 2      So I had a group of patients, homeowners, that needed work in

 3  their home done.  And I had another group of patients who needed

 4  to work, who needed to be able to get a chance in life.  Just

 5  somebody accepting them.  They are felons.  They came out of

 6  prison.  Getting clean from drugs.  Shunned by the society,

 7  family.  Nobody wants to deal with them.

 8      So initially, I think it was around 2017, I started

 9  connecting these two groups.  So I would basically introduce them

10  and say:  This person needs his plumbing repaired, or his

11  flooring done, or house painted, could you go please help him?

12  Somebody needs a roofer.  I tell a patient:  I got roofer, no

13  problem.  How many?  I got a dozen roofers on my list, no

14  problem.  I give you the best.

15      So I would send the roofer guy to the address.  Help out and

16  make some money.  And I did that quite a bit for almost a year,

17  doing the matchmaking.

18      At some point I figure out it's a win-win situation for a lot

19  of people; the homeowners are getting their home repaired, my

20  other group of patients making some money, and I'm generating

21  quite a bit of work.  Like, I would sometimes later find out how

22  much money they made and how much work they have done, once I

23  make the connections.  It spreads.  They have their friends,

24  other construction workers.  This homeowner knows ten other

25  homeowners that needs work done.

1    So eventually, intricate web kind of connection being made in

2    Snohomish and King County; me being the initial catalyst.  Maybe

3    one phone number exchange has created five other connections.

4    And initially I didn't understand how much it is working in my

5    background.  After seven to eight months, I figured out that it's

6    getting spread, to the point that a lot of people knows me, in

7    Snohomish County and even in Seattle, in the east side.  I became

8    well known, as a doctor, and as somebody who can get a worker for

9    cheap at the drop of a hat.

10   Q   Were you -- did your role evolve beyond just being a

11   matchmaker?

12   A   Yes.  So after doing it for a year, I -- a little less than a

13   year, I figured out that I can make a commission out of it.  And

14   I started making some money out of it by doing that.  But nowhere

15   near running it as a business, or hiring anybody, or paying

16   anybody salary, or anything like that.

17   Q   When did that start?

18   A   That started -- I would say it's a gradual process.  But it

19   started end of '17, 2017.

20   Q   Okay.  Well, tell us about, you know, workers.  Did you have

21   people working for you doing some of this work?

22   A   I did use some of them.  Two of my rentals up in Snohomish

23   and Skagit County that -- I bought one for $40,000 and the other

24   for $60,000, when the market dropped in 2010.  And I did -- I

25   mean, earlier David Madrid, he testified that he sold those two

1    properties.  But they sold for five to six times more than what I

2    bought for, eventually.  But I had to do some repair work.  And,

3    of course, my patients, they helped me out, with connections.

4    And I got them done.

5        2018, the market -- the market changed in 2013, April.  And I

6    was looking for opportunity when the market drops a little bit,

7    so that I can buy some more houses.  The opportunity came in

8    2018, summer.  I picked up three houses in South Seattle at that

9    time.  Very quick succession, like within a couple of months

10   apart.  And by that time, I already have -- my crew is working.

11   Not a major crew.  But I had -- I could pull bigger numbers if I

12   wanted to.  But I was operating in a smaller scale at that time,

13   like doing small renovation jobs, like changing the highest

14   amount that I did, like replacing twelve windows in a house; that

15   would be the biggest at that point.  Painting houses.  Flooring.

16   Repairing faucets.  Those kind of things.  I was doing all along

17   by that time.  Some landscaping.  Replacing cabinets.  Things

18   like that.

19   Q   Let's move ahead to 2019.  What's the state of your medical

20   practice at that point?

21   A   2019, by that time, I was disillusioned with the new setting

22   as well.  I had, by that time, in my registry, 1,500-plus

23   patients.  I do not believe in keeping a patient forever as my

24   patient.  I'm about fixing them and giving them the tools they

25   need.  And if you need prescriptions, there's a lot of places to

1  get prescriptions, no problem.  But this is how you are going to

2  follow it.

3      And I hit a wall with insurance companies, documentation

4  issues.  I had almost a library full of medical records.  Dr.

5  Hong gave me, like, an entire wall full of medical records.  And

6  I had another wall, massive, when I look at it.  I think --

7  probably glad we probably have less paper than that.

8      So I, by that time, I started doing EMR, electronic medical

9  records.  But I dare not try to scan all of these papers and try

10 to get in there.  So I started EMR with the new patients.

11 Q   What was different about the new patients and how they paid

12 you?

13 A   Oh.  So, I gradually moved out of insurance.  It was a -- it

14 was a massive amount of work to collect money from them.  And I

15 was a critical service that I was doing, kind of like a one-stop

16 shopping, where you get a primary care, you get an addiction

17 doctor, a mental-health provider.  You've got almost everything

18 taken care of.  And weight loss.  And this person is available at

19 the drop of a hat.  You call him, it never misses, you get him in

20 one call.  And he will see you in 30 minutes to one hour.

21 Q   How were you paid in this situation?

22 A   My patients are more than happy to pay me, to save me from

23 the insurance BS, I mean.

24 Q   Are you paid in cash, or --

25 A   Yes.  I was -- I turned completely cash.  I had a payment

1   system based on medical issues, not based on some insurance

2   calls.

3   Q   So a related question.  In 2019, you have cut back on stuff.

4   Have you -- has your patient caseload declined during that

5   period?

6   A   Oh, yes.  Definitely.  I almost -- 2019, I became, from, yes,

7   I reduced down to, I would say, I remember at some point the

8   Department of Health investigator asked me:  Dr. Shibley, can you

9   give us a list of your breakdown of your patient numbers?  I

10  think I got that e-mail December 2018.  And the number I gave him

11  -- gave her a month later was 150, altogether.

12  Q   At the same time your medical practice is declining, are you

13  ramping up your real estate --

14  A   Yes.

15  Q   -- activity?

16  A   Yes.

17  Q   In what way?

18  A   So back in 2018, summer of, I bought three houses.  So I

19  needed to repair them right way to make them livable.  One of

20  them was a situation where you couldn't even get in.  I bought

21  that without seeing it, because it was under a forest.  So I did

22  those quickly.  And then --

23  Q   Did you -- I mean, did you hire people -- did you hire

24  workers to help you do the renovations?

25  A   Oh, yeah.  I had people -- I had people in all three

1   counties.

2   Q    How did you pay them?

3   A    Cash.

4   Q    Why?  Why pay them in cash?

5   A    That's all they know.  They basically -- that's what they

6   asked for.  They demanded.  And it would be one of the most

7   awkward things to even talk about anything else.  Like if I tried

8   to say:  Here is a check for you, I mean, they are going to laugh

9   at me.

10  Q    Where would they cash a check?

11  A    There is no place.  Money Tree, maybe.  But it will require a

12  couple of phone calls I have to respond to, verify.  They have to

13  charge the customer 10 percent, which -- not one person willing

14  to pay.  They're hard on money.  And that's pretty much the only

15  option they have.

16       Another option would be if I take them to my bank, write a

17  check, and ask for cash in the counter, from the banker, and then

18  hand over the cash to them.  That is the only other option.  That

19  requires a trip to my bank with the worker, with me inside the

20  vehicle.  We're going for a trip.  It is highly impractical to

21  take each one of them to my bank, for every day.  The way they're

22  used to is:  Here, you get paid.  Five of them.  That's how you

23  pay.  And that saves the trip to the bank.  That saves their trip

24  to the Money Tree.  And that gives me -- basically that's the

25  socially accepted way of doing things there.  I mean, anything

1  else is not acceptable.

2  Q   Where did these folks, these workers come from?  Where did

3  they live?

4  A   Boy.  Under the bridge.  We call it shanties.  Homeless.

5  Couch surfing.

6  Q   The other question is, what kind of workers were they?

7  A   Sorry?

8  Q   What kind of workers were they?  What kind of work were they

9  capable of doing?

10 A   Well, they're pretty skilled.  They have a background of

11 doing -- or many of them had licenses.  Just fell out of the

12 system, because of addiction.  Because of whatever.  Maybe they

13 went to jail maybe.  Maybe they had mental problems.  Maybe they

14 were in financial -- something happened to them, bad.  And they

15 fell out of the favor of society.  And they were -- they didn't

16 really have an option to go and present themselves to somewhere

17 and say:  Hey, please give me a job.

18     Their story of people who -- just like David Madrid came

19 around earlier and said meth head, I don't use that term.  But

20 that's the thing that they're used to hearing that, oh, just go

21 home.  They're not accepted anywhere.  Nobody would employ them.

22 They're -- some of them, I found veterans, that had to do carpet

23 bombings and so they are traumatized.

24          MR. WERNER:  Objection, Your Honor.

25          THE COURT:  Sustained.  Ask another question.

1    Q    So you're paying these folks in cash?

2    A    Yes.

3    Q    All right.  How are you being paid for projects that you have

4    them do?

5    A    Okay.  So at any scale, you name it, my customers that I'm

6    serving, the homeowners, they will go to their bank, pull money

7    out of their bank, and hand me over the cash.  That is the way.

8    I did not accept any check, almost ever.  In fact, I don't

9    remember ever accepting a check for any amount.  I have done a

10   lot of work.  I have done ground-up work, without accepting any

11   check.  And where they get the cash from, it's pretty much their

12   matter.  And I don't get into that detail.  But they brought cash

13   to me.

14   Q    How -- were there significant expenses that you incurred in

15   doing your real estate projects?

16   A    Yes.  I had -- it's hard to imagine, like, how expensive real

17   estate can get.  The labor costs.  I'm getting cheap labor, yes.

18   Material.  You call in Roto-Rooter to get plumbing done in your

19   basement.  They're going to run a camera, do a $500 camera for

20   free, but send you estimate:  Oh, we need $25,000, half down.

21   That is not including rough-in, that is not including fixtures,

22   that is not including nothing on the top.  Just pipes.  Now,

23   so -- did you ask me anything?

24   Q    Well, I think you generally answered it.  I was going to ask

25   you about, just generally about some of your projects.  And I

1  would ask you, if you could be shown Defense Exhibit A-4.  Are

2  you able to call that up?

3          MR. WERNER:  It's coming now.

4          MR. NANCE:  Okay.

5  Q   Okay.  First of all, this is a multipage document.  It's

6  about -- I'm counting 22 photographs.  What are these?

7  A   These are work done by my workers.

8  Q   Okay.  These are exterior shots of construction?

9  A   Yes.  Yes.  Roof repair.

10 Q   Yeah.  Is this a representative sample of some of the things

11 you have done?

12 A   Yes.

13 Q   Work crews have done?

14 A   Yes.

15 Q   Okay.  Did you take these photographs?

16 A   Yes.

17 Q   Okay.  Do they accurately represent what they purport to be?

18 A   Yeah.  I was going to explain the previous one.

19 Q   Okay.  Well, hang on.

20         MR. NANCE:  We would offer A-4.

21         MR. WERNER:  It's my understanding all of these

22 pictures -- it's my understanding that the testimony is that all

23 of these pictures are jobs that Mr. Shibley has --

24         MR. NANCE:  I think so.  I think that's the testimony.

25         MR. WERNER:  If that's the testimony, no objection.

1          THE COURT:  Admitted.

2                    (Exhibit No. A-4 admitted.)

3          MR. NANCE:  If they could be published, Your Honor.

4          THE COURT:  Yes.

5     Q    Here we are.  Let's just run through these quickly.  What

6     are -- what's in front of you there?

7     A    So this is a mother-in-law unit.

8     Q    Your workers renovated this?

9     A    Yes.

10    Q    Okay.  What part of town is this in?

11    A    It's in South Seattle.

12    Q    Okay.  What about No. 2?

13    A    This is in my office.

14    Q    Is that the roof of your office?

15    A    Yes.

16    Q    Three?

17    A    That is in South Seattle.  It's a landscaping and window --

18    those windows are cut.

19    Q    What about four?

20    A    This is a job, that was a painting job going on.

21    Q    It may be cut off.  Was there a way to -- or not.  Okay.

22    That's a little better.

23    A    Yeah.

24    Q    Okay.  Five?

25    A    This one is an underground plumbing connection.

1    Q   Okay.

2        Let's just kind of keep it -- so six is more landscaping.

3    A   Yeah.  Fence, landscaping.

4    Q   How about seven?

5    A   Fence.

6    Q   Who put up the fence?  Your workers?

7    A   Yes.

8    Q   Eight?

9    A   Yes.  This one started plumbing there, connecting the

10   internal plumbing from the main house coming from the street,

11   getting a plumbing line there into -- to get a bathroom going on

12   down the road.

13   Q   Okay.  Let's just leaf through the rest of them.  If I have a

14   question I will ask you.  Nine?

15   A   Paint job.

16   Q   Ten?

17   A   This one?  Oh, this is a concrete job.

18   Q   Okay.  What about 11?

19   A   Underground plumbing line, coming from all the way from the

20   street.

21   Q   Okay.  What about 12?

22   A   These are my bobcats.

23   Q   Your bobcats?

24   A   Yes.

25   Q   Do you own bobcats, or did you rent bobcats?

1    A    I use them, I keep them there.

2    Q    Thirteen?

3    A    These are sidings, the floor sidings.

4    Q    Okay.  How about 14?

5    A    This is an electric line going between a house and a

6    mother-in-law.  The mother-in-law getting a new electric line,

7    and --

8    Q    And how about --

9    A    The main power line getting improved to 485 amp.

10   Q    How about 15?

11   A    Landscaping job, to reduce the angle of the slope.  This is

12   where the bobcat comes in, to get this thing leveled.  And have

13   my guys go run it for a couple of days, and it should be level

14   like that.

15   Q    Okay.  How about 16?

16   A    Roof repair.

17   Q    Seventeen?  Is that --

18   A    Yeah.  He's doing the fascia in the roof.

19   Q    Is that a worker of yours?

20   A    Yeah.

21   Q    Do you pay him a salary?

22   A    Cash.

23   Q    Paid him cash.

24        Eighteen?

25   A    Cedar fence, and putting landscaping things.  Just prepping

1    for landscaping.

2    Q    Okay.  Nineteen?

3    A    Cedar fence.

4    Q    Nineteen and 20, basically, looks like the similar thing.

5    What's 20?

6    A    Fencing.

7    Q    Same?

8    A    Yes.

9    Q    Okay.  Two more here.  Twenty-one.

10   A    This project, I was doing the interior fixtures.  I'm not a

11   contractor, by the way, I don't have a contractor's license.

12   Never had one.  These are -- I'm sending my guys to help somebody

13   else to finish the interior fixtures.

14   Q    Twenty-two is the last one, if we could show the full --

15   yeah.

16   A    This is one of my guys here.  We had to do a quite a bit of

17   dump runs.  I have used probably more than half a dozen trucks to

18   do dump runs.  Construction garbage has to be taken out.  So I

19   have guys who help me with that.

20   Q    All right.

21       Let me direct your attention to Defense Exhibit A-3.  We will

22   run through these even more quickly, since there are a few more

23   of them.

24       Same general question.  Actually, take it down.  It's not

25   been admitted yet.

 1          THE COURT:  It's not admitted.

 2          MR. NANCE:  It's okay.

 3   Q    Could you take a look -- have you looked at A-3, the photos?

 4   A    Yes.

 5   Q    And what are they?

 6   A    These are marble tiles.

 7   Q    Well --

 8   A    Going around a hot tub.

 9   Q    Mr. Shibley, the bulk of the exhibits, what are they a

10   collection of?

11   A    Construction sites.

12   Q    Interior construction sites?

13   A    Interior construction.

14   Q    Okay.  Let's run through them very quickly here.  Three,

15   four, you can keep going.  Let me stop it on six.  What is that?

16   A    This is something used to cut the tiles.  It's a tile cutter.

17   Q    Is that a tool you own, or did you rent that, or --

18   A    No.  I have a lot of those.

19   Q    Okay.  Where do you keep those?

20   A    I have a warehouse, 5,000 square feet, at 117115 South 108th

21   Street, Seattle, Washington.

22   Q    Okay.  Do you keep construction tools there?

23   A    Yes.  Construction tools.  I also have a lot in the back

24   where I keep the bigger equipment.

25   Q    Let's continue rolling through these here.  Seven?

 1  A    This is a -- sometimes they want to repair stuff, so there's

 2  -- and the bottom one is a finish work in an interior kitchen.

 3  Q    Okay.  Your crew did that?

 4  A    Yes.

 5  Q    How about 10?

 6  A    That is sometimes one of the favorite things that I do.

 7          MR. NANCE:  Could we -- I would move to admit these into

 8  evidence.

 9          MR. WERNER:  Your Honor, I object.  There's no

10  foundation.  The concern is duplicates.  I don't know when the

11  pictures were taken.  I object.

12          THE COURT:  Overruled.  They will be admitted.

13              (Exhibit No. A-3 admitted.)

14  A    This is one of the things that I offer the homeowners, that

15  if they have an attic, I would offer them that I will open up the

16  attic.

17          MR. NANCE:  Ask to publish.

18  A    And finish it, at a very low cost.  And even be able to put a

19  bathroom up there.  And this is what I do is just get a stair

20  going.

21  Q    So 10 is the before shot?

22  A    Yes.

23  Q    What would 11 be?

24  A    After.  This wall has been created brand new.  These steps

25  are created new.

1    Q    Okay.  What about 12?

2    A    This is creating new plumbing lines that's coming from a

3    different location, and putting a bathtub with -- basically after

4    you do the plumbing, you do the rough-in job, which is running

5    the lines through the walls, and getting the -- getting it ready

6    for final fixtures.  So it's a rough-in job in progress, with

7    some tiles around.

8    Q    Let's skip from that photo 12, to No. 14.

9    A    Yeah.  It's just prepping for putting the tiles.

10   Q    And 15, would that be part of the same room?

11   A    Yes.  This is tiling the floor.

12   Q    Okay.  Sixteen.  Same room?

13   A    Yes.

14   Q    Seventeen?

15   A    Yes.

16   Q    Eighteen?  This is the finished floor?

17   A    Yes.  This vent that we -- I think that I'm also -- I have

18   crews who does furnace replacement for cheap.  If you ever call

19   Evergreen Fireplace, or somebody, they're going to ask you

20   $11,000 on average to replace a furnace.  I get to do it for

21   maybe $2,000.  The furnace has been provided.  That's been cut,

22   and connected inside.

23   Q    Take a look at No. 20.  Same room?

24   A    Yeah.  It's not finished yet.  It needs the siding.

25   Q    Twenty-one would be, what, an attic you're working on?

1   A    Yeah.  Attic conversion.  What I do is to make it feel like

2   wooden floor.  I use this kind of Pergo or laminate, this type of

3   -- which is not very expensive, but looks really nice.  I had

4   purchased a massive amount of those and stored it.  And I use it.

5   Almost anybody that needs a flooring job done, I will get it done

6   very fast, quickly.

7   Q    Twenty-two?

8   A    It's an attic converted.  Getting converted.

9   Q    Okay.  Twenty-three?

10  A    This is a floor.  Many of the time in Puget Sound, you have

11  rotten woods.  And once you pull the laminate, you see there are

12  problems.  So in that case, you inform the homeowners that it

13  needs to be replaced.  So I have a lot of framers in my crew,

14  carpenters.  So just pull anybody and get it done in a day.

15  Q    Pull up 24.

16  A    That's the signature thing that I was talking about, the

17  flooring.

18  Q    Okay.  What about 25?

19  A    That's like -- the house is gutted.

20  Q    So look at that.  And is the following photo a more finished

21  version of that, 26?

22  A    Yes.  The house is -- the walls are brand new.  The walls

23  were stripped off to the stud.  And after the stud, this is new

24  stuff put in, with drywall, framing replaced at places needed.

25  Windows created.  Floor created.  Same thing.

1    Q    Twenty-eight?

2    A    New wiring being placed.  The island, kitchen island created

3    by pulling the plumbing and electric line from a different

4    source.  New lighting on the top.  I did quite a bit of this kind

5    of ceiling with wood -- wood ceiling, that's one of the things

6    that I do quite frequently.  Homeowners like it.

7    Q    Okay.  Thirty and 31.

8    A    Yeah.  Flooring.  Subfloor.  And then underlayment.  And then

9    laminate.

10   Q    This one may be out of order, 32, is that one of the before

11   shots?

12   A    Yeah.  There are a couple of things going on here.  Of

13   course, the floor is getting changed.  Cabinets are getting

14   changed.  Appliances are already in the process of changing.  But

15   if you look at the right side, there is a wall being created.

16   Oh, actually, not created, in the process of getting demolished

17   and getting -- I'm closing it.  And so there's -- a prototype of

18   what I do is I separate the basement out from the top floor, and

19   create extra windows in the basement, and extra doors in the

20   basement.  So what happens is if you have a single-family house

21   with -- say I opened up the attic.  I separated the basement, got

22   a separate opening into the basement with new windows.  Now

23   you've got two, three, maybe four units out of the house.

24   Q    Who's doing this work?  Your workers?

25   A    Yeah.

1   Q    Okay.  Thirty-four.

2   A    Same thing.  Basically prototype of -- what I did many times

3   is basically closing that thing, that interior stair that's going

4   into the basement.  Once I close that, the basement becomes a

5   separate unit.  And then I'm creating some extra square footage

6   in the top floor, and getting an extra unit in the basement.

7   Q    Okay.  And so on.  Are these just representative photos of

8   some of the work you have done?

9   A    Yes.  It's really a representative.

10  Q    Okay.  So I would like you to take -- and I'm going take far

11  less time with this exhibit, because it's much larger.  It's A-2.

12  Yeah.  What are these?

13       Take them off until --

14  A    When you use a debit card in a shop like Home Depot or

15  Lowe's, that card asks, after you swipe the card, it asks you to

16  enter your e-mail.  So if you enter the e-mail just one time, it

17  remembers it forever, it connects you with your link, and it goes

18  into -- e-mailed receipt being sent to the e-mail right away.  So

19  it creates a profile for you.  You can go to Home Depot and

20  access your previous history.  You can go to e-mail.

21  Q    Okay.  I'm really asking you, what are these?  What is this

22  exhibit?

23  A    So, oh -- no, in back there's a tool rental receipt for four

24  hours.  One --

25  Q    Mr. Shibley.  It's a thick --

1    A    These are more than 400 receipts from Home Depot, in the

2    first half of 2020.

3    Q    What time frame do they appear to cover?

4    A    2020, first quarter.  2019, fourth quarter.  Last quarter.

5    This time frame.

6    Q    Okay.  And if I could ask you to take a look at the tail-end

7    of these exhibits.  If you could skip to the very end.  I think

8    it's No. 3 -- 314.  It includes the very end of it.  What's the

9    date on that?

10   A    Um, I don't have my eyeglass, I'm sorry.

11   Q    Let me -- it appears to read June 21st, 2020.

12   A    Yes.

13   Q    Okay.  So are these in -- generally in chronological order

14   between October of 2019 through June of 2020?

15   A    Yes.  I reviewed those, and it is in chronological order.

16   Q    Okay.  They have been assembled and you have looked at them

17   after they were assembled; is that accurate?

18   A    Yes.

19   Q    Do they depict -- for the most part, I see there's some

20   other -- there's, for example, a receipt from Lowe's here.  But

21   do they, for the most part, depict receipts of items that you've

22   purchased in connection with your businesses?

23   A    Yes.  It's in connection with the businesses, yes.

24   Q    Okay.

25            MR. NANCE:  We would offer A-2, Your Honor, both as he's

1   indicated, I think, and they're also self-authenticating business

2   records.

3            MR. WERNER:  No objection.

4            THE COURT:  They will be admitted.

5                    (Exhibit A-2 admitted.)

6   Q   Were there other expenses that you -- non-personal expenses

7   that you incurred that is not reflected in these exhibits?

8   A   Yes.

9   Q   Okay.  Why would you be paying cash for -- well, did you pay

10  cash for those, or did you use some other way to pay for them?

11  A   Overwhelming majority of times my material is bought with

12  cash.

13  Q   Okay.  Why would you pay cash sometimes, maybe the majority

14  of time, and use a card, a debit card or a credit card on other

15  occasions?

16  A   Yeah.  So it's for -- it's just fast to get out of a checking

17  line with the card.  That's one reason.  The other reason would

18  be that I have -- by the time, looking at this time, I already

19  have almost a military-like hierarchy system in my businesses.

20  So I've got site managers who is doing purchases, who is carrying

21  money, paying contractors and employees.  Below that, I got

22  journeyman contractors who are supervising the worksite.  They

23  have licenses, who manage the work site.

24       And if you go to the number, I have said 20 to 25

25  contractors, and another 20 do 25 of site managers.  So site

1   manager's job is to go and get the material.  They would go in

2   and get whatever material the contractor needed, to streamline

3   the process.

4   Q    Let me just pull up an example from A-2, page 156.

5        This is a receipt from Home Depot, it looks like?

6   A    Yes.

7   Q    And I see the date is, what, December 2nd, 2019?

8   A    Yes.

9   Q    And then there's a number of items that were -- this is a

10  Tukwila store.  And it looks like there's a number of items that

11  was purchased.  Then it looks like -- yeah, there we are, $722

12  was charged?

13  A    A typical Home Depot run would cost easily -- you get a cart,

14  you won't be surprised if it is $2,000.  We don't understand how

15  expensive Home Depot store is, construction stuff is.  You go to

16  Walmart, average value price of items that you by is maybe $4 to

17  $5.  In construction stores, it's probably average $200.  So it's

18  not unusual to have $1,000 or $2,000 in each run.

19  Q    Okay.

20            MR. NANCE:  Your Honor, we are withdrawing a portion --

21  a small portion of what we have tendered to the court earlier as

22  Exhibit A-1.  And so what I would like to do is have him identify

23  A-1.  And we would be withdrawing two pages of that.  We would

24  withdraw page 1 and page 10.  So with that caveat, I would ask

25  him to identify Exhibit A-1, Defense Exhibit A-1.

1   Q   What are these?

2   A   So these are the pictures found in my cell phone.  I do not

3   have my cell phone with me.  I have been separated from that for

4   almost two years now.  So I, as you know, that my offices,

5   houses, residences, got ransacked.

6   Q   Hang on.  I'm asking you to just tell me what it is, Exhibit

7   A-1 is.

8   A   What it is, these are pictures of people who work for my

9   businesses.

10  Q   Okay.  So it looks to me like there's three or four

11  photographs.  In fact, they're all photographs.  Are they of IDs,

12  of folks that did work for you?

13  A   Yes.

14  Q   Some of these?

15  A   They are my ground-level workers.  The IDs come to me from my

16  worksite managers.

17  Q   Okay.  And let's see if we can take a look at -- before we

18  ask that it be admitted -- there are -- take a look at 15 --

19  it's loading -- not so much the photograph, but as the subject

20  matter.

21  A   Somebody is -- I think some names.  With their date of birth.

22  Q   I mean, do you recognize the names?

23  A   Yes.

24  Q   Okay.  Sixteen -- actually, 16, 17, 18 and 19.

25  A   This guy worked.

1    Q    And 20 and 21.

2    A    Yes.  It's me with one of the workers.

3    Q    Okay.  Do these photographs depict what you have just

4    referred to?

5    A    Yes.

6              MR. NANCE:  We would move for the admission of A-1.

7              MR. WERNER:  Your Honor, some of them are -- appear to

8    be more like records rather than photographs.  So, for example,

9    the last two pages --

10             MR. NANCE:  Well, it's -- they are photographs of

11   records, 20 and 21.

12             MR. WERNER:  I don't think there's foundation for 20,

13   21, or 14.  The things that are not photographs.  Of people, I

14   guess I should say, the things that appear to be photographs of

15   documents.

16             MR. NANCE:  I can certainly ask him about it.

17   Q    What is 14, page 14?

18   A    It is the photograph taken from a cell phone.

19   Q    Of what?

20   A    Of a document signed by a worker.

21   Q    Okay.  Is it a W-4 form?

22   A    It appears to be.

23   Q    Okay.  Does that accurately, other than the redaction, does

24   it portray what you recall seeing on it?

25   A    Yes.

 1              MR. NANCE:  What was the other one you objected to?

 2              MR. WERNER:  Nos. 20 and 21.

 3   Q   Nos. 20 and 21.  Take a look at those.

 4   A   Yes.  Tracy Dennis.  I recognize her.

 5   Q   How about the other two?

 6   A   Darell Cadotte and Deuce McDuffy.  They worked for me.

 7   Q   Okay.  These appear to be receipts?

 8   A   Yes.

 9   Q   That they signed?

10   A   Yes.

11   Q   These photographs accurately portray the receipts, as you

12   recall?

13   A   Yes.

14              MR. NANCE:  We, again, offer all of A-1.

15              MR. WERNER:  No objection.

16              THE COURT:  They will be admitted.

17                   (Exhibit No. A-1 was admitted.)

18   Q   So let's just kind of run through this, Mr. Shibley.

19       No. 2, page 2.  Who is that?

20   A   I personally, as far as I can recall, this person is, of

21   course, one of the employees.  Somebody who's likely -- who's

22   doing cleaning work.

23   Q   Okay.

24   A   Construction site.

25   Q   Okay.  Page 3?

1    A    Mostly cleaning.

2    Q    Okay.  Four?

3    A    I recognize him.  He was doing the landscaping, pressure

4    washing, painting.

5    Q    Okay.  How about five?  Maybe skip five.

6    A    I remember him.  He did interior work.

7    Q    I'm sorry, you are referring to which one?

8    A    The top one.

9    Q    Top one.  Okay.  And No. 7?

10   A    No. 7, the guy in the bottom, he had an electrical license,

11   that I think he fell off and he was trying to get it back.  He

12   worked a couple of houses.  Pretty good job.

13   Q    And 11 and 12?

14   A    It's a social security number, I think for the same person

15   that we saw earlier.  The one in the bottom is -- I think one of

16   the names, of the ten names earlier that was given, he's one of

17   those ten guys.  Read Leaf was doing interior work, cabinet

18   replacement.  This guy on the top, Curtis Nelson, he does quite a

19   bit of interior work, drywall, framing.

20   Q    No. 15 -- page 15.  Again, just focus on the center of that.

21   A    Yes.  Those four, I -- I'm not very familiar with them.  I

22   definitely know the people.  They have done some work, yes.

23   Q    No. 16?

24   A    Yeah, I know him.

25   Q    What did he do?

1    A    His name is Jigga, J-I-G-G-A.  He did a whole lot of loading,

2    truck loading, site clearance.

3    Q    You paid him in cash?

4    A    Yeah.  Many of the times -- I personally do not pay people in

5    cash anymore.  In the beginning when I was doing it, I was doing

6    that way.  But when I started getting designated worksite

7    managers, they would handle the ground-level employees.

8    Q    What about No. 17?

9    A    Yeah.  He's --

10   Q    That's you on the left; is that right?

11   A    Yeah.

12   Q    Yeah.

13   A    It looks like one of the vehicles I drive.  And me, and Nate.

14   Three guys, Payton --

15   Q    You are referring to 18?

16   A    Yeah.  Payton, Rich --

17   Q    Center that, if you could.

18   A    -- and James.

19   Q    There you go.  No, the other way.

20   A    This is in front of my warehouse, with Nate.  Nate has --

21   he's Samoan, so he knows a lot of Samoan workers.  These guys are

22   from Centralia.

23   Q    What kind of work did they do?

24   A    Electric.

25   Q    No. 19.

1   A    Rico.  Getting the -- basically getting the trailer loaded to

2   connect to the truck.

3   Q    So there were -- you listed in your PPP application, or

4   applications, other employees, a number of other employees.

5   A    Yes.

6   Q    What about them?  Where are they?  And, you know, why --

7   what --

8   A    What is their details?

9   Q    Well, yeah.  To the extent you can tell us.

10  A    I have been sitting in federal prison year number two now.

11  So my whole world has been wiped out from me.  My office -- I had

12  four construction office sites, before I got incarcerated,

13  including my medical offices.  You heard about three of them.

14  One by one, within weeks, when I got locked up, right in front of

15  the FBI sitting there.

16  Q    Well, let me move you to earlier in 2020.

17  A    Okay.

18  Q    Okay.  You're operating your businesses?

19  A    2020?

20  Q    2020.  Early 2020.

21  A    Beginning, yes.

22  Q    Okay.  And then in March, we all kind know what happened, the

23  pandemic hit.

24  A    Yes.

25  Q    And everything kind of came to a standstill.  How did that

1   impact you?

2   A   That put me in a full stop.  There was the Governor's order

3   to stop.  There was a virus that basically last time we had a

4   situation like that in 1918, 50 million people died in the United

5   States only.  Reduced the life expectancy from, like, ten years,

6   within a matter of twelve months.

7   Q   So this was a scary time for you?

8   A   I, myself, knew that is coming, because I told many people

9   back in first week of March:  You are looking at least a million

10  dead bodies.  Nobody believed me.  I said a million is a low

11  number.  If you look at the history.  In 1918, after Second World

12  War, United States didn't have that --

13          THE COURT:  Ask another question.

14          MR. NANCE:  Okay.

15  Q   So your business is shut down?

16  A   Yes.

17  Q   What do you do about it?

18  A   I had to keep things together, which is to survive.  I'm not

19  a person who makes a lot of money.  My profit margin is barely

20  10 percent.  To make $100,000, I have to, as you have seen, I

21  have to run a payroll of a million dollars.  There is -- that

22  means I have to earn more than that.

23  Q   Okay.  So let me ask you this:  When did you first hear of

24  the Paycheck Protection Program, the PPP program?

25  A   I believe, as I heard sitting here, the end of March,

1    March 29th, the CARES Act got passed.

2    Q    Okay.  Was that of interest to you?

3    A    Yes.  I get to know it from my bookkeepers.

4    Q    Okay.  So what did you do?

5    A    Well, I was -- my bookkeepers told me that I -- this is my

6    lifeline, because they know all of my finances, they know my

7    situation, they know my margin, and they know what's happening.

8    I'm in the hole.  And I had to basically stop.

9    Q    Did you think that you probably qualified for PPP loan

10   assistance?

11   A    Yeah.  I definitely thought that I qualified.

12   Q    Where did you learn about it?

13   A    About the program?

14   Q    About the program.

15   A    As for -- I mean, my memory has been basically -- I mean, I'm

16   living in a small cell for two years, so --

17   Q    Let me -- let's -- were there -- was there internet

18   advertising?  Was there word-of-mouth?

19   A    That is the only word in town for a couple of weeks, first

20   two weeks of March 2020, people are only talking about that

21   program.  It's in the internet, news media, TV.

22   Q    And what was your understanding of what the PPP promised?

23   A    To patch things together until we run through the tough

24   times, and keep the employees in the payroll, even if they're

25   sitting home.  If they have a check coming, their children have

1   food on their plate.  They're not falling apart financially,

2   socially.  And they're not forced to leave their profession, or

3   whatever they have been doing, and downgrade to some other jobs

4   they have never done.  Or stop working altogether for six months,

5   and then become unemployed for the rest of many, many years.  And

6   to keep things patched together, as much as possible, until we

7   ride it through.

8   Q   So you did your applications online?

9   A   Well, my bookkeepers.  Yes.

10  Q   I mean, you signed the applications, right?

11  A   Well, I had to sign it, yes.  I did sign.

12  Q   And you did it in a number of -- by the way, I didn't ask you

13  this.  Why did you have so many different LLCs?

14  A   Because I was operating, as you understand, in three

15  counties.  Completely different crews.  Different locations.  One

16  group of crews do not have any contact with the other crew.  One

17  group of customers have nothing to do with the other group of

18  customers.  So -- and I was pretty aware of the liability issues

19  that can happen, if something happens.  I don't want to just

20  completely go under with everything.  So I wanted to separate

21  these sides and groups, and basically run it as separate

22  businesses.  Different areas.

23  Q   That's even what the name says, limited liability

24  corporation?  You wanted to limit your liability.

25  A   That's one of the prime reasons.

1    Q    Okay.  Why did you make so many applications, so many

2    different applications.  What was your thinking there?

3         I mean, many of your -- I mean, you applied in the name of

4    A Team Holdings?

5    A    Yes.

6    Q    And Seattle's Finest Cannabis?

7    A    Yes.

8    Q    And Dituri Construction?

9    A    Yes.

10   Q    SS1.  And in Eric Shibley MD.

11   A    Yes.

12   Q    Yeah.  And others.

13        As well as these EIDL applications.  So what was your

14   mind-set?  What were you thinking that you could do, applying

15   that many different times in that many -- the names of that many

16   different entities, the LLCs?

17   A    I was not really thinking much.  My thinking is done

18   regarding these matters by the tax professionals, CPAs,

19   accountants, bookkeepers.

20   Q    You filed your taxes in the past; is that right?

21   A    I think I'm trying to catch up with all the taxes now.  I did

22   not know that 2019 actually didn't get filed, but I think I was

23   under the impression that it at least got prepared a couple of

24   years ago.

25   Q    What was your understanding on the 941 forms, the payroll

1   withholding and the reporting there?

2   A   My understanding --

3   Q   Yes.

4   A   -- about that form?

5   Q   Right.

6   A   I do not do anything with that form.  I do not create those

7   forms.

8   Q   Weren't they submitted on several occasions with your PPP

9   applications?

10   A   Yes.

11   Q   Okay.  You represented that you had a certain number of

12   employees and a certain payroll on each of the 941s; is that

13   right?

14   A   Yes.  So basically to clarify the issue, that I have office

15   managers, I have around more than a dozen burner phones, five or

16   six cell phone lines and land lines.  It's impossible,

17   physically, for me to answer a couple of hundred phone calls, a

18   couple of hundred text messages, and maybe another 50 to 60

19   e-mails every day.

20       So as you understand, my attorney currently has one of my

21   computers.  The way that earlier exhibit that you saw, he pulled

22   that out of my computer, by logging into my e-mail, a couple of

23   -- I think a week ago.  He was able to do that, because I do not

24   keep passwords.  All passwords autopopulate in my business

25   computers.  Every e-mail, every business has separate e-mails.

1    And the passwords are already -- the computer remembers the

2    password.  So anybody who goes in that computer, if the computer

3    is given to you, you would be able to log into every e-mail,

4    answer every e-mail that day that came.  Basically there's no

5    need for any password, in any of the business computers that I

6    have.

7        All these e-mails that you have been shown today, the last

8    two days, these are my business e-mails.  Nothing to do with my

9    personal.  I do not even -- there has been days gone by I didn't

10   even log into those myself, personally.  I have office managers,

11   as I explained earlier, the site managers.  I rotate them,

12   biweekly.  Two of them turn into office managers.  They handle

13   phone, e-mail, computer, correspondence.

14       I have patients.  I have -- my job is to make sure things are

15   running.  My workers have a next place to go, for what is the

16   next project.  How to keep things moving and floating, so that

17   all of this workers, they have children, I don't want them to

18   look at an empty refrigerator, basically.

19       So I'm not going to be -- I have to -- have to prioritize.  I

20   cannot be thinking:  Well, today is it this tie and the next day

21   another tie.  I'm not like that when I'm out there working.  I

22   have to prioritize things, and think of the bigger picture.

23   Q   So what were you planning to do with the proceeds of any PPP

24   loans that you ever received?

25   A   Planning to do?

1    Q    Yeah.  You applied for them.

2    A    PPP monies is for the workers.  I do not plan to do anything

3    with that money.  I never spend one dollar of that money for

4    anything to do with me, or any other purpose.

5    Q    Well, okay.  You applied for a number of them, and some of

6    them were -- apparently were approved?

7    A    Yeah.

8    Q    And we heard testimony that one, in particular, I think the

9    one in -- there's so many different ones -- but there was the

10   large fund that came in, it was $560,000, that came into the bank

11   down in Tukwila.  You heard the testimony, right?

12   A    Yeah.

13   Q    Where you went into the bank and you tried to withdraw the

14   money?

15   A    I informed the bank that if I were to use this money -- first

16   of all, I inquired that, what is your procedure for -- what are

17   the procedures to draw this money?  And they told me that, yes,

18   basically they asked me why, what is this money for?  I said:

19   It's the workers.  And I have workers that are paid in cash.

20   They went with me and said that, "Don't you do ACH transfer?  How

21   about ADP?"  I laughed.  And as you saw, the clothes that I was

22   wearing, blue T-shirt and jeans and running shoes.  So I said:

23   You think that marginal construction workers have bank accounts

24   and they're going to do ACH transfer?  How do you think?  I mean,

25   it seems like their world is completely different than the world

 1    I dwell in.  I just couldn't get through it.  I'm talking Greek,

 2    and he's talking Hindi, or --

 3              THE COURT:  All right.  Let's take a 15-minute recess.

 4                        (Recessed.)

 5              THE COURT:  Mr. Nance, did you decide how you wanted to

 6    handle the forfeiture issue?

 7              MR. NANCE:  I'm sorry?

 8              THE COURT:  Did you decide how you wanted to handle the

 9    forfeiture issue?

10              MR. NANCE:  I apologize, I didn't actually discuss it.

11              THE COURT:  All right.

12              MR. NANCE:  I will get you an answer before we leave

13    today.

14              THE COURT:  That would be fine.  Okay.  Let's bring in

15    the jury.

16              MR. WERNER:  Your Honor, may I briefly -- the government

17    would respectfully request that the court reconsider its ruling

18    regarding the summary restrictions placed on Mr. Shibley's

19    medical license in late 2019, related to his ability to prescribe

20    controlled substances.  Mr. Shibley testified that he voluntarily

21    left the medical profession, that his medical profession started

22    to go under because of his decisions.  This contradicts both his

23    testimony today, as well as the PPP applications, that indicates

24    how the medical practice is doing.

25              THE COURT:  I had the feeling that the door was

 1  squeaking open as I was listening to the testimony.  I'm not

 2  going to open it up.  I think its potential for prejudice

 3  outweighs the probative value.  So I understand your request, but

 4  I'm denying it.  Okay.  Let's bring the jury in.

 5          MR. WERNER:  Okay.

 6          THE COURT:  But I would be careful about opening the

 7  door, Mr. Nance.

 8          MR. NANCE:  Yes.

 9        (The following occurred in the presence of the jury.)

10          THE COURT:  Please be seated, folks.

11  Q   Mr. Shibley, we were discussing -- you were discussing the

12  your interchange with the bank, I believe, when we broke.

13  A   Yes.

14  Q   You had a -- you had an interchange with the bank.  And

15  eventually you spoke with Mr. Mondala at the bank, is that --

16  A   Yes.  I spoke with Mr. Mondala twice.

17  Q   Okay.  Let me pull up Exhibit 12.  If you could maybe just

18  blow this up a little bit.

19      You heard testimony about this earlier.  You had a -- you had

20  applied for a large PPP loan that was apparently funded?

21  A   Yes.

22  Q   Is that right?

23  A   Yes.

24  Q   So tell us about it, from your perspective.  You applied for

25  this loan, and they said yes.  They funded it.  And so --

1    A    Yeah.  Definitely.

2    Q    What happened from your end?

3    A    It was -- it happened in lightning speed.

4    Q    Okay.

5    A    As far as I remember, it was -- with this specific bank,

6    Celtic Bank, typically a PPP loan that I have seen that, you

7    know, they at least try to e-mail you and schedule a phone

8    conversation.  With Celtic Bank, I remember that there was one

9    person.  My memory -- I'm really not going to the accurate point.

10   But it's two years now, and my life has changed.  That somebody

11   -- I don't know if it was this bank or some other bank, somebody

12   said that typically they will throw a number out.  They will look

13   at the 941.  They will e-mail me back, say that, we will give you

14   this much money.  If you are okay, plug that number and send us

15   the application.

16       And that amount varies.  It's -- with this -- 563 came from

17   one bank; another bank.  I mean, they're just trying to learn how

18   to do this math, and come up with this number.  And the question

19   was the average monthly payroll, what "average" means.  Some bank

20   was saying:  Average means any 941 we will take.  Some banks was

21   saying:  We're going to need at least two.  Some banks was

22   saying:  We need all four, and then we will make an average.  And

23   I had banks saying:  We don't do 941 at all, we only need the tax

24   return.  Some banks was saying:  We need ADP, we need -- some

25   other stuff that I have no idea.  So there was widespread

1  confusion among them, like -- the people that I figured out

2  pretty soon, the people who were doing this are not really

3  regular bank employees either, it's probably out of some garage,

4  somebody just got a job a week ago.

5  Q   Did you shop around with different banks to find -- did you

6  make multiple applications?

7  A   Well, as I mentioned, yeah.  I did shop around.  But as I

8  mentioned before -- I would like to clarify that I'm not sitting

9  in front of the computer all day to just correspond.  I have many

10  other things to do.  I am on the run, basically, so much of the

11  time.  But I have always -- I always have people around me.

12  That's one thing I never had problem with, that if I need

13  somebody, I have somebody.

14      So I got bookkeepers who basically handle that.  And they

15  have -- nobody needs any password to get into my e-mails, for

16  many years.  So if there is a straightforward -- if there is a

17  complex, like big decision, like final, okay, here is 563,

18  Dr. Shibley wanted us to go ahead with it.

19      If it comes to the final, then they're going to call --

20  contact me.  But for minute details and clarifying things with

21  people, I personally do not do that.

22  Q   Okay.  I guess to get back to this particular funding.

23  A   Yeah.

24  Q   That's where we started, it seems like a lot of money,

25  $563,000 -- and 500 -- that's a lot of money?

1    A    Yeah.

2    Q    That's wired into your account, right?

3    A    Yes.

4    Q    That's the Dituri Construction account?

5    A    Yes.

6    Q    So what -- and there was testimony that it was -- and maybe

7    bank records -- that it was transferred to a different account

8    shortly after it was received.

9    A    Yes, it was the same.  I mean, who keeps $563,000 in the

10   checking account?  My wallet falls out of my pocket, somebody

11   gets my debit card, I'm dealing with -- just imagine the

12   population.  And they -- a checking account is very vulnerable to

13   any sort of -- it's easy to access a checking account.  It's very

14   difficult to access a savings account.  The moment you get a

15   large deposit in your checking account, the first thing you do is

16   transfer it to your savings so that you're secured.

17   Q    Okay.  So the ultimate purpose, you told the bank, was to pay

18   the payroll of your workers.

19   A    Yes.

20   Q    Right.  So what was the plan on that?

21   A    The plan is to rehire and retain.  And get things moving.  I

22   was under the impression that help was offered, and greatly

23   encouraged to receive their help.  I was under the impression

24   that it is a genuine offer of help, even though there was a lot

25   of talk around it that, like, as we have seen earlier, that

1  people have made -- like one guy came here and said a hundred

2  thousand applications he processed.  He actually, by the time his

3  representative talked with me, he already got $20 billion of loan

4  out, and 5 percent of $20 billion is --

5  Q   Let me ask you this:  In your conversation with Mr. Mondala

6  at BECU, he and you discussed your intentions with the money --

7  for the money, right?

8  A   My intention for the money?  Yes, I did.

9  Q   You told him what?

10  A   I was clear about it, with everybody.

11  Q   What did you tell him?

12  A   My workers needs to be retained, kept on payroll.  They need

13  to be paid.  And even if they are not working, they need that.

14  They have families.  They are barely keeping it together.  And

15  they have children.

16  Q   His testimony was that he offered to try and cut checks to

17  your employees.

18  A   Yes.

19  Q   And what was your response?  And why would you say what you

20  said?

21  A   Well, as you heard today from him, that it was not a long

22  conversation.  It was a pretty short conversation.  Pretty

23  straightforward.  He told me -- Mondala -- Mondala called me,

24  early in the morning, 8 o'clock -- the way it happened is, I went

25  to the bank, that you saw the picture.  I was told that we will

1   need one week to decide that.  So we will give you a call in a

2   week.  I believe it was a Wednesday.

3       The next Wednesday morning, I got a call from Mondala.  First

4   question, "Where is your arena?"  Just somebody -- I'm still in

5   bed.  "Where is your arena?"  And I'm smart enough to understand

6   where he's going with it, because in one of the PPP applications,

7   in the beginning, they asked a question like, like, NCAIS {sic}

8   code.  "What is the NCAIS code for your business?"  So you've got

9   to Google that and find out what that code is and then plug in

10  the right code.

11      For construction, there's probably a couple hundred codes,

12  and I didn't care.  My folks asked me.  I said:  Just use

13  whatever.  Some of this application, they put in a code:

14  Construction of Arena.  That was it.  The first one came, so they

15  picked the first code.  And he probably found that code.  And he

16  probably found that code -- The BECU application, I did early.

17  And he saw my BECU application, at least at that code.

18      So his first question is:  Where is your arena?  And I'm

19  pretty -- I understand he's basically trying to, like, make it a

20  joke out of me, or something, you know, first talk.  And I said:

21  There is no arena.  I understood where you find arena, but I

22  don't have arena.

23  Q   Did you -- it sounds like you didn't settle the question

24  about whether you could take cash to pay the workers?

25  A   No.  Basically he told me that -- it was a very short

 1  conversation.  He said that:  Are you going to -- there is

 2  another $820,000 coming.  Are you going to --

 3  Q    You told him?

 4  A    No, he told me.

 5  Q    He told you?

 6  A    He knows that already because the money is already ACH --

 7  Harvest approved it a couple of weeks ago.  And they were doing

 8  the ACH.  Somehow -- I'm not sure that whether the money was

 9  already in there, or he knew it was coming.  He asked me about

10  it:  Is that the same way?  I said:  Yeah.

11       I mean, by that time, I already talked with the Wells Fargo

12  Bank.  And they didn't have any problem with cash withdrawal.

13  They said 150 at a time, whenever you come, give us a call, we

14  will be ready.

15       I talked with Navy Federal Credit Union, there's a $100,000

16  PPP loan there.  They said, "We just need seven days to get money

17  together, cash together."  But we have to schedule you.  Like,

18  once a week.

19  Q    BECU --

20  A    Yeah.  I mean --

21  Q    -- that wasn't happening?

22            THE COURT REPORTER:  One at a time.

23  Q    At BECU, that wasn't happening.  You weren't going to be --

24  A    No.  The first question:  What is your arena?  So -- so by

25  that time, I already -- Wells Fargo scheduled me for 150 at a

 1    time for every three days.  Navy Federal scheduled me seven days,

 2    $50,000 each.  Every seven days.  Two times.

 3        And BECU told me that:  We will give you a call a week later.

 4    That was the call.  And when he said -- he didn't come clear that

 5    what he's going to do, whether he will give me the money, in

 6    cash, or give me any alternatives.  Like, no, you have to bring

 7    the employee here, and we're going to hand the cash to each

 8    employee at a time; or you are going to write a check, come into

 9    our branch, bring the guy with you, and we will cash the check in

10    front of him.  Stand in the line.  That's how we will handle

11    that.  There are different ways to do that.  He didn't make it

12    clear, which route he goes.

13        I said:  It's not that I'm coming with a bag and wiping out

14    all your cash and walking out with the bag from you, it's not

15    like that.  If you understand what I'm trying to clarify.

16    Q    Let me move you ahead here.

17        Do you recall events of June 10th, 2020?

18    A    Oh, yeah.  Very.  Very.

19    Q    What happened that day?

20    A    A very memorable day.

21        The day pretty much went by with three government federal

22    agents.  I got SOS alert from my contractors.  They're not --

23    many of them have warrants; they came out of jail.  The last

24    thing they want is to talk with the police.  And they never had

25    FBI or Homeland Security or a special agent for the federal

1  government, SBA, call them 25 times a day and demanding:  We need

2  to talk with you.  You need to call us back.  That situation is

3  unprecedented.  These people never had their phone blow up like

4  that.  Once that happened, the news reached to me, like, pretty

5  fast.

6  Q    Well, let me ask you this:  Prior to that day, had you

7  provided contact information for some of these people?

8  A    Oh, yeah.  I'll explain how it happened.

9        That is, by the way, part of the Mondala thing.  Mondala

10  called me on the 27th of May -- that is the second call -- and

11  said that this would not happen at all; the only reason this is

12  going is that you applied for a bank account for your cannabis

13  and we rejected it.  So what's the problem?  I don't need an

14  account for cannabis.  I don't do cannabis at all.

15            MR. WERNER:  Objection.  Hearsay.

16            THE COURT:  Overruled.

17  A    So I don't do cannabis at all.  I mean, that license, I got

18  turned down, and I moved on doing other stuff.  I don't need your

19  cannabis account.  But that is the red flag.  I said, "Red flag

20  for what?"  "Well, you would know."  So that's how Mondala had

21  that small little call with me.

22        I think within ten minutes I got another call.  This time

23  presenting as Celtic Bank.  "I'm the boss of Rob."  Rob is the

24  guy who just -- I think only one e-mail I got:  What is your --

25  I'm not sure how many, but as far as Rob's e-mail, he said:  Hey,

1  you are approved for 562,000, and we just need a bank account

2  number and a check, a voided check.  I gave him the check, a copy

3  of the check.  That's the only direction.  But I remember Rob's

4  name.  So they say:  Oh, I'm Rob's boss.  Oh, okay, no problem.

5  But then he asked me:  What is your social security number?

6  Social security number, that's the first time in my life I heard

7  somebody asking me for my social security number over the phone.

8  So I kind of got a little -- I thought maybe the bank is like

9  that, too cautious.  Gave my social.

10      A pretty long conversation, more than half an hour, I guess,

11  about various detailed things about my life, about my business,

12  about a whole lot of things.  And my understanding was that how

13  come somebody knows that much about me.  I answered everything

14  truthfully, as much as I could.  And he is saying that:  We

15  pulled the money from your account, Dituri.  We have the money,

16  but we need to talk with you before we put it back in that

17  account.  I said, "Okay.  If you feel like, call me any time.

18  I'll talk again."  No, he said, we will clear it with you.  We

19  just need one small little last thing.  Could you give us like a

20  couple of names?  I understand that you stopped your activities,

21  the COVID going on and all of this, but we just need some people

22  that is on site.  Like if you have maybe, I don't know, some -- I

23  said, "How many?"  He said, "A couple."  He didn't give me really

24  a number.  I kind of said a couple means, like, up to five.  I

25  said, "Okay.  No problem.  I will give you ten.  And I'm going to

1    e-mail you -- e-mail Rob today."

2         So I called my contractors, said, hey -- two of the sites, so

3    work managers, site manager, and the contractor, and said, "I

4    need ten names who is on the ground now.  Like just don't throw

5    their names at me, just people who are working today.  I need

6    ten."  So they came -- two people came, five and five, with

7    names.  And I told them that I also need phone number and their

8    last four of their social, and make sure they're working

9    currently now.

10        So I think that evening, by the time -- it was 10:30, I got

11   the ten names.  By 11:00, around 11:00, I send e-mails to Rob --

12   or Rob's like -- yeah.

13        In that list, I do know some of those people, and some of

14   them I don't know.  And --

15   Q   Well, let me ask you this before you go any farther:  In that

16   list, there's two names that kind of stand out.  One is that of

17   Lisa Velotta.  We heard her testify here that you two have never

18   met, she's never worked for you, et cetera.

19   A   Yeah.

20   Q   You gave her name and a phone number and the last four of a

21   social security number and the address.  Where did you get that

22   information?

23   A   The worksite manager.

24   Q   Provided that to you?

25   A   Yes.

1    Q    And you don't know where the manager got it?

2    A    (No audible response.)

3    Q    No?

4    A    I mean, no, I don't.  He got it, and he brought it to me.

5    Q    Okay.  The name "Sam Morgan."  This is the -- there is a --

6    as we heard, there is a deceased Sam Morgan --

7    A    Yes.

8    Q    -- back East somewhere that would be 100 years old now.

9    A    So this is how it happened.  Nobody 100 years old worked for

10   me.  But the point is that that phone number definitely blew up

11   the next morning, I guess, and they got ahold of him.  There was

12   a live person in that phone number that actually was at my

13   worksite.

14   Q    Did he represent himself as having the name "Sam Morgan"?

15   A    Well --

16        MR. WERNER:  Objection, Your Honor.

17        THE COURT:  Sustained.

18   A    Did he --

19        THE COURT:  No.

20   Q    How did that person represent himself?

21        MR. WERNER:  Objection.

22        THE COURT:  Counsel, that's hearsay.

23        MR. NANCE:  Okay.

24   Q    Where did you get the name "Sam Morgan"?  Where did it come

25   from?

1   A    My worksite manager brought the name to me.

2   Q    Okay.  The phone number, the same thing?

3   A    Yes.

4   Q    And the last four of his social, the same thing?

5   A    Yes.

6   Q    Okay.  So we're probably going to get there.  Go back to

7   June 10th.  Are any of these people that you provided the contact

8   information for, do you see them that day, on June 10th?

9   A    June 10th?

10   Q    Yes.

11   A    Did I meet them?  No.

12   Q    Well, did you see -- were you at the McDonald's parking lot?

13   A    Oh.  Well, June 10th -- I'm sorry.  I'm thinking something --

14        Yes, I was personally there.  I met Agent Moran.  I actually

15   brought one of the guys there.

16        The way it happened is that at 3:00 p.m., just right -- just

17   after 3:00 p.m. -- I pick up food for my workers, and it's kind

18   of like our culture that we get McDonald's food for our workers.

19   And, typically, I personally cannot pick up food for everybody,

20   so site managers do that.  And that day, I saw my -- one of my

21   trucks, Dodge, is parked at the McDonald's.  I didn't go in

22   McDonald's.  I took a left turn, went into the Red Apple, across

23   the street, and I did my thing there and I turned back, went back

24   on Des Moines Drive.

25        An hour later, at around 4:00 p.m., I'm driving again on that

1  road.  This time I still see my truck in the same spot.  That

2  caused me to turn around and this time go into McDonald's.  And I

3  saw Alicia Smith and Matthew Stellar, they're sitting inside the

4  vehicle, and --

5  Q   Are these employees of yours?

6  A   Yes.

7      Agent Moran, Homeland Secret Agent, and FBI Agent Eric Hunter

8  was there.  I came out of the car and basically tried to figure

9  out what's going on with my people, and I was given the subpoena

10 paper.

11 Q   By whom?

12 A   I believe Eric Hunter.

13 Q   Okay.

14 A   Homeland Security agent introduced first and said, "I'm

15 Department of Homeland Security."  I said, "Wow."  I was a civil

16 surgeon for Department of Homeland Security for a long time for

17 immigration.

18      MR. WERNER:  Objection.  A narrative response.

19 A   Oh, I'm sorry.

20      THE COURT:  Sustained.

21      Ask another question, please.

22 Q   Were there -- did you observe or overhear any other

23 encounters between law enforcement and your employees that day?

24 A   Yeah.  In the many -- in three different ways I heard --

25      MR. WERNER:  Objection to any further answer to that

 1    question.

 2             THE COURT:  Sustained.

 3    Q    Well, what were they?

 4             THE COURT:  No.

 5             MR. WERNER:  Objection.

 6             THE COURT:  Sustained.

 7    Q    Subsequent to that time, did you -- were you in contact with

 8    an accountant by the name of Mario Davis?

 9    A    Yes.

10    Q    What was all of that about?

11    A    It was about -- I got charged with this case and arrested and

12    then given bond, and looking at the situation, I -- Of course, I

13    was in contact with you at that time.  And the situation was that

14    I have to catch up with my tax filing and all these things have

15    to come clean with the government, completely full disclosure and

16    full compliance ASAP.  That was the advice and that was my

17    feeling as well.

18             And my previous accountants and the folks that I have, his

19    office and his bookkeepers, and all of the CPA thing is just not

20    working.  Their excuse is that it's tax filing season and

21    whatnot.  So I get on the back burner and my things didn't get

22    filed, my things are behind.  So I needed -- basically I knew a

23    person who is a financial advisor, so I called her and said, "Do

24    you have any accountant who will just get this thing filed?"

25    And --

1    Q    What were you looking to file?

2    A    I wanted to get totally updated with all the payroll general,

3    W-2s, W-3s, 941s, 1040, 1120S.

4    Q    Did you even know for sure what it was that you were supposed

5    to file at that point?

6    A    Well, now I know better.

7    Q    Well, I'm talking about at the time.

8    A    At the time, I was not as tax savvy, no.

9    Q    Okay.  So did you follow up with Mr. Davis?

10   A    Yes.  I was referred to Mr. Davis by her.  And I --

11   Q    And what is he?  Is he a --

12   A    He's a -- he's -- he has -- he works for Pinnacle Signature,

13   I guess, his firm's name, and he's the accountant there.

14   Q    Okay.  What did you ask him to do for you?

15   A    Get me updated, get all my businesses' paperwork done, filed.

16   What do you need?  How can I get it going?

17   Q    And what was he able to do for you?

18   A    He got my 2018 and -- I was behind two years.  '18, '19, I

19   didn't get to, and it didn't get filed.  It's not that -- The

20   background thing was done, but the final form was not -- the

21   final product, which is printed, didn't get filed.  There was a

22   reconciliation problem.  Basically, all the dots needs to be

23   connected.  And there was quite a bit of work.  I have

24   essentially freestanding driver's licenses sitting in my hard

25   drive which goes through bookkeepers, to the CPA firm.  They sit

1  down and do their charts and journals, whatever they do there.

2  And reconciling that many businesses, that many employees, and

3  that many numbers, and it's all on cash.  It's -- you saw

4  $571,000 in 12 months that the accountant showed you.  Other than

5  that -- so you are looking at a small percentage in going through

6  the bank account.

7       So first thing accountant asked:  Give us all the bank

8  statements for twelve months.  All I do is call the bank, get it

9  faxed to me, fax it back to the accountant.  But that is

10 meaningless because that piece of paper is less than 5 percent

11 of my activity.  So --

12 Q   Let's elaborate just a little bit on that point.  Your bank

13 statements reflect less, is that what you said, about 5 percent

14 of your --

15 A   It's actually meaningless in terms of my total picture.  If

16 anybody tries to induce or infer or make a reference or try to

17 deduct anything out of that, it will be like you're looking at a

18 tree when you are asked to survey the forest.  It's completely

19 nonrepresentative of my activities.

20 Q   So you heard Mr. Petron this morning testify, right?

21 A   Yeah.

22 Q   Those big charts, big fancy charts?

23 A   Oh, yes, nice charts.

24 Q   What's your reaction to that?

25 A   There's a saying:  men are in Mars and women are in Venus.

1    Kind of like that.  He is talking about, well, the money has to

2    come from somewhere.  So he's saying that the money has to come

3    from a -- money has to also go through my bank account.

4        Well, of course, money comes from somewhere, but that's --

5    money doesn't run through my -- or those 53 accounts.  There is

6    no reason to.  And it's not even practical.

7        And I don't understand how every day or every couple of days

8    I would go in to all these banks and get specific amount

9    deposited and then get it out to 256 people in a weekly -- or,

10   actually, daily.  Contractors get it weekly, and they go in and

11   out daily.  That person is not coming back to work tomorrow if he

12   doesn't get his money today.  He worked today.  So he's going

13   out of the site with cash in his hand.

14       And that interaction between my contractor and my worker, it

15   is humanly not possible for me to go to like three counties,

16   Skagit, Snohomish, King, going to worksites, go all these places

17   with cash at the end of the day at the time, in all 25 locations,

18   and meet their demands and deal with them.  There's no way I can

19   or anybody can do that.

20   Q   Is that the problem that you had with Mr. Petron's charts?

21   A   Oh, I have problem with every word he said.  He is not in my

22   world.  He doesn't -- he probably understands my point, but he

23   got paid good money.  He's not here to really understand what

24   you're trying to make him understand.

25   Q   Let me jump to a different point.  I'm going to use

1    Exhibit 1, page 5, and have you talk about it, what you -- what

2    your numbers are, how you calculate things.

3    A    So this --

4              MR. NANCE:  Blow up the figures, down, 1 through 15.

5    There you go.

6    A    Okay.  So this --

7    Q    So, first of all, let's go up to the top.  And this is

8    actually an A Team Holdings LLC 941 form for the third quarter --

9    I'm sorry, the fourth quarter of 2019, correct?

10   A    Yes.

11   Q    Yeah.  Okay.

12       Let's go down to the numbers below there.  And so how would

13   you arrive at a number -- and the number here is 975,000 -- for a

14   payroll for that quarter?

15   A    Okay.

16       So you have workers at different skill level, different level

17   of payment, different demands, different sites.  But if you

18   average it out, if you just ask somebody, what is average hourly

19   wage of a construction worker and how much is an average hourly

20   schedule for a construction worker's work schedule every month.

21   You average it out, 160 hours, 40 hours a week.  Their days are

22   usually ten hours a day.  They start early in the morning, done

23   by 4:00.  Give you four days a week -- that's a full-time

24   schedule -- 160.  If you average out $40 per hour, you've got 156

25   guys times 40 times 160 is a million.

1      It is apparently hard to grasp until you actually see it with

2   a calculator.  A million seems a lot of money, but it is not.  To

3   make $100,000 from a business with a 10 percent margin, you're

4   going to have to generate revenue of a million, and to be able to

5   pay 100 -- sorry, a million, you must generate a million.

6   Otherwise, you're in the hole.  You cannot go like that for even

7   two weeks.  So you're trying to stay afloat anyhow you can.

8      And this number is a three-month number, it's quarterly.

9   It's 975 divided by three is 380-something.  So 48 times --

10  Q   325,000.

11  A   Okay.  48 times 40 times 160 is 325,000.  So that's an

12  extremely gross calculation.  That is nowhere near to actual

13  accounting and bookkeeping.  I'm talking about basic tables and

14  all of this.  If you ever seen a payroll journal, how complicated

15  it is and how many pages per person it is and how long it takes

16  for accountants and bookkeepers to get it done, to reach that

17  simple math that I just gave you, there's a massive amount of

18  work behind that number, and these numbers definitely just don't

19  pop out.

20  Q   Okay.

21  A   Like --

22  Q   Are there fluctuations in business, particularly, you know,

23  in construction-type work?

24  A   Definitely.  I mean, especially in my situation, if you think

25  about my history, that I started out as a doctor.  I'm still a

1  doctor.  I will be a doctor until I die.  Okay.  I'm a very

2  scholarly person.  I will stay in the profession.

3      But if you see the transition on how it happened, there are

4  quarters I dealt with like maybe six guys.  But my connections

5  and network are there.  There is still need there.  If somebody

6  needs their MIL converted into a living place, six months later,

7  they still need it.  They're still there.  They're not going

8  anywhere.  I'm not losing the work because I'm not jumping into

9  it.

10     So, in one quarter, I may have done nothing.  In another

11 quarter, yes, I started different.  Now, if you sit down there

12 and pick up one number from one quarter, say 325,000, say you

13 pick up one number from a document, multiply that with four,

14 because you are trying to reach a yearly number, right?  Multiply

15 that with six, because now you are at six businesses -- five

16 construction, one medical -- yeah, 4 million.

17     Make a pie chart.  Wow, how did you get $4 million to pay?

18 Like, where does $4 million come from cash?  Right?  So anybody

19 can make a pie chart like that.  And I can pull a pie chart like

20 that.  I'm right now in a cell, solitary confinement, cannot

21 reach phone or anybody.

22         MR. WERNER:  Objection, Your Honor.

23         THE COURT:  Sustained.

24     Let me see counsel at sidebar.

25                    (Off-the-record sidebar.)

1    Q    (By Mr. Nance:)  Mr. Shibley, are you still delinquent on

2    your taxes at this point?

3    A    (No audible response.)

4    Q    Do you still the owe the government money?

5    A    Yes.  I'm big-time delinquent.

6    Q    And are you in any position to pay them at this point.

7    A    No, I'm not in a position to pay even anything at this point.

8    Q    Okay.

9              MR. NANCE:  Thank you very much.

10             THE COURT:  You know, counsel, I wouldn't be

11   particularly adverse to adjourning for the day and crossing in

12   the morning.

13             MR. WERNER:  That would be a good point.

14             THE COURT:  Would any of you object to that?  I didn't

15   see any objection.

16        All right.  We will start up again tomorrow morning at 9:00.

17   We will be in recess.

18             THE CLERK:  Please rise.  Court is in recess.

19                       (Adjourned.)

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3        I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

 4    United States District Court in the Western District of

 5    Washington at Seattle, do certify that the foregoing is a correct

 6    transcript, to the best of my ability, from the record of

 7    proceedings in the above-entitled matter.

 8

 9

10                         /s/ Nickoline Drury

11                         Nickoline Drury

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```