1    UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____

                                    )
4    UNITED STATES OF AMERICA,       ) CR20-00174
                                    )
5                   Plaintiff,       ) SEATTLE, WASHINGTON
                                    )
6    v.                              ) November 18, 2021 -
                                    ) 9:00 A.M.
7    ERIC SHIBLEY,                   )
                                    )
8                   Defendant.       ) TRIAL - DAY 4
                                    )
9    _____

10              VERBATIM REPORT OF PROCEEDINGS
11       BEFORE THE HONORABLE JOHN C. COUGHENOUR
                UNITED STATES DISTRICT JUDGE
12   _____

13

14   APPEARANCES:

15    For the Plaintiff:      Brian Werner
                             Assistant United States Attorney
16                            700 Stewart Street, Suite 5220
                             Seattle, WA  98101
17
                             Laura Connelly
18                            U.S. Department of Justice
                             Criminal Division
19                            1400 New York Avenue N.W., RM 10100
                             Washington, D.C. 20530
20

21    For the Defendant:      Michael Nance
                             Attorney at Law
22                            P.O. Box 11278
                             Bainbridge Island, WA 98110
23

24

25

Proceedings stenographically reported and transcript produced with computer-aided technology

1                        EXAMINATION INDEX

2    EXAMINATION OF                                      PAGE

3    ERIC SHIBLEY        CROSS-EXAMINATION               560
                         BY MR. WERNER
4                        REDIRECT EXAMINATION            618
                         BY MR. NANCE
5                        RECROSS-EXAMINATION             620
                         BY MR. WERNER
6

7

8                          EXHIBIT INDEX

9

10   EXHIBITS ADMITTED                                   PAGE

11    98                                                 590

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Ready for the jury?

 2              MR. WERNER:  Your Honor, the government would like to

 3    renew its request to admit evidence of Mr. Shibley's license

 4    being revoked by the State of Washington, based on his testimony

 5    at the end of the day yesterday.

 6              THE COURT:  I'm going to deny the motion.  I think it's

 7    of very marginal probative value, and the prejudice under 403

 8    outweighs what marginal probative value exists.

 9         I understand from Mr. Gabe, Mr. Nance, that you're agreeable

10    to the forfeiture issue, depending upon the verdict?

11              MR. NANCE:  Be decided by the court?

12              THE COURT:  Yeah.

13              MR. NANCE:  If there's a verdict the wrong way.

14              THE COURT:  All right.  Thank you.  So bring in the

15    jury.

16         (The following occurred in the presence of the jury.)

17              THE COURT:  Please be seated.

18                            ERIC SHIBLEY,

19         previously sworn, resumed and testified as follows:

20                          CROSS-EXAMINATION

21    BY MR. WERNER:

22    Q    Hello.

23    A    Hello.

24    Q    Mr. Shibley, yesterday we talked about how you moved to the

25    United States from Bangladesh.  Do you recall that?
```

 1    A    Yes.

 2    Q    And you became licensed as a doctor in the United States,

 3    correct?

 4    A    Yes.

 5    Q    You also became a citizen of the United States, correct?

 6    A    Yes.

 7    Q    Today, I'm going to ask you some questions about your PPP and

 8    EIDL applications.  Okay?

 9    A    Yes.

10    Q    I want to show you what's been admitted as Government's

11    Exhibit 205.

12         Mr. Shibley, this is the first page of Government's 205 on

13    the screen.  Do you see that?

14    A    Yes.

15    Q    I'm going to ask Mr. Arnold to go to the second page.

16         Do you see the second page?

17    A    Yes.

18    Q    Mr. Shibley, you sent in all of the applications that are on

19    this exhibit, correct?

20    A    I believe so.

21    Q    You filled out the applications online, correct?

22    A    I believe so.

23    Q    And you hit "send" to the bank, correct?

24    A    Yes.

25    Q    Okay.  And on each of one of these applications, you

 1   certified that the information was true and accurate, correct?

 2   A   Yes.

 3   Q   Okay.  And your testimony yesterday was that the information

 4   on these applications was true and accurate?

 5   A   Yes.

 6   Q   And the reason you know, or the reason you testified that

 7   everything is correct on these applications, is because you

 8   filled it out, right?

 9   A   Yes.

10   Q   Could we look at page 3 of this exhibit, please?

11       Do you see page 3 of the exhibit, with the EIDL applications?

12   A   Yes.

13   Q   And, Mr. Shibley, you completed all 13 of these EIDL

14   applications, correct?

15   A   Yes.

16   Q   And you submitted them to the SBA, correct?

17   A   Correct.

18   Q   And it's your testimony that everything on these EIDL

19   applications was true and correct?

20   A   Yes.

21   Q   And the reason you're saying that is because you filled them

22   out, correct?

23   A   Correct.

24   Q   Let's go to Exhibit 3, please, page 1.  Could we do the top

25   half, please?

1      Mr. Shibley, this is a PPP application for a business called

2  Dituri Construction, correct?

3  A    Correct.

4  Q    And this is a PPP application that you filled out, correct?

5  A    Correct.

6  Q    That you signed as true and accurate?

7  A    Yes.

8  Q    And the average monthly payroll that you put on this form is

9  $392,000, correct?

10 A    Yes.

11 Q    Was that the average -- is it your testimony that the average

12 monthly payroll for a business called Dituri Construction was

13 $392,000?

14 A    Yes.

15 Q    Let's look at Exhibit 4.  Mr. Shibley, do you see Exhibit 4?

16 A    Yes.

17 Q    This is a PPP application for the same business, Dituri

18 Construction, right?

19 A    Right.

20 Q    And you filled out this application?

21 A    Yes.

22 Q    You certified that it was true and accurate?

23 A    Yes.

24 Q    And you listed monthly payroll of Dituri Construction, on

25 this application, as $225,400, correct?

1    A    Correct.

2    Q    Was that true and accurate?

3    A    Yes.

4    Q    Let's look at the date of this application, the $225,400

5    application.  Could we go to the second page, please?  Third

6    page, please.

7         Mr. Shibley, you said that the monthly payroll of Dituri

8    Construction was $225,400 on April 30th, 2020, correct?

9    A    Correct.

10   Q    Let's go back to Exhibit 3, page 1.

11        And, again, this is another PPP application for Dituri

12   Construction, with an average monthly payroll of $392,000.  Could

13   we go to the signature page on this one, Mr. Arnold?

14        And you signed this on May 2nd, 2020, correct?

15   A    Correct.

16   Q    And it's your testimony that both of these applications are

17   true and correct?

18   A    Correct.

19   Q    It's the same business, right?

20   A    Yes.

21   Q    The same number of employees on both applications?

22   A    It seems like.

23   Q    And you didn't only fill out two different application forms,

24   you also put in two different Form 941s, correct?

25   A    Correct.

1   Q    Those also had the two different monthly payrolls, correct?

2   A    Correct.

3   Q    And, again, is it your testimony that both were true and

4   accurate?

5   A    Yes.

6   Q    This is the PPP -- let's go to Exhibit 1, please, Mr. Arnold,

7   page 5.  Start with -- I'm sorry, start with Exhibit 1, page 1.

8        It's a PPP application for the A Team Holdings, do you

9   remember this?

10  A    Yes.

11  Q    You signed this application indicating that everything was

12  true and correct?

13  A    Yes.

14  Q    And you indicated that the A Team Holdings had 48 employees?

15  A    Yes.

16  Q    And you signed on page 6 of this application?

17  A    Yes.

18  Q    April 15th, 2020.  Correct?

19  A    Correct.

20  Q    And you filled out an EIDL application for the same business,

21  A Team Holdings, right?

22  A    Yes.

23  Q    Let's go to -- let's go to Exhibit 39.  We should do the

24  top -- there.  Could we get a little more, please, Mr. Arnold, so

25  we can see the date?  There we go.

1          And this is Exhibit 39.  Correct, Mr. Shibley?

2     A    Correct.

3     Q    A Team Holdings.  The same business, right?

4     A    Yes.

5     Q    And this application was filled out on March 31st, 2020?

6     A    Correct.

7     Q    And if we go to the bottom quarter of the page, please, how

8     many employees did you say it had, on line 33?

9     A    Four.

10    Q    And that's different than how many employees you said on the

11    PPP application, right?

12    A    Yes.

13    Q    But is it your testimony that this statement you made to the

14    SBA on March 31st, 2020, is true and correct?

15    A    Correct.

16    Q    You were served with a subpoena on June 10th, 2020.  Do you

17    recall that?

18    A    Yes.

19    Q    And you testified yesterday that you remember that day.

20    A    I remember that day, yes.

21    Q    The subpoenas asked for information about your businesses,

22    correct?

23    A    Correct.

24    Q    They asked for payroll records, right?

25    A    Right.

 1   Q    They asked for lists of employees, right?

 2   A    Right.

 3   Q    And you responded to that subpoena, correct?

 4   A    Correct.

 5   Q    And you gave the documents that have been admitted in this

 6   court as Exhibit 225, right?

 7   A    Right.

 8   Q    But this response didn't contain any employee names, did it?

 9   A    It did not.

10   Q    Didn't contain any payroll records, did it?

11   A    It did not.

12   Q    It didn't contain any time sheets?

13   A    It did not.

14   Q    And the subpoenas also asked for receipts, to see how much

15   your businesses were making, right?

16   A    Yes.

17   Q    And you didn't provide any receipts?

18   A    I did not.

19   Q    You didn't provide any invoices for your company?

20   A    I did not.

21   Q    Because those documents didn't exist, right?

22   A    No.

23   Q    The documents -- again, you did not provide invoices?

24   Correct?

25   A    Yes.

1    Q    Because you didn't create invoices for these companies.

2    A    I am not the person who does that.

3    Q    Right.  You don't create invoices for the company, Dituri

4    Construction?

5    A    Are you asking personally?

6    Q    I'm asking -- yes.  I'm asking, did Dituri Construction

7    produce invoices?

8    A    Yes.  It does.

9    Q    It does produce invoices?

10   A    Yeah.

11   Q    And SS1 LLC creates invoices?

12   A    Yes.

13   Q    And you did not -- but you did not turn them over, in

14   response to the subpoena?

15   A    I did not.

16   Q    You did not?

17   A    Yes.

18   Q    You responded to the subpoena, correct?

19   A    Yeah.  I had to.

20   Q    You had to.  And you were required to produce invoices.

21   A    It's -- certain laws apply on that.  Like, I had to research

22   the United States Code behind it.

23   Q    You responded to the subpoena through your attorney, correct?

24   A    Yes.

25   Q    Your attorney actually responded on your behalf, right?

1    A    Right.

2    Q    So the attorney would be in charge of -- if there was any

3    laws that prevented responding?

4    A    Of course.

5    Q    So you didn't -- again, you didn't produce any employee names

6    for the business Dituri Construction, right?

7    A    Right.

8    Q    Because you didn't -- because you didn't keep those employee

9    names, right?

10   A    Me, or my business?  I mean --

11   Q    Your business.  I'm asking about the business.  The business

12   didn't keep those names?

13   A    No.  They did keep those names.

14   Q    But didn't turn them over as part of the subpoena response?

15   A    Didn't turn them over, because -- okay.  Didn't turn them

16   over, yes.

17   Q    Didn't turn them over -- because, again, you failed to turn

18   them over.

19   A    I chose not to.

20   Q    You chose not to turn them over.

21        So is it now your testimony, Mr. Shibley, that you had

22   payroll records for Dituri Construction and SS1 LLC?

23   A    Yes.

24   Q    You had payroll records?

25   A    I'm trying to understand.  Are you asking me, as a person?

1   Q   Yes.  I'm asking you, yes.  I'm asking you as a person,

2   Mr. Shibley.

3   A   Personally?

4   Q   Yes.

5   A   I, personally, do not keep these records.

6   Q   Your business keeps the records?

7   A   My business does.

8   Q   And you -- but you are who's in charge of your business.

9   A   I'm the business owner.  So it has to be me, in charge.

10  Q   Right.  Did you testify yesterday that there's a military

11  hierarchy in your business?

12  A   Yes.

13  Q   Who's at the top of that hierarchy?

14  A   Me.

15  Q   Who got served with these subpoenas?

16  A   Me.

17  Q   And who responded to these subpoenas?

18  A   Me.

19  Q   Who failed to produce these so-called payroll records?

20  A   I don't think I failed to produce anything that I was

21  required to produce, according to your subpoena.

22  Q   Your testimony is that you had about 150 different employees,

23  prior to the pandemic; is that right?

24  A   Yes.

25  Q   And you didn't turn in those -- you didn't turn in payroll

1    records for those employees?

2    A    I did not.  And there's good reason behind it.

3    Q    Did you contact the site managers after you received these

4    subpoenas, and -- did you contact the site managers?

5    A    I was in contact with them, yes.

6    Q    Did they turn in -- did they give you the records of the

7    names?

8    A    They don't -- it doesn't go through me.  If I have the

9    opportunity to explain how it happens.

10   Q    Is there someone -- I would like to ask the questions.  But

11   are you testifying that there is someone between the site manager

12   and you in this hierarchy; is that your testimony?

13   A    Yes.

14   Q    Is that a supervisor?  What's the name of that position?

15   A    No.  It's the professional who deals with that, the

16   bookkeepers, CPAs, accountants.  They handle this.

17   Q    And you contacted your bookkeepers to get their response to

18   this subpoena?

19   A    Of course I did.

20   Q    This is what they provided?

21   A    They -- I contacted my attorney as well.

22   Q    Tell me -- don't say what you said to your attorney.

23   A    Okay.

24   Q    That would be improper.  But what I'm asking about is the

25   bookkeepers.  You're in charge of the bookkeepers, correct?

1   A   Yes.  I contacted them, yes.

2   Q   This is what you got back; is that right?

3   A   No.  That's not what I got back.  No.

4   Q   So why did you -- is it your testimony that you withheld

5   payroll records in response to the subpoena?

6   A   I did not withheld.  I was of the understanding, according to

7   the advice that I got, that that paper that you served me did not

8   call for what was existing at the time in my possession.  What I

9   mean by that is, I'm only required to produce things that I

10  possess at the time available, existing documents that I possess.

11  If I'm not the record custodian of something, I believe that

12  you're essentially barking up the wrong tree, you have to

13  subpoena the accountant, which I don't think that happened.

14  Q   So another thing that was in there that was requested in

15  these subpoenas was a list of accountants.  Do you remember that?

16  A   Yes.

17  Q   You turned over a correspondence with Mario Davis.  Do you

18  remember that?

19  A   I think so.

20  Q   But you didn't turn over the list of these accountants.

21  That's not in this Exhibit 225, is it?  No one other than Mario

22  Davis is in this subpoena return, Exhibit 225.

23  A   Yeah, Mario was in the process of filing all the taxes at the

24  time.

25  Q   Not on June 10th, but afterwards, you contacted Mr. Davis,

1   right?

2   A    I believe so, yeah.

3   Q    So again, the subpoenas were addressed to your businesses?

4   A    Yes.

5   Q    You are in charge of your businesses?

6   A    Yes.

7   Q    The bookkeepers work for you?

8   A    Yes.

9   Q    And if they had records, it was your responsibility to get

10  them?

11  A    If I'm legally required to do so.

12  Q    So your testimony has been that you had 150 employees,

13  correct, before the pandemic?

14  A    It's give and take.  I think the accurate number would be 52

15  or 56.  I'm not sure what the correct number was there.

16  Q    You mean 152 or 156?

17  A    Yes.

18  Q    Okay.  But, again, we agree that there are no payroll records

19  in this subpoena response?

20  A    Nothing was provided in response to the subpoena that was

21  drafted.

22  Q    Okay.  And, again, these 152 to 156 employees had $1 million

23  in payroll a month, prior to the pandemic.  That's your

24  testimony, correct?

25  A    Prior to the pandemic, yes.

1   Q    You talked a little bit yesterday about how you got there,

2   about how you arrived at that million-dollar number.  You said

3   that your workers are paid $40 an hour, correct?

4   A    I did a very, very gross calculation.  That number is just an

5   average, and for the purpose of kind of giving an idea.  It's

6   not -- I'm not saying that everybody got $40 an hour.  That's not

7   how it works.  People have different skills, different rates.

8   There is some people are -- there is differences.  It's not like

9   everybody $40 an hour.

10  Q    So your testimony is that some people made more and some

11  people made less?

12  A    Yes.

13  Q    But you said most of your workers made $40 an hour; is that

14  fair?

15  A    I'm speaking average amount.  I just picked up a number

16  yesterday.  That's how I was explaining.  I was asked to ask -- I

17  was asked to explain a number.  So I was doing my best to explain

18  it.

19  Q    And you explained it by saying that $40 an hour, times 160

20  hours a month --

21  A    Yes.

22  Q    -- comes up with about $6,400 for a month?

23  A    Times 156, is a million.

24  Q    Right.

25  A    Yes.

1  Q   So that's -- that's how you came up with the payroll in this

2  case.  That's how you support the million dollars, right?

3  A   That's not how the number came.

4  Q   That's not how the number came?

5  A   That was the explanation yesterday, while I'm sitting here,

6  without the background documents, the payroll journals and actual

7  tables.  That's all -- that's the extremely simplified

8  explanation.  I cannot be saying that that's, like, pinpoint.

9  Q   Well, those applications are pinpoint, that's your testimony,

10  right?  Those applications are accurate, those PPP applications?

11  A   Yeah.  Those are accurate.

12  Q   Forty-nine employees for Dituri Construction?

13  A   There is 49.

14  Q   Absolutely accurate?

15  A   Absolutely.

16  Q   $225,000 in payroll a month on April 30th, right?  Yes or no?

17  Yes?

18  A   Yes.

19  Q   $392,000 in payroll on May 2nd, right?

20  A   Yes.

21  Q   Okay.  But, again, none of those employee names, none of

22  those 49 employees names are in this subpoena response, right?

23  A   Yes.

24  Q   The number is 48 employees for A Team Holdings, correct?

25  A   Yes.

 1    Q    A monthly payroll, again, of almost $400,000 a month?

 2    A    Yes.

 3    Q    No payroll records in this -- in Exhibit 225, correct?

 4    A    No payroll records were provided to you at the time, yes.

 5    Q    These PPP applications contained tax forms, right?

 6    A    Yes.

 7    Q    And you filled out those tax forms, right?

 8    A    I filled out those tax forms?

 9    Q    Yeah.

10         Well, let's show you one.  Exhibit 5, page 7.  Can we get the

11    whole thing in, please, Mr. Arnold?

12         This is a form W-3 provided to Harvest Finance for SS1 LLC.

13    Do you see that, Mr. Shibley?

14    A    Yes.

15    Q    You filled out this document, correct?

16    A    Not personally.

17    Q    Whose signature is there?

18    A    My signature.

19    Q    Let's -- but your testimony is someone else filled out this

20    document?

21    A    Yes.

22    Q    How many total -- can you look at this?  How many number of

23    forms W-2?

24    A    Forty-one.

25    Q    Who put that number there?

 1    A    Bookkeeper.

 2    Q    Bookkeeper?

 3    A    Yes.

 4    Q    Who turned over the forms W-2 to the IRS?

 5    A    The tax professional is supposed to do that.  I don't know if

 6    it happened or not.

 7    Q    But you do, because the IRS has no records of any W-2s.

 8    A    Yes, it got reviewed.  Yes.

 9    Q    So your testimony, Mr. Shibley, is that somebody else filled

10    out this form?

11    A    Yes.

12    Q    And somebody else was responsible for sending 41 forms W-2 to

13    the IRS?

14    A    Yes.

15    Q    And somebody else reported that SS1 LLC paid out $538,000 in

16    wages in 2019?

17    A    Yes.

18    Q    Somebody else said that social security tax and Medicare

19    taxes was withheld from those wages?

20    A    Yes.

21    Q    Why would someone say, that when you told us yesterday that

22    you pay your employees in cash?  I'm sorry, strike that.

23         You pay your employees in cash, correct?

24    A    Yes.

25    Q    And you don't withhold Medicare tax, right?

1    A    I -- I don't withheld Medicare?  That's not right.

2    Q    When you pay an employee, you hold back the taxes that belong

3    to the government; is that right?

4    A    Yes.

5    Q    And you submit those taxes to the IRS?

6    A    That's the way it works.

7    Q    But the IRS did not receive money from these businesses, did

8    not receive Medicare, social security tax?

9    A    Various reasons behind it.

10   Q    So, again, your testimony is that this money was, in fact,

11   withheld?

12   A    Yes.

13   Q    But the money was not paid to the IRS?

14   A    Yes.

15   Q    And your testimony is that it's true that SS1 LLC paid out

16   $538,000 in 2019?

17   A    Yes.

18   Q    On the dot?

19   A    On the dot means, like -- I have to rely on what's in the

20   paper.  I mean, I don't crunch those numbers.  I don't plug those

21   numbers in the form.  I do not calculate these.  The calculations

22   are done by bookkeepers, and a CPA firm.

23   Q    Who signed this?  You signed this?

24   A    I signed it.

25   Q    Let's go to Exhibit 8, page 7, please.

1      Mr. Shibley, this is another form W-3 for one of your

2  businesses, right?

3  A    Right.

4  Q    And you signed this form?

5  A    Yes.

6  Q    And this form indicates that six W-2s were sent?

7  A    Yes.

8  Q    And this form indicates that social security tax and Medicare

9  tax were withheld?

10 A    Yes.

11 Q    This form is filled out April 24th.  That's 2020, right?

12 A    I believe so, yes, it should be.

13 Q    And you completed this form; isn't that right?

14 A    I signed it.  I didn't do this form.

15 Q    Someone else made this -- put the numbers in this form; is

16 that your testimony?

17 A    Yes.

18 Q    Someone else put the date 202020 in there?

19 A    I believe so.

20 Q    And this isn't filed with the IRS, is it?

21 A    That is what I know now, yes.

22 Q    Let's look at Exhibit 5, page 5.  If we can just do the top

23 half, please, Mr. Arnold.

24      Now, this is a Form 941 for 2020, for SS1 LLC.  Do you see

25 this, Mr. Shibley?

 1    A    Yes.

 2    Q    And this claims that SS1 LLC has 41 employees, right?

 3    A    Right.

 4    Q    $656,000 in wages, correct?

 5    A    Correct.

 6    Q    And this form was completed by you?

 7    A    No.

 8    Q    Well, let's look at the second page.  Let's blow out the

 9    bottom.

10         Who signed this form?

11    A    Me.  I signed.

12    Q    And who dated this form?

13    A    I dated it.

14    Q    That's your phone number?

15    A    Yes.

16    Q    And the paid preparer section down here, do you see that?

17    A    Yes.

18    Q    That's blank, right?

19    A    Yes.

20    Q    But, again, I'm going to ask you one more time.  Did you

21    prepare this Form 941?

22    A    No.

23    Q    Are the numbers in the Form 941, 41 employees, $656,000 in

24    payroll, are those numbers true and accurate?

25    A    To the best of my knowledge, yes.

 1   Q    And the money due to the IRS, you never paid that money over
 2   to the IRS, right?
 3   A    I believe it's not paid.
 4   Q    You didn't even file this form with the IRS, right?
 5   A    I don't file.  I have no way to file those, personally.
 6   Q    You told the banks that you had filed these forms, didn't
 7   you?
 8   A    No.  Never.
 9   Q    Well, you are trying to make the banks think that you filed
10   these forms.
11   A    Never.  I told the bank, every time -- and you have recorded
12   statement from undercover agents -- I told them very clearly,
13   these are not filed.
14   Q    Let's look at Exhibit 53, please.  Let's look at that top
15   e-mail, please.
16        This is an e-mail that you sent.  Right, Mr. Shibley?
17   A    Yes.
18   Q    And you sent it to BECU, correct?
19   A    Correct.
20   Q    And you wrote, "I corrected the PPP application to change the
21   loan amount, based on the actual numbers in tax filings, which is
22   attached."  Do you see that?
23   A    Yeah.
24   Q    You're telling the bank that the tax filing that is attached
25   to this e-mail as part of Exhibit 53, you are telling them that

1   that's filed?

2   A   I'm not telling them that it's filed, it's a vocabulary

3   issue.

4          THE COURT REPORTER:  I'm sorry?

5          THE WITNESS:  Vocabulary issue.

6   Q   Vocabulary issue.  Are you saying it's a "vocabulary issue"?

7   A   Sorry for my accent.

8       I'm not saying that those are filed in this statement.

9   Q   You are calling it a tax filing.

10  A   I'm calling it something -- I could have called it five other

11  things.

12  Q   But you chose to call it a tax filing, correct?

13  A   Correct.  Yes.  But I did not mean that I filed those forms

14  by saying that.

15  Q   You didn't write in this e-mail that you did not file those

16  forms, those forms weren't filed, correct?  That's not in this

17  e-mail.

18  A   Of course not.  I don't say it, yes.

19         MR. NANCE:  Objection, Your Honor.  The e-mail says what

20  it says.

21         THE COURT:  Overruled.

22  Q   You did not write in this e-mail that that Form 941 was not

23  filed?

24  A   I --

25  Q   Correct?

1    A    Yes.  Correct.

2    Q    Because you were trying to deceive BECU, weren't you?

3    A    Absolutely not.

4    Q    You told them a half-truth, wouldn't you say?

5    A    No.

6    Q    The whole point of these tax forms being sent to the bank was

7    to make it look like your companies were filing taxes -- taxes

8    with the IRS, right?

9    A    I never tried to make it look like anything.  I called them.

10   I was in contact with them.  They called me.  I made it clear,

11   every time they asked me about filings, I told them these are not

12   filed.

13   Q    You told BECU they weren't filed, in this e-mail?

14   A    I never -- I don't recall ever talking with a live person,

15   because this application didn't go anywhere, obviously.  There

16   was no -- the way it works is that you --

17   Q    Is it -- Mr. Shibley, is it your testimony that you were

18   truthful and honest in all your dealings with the banks and

19   lenders in this case?

20   A    Absolutely.

21   Q    Do you recall sending an e-mail to Harvest, with ten employee

22   names for SS1 LLC?

23   A    Yes.

24   Q    And Harvest Finance is the SS1 loan for $820,000, right?

25   A    Right.

1   Q   Let's look at Exhibit 48, page 3.

2       And this is the e-mail, Exhibit 48, page 3, this is the

3   e-mail that you sent to Harvest, correct?

4   A   Yes.

5   Q   So is it your testimony that these ten people worked for SS1

6   LLC?

7   A   Yes.

8   Q   That's your SS1 LLC crew?

9   A   They worked on the ground, yes, at the time.

10  Q   Let's look at Exhibit 50, page 1.  You also sent in a list of

11  employee names to Celtic Bank.  Do you remember?

12  A   Yes.

13  Q   And these are the names you sent in to Celtic Bank, correct?

14  A   Correct.

15  Q   And for Celtic Bank, that was a loan for Dituri Construction,

16  right?

17  A   Right.

18  Q   $563,500, right?

19  A   Right.

20  Q   You sent in the same names, didn't you?

21  A   I did.

22  Q   Is it your testimony that these names that are in Exhibit 50,

23  that they worked for the Dituri Construction?

24  A   Yes.

25  Q   They're a part of that crew?

1    A    They're interchangeable.

2    Q    Mr. Shibley, you told us yesterday that your crews are

3    separate, didn't you?

4    A    Yes.  They're separate.  However, the bookkeeper decides who

5    is belonging to which company.  And I, at that time -- this

6    happened in the same day.  These two e-mails, if you look at the

7    time, is the same day, probably in the same hour.  And --

8    Q    But it's -- so your testimony is that these are employees of

9    Dituri Construction and employees of SS1 LLC?

10   A    See, I'm trying to clarify.  I'm not double counting the

11   employees here.

12   Q    Mr. Shibley, you don't have employees, do you?

13   A    That's not true.  I have employees.  I had -- you keep saying

14   nothing exists.

15   Q    Mr. Shibley, again, it's your testimony that you did not

16   deceive Celtic Bank by this e-mail; is that correct?

17   A    Absolutely did not deceive Celtic, or any other bank.

18   Q    So this loan, this $563,500 loan, Mr. Shibley, that's the

19   same money that you went into the Tukwila branch to try to

20   withdraw from BECU, correct?

21   A    Yes.

22   Q    That's when you told Mr. Mondala -- or later you told Mr.

23   Mondala that the reason you needed to withdraw it in cash was

24   because your employees don't have social security numbers, right?

25   Yes or no, that's what you told him?

1   A    It's a mischaracterization -- mischaracterization of what I

2   told him.

3   Q    Did you talk to Mr. Mondala?

4   A    Yes.

5   Q    And did you tell Mr. Mondala you wanted to withdraw it in

6   cash?

7   A    Yes.

8   Q    And did you tell Mr. Mondala you wanted to withdraw it in

9   cash to pay your employees?

10  A    Yes.

11  Q    And did you say that the reason you needed to withdraw it in

12  cash is because your employees don't have social security

13  numbers?

14  A    That is not the primary reason.

15  Q    Did you say that the reason -- did you say that a reason you

16  wanted to withdraw the money in cash, is because your employees

17  don't have social security numbers?

18  A    I don't think that's how it came out, no.  That's not how it

19  came out.

20  Q    So there's a different reason -- you are testifying now

21  there's a different reason -- or, I'm sorry, you are testifying

22  now that you didn't say that to Mr. Mondala?

23  A    I say that in a different conversation, not in the

24  perspective of what -- how you are presenting it.

25  Q    Okay.  Because you are here -- because you see what I'm

1  driving at.  You see here that you are offering social security

2  numbers for supposed Dituri Construction employees?

3  A   Yeah.

4  Q   You see how that's inconsistent with what you told Mr.

5  Mondala, right?

6  A   It is not inconsistent.  Mr. Mondala and I spoke, had a brief

7  conversation.  And in the conversation, at some point, during the

8  conversation, there was a question about social security numbers.

9  And I say that it's hard to track those things, and --

10  Q   But it wasn't hard to track here, because when you thought

11  you were going to get the money, you came up with social security

12  numbers, right?

13  A   I came up with -- I was asked to provide a couple of names.

14  Q   Right.  And the reason you did it is because you thought you

15  were going to get this $563,000, right?

16  A   I was already told that the money would be there tomorrow.

17  Q   Once you gave these names, right?

18  A   I was under the impression that they're sending the money the

19  next day, anyway.

20  Q   Once you gave the names?

21  A   I'm not sure whether it was contingent on that.  I talked to

22  them around 12 -- noon that day.

23  Q   Well, the money -- you didn't have the money at this point in

24  time, right?  They wouldn't give it to you.

25  A   No.  That was not the situation.

1   Q    They wouldn't let -- BECU wouldn't let you withdraw that

2   money in cash, right?

3   A    Would not let me withdraw that money in cash?

4   Q    Mr. Shibley, you'll say different things about your

5   businesses at different times, won't you?

6   A    I do not say different things.  I'm saying that BECU --

7   Q    Mr. Shibley, did you apply for unemployment with the State of

8   Washington?

9   A    There was a CARES Act payment for businesses at the time.

10  Q    You initially applied for state -- with the state, though,

11  correct?

12  A    There was a funding approved for non-employees,

13  self-employed, and business owners at the time, for under CARES

14  Act.  I believe that that was a short funding.  And that

15  Washington State Employment Security Department was in charge of

16  disbursing it.  It was not their money, as far as I know.

17  Q    Right.  Right.  You listened to the testimony earlier --

18  A    Yes.

19  Q    -- during this trial.

20       But initially your application was processed to see whether

21  or not the state would give you money.  Do you recall that?

22  A    I do not try to take state money, it is federal money.

23  Q    You did take federal money, correct?  You got pandemic

24  unemployment assistance, right?

25  A    Yes.  That was part of the CARES Act, yes.

 1   Q   You told -- in connection with that application, you said you
 2   were laid off from your job at the doctor's office, right?
 3   A   The question, the way it was asked, are you working or not?
 4   At that time I could not run anything, I was under the order to
 5   stop working, by the Governor.
 6   Q   Call up the bottom of page -- actually, let's look at the
 7   whole page here.  It has been admitted as Government's
 8   Exhibit 87.
 9       These are the business records of Employment Security.  And
10   in these records, Mr. Shibley, you listed that you were laid off
11   from Eric Shibley MD, and you are on a leave of absence from ES1
12   LLC.  Do you see that?
13   A   The answer to the question depends on the question itself.
14   If you ask me if I'm working or not, what it really means, at
15   that time my office was closed.
16   Q   Mr. Shibley, I'm going to show you what's been marked, but
17   not admitted, as Exhibit 98.  Do you see that there, Mr. Shibley?
18   A   Yes.
19   Q   Look at the second page, please.
20       Did you sign this document, Mr. Shibley?
21   A   I believe so.
22   Q   Did you send it in to the Employment Security Department?
23   A   Yes.
24           MR. WERNER:  Offer Exhibit 98.
25           MR. NANCE:  No objection.

```
 1              THE COURT:  Admitted.
 2                   (Exhibit No. 98 admitted.)
 3   Q   Can we go to page 1, please?
 4       Mr. Shibley, this is a document that you sent in to the
 5   Employment Security Department, correct?
 6   A   Correct.
 7   Q   And your signature is on the second page?
 8   A   Correct.
 9   Q   And you -- thank you.
10       And you're reporting here, to the Employment Security
11   Department, that you worked 680 hours the first quarter of 2020,
12   right?
13   A   I believe that's what was reported here.
14   Q   And that was a magic number with Employment Security, right,
15   that's what you made you qualify for benefits?
16   A   680 was the cutoff, yes.
17   Q   Right.  You are reporting $20,500 in wages, correct?
18   A   That's what I see reported, yes.
19   Q   You filled that out, right?
20   A   Oh, yeah.  This one is mine.
21   Q   And you said that the wages will be reported to the State of
22   Washington?  Right here.
23   A   Yeah.  That's what I said, yes.
24   Q   But you didn't do that, did you?
25   A   The people who does this reporting is not me.
```

1    Q    So the answer is, no?

2    A    I personally didn't do it.

3    Q    You didn't do it?

4    A    No.

5    Q    So, Mr. Shibley, you didn't report any employee -- you didn't

6    turn over any employee names, in response to the subpoena.  But

7    you have shown us Exhibit A-1 with some driver's licenses,

8    identification cards.  Do you remember looking at that yesterday?

9    A    Yes.

10    Q    And let's call up Exhibit A-1, maybe page 2 in our system.

11    Let's go to page 2, please.  And let's go to page 3.  I'm sorry,

12    I should publish this.  So this is what's been admitted as

13    Exhibit A-1.  Let's go up to page 2, in our system.  I think it's

14    on the first page of the exhibit.  Go down to page 3, please.

15    Page 4.

16        Is it your testimony that every person with a driver's

17    license in Exhibit A-1, that they were your employee?

18    A    I believe so.

19    Q    I understood your testimony to be that you took pictures of

20    these licenses.  You took these pictures, right?

21    A    These licenses -- these pictures were found in one of my cell

22    phones.

23    Q    And you took these pictures?

24    A    It has to be me, yes.

25    Q    Is it your testimony that you collect a driver's license from

 1   every employee?

 2   A   Yes, I do.

 3   Q   And there are about how many driver's licenses in Exhibit

 4   A-1?

 5   A   I believe I gave you 40 names out of that driver's licenses

 6   that could be --

 7   Q   No, Mr. Shibley, you didn't provide any of this in

 8   response --

 9   A   I'm still replying.

10       The driver's license was provided -- I didn't count, I mean,

11   if you count --

12   Q   Well, that's fair, Mr. Shibley.  This isn't a math test.

13       These pictures -- some of these pictures were actually taken

14   after the charges in this case; isn't that right?

15   A   Could be.  I don't recall.

16   Q   Let's look at the next page, please, Mr. Arnold.

17       This picture, in particular, this picture was actually taken

18   in August, correct?  August 2020.

19   A   I do not have a way to verify when.

20   Q   Is there anything that would refresh your recollection?  If I

21   showed you the picture in native format, would that help you

22   refresh your recollection, this was taken August 21st, 2020?

23   A   I know the person.  But I have no way to remember exactly

24   which date I took the pictures.

25   Q   But do you agree that some of these pictures were taken after

1    the charges in this case?

2    A    It could be, yes.

3    Q    Are you saying some of these pictures were taken before the

4    charges in this case?

5    A    I really have no idea of the date and time of the pictures.

6    Q    Let's go to the next page, please.  And the next page.  It

7    should stop there.

8         Is the reason you took these -- the reason you took these

9    pictures, is because these people were tenants, right?  Isn't

10   that the reason you took these pictures?

11   A    No.

12   Q    Are any of these people your tenants?

13   A    The person in front, he's not.

14   Q    Were any of the people in the pictures, tenants?

15   A    I'm trying to recall whose picture was there.

16   Q    Did you take pictures of the driver's licenses of your

17   tenants?

18   A    Yes.  Sometimes I did, yes.  These are not tenants' pictures.

19   I have to look at all of this and go one-by-one and make sure.

20   Q    Let's -- actually, let's take it back up.  Let's go to

21   page 9.

22   A    This one is not a tenant.

23   Q    Okay.

24   A    This is not.

25   Q    Let's go to the second-to-last page in the exhibit.  Let's go

1   up -- I'm sorry, up two more.  Let's try page 20, please.  The

2   page right up there.  Yes.  That one.

3        Do you see that picture?

4   A   Yes.

5   Q   Mr. Shibley, this is not a picture of a driver's license,

6   correct?

7   A   Of course not.

8   Q   These are pictures -- it's a picture that you took?

9   A   It's -- yeah.  I believe I'm taking the picture.

10  Q   And, again, is this part of your process of taking pictures

11  of your employees?

12  A   No.  It's just a funny selfie.

13  Q   Right.  Because these gentlemen in the picture are not your

14  employees, correct?

15  A   They did work for me, and my company.

16  Q   They did some rehab work.  You hired them to do rehab work on

17  your property?

18  A   They did a lot of work.

19  Q   You hired them to do rehab work on your property, correct?

20  A   They did.  They did.  They worked in properties that was not

21  my property as well.

22  Q   And that's true, right, because they work for a company

23  called Exact Electric, right?  Do you see that on their shirts?

24  A   Yeah.  Sure.

25  Q   That's who they worked for?

1   A    That's the shirt that he's wearing.  I believe he used to

2   work for them.  He probably still does.

3   Q    This gentlemen over here on our left as well, correct?

4   A    I don't know that if he's an Exact.

5   Q    Do you see the hat he's hearing?

6   A    What I know is that he's related to this guy.  But I don't

7   know that if -- the first guy, I know that he worked at some

8   point for Exact.  The other two guys, I was never aware that they

9   worked for Exact.

10  Q    You can take it down now.

11       Your testimony is, again, that your average employee made

12  $6,400 a month?

13  A    It was a very average number picked up yesterday to explain a

14  number.

15  Q    $6,400 a month would be more than $70,000 a year, correct?

16  A    Yes.

17  Q    But that's not -- you didn't tell your accountant, Mr. Davis,

18  that you're paying your employees $70,000 a year, did you?

19  A    I did.

20  Q    You told him that you were paying your employees $8,000 a

21  year?

22  A    I talked with him many times.  I texted him day after day.

23  Q    Well, let's look at the e-mail.  You sent an e-mail, right?

24  A    Yeah.  I saw that e-mail yesterday.  Yes.

25  Q    Let's look at that.  It's Exhibit 225, page 273.  If we could

 1    blow up the "from" "to" and the first paragraph, please.

 2         This is an e-mail from you, correct?

 3    A    Correct.

 4    Q    To Mario Davis, your accountant, correct?

 5    A    Correct.

 6    Q    And this is after you were served with a subpoena, correct?

 7    A    Correct.

 8    Q    You knew about the federal investigation at this time,

 9    correct?

10    A    Of course.

11    Q    And in the bottom four sentences, if you can call out that

12    where it says, "Due to their transient nature..."  Can you call

13    out that a little bit more, please?

14         You told him that most of your employees received between

15    $8,000 to $12,000 in salary, correct?

16    A    The way it was worded.

17    Q    First -- first, you did say that, correct?

18    A    That's what it says on its face, yes.

19    Q    And that's different than what you said yesterday.  You said

20    your employees were making $6,000 a month.

21    A    There's variation among -- it doesn't match -- one person

22    doesn't match another person.

23    Q    But you are telling Mr. Davis, "Most of my employees," that's

24    what you are saying in this e-mail, correct?

25    A    Yeah.  Many of them work in one quarter, do not work other

1    quarters.  Some of them probably just work seven days and never

2    showed up in their life.  Some of them worked for two years.

3    Some of them worked for one year.  They all vary.

4    Q    Right.  But your testimony has been that these businesses

5    had -- at the time you applied for these applications -- you had

6    150 employees on salary, correct?

7    A    Yes.

8    Q    And you were paying a payroll of a million dollars, right?

9    A    Yes.

10   Q    And these -- these employees, there were no payroll records

11   for these employees, in the response?

12   A    There is payroll records, but I didn't give it to you.

13   Q    The reason you're telling -- you complete the sentence and

14   you say, "... my understanding is no income tax withholding was

15   necessary."  Do you see that?

16   A    My understanding, based on the legislation at the time, was

17   in process.  There's multiple.

18   Q    You don't mention legislation.  You say, "Because they are

19   all below 13K a year, my understanding is no income tax

20   withholding was necessary," right?

21   A    My understanding, what I knew --

22   Q    Sorry, just answer my question first, please.  Did you write

23   this?

24   A    I did.

25   Q    Was your understanding -- I'm sorry, this e-mail is from you,

1  right, Mr. Shibley?

2  A    Yes.

3  Q    Not any bookkeeper?

4  A    No.

5  Q    That's you that's saying that.

6  A    I'm talking, yes.

7  Q    And you are explaining to your accountant, who you just

8  started a relationship with -- this is a new accountant, correct?

9  A    Very new.

10 Q    You're explaining to him, here is why I don't have any taxes

11 filed, right?  You are giving -- you are explaining that to him,

12 right?

13 A    This is a really small part of my communication with him.

14 Q    And, again, that's different than what you are telling the

15 banks.  You are telling the banks, 48 employees, $400,000 in

16 payroll a month.

17 A    That is not different at all.

18 Q    All right.

19 A    I had a conversation with him multiple times.

20 Q    All right.

21 A    Text messages.  There's many other e-mails.  There is other

22 people involved in between us.

23 Q    This is the e-mail that you provided, on Exhibit 225?

24 A    Okay.

25 Q    Correct?

1    A    Yeah.

2    Q    Your testimony yesterday, Mr. Shibley, was that prior to the

3    pandemic, you were paying your employees $1 million a month in

4    payroll, correct?

5    A    Yes.

6    Q    Let's look -- and you were paying that payroll in cash,

7    correct?

8    A    Yes.

9    Q    Let's look at Exhibit 208, page 20.

10        I understood -- you testified that you agree with this chart,

11   correct?  This chart, 208, 20 compares payroll to the money

12   that's in your bank account, right?

13   A    I testified this whole thing, I don't agree with one word of

14   it.

15   Q    Well, you agree that there's $151,000 in your bank account,

16   right, in this timeframe?

17   A    If he was given all the bank statements, and he's a CPA, he

18   did the --

19   Q    You agree that the payroll, that you said on your PPP

20   applications, in this six-month timeframe, was more than

21   $4 million, right?

22   A    That number really came out of his hat.

23   Q    Well, he cites on the bottom here what the payroll numbers

24   are from.  And you told -- you told the banks that you were

25   paying in SS1 LLC, almost $400,000 a month in payroll, right?

1    A    I think it was less than that.

2    Q    You told the banks that you were, that you had paid them --

3    300 -- $328,000; is that right?

4    A    I think something like 328 --

5    Q    I think that's right.  And that payroll was for the first

6    quarter of 2020, right?

7    A    Yes.

8    Q    And the third quarter -- I'm sorry, the fourth quarter of

9    2019?

10   A    Yes.

11   Q    And that adds up.  You also said that you paid Dituri

12   Construction $392,000 for the first quarter of 2020, right?

13   A    Yes.

14   Q    And you also said you were paying the A Team Holdings about

15   $384,000 for the first quarter of 2020, right?

16   A    Right.

17   Q    And the third quarter -- and the fourth quarter of 2019,

18   right?

19   A    Right.

20   Q    Right.  So, again, that's how we get -- and there's other

21   businesses too, right?

22   A    Yes.  There's --

23   Q    That's how we got to $4 million, right, Mr. Shibley?

24   A    I --

25   Q    You don't think so?

 1   A   The $4 million is blown out of -- it's not a real number.

 2   Q   Well, that's my question.  You are anticipating my question.

 3   Is this a real number?  Did you really pay this much money in

 4   cash to your employees?

 5   A   This number, the way he calculated it, is not what really my

 6   filings show.

 7   Q   Well, let's talk, then, about your testimony.  Your testimony

 8   is that you paid -- you were paying -- let's take January 2020,

 9   for example.  Okay?

10   A   Yes.

11   Q   That month before the pandemic, you were paying a million

12   dollars across your businesses; is that right?

13   A   Yes.

14   Q   And that was in cash?

15   A   Yes.

16   Q   And you would agree that you did not have that kind of money

17   going through your bank accounts at that time?

18   A   Correct.

19   Q   It's your testimony that not only were you paying out your

20   employees in cash, you were receiving income in cash as well,

21   right?

22   A   Exactly, yes.

23   Q   You were receiving enough income to make a 10 percent profit

24   each month, right?

25   A   Average.

1    Q    So that means you weren't just receiving a million dollars a

2    month, you were receiving about $1.1 million a month, right?

3    A    That would be a true estimate, yes.

4    Q    And that extra $100,000, that's your money, that's your

5    profit, right?

6    A    That's what I'm taking home, yes.

7    Q    But that money didn't go to your bank account.  That money

8    doesn't show up in your bank accounts?

9    A    No.

10   Q    You have bank accounts, right, Mr. Shibley?

11   A    Of course I do.  I have expenses, too.

12   Q    Your testimony is that your businesses were receiving

13   $1.1 million a month for construction jobs, right?

14   A    Yes.

15   Q    Again, in cash?

16   A    Yes.

17   Q    And you didn't provide any receipts or ledgers that show how

18   much of this cash was coming in, correct?

19   A    I did not give it to you, yes.

20   Q    But you are going to tell us -- but you testified that you

21   were doing a lot of jobs, right, to make that much money?

22   A    A lot, yes.

23   Q    You told us yesterday that you could do a furnace job for

24   about $2,000.  Do you remember that?

25   A    Yes.

1    Q    And so to make $1.1 million a month, you would have to do 550
2    furnace jobs, right?
3    A    That is completely unrealistic.
4    Q    It's unrealistic to do 550 jobs a month, isn't it?  You agree
5    with that, right?
6    A    That's not how it happened.
7    Q    So you would do a furnace job -- you testified yesterday that
8    you would do a furnace job for $2,000, right?
9    A    I can.
10   Q    And is that an average job for you, $2,000?
11   A    For a furnace replacement?
12   Q    No.  Just an average job for these construction companies.
13   Is your testimony that's $2,000?
14   A    No.
15   Q    Does it average $5,000?
16   A    It varies widely.
17   Q    Does it average $10,000?
18   A    How could I give you a number on that.  It can be a couple of
19   hundred thousand, one job.
20   Q    You could give me -- you could have given me a number on
21   this.  Your testimony is that you -- is that you have -- you must
22   have at least -- you must have at least hundreds of jobs a month.
23   To make $1.1 million in cash, you hundreds --
24   A    I have jobs -- more jobs than I can do.  And I have jobs
25   lined up in the pipeline.

1    Q    Hundreds, right?

2    A    If I really look into my network, I can pick 100 jobs, yes.

3    Easy.

4    Q    I mean, you can't be charging -- you told us yesterday that

5    you provide cheap labor, right?

6    A    I do.

7    Q    So these aren't expensive jobs, are they?

8    A    These are expensive, depending on who you go to.  If you are

9    going to Evergreen Concrete and ask them to cut concrete, they're

10   going to charge you $2,600 just to cut it, without any garbage

11   cleanup.

12        If you call me, I'm going to give you an estimate.  I'm going

13   to install the window.  I will cut the concrete.  I will clean

14   out the garbage.

15   Q    Sorry for interrupting.  Is that your job, Mr. Shibley?  Are

16   you the one who gives estimates?

17   A    No, not personally.  I'm talking about my business.

18   Q    Your business.

19        Mr. Shibley, so however many -- so all of these jobs that

20   were cash, you are getting hundreds of jobs a month with

21   cash-paying customers, right?

22   A    Yes.

23   Q    Yesterday we looked at Exhibit A-3, correct?  Put that up,

24   please.

25        Do you remember Exhibit A-3?

 1    A    I do.

 2    Q    It's about 45 pages, right?

 3    A    Yes.

 4    Q    And you're not -- you didn't testify that each picture

 5    represents a different job, right?  That's not your testimony.

 6    A    No, that's not what I said.

 7    Q    Because some of these pictures are the same job, right?

 8    A    Yeah.  Definitely, yes.

 9    Q    Let's look at page 36, please.  And then let's look at

10    page 37.

11         Those are the same job, right?

12    A    It appears to be, yes.

13    Q    Let's look at 41, and then 42.

14         Again, that's the same job, right?

15    A    It appears to be the same location.

16    Q    And let's go to 43, and 44, and 45.

17         Those are -- all those three pictures were all the same job?

18    A    Yeah.  It appears to be the same place, yes.

19    Q    Right.

20         And let's look at A-4.  These are exterior pictures of jobs.

21    Right, Mr. Shibley?

22    A    Yes.

23    Q    And there are 22 pictures in this exhibit, right?

24    A    Right.

25    Q    But most of these pictures are the houses you own, right?

 1   A   Yes.

 2   Q   The houses that David Madrid had visited?  Right?

 3   A   I do not know how many times he visited these places.

 4   Q   Okay.  But this first house, that's the property on Donovan

 5   Street, right?

 6   A   Yes.

 7   Q   And the second picture, that's your medical -- that was your

 8   medical building, right?

 9   A   Yes.

10   Q   And the third picture, that's the Des Moines Way South -- Des

11   Moines Way South property?

12   A   Correct.

13   Q   And let's go to five, please.  This is also the Des Moines

14   Way South?

15   A   Correct.

16   Q   Six.  Des Moines Way South?

17   A   Yes.

18   Q   Seven.  Des Moines Way South?

19   A   I believe so.

20   Q   Eight.  Donovan?

21   A   I believe so.

22   Q   And more -- how about we go to 15, please.

23       It's the backyard of the Des Moines Way?

24   A   Yes.

25   Q   When you talked about levelling it, you were talking about

1    your own house, right?

2    A    Yeah.  Yeah.

3    Q    And let's go to page 18.  This is your Fifth Avenue South

4    property, right?

5    A    Yes.

6    Q    Nineteen is also that property?

7    A    Yes.

8    Q    And 20?

9    A    Yes.

10   Q    So these aren't pictures of contractor jobs, these are

11   pictures of you working on your own properties, right?

12   A    Right.

13   Q    These pictures aren't part of the 550 jobs a month, right?

14   A    No.  That's not -- can you rephrase it?  Say again.

15   Q    When you --

16         MR. NANCE:  You know, I think that question

17   mischaracterizes his earlier testimony.

18         THE COURT:  Sustained.

19   Q    Mr. Shibley, when you testified about the contractor jobs

20   that your companies have, you aren't including the jobs at your

21   own property, right?

22   A    I'm not including my properties there, no.

23   Q    All right.  Because you own these properties, right?

24   A    Yes.

25   Q    And you didn't pay yourself?

 1    A    I didn't pay myself, yes.

 2    Q    All right.

 3         So, again, it's your testimony that your crews are doing

 4    hundreds of jobs a month, correct?

 5    A    Correct.

 6    Q    For cash?

 7    A    Correct.

 8    Q    Without a contractor license?

 9    A    That's not correct.

10    Q    You testified yesterday that you never had a contractor

11    license?

12    A    I'm not a contractor.

13    Q    Your businesses don't have contractor licenses, right?

14    A    My businesses are not contractors.  They're businesses.

15    Q    And you testified yesterday that you won't accept checks from

16    homeowners.  Do you remember that testimony?

17    A    It's not the way it works with the homeowners.  The whole

18    situation is different.  The setting is cash.

19    Q    You said yesterday you can't ever remember accepting a check

20    for a construction job?

21    A    That is true.

22    Q    And that's why there's no -- according to you -- that's why

23    there's no checks for construction jobs in your bank accounts?

24    A    Exactly.

25    Q    Exactly.

```
 1        Isn't the real reason you don't have checks from homeowners
 2    in your bank accounts, is because you don't have a construction
 3    business?
 4    A   That's not true.
 5    Q   You are testifying, again, you had hundreds of jobs a month,
 6    but you hid all of that from David Madrid?
 7    A   I hid something?  David Madrid is not my friend.  I mean, why
 8    would I --
 9    Q   David Madrid didn't know about your construction business?
10    A   Of course not.
11    Q   David Madrid is a real estate agent, right?  He could have
12    referred your business --
13    A   He's the shadiest character that I know of.
14    Q   So back to you, Mr. Shibley, and your $1 million in payroll,
15    in cash.  Let's go back to Exhibit 208, page 20.
16        So we talked about how you didn't produce any ledgers, in
17    your response to the subpoena.  But there are two pages in
18    Exhibit A-1, the last two pages of Exhibit A-1 -- if we could
19    look at those.
20        Do you see these on the screen, Mr. Shibley?
21    A   Yes.
22    Q   These are records that you testified yesterday that you kept,
23    right?
24    A   Came out of my cell phone.
25    Q   These are records that you kept for paying people for working
```

1   on your house, right?

2   A   At some time I took these pictures.  And I didn't delete it

3   for some reason, I don't know.  It ended up staying there.  And

4   one of my cell phones was -- I was able to save, out of all my

5   belongings.  And it got shipped to my attorney.

6   Q   These are the -- again, I can't -- I don't want you to talk

7   about what you discussed with your attorney.  But these are

8   records that reflect payments to employees, correct?  Page 20 and

9   page 21?

10   A   It does reflect that --

11   Q   Payment -- I'm sorry, I misspoke.  Payment to individuals who

12   did work on your houses, right?

13   A   They definitely worked, and they got paid.  And they're just

14   saying that they are paid for their work, yes.

15   Q   Right.  And, again -- but you didn't keep these types of

16   records for Dituri Construction, did you?

17   A   I have detailed payment history for each of the workers, for

18   Dituri.

19   Q   But, again, served with a subpoena, remember?

20   A   Yes.

21   Q   Memorable day?

22   A   Yes.

23   Q   No payroll records, right?

24   A   I didn't give it to you.

25   Q   Let's go to your testimony, then.  Let's talk about your

 1   testimony.
 2       Your testimony is that you paid $1 million in cash a month to
 3   these workers, correct?
 4   A   Correct.
 5   Q   And you handed it to them; is that right?  That's how it has
 6   to go, someone handed them the money?
 7   A   Someone.  It's not personally me all the time.
 8   Q   It was personally you who tried to personally withdraw the
 9   $560,000 from Celtic Bank in cash, right?
10   A   Who else would do that --
11   Q   I'm sorry?
12   A   -- besides me, from the bank.
13   Q   And you testified yesterday that you moved that money from
14   your checking account to your savings account.  Do you remember
15   that?
16   A   So that the money doesn't get mishandled, yes.
17   Q   You didn't want that money to stay in your checking account,
18   because you were worried that your wallet could fall out, right?
19   A   That's one of the scenarios.  There's many other ways.
20   Q   Well, the one you talked about yesterday was you were worried
21   about your wallet falling out and someone getting your debit
22   card, right?
23   A   If someone gets my debit card, they can access my checking
24   account, and a large amount of money can be stolen.
25   Q   Right.  And you testified yesterday, when you were talking

1    about this, you said, "Just imagine the population that I'm

2    dealing with."

3    A    Yes.

4    Q    Isn't that what you said?

5    A    Yes.  Yes.

6    Q    And you are talking about your workers, right?

7    A    I know thousands and thousands of people.

8    Q    And you said that your business had millions of dollars in

9    cash that was being handed out at these job sites?

10   A    Yes.

11   Q    But you're testifying that you were afraid to bring your

12   wallet, you couldn't lose your wallet at one of these sites; is

13   that your testimony?

14   A    I would prefer not to have my wallet stolen, because it's

15   inconvenient to go to all of these locations.  I guess you got 53

16   accounts yesterday.  If my wallet is stolen, it has my driver's

17   license, bank cards, and who knows what.

18   Q    You were afraid of losing -- you testified you couldn't even

19   leave your wallet at one of these sites, that's how scared you

20   were to be there?

21   A    I would not leave my wallet anywhere, unattended.  I mean, it

22   doesn't matter if it's a worksite, or a bus station, or wherever.

23   Q    You were talking about your properties, right?

24   A    It could be my bedroom.  And I would not be just leaving it

25   like that.  I'm more careful than that.

1  Q    Besides paying employees in cash, you also paid expenses in
2  cash, correct?
3  A    Correct.
4  Q    Let's look at A-2.  Do you remember testifying about A-2
5  yesterday?
6  A    Yes.
7  Q    There are more than 300 pages in this exhibit, correct?
8  A    Correct.
9  Q    And is your testimony that A-2 shows that you paid expenses
10 in cash?
11 A    That's not cash.  This is -- this goes through a bank card.
12 Q    Well, the first one is a cash -- is a picture of a cash
13 purchase, correct?
14 A    Let me see.  I don't have my eyeglasses, so I may have missed
15 it.
16 Q    Could you blow that up there?
17 A    It says, "Cash, $20."
18 Q    Okay.  And let's look at page 90, please, Mr. Arnold.
19      This is cash also.  Right, Mr. Shibley?
20 A    Yes.
21      THE COURT:  Let me see counsel at sidebar.
22             (Off-the-record sidebar.)
23      THE COURT:  You folks can stand up and stretch if you
24 would like.
25 Q    Mr. Shibley, I believe you did confirm earlier that most of

1  these purchases are made with a Visa card, correct?

2  A    I believe so.

3  Q    Okay.

4  A    If you want to know how it came, I can explain.

5  Q    There are a lot of duplicates in this exhibit, aren't there?

6  A    I really -- I'm sitting in federal prison right now.  I have

7  no way to confirm this.

8  Q    Let's look at page 102, that's 4.97.  And page 104.  Those

9  are the same, the ones -- the two we just looked at; is that

10 right?

11 A    It appears to be, yes.  You are correct.

12 Q    And there are lots of these duplicates in this packet, aren't

13 there?

14 A    There could be -- I only had 30 seconds to go through it, two

15 days ago.

16 Q    Just one -- just two more small points about this.  Page 8.

17 Page 8 is a customer invoice, and the total is $114.53, correct?

18 A    Correct.

19 Q    Invoice ending in 975, right?

20 A    Right.

21 Q    And these invoices are then duplicated later in the exhibit

22 as well, right?  I will show you page 130.  This is a $114.53

23 purchase, correct?

24 A    Correct.

25 Q    ID ending in 975, right?

```
 1   A   Right.

 2   Q   We can take that -- go back to the first page, please,

 3   Mr. Arnold.

 4       All of A-2 -- all of these pages here, the name Dituri

 5   Construction is not on any of these receipts, right?

 6   A   Yeah, you're right.  Why would there be the Dituri name here?

 7   Q   SS1 isn't on any of these receipts, right?

 8   A   I don't think the receipt has a provision for that.

 9   Q   A Team Holdings is not on these receipts?

10   A   There is no business's name in this receipt.

11   Q   You didn't have a contractor license on file with Home Depot,

12   did you?

13   A   I do not carry a contractor license.

14   Q   These receipts for A-2, these are purchases you made when you

15   were working on rehabbing your own properties, right?

16   A   I do not know the time -- the timing of this receipt shows

17   what time?  Let me see.

18   Q   Let's look at page 104.  I think that might draw us right

19   to --

20   A   That is not -- no.  This is not when I was rehabbing any of

21   my houses.

22   Q   The job says "515."  That's the address of your Donovan

23   property; isn't it?

24   A   That is not -- that is code name.

25   Q   Is that coincidence that 515 is on this receipt?
```

 1    A    It's not a -- it is a code that I use.

 2    Q    Let's go to page 105.  That also has 515 for your Donovan

 3    property.

 4    A    It is a code.

 5    Q    Let's go to page 106.

 6         It says 10080.  That's the address of your Des Moines

 7    property, right?

 8    A    That is not the address.

 9    Q    That is not the address?

10    A    That is not.  That's the code number that I use.

11    Q    So let's go back to the front page, please.  These receipts

12    are things you bought to rehab your properties?

13    A    No.

14    Q    No.  Some of these receipts are things that you bought to

15    rehab your property?

16    A    Doesn't appear to be.  The timing is last quarter of, I think

17    November 2019.  That's not when I rehabbed any of these houses.

18    Q    The -- there are $40,000 worth of expenses covered in here;

19    is that right?

20    A    Could be.  Yes.

21    Q    Your testimony is these are for something other than your

22    properties?

23    A    The timing says that, yes.

24    Q    So, again, 515 doesn't relate to Donovan?

25    A    No.

```
 1   Q    108 doesn't relate to Des Moines Way South?
 2   A    No.
 3   Q    You were rehabbing properties, right?  You were rehabbing
 4   those three properties, right?
 5   A    2018.
 6   Q    In 2019?
 7   A    No.
 8   Q    And in 2020?
 9   A    No.
10   Q    And when you rehab a property, you don't make money until you
11   sell the property, right?
12   A    The selling depends on when I decide to sell.
13   Q    And you never sold those three properties, did you,
14   Mr. Shibley?
15   A    As of today -- I have an offer today.  I didn't like the
16   offer.  I said that I'm not going to do it.
17   Q    All these pictures, all these receipts, they're evidence that
18   you were flipping houses, right?
19   A    This receipts are -- has nothing to do with me flipping
20   houses.
21   Q    You were trying to rehab those houses, right?
22   A    Not now.
23   Q    Before, prior to this case, you were trying to rehab those
24   houses, right?
25   A    Four years ago.
```

1   Q   You were trying to -- and you had people working on those

2   houses?

3   A   Four years ago.

4   Q   And David Madrid went to those houses and saw people working

5   on those houses in 2018?

6   A   I really do not have a date.

7   Q   And in 2019, David Madrid went to those houses, right?

8   A   I had a big --

9   Q   Yes or no.  Did David Madrid go to those houses in 2019?

10  A   I don't know where he goes.

11  Q   You are trying to flip houses and use that evidence to back

12  up a million dollars in payroll?

13  A   Absolutely not.  Your timing is off.

14  Q   That's exactly what you were trying to do.

15          MR. WERNER:  No further questions.

16          THE COURT:  Redirect?

17          MR. NANCE:  Is the court contemplating a --

18          THE COURT:  At 10:45.

19                      REDIRECT EXAMINATION

20  BY MR. NANCE:

21  Q   So, Mr. Shibley, can you just touch on the degree to which

22  your businesses fluctuated?

23  A   Greatly fluctuated, yes.

24  Q   Well, tell us how that happened.

25  A   Well, the way it happens is -- so, some quarters I'm picking

1   up big jobs.  Some quarters I'm doing something small or maybe

2   some quarters I did nothing.  There are four quarters every year.

3   They never are the same.  Things never are permanent.  Everything

4   changes.  Time-to-time, week-to-week, sometimes day-to-day.

5   Q   Okay.

6   A   And also it depends on what I choose to do, what's going on

7   with my workers, what's going on with the country, society.

8   Everything comes into play.

9   Q   Let me ask you just briefly about -- you were asked about

10  records that you produced or failed to produce.  Do you recall

11  those questions?

12  A   Yes.

13  Q   Was there a distinction, in your mind, about existing records

14  and records that had not yet been created?

15  A   Exactly.  So the way it works, and the way I understood at

16  the time when I was given the paper, that I personally looked at

17  the -- you know, I was concerned about it.  I consulted my

18  attorney.  The keyword there was "existent" or "nonexistent."

19  And whether I possessed that personally or not.  I'm -- if a

20  document is -- who is the record custodian of the document?  If a

21  record custodian of a document is an accountant, and he didn't

22  get served with the subpoena, that paper doesn't come out.

23  Q   All right.  Let me ask you this, Mr. Shibley:  The

24  receipts -- you were asked several questions about the Home Depot

25  receipts, or the receipts in Exhibit A-2.

 1    A    Yes.

 2    Q    The big stack of exhibits.

 3    A    I believe that --

 4    Q    I'm just giving you the reference, I'm about to ask you the

 5    question.

 6    A    Yes.

 7    Q    Okay.  You know that A-2 was that large stack of exhibits --

 8    A    More than --

 9    Q    -- of expenses?

10    A    More than 400 receipts there that you retrieved from one of

11    my e-mails.

12    Q    Okay.  Were there other expenses for which you do not have

13    receipts?

14    A    Definitely, yes.  This is a drop in the bucket.  Basically

15    doesn't present the whole picture at all.

16              MR. NANCE:  Thank you very much.  That's all.

17              THE COURT:  All right.  Any recross?

18                        RECROSS-EXAMINATION

19    BY MR. WERNER:

20    Q    Can you call up Exhibit A-2, page 52, please?

21         This is a receipt with your name on it, correct?

22    A    It appears to be, yes.

23    Q    The job description is "Donovan," right?

24    A    It appears to be.

25    Q    And, again, you owned a property on Donovan Street, correct?

 1   Yes or no?

 2   A   Yes, I do.

 3   Q   Okay.  And this is a receipt from January of 2020 for

 4   merchandise that you bought to flip the Donovan house, correct?

 5   A   I don't believe the Donovan house was getting any work done

 6   at that time, no.

 7             MR. WERNER:  Nothing further.

 8             THE COURT:  All right.  You may step down.

 9        You may step down.

10             THE WITNESS:  Oh.

11             MR. NANCE:  Your Honor, the only -- we have no further

12   witnesses.  And there's one open matter that maybe we should

13   address at sidebar.

14             THE COURT:  All right.  Well, no.  I'm going to let the

15   jury go out for a morning recess.  We have some legal matters we

16   have to discuss also, so it may be more than 15 minutes.

17        (The following occurred outside the presence of the jury.)

18             MR. NANCE:  I filed this a day or two ago.  It was a

19   request for judicial notice on the issue of lender fees.

20             THE COURT:  I haven't seen that.

21             MR. NANCE:  Okay.  It was -- I believe it should have

22   made the ECF yesterday.  I mean, I can --

23             THE COURT:  Do you have a copy of it?

24             MR. NANCE:  Electronically only.  But I could probably

25   pull it up.

```
 1        THE COURT:  We can print it out.  Mr. Nance, we can
 2   print it out.
 3        MR. NANCE:  Okay.  Did you get it?
 4        THE COURT:  Yes.
 5        MR. NANCE:  You do have it.  All right.
 6        MS. CONNELLY:  Your Honor, may the government be heard
 7   on the judicial --
 8        THE COURT:  Yes.
 9        MS. CONNELLY:  The government would object to the court
10   taking judicial notice of this fact.  The fact was established
11   through the witness.  It's already in evidence.  It's through --
12   Adam Seery testified to this on his cross-examination with
13   Mr. Nance.
14     Beyond that, I think it's entirely irrelevant what the
15   lenders were paid, which is based on the court's ruling on that
16   issue pretrial, on our motion in limine.
17        MR. NANCE:  A couple of things.  It is true that
18   Mr. Seery testified to it.  And it's also true that --
19        THE COURT:  Was his testimony different than what you
20   are asking?
21        MR. NANCE:  His testimony was very similar.  However,
22   there was a slight conflict in testimony.  The SBA
23   representative, Ms. Zelaya, testified it was simply 1 percent,
24   which is -- it's true for large loans, but it's not true for the
25   bulk of the loans.  So there's a bit of a conflict.  And there's
```

1    really no dispute about what the actual law is.  It's right in

2    the CFR, the administrative code.

3              MS. CONNELLY:  Your Honor, I just think that if the

4    defense is going to be arguing about lender fees in closing, and

5    that that somehow is a defense to this case, we would object to

6    that.  And that seems to be where we're headed with this judicial

7    notice.  I think it gives it more weight than it should have.

8              THE COURT:  The objection is overruled.  It will be

9    permitted.

10             MR. NANCE:  Thank you.

11             THE COURT:  Does the government have any problems with

12   the proposed instructions?

13             MS. CONNELLY:  No, we do not, Your Honor.

14             MR. WERNER:  Your Honor, can I just -- real briefly.  I

15   want to make -- there's a bracketed section.

16             THE COURT:  Oh, yes.  What number is that?

17             MR. WERNER:  And I don't think any evidence was admitted

18   for a limited purpose.

19             THE COURT:  I think that's true.

20        What number is that?

21             MR. WERNER:  That is, I think -- I'm sorry.

22             THE COURT:  Yeah.  That's No. 7.

23             MR. WERNER:  Seven.

24             THE COURT:  We will change that to strike the bracketed

25   portion.

 1          MR. WERNER:  I also believe that Instruction No. 15 is

 2   not appropriate here.  That's charts and summaries not admitted

 3   into evidence.  I don't believe that anything was used for

 4   demonstrative purposes.

 5          THE COURT:  I think that's true.

 6      Mr. Nance, do you agree with that?

 7          MR. NANCE:  I agree with that.  Yes, Your Honor.

 8          THE COURT:  All right.  We will strike No. 15.

 9          MR. WERNER:  I think -- sorry, Your Honor.

10      Nothing further.

11          THE COURT:  Okay.  Mr. Nance, do you have any

12   exceptions?

13          MR. NANCE:  I'm kind of whipping through this.  I have a

14   standard exception to the reasonable doubt instruction.  I

15   realize what you have given is the model instruction.

16          THE COURT:  And I understand your exception.

17          MR. NANCE:  Well, you have seen the difference; "should

18   convict" rather than it "has a duty to convict."

19          THE COURT:  I'm not going to change that.

20          MR. NANCE:  Okay.

21      None others jump to mind.  Let me see.  One moment, here.

22      We had asked for a good-faith instruction.

23          THE COURT:  I understand the exception.  I'm not going

24   to give it.

25          MR. NANCE:  All right.  I think that sums it up.

```
1            THE COURT:  Okay.  All right.  Then let's take
2   15 minutes.  Then I will instruct.  And then we will go right
3   into argument.
4            MR. NANCE:  Your Honor, I would like to just make a
5   record, a Rule 29 record --
6            THE COURT:  Sure --
7            MR. NANCE:  -- just to say we want to object to the lack
8   of a prima facie showing.
9            THE COURT:  All right.  And the motion is denied.
10           MR. NANCE:  And we're going immediately into argument
11  afterwards?
12           THE COURT:  Yes.
13       How much time are you going to need?
14           MS. CONNELLY:  One hour, please.
15           THE COURT:  And you?
16           MR. NANCE:  Not that long.
17           THE COURT:  All right.
18           MR. NANCE:  Maybe half an hour.
19           THE COURT:  All right.  I'm not going to limit you, but
20  an hour seems a little excessive.
21           MS. CONNELLY:  I will try and cut it down.
22           THE COURT:  All right.  We will be in recess for
23  15 minutes.
24           THE CLERK:  All rise.  Court is in recess.
25                       (Recess.)
```

1          THE COURT:  Are you ready for the jury?

2          MS. CONNELLY:  Yes, Your Honor.

3          THE COURT:  All right.  Bring them in.

4       (The following occurred in the presence of the jury.)

5          THE COURT:  Please be seated.

6      So, folks, in just a moment I'm going to deliver the court's

7   instructions on the law.  Copies of these instructions will be

8   given to each of you, so you don't have to take notes on the

9   instructions.  But do listen carefully to what I have to say.

10      Members of the jury, now that you have heard all the

11  evidence, it is my duty to instruct you on the law that applies

12  to this case.  Copies of these instructions will be available for

13  each of you in the jury room for you to consult.

14      It is your duty to weigh and to evaluate all the evidence

15  received in the case, and in that process to decide the facts.

16  It is also your duty to apply the law as I give it to you, to the

17  facts as you find them, whether you agree with the law or not.

18  You must decide the case solely on the evidence and the law.  Do

19  not allow personal likes or dislikes, sympathy, prejudice, fear,

20  or public opinion to influence you.

21      You should also not be influenced by any person's race,

22  color, religious beliefs, national ancestry, sexual orientation,

23  gender identity, gender, or economic circumstances.

24      Also, do not allow yourself to be influenced by personal

25  likes or dislikes, sympathy, prejudice, fear, public opinion, or

1    biases, including unconscious biases.  Unconscious biases are

2    stereotypes, attitudes or preferences that people may consciously

3    reject, but may be expressed without conscious awareness, control

4    or intention.  You will recall that you took an oath promising to

5    do so at the beginning of the case.

6        You must follow all these instructions and not single out

7    some and ignore others.  They are all important.  Please do not

8    read into these instructions, or into anything I may have said or

9    done, any suggestion as to what verdict you should return.  That

10   is a matter entirely up to you.

11       The indictment is not evidence.  The defendant has pled not

12   guilty to the charges.  The defendant is presumed to be innocent,

13   unless and until the government proves the defendant guilty

14   beyond a reasonable doubt.  In addition, the defendant does not

15   have to testify or present any evidence.  The defendant does not

16   have to prove innocence.  The government has the burden of proof

17   of proving every element of the charges, beyond a reasonable

18   doubt.  The defendant has testified.  You should treat his

19   testimony just as you would the testimony of any other witness.

20       Proof beyond a reasonable doubt is proof that leaves you

21   firmly convinced the defendant is guilty.  It is not required

22   that the government prove guilt beyond all possible doubt.

23       A reasonable doubt is a doubt based upon reason and common

24   sense, and is not based purely on speculation.  It may arise from

25   a careful and impartial consideration of all the evidence, or

1    from lack of evidence.  If, after a careful and impartial

2    consideration of all the evidence, you are not convinced beyond a

3    reasonable doubt that the defendant is guilty, it is your duty to

4    find the defendant not guilty.

5        On the other hand, if, after a careful and impartial

6    consideration of all the evidence, you are convinced beyond a

7    reasonable doubt that the defendant is guilty, it is your duty to

8    find the defendant guilty.

9        The evidence you are to consider in deciding what the facts

10   are, consists of the sworn testimony of any witness, the exhibits

11   received into evidence, and any facts to which the parties have

12   agreed.  The parties have agreed to certain facts that have been

13   stated to you.  Those facts are now conclusively established.

14       In reaching your verdict, you may consider only the testimony

15   and exhibits received in evidence.  The following things are not

16   evidence, and you may not consider them in deciding what the

17   facts are.

18       First, questions, statements, objections and arguments by the

19   lawyers are not evidence.  The lawyers are not witnesses.

20   Although you must consider a lawyer's questions to understand the

21   answers of a witness, the lawyer's questions are not evidence.

22   Similarly, what the lawyers have said in their opening

23   statements, closing arguments, and at other times, is intended to

24   help you interpret the evidence, but it is not evidence.  If the

25   facts as you remember them differ from the way the lawyers state

1    them, your memory of them controls.

2        Second, any testimony that I have excluded, stricken, or

3    instructed you to disregard is not evidence.

4        And third, anything you may have seen or heard when the court

5    was not in session is not evidence.  You are to decide the case

6    solely on the evidence received at the trial.

7        Evidence may be direct or circumstantial evidence.  Direct

8    evidence is direct proof of a fact, such as testimony by a

9    witness about what that witness personally saw or heard or did.

10   Circumstantial evidence is indirect evidence.  That is, it is

11   proof of one or more facts from which you can find another fact.

12   You are to consider both direct and circumstantial evidence.

13   Either can be used to prove any fact.  The law makes no

14   distinction between the weight to be given to either direct or

15   circumstantial evidence.  It is for you to decide how much weight

16   to give to any evidence.

17       In deciding the facts in this case, you may have to decide

18   which testimony to believe and which testimony not to believe.

19   You may believe everything a witness says, or part of it, or none

20   of it.  In considering the testimony of any witness, you may take

21   into account the opportunity and ability of the witness to see,

22   or hear, or know the things testified to; the witness's memory;

23   the witness's manner while testifying; the witness's interest in

24   the outcome of the case, if any; the witness's biases or

25   prejudice, if any; whether other evidence contradicted the

1   witness's testimony; the reasonableness of the witness's

2   testimony, in light of all the evidence, and any other factors

3   that bear on believability.

4        Sometimes a witness may say something that is not consistent

5   with something else he or she said.  Sometimes different

6   witnesses will give different versions of what happened.  People

7   often forget things or make mistakes in what they remember.

8   Also, two people may see the same event but remember it

9   differently.  You may consider these differences, but do not

10  decide the testimony is untrue, just because it differs from

11  other testimony.

12       However, if you decide that a witness has deliberately

13  testified untruthfully about something important, you may choose

14  not to believe anything that witness said.

15       On the other hand, if you think the witness testified

16  untruthfully about some things, but told the truth about others,

17  you may accept the part that you think is true and ignore the

18  rest.

19       The weight of the evidence as to a fact does not necessarily

20  depend on the number of witnesses who testify.  What is important

21  is how believable the witnesses were and how much weight you

22  think their testimony deserves.

23       You are here only to determine whether the defendant is

24  guilty or not guilty of the charges in the indictment.  The

25  defendant is not on trial for any conduct or offense not charged

1    in the indictment.  A separate crime is charged against the

2    defendant in each count.  You must decide each count separately.

3    Your verdict on one count should not control your verdict on any

4    other count.

5         You have heard testimony that the defendant made a statement.

6    It is for you to decide whether the defendant made the statement,

7    and if so, how much weight to give to it.  In making those

8    decisions, you should consider all the evidence about the

9    statement, including the circumstances under which the defendant

10   may have made it.

11        You have heard testimony about an uncover agent who was

12   involved in the government's investigation in this case.  Law

13   enforcement officials may engage in stealth and deception, such

14   as the use of undercover agents, in order to investigate criminal

15   activities.  Undercover agents may use false names and

16   appearances.

17        Certain charts and summaries have been admitted into

18   evidence.  Charts and summaries are only as good as the

19   underlying supporting material.  You should, therefore, give them

20   only such weight as you think the underlying material deserves.

21        The defendant is charged in Counts 1 through 7 of the

22   indictment with wire fraud, in violation of Section 1343 of Title

23   18 of the United States Code.  For the defendant to be found

24   guilty of that charge, the government must prove each of the

25   following elements beyond a reasonable doubt:

1       First, the defendant knowingly devised a scheme or plan to

2    defraud, or a scheme or plan for obtaining money or property by

3    means of false or fraudulent pretenses, representations, or

4    promises.  Deceitful statements or half-truths may constitute

5    false or fraudulent representations.

6       Second, the statements made or facts omitted as part of this

7    scheme, were material; that is, they had a natural tendency to

8    influence or were capable of influencing a person to part with

9    money or property.

10      Third, the defendant acted with the intent to defraud, that

11   is, the intent to deceive and cheat.

12      And fourth, the defendant used or caused to be used an

13   interstate wire communication to carry out or attempt to carry

14   out an essential part of the scheme.

15      In determining whether a scheme to defraud exists, you may

16   consider not only the defendant's words and statements, but also

17   the circumstances in which they are used as a whole.  A wiring is

18   caused when one knows that a wire will be used in the ordinary

19   course of business, or when one can reasonably foresee such use.

20   It need not have been reasonably foreseeable to the defendant

21   that the wire communication would be interstate in nature.

22   Rather, it must have been reasonably foreseeable to the defendant

23   that some wire communication would occur in furtherance of the

24   scheme; and an interstate wire communication must have actually

25   occurred in furtherance of the scheme.

1       The defendant is charged in Counts 8 through 10 of the

2   indictment with bank fraud, in violation of Section 1344(2) of

3   Title 18 of the United States Code.

4       For the defendant to be found guilty of that charge, the

5   government must prove each of the following elements beyond a

6   reasonable doubt:

7       First, the defendant knowingly carried out a scheme or plan

8   to obtain money or property from the financial institution, by

9   making false statements or promises.

10      Second, the defendant knew that the statements or promises

11  were false.

12      Third, the statements or promises were material; that is,

13  they had a natural tendency to influence, or were capable of

14  influencing a financial institution to depart with money or

15  property.

16      Fourth, the defendant acted with the intent to defraud.

17      And fifth, the financial institution was federally insured.

18      The defendant is charged in Counts 11 through 15 of the

19  indictment with money laundering, in violation of Section 1957,

20  Title 18 of the United States Code.

21      For the defendant to be found guilty of that charge, the

22  government must prove each of the following elements beyond a

23  reasonable doubt:

24      First, the defendant knowingly engaged or attempted to engage

25  in a monetary transaction.

1    Second, the defendant knew the transaction involved

2    criminally derived property.

3    Third, the property had a value greater than $10,000.

4    Fourth, the property was, in fact, derived from wire fraud or

5    bank fraud, as alleged in Counts 1 through 10 of the indictment.

6    And fifth, the transaction occurred in the United States.

7    The term "monetary transaction" means the deposit,

8    withdrawal, transfer or exchange in or affecting interstate

9    commerce, of funds, or a monetary instrument by, through, or to a

10   financial institution.

11   The term "financial institution" means a federally insured

12   bank or any credit union, as alleged in the indictment.

13   The term "criminally derived property" means any property

14   constituting or derived from the proceeds of a criminal offense.

15   The government must prove that the defendant knew that the

16   property involved in the monetary transaction constituted or was

17   derived from proceeds obtained by some criminal offense.

18   The government does not have to prove that the defendant knew

19   the precise nature of that criminal offense, or knew the property

20   involved in a transaction represented the proceeds of wire fraud

21   or a bank fraud, as alleged in Counts 1 through 10 of the

22   indictment.

23   Although the government must prove that, of the property at

24   issue, more than $10,000 was criminally derived, the government

25   does not have to prove that all the property at issue was

1    criminally derived.

2        An act is done knowingly if the defendant is aware of the act

3    and does not act through ignorance, mistake or accident.  The

4    government is not required to prove that the defendant knew that

5    his acts or omissions were unlawful.

6        You may consider evidence of the defendant's words, acts or

7    omissions, along with all the other evidence, in deciding whether

8    the defendant acted knowingly.

9        An intent to defraud is an intent to deceive and cheat.

10       A defendant may be found guilty of the crimes charged, even

11   if the defendant did not personally commit the acts constituted

12   in the crime, if the defendant willfully caused an act to be

13   done, that if directly performed by him would be an offense

14   against the United States.

15       A defendant who puts in motion or causes the commission of an

16   indispensable element of an offense, may be found guilty as if he

17   had committed this offense himself.

18       With regard to Instruction No. 20, an act is done willfully

19   if it was undertaken with bad purpose and with knowledge that the

20   conduct is unlawful.

21       The indictment charges that the offenses alleged in Counts

22   1 through 15 were committed on or about a certain date.  Although

23   it is necessary that the government prove beyond a reasonable

24   doubt that the offense was committed on a date reasonably near

25   the date alleged in Counts 1 through 15 of the indictment, it is

1   not necessary for the government to prove that the offense was

2   committed precisely on the date charged.

3      When you begin your deliberations, elect one member of the

4   jury as your foreperson, who will preside over the deliberations

5   and speak for you here in court.  You will then discuss the case

6   with your fellow jurors, to reach agreement, if you can do so.

7   Your verdict, whether guilty or not guilty, must be unanimous.

8   Each of you must decide the case for yourself.  But you should do

9   so only after you have considered all the evidence, discussed it

10   fully with the other jurors, and listened to the views of your

11   fellow jurors.

12      Do not be afraid to change your opinion, if the discussion

13   persuades you that you should.  But do not come to a decision,

14   simply because other jurors think it is right.  It is important

15   that you attempt to reach a unanimous verdict, but, of course,

16   only if each of you can do so, after having made your own

17   conscientious decision.  Do not change an honest belief about the

18   weight and effect of the evidence, simply to reach a verdict.

19      Perform these duties fairly and impartially.  Do not allow

20   personal likes or dislikes, sympathy, prejudice, fear, or public

21   opinion to influence you.

22      You should also not be influenced by any person's race,

23   color, religious beliefs, national ancestry, sexual orientation,

24   gender identity, gender, or economic circumstances.

25      Also, do not allow yourself to be influenced by personal

1    likes or dislikes, sympathy, prejudice, fear, public opinion, or

2    biases, including unconscious biases.

3         Unconscious biases are stereotypes, attitudes or preferences

4    that people may consciously reject, but may be expressed without

5    conscious awareness, control or intention.

6         It is your duty, as jurors, to consult with one another, and

7    to deliberate with one another with a view towards reaching an

8    agreement if you can do so.  During your deliberations, you

9    should not hesitate to examine your own views -- or re-examine

10   your own views, and change your opinion, if you become persuaded

11   that it is wrong.

12        Some of you have taken notes during the trial.  Whether or

13   not you took notes, you should rely on your own memory of what

14   was said.  Notes are only to assist your memory.  You should not

15   be overly influenced by your notes or those of your fellow

16   jurors.

17        The punishment provided by law for this crime is for the

18   Court to decide.  You may not consider punishment in deciding

19   whether the government has proved its case against the defendant,

20   beyond a reasonable doubt.

21        A verdict form has been prepared for you.  After you have

22   reached a unanimous agreement on a verdict, your foreperson

23   should complete the verdict form, according to your

24   deliberations, sign and date it, and advise the court that you're

25   ready to return to the courtroom.

1    If it becomes necessary, during your deliberations, to

2    communicate with me, you may send a note, through the clerk,

3    signed by any one or more of you.  No member of the jury should

4    ever attempt to communicate with me, except by a signed writing.

5    And I will respond to the jury concerning the case, only in

6    writing or here in open court.

7        If you send out a question, I will consult with the lawyers

8    before answering it, which may take some time.  You may continue

9    your deliberations while waiting for the answer to any question.

10   Remember, that you are not to tell anyone, including me, how the

11   jury stands, numerically or otherwise, on any question submitted

12   to you, including the question of the guilt of the defendant,

13   until after you have reached a unanimous verdict or been

14   discharged.

15       All right.  Ms. Connelly.

16       MS. CONNELLY:  May it please the court.  This case is

17   about the defendant's decision to perpetuate a massive fraud at a

18   time of national crisis.

19       Just over 18 months ago, the COVID-19 pandemic shut down our

20   country.  Businesses were told to close their doors.  People were

21   told to stay home.  And workers were laid off.  In the face of

22   this, the government moved quickly to establish pandemic relief

23   programs for suffering people and businesses.

24       The PPP and EIDL programs were designed to get money out

25   quickly, in the face of this diaster.  The funds were meant to be

1    a lifeline to small businesses and their employees.  They were

2    meant to keep small businesses open and employees on the payroll.

3    In sum, they were meant to help small business owners and their

4    employees survive.

5         And in order to do so quickly, in order to get money to the

6    people who needed it most, these programs relied on people to

7    tell the truth.  The defendant, Eric Shibley, chose not to tell

8    the truth.

9         Instead, he decided to lie, and to line his pockets with

10   COVID relief money.  Eric Shibley submitted 26 fraudulent PPP

11   applications, and 13 fraudulent EIDL applications.  He received

12   over $2.8 million in taxpayer money.  He then tried to hide his

13   ill-gotten proceeds, by taking them out in cash.  And he was

14   successful in getting over $200,000 in cash.

15        We're not here today because Eric Shibley made a one-time

16   mistake, or made a small misstatement on loan paperwork, or is

17   bad at recordkeeping.  We're here today because Eric Shibley

18   chose to submit application, after application, after

19   application, containing lie, after lie, after lie.  He lied about

20   having employees.  He lied about the salaries that he paid those

21   employees.  And he lied about having paid payroll taxes on those

22   employees.

23        He submitted fake tax forms, with every application that he

24   submitted to the PPP lenders.  And he did all of this for one

25   purpose:  To steal money from pandemic relief programs that were

1   meant to help legitimate small businesses and legitimate

2   employees.

3       Over the last few days, you have seen the evidence.  And it

4   shows that the defendant is guilty.  And now time for Eric

5   Shibley to be held accountable for his actions.  It is Eric

6   Shibley's actions and choices that bring us to this courtroom

7   today.

8       Eric Shibley is here today, having been charged with seven

9   counts of wire fraud, three counts of bank fraud, and five counts

10  of money laundering.  Judge Coughenour has instructed you as to

11  the elements of those charges.  He's instructed you what the

12  government needs to do to prove its case.

13      And now I'm going to walk you through all 15 of those counts,

14  and you will see how the evidence that we've presented to you

15  over the last few days at trial, proves beyond a reasonable doubt

16  each and every one of those elements.

17      But as we go through the evidence, I ask that you keep two

18  important things in mind:  First, when you consider a piece of

19  evidence, don't do it in isolation.  And what I mean by that is,

20  please consider each piece of evidence in the context of all the

21  other evidence that you have seen and heard in this case.  We

22  haven't shown you every loan document or every bank record, but

23  it's all in evidence.  You will be able to see it when you go

24  back to the jury room.  We're just highlighting certain loan

25  applications and certain bank records to help tell the story.

1       But when you start deliberating, step back and look at the

2  big picture here.  None of this was about one bad loan, or one

3  small mistake.  None of this was done by accident.  And none of

4  this was a mistake.

5       Second, and most importantly, use your common sense when you

6  are evaluating the evidence and the testimony in this case.

7  Members of the jury, when you walk into a federal courthouse, you

8  don't have to check your common sense at the door.  You don't

9  have to leave your experiences and your intuition and your

10  instincts, when you walk through security.  So if you do those

11  two things, you will know that beyond a reasonable doubt, that

12  Eric Shibley is guilty for every count for which he's been

13  charged.

14       My presentation today has three parts.  First, we're going to

15  go through the scheme, which shows that Eric Shibley was engaged

16  in a scheme to defraud, and the material lies that he told SBA

17  and the lenders to take their money.

18       Second, we're going to review the evidence that shows that

19  Eric Shibley knew he was lying, that he had what Judge Coughenour

20  has told you, is the intent to defraud.

21       And, finally, I'm going to go through the elements of each of

22  the counts in the indictment, and show how the evidence ties into

23  all of them.

24       I'm going to use a slide deck as I speak with you, which is

25  simply meant to summarize the evidence.  These slides I show you

  
1    are not going to be going back with you, but the exhibits and the

2    evidence will.

3         My slides are going to have exhibit numbers on them.  So you

4    should write them down, and take them back with you into the jury

5    room to help you deliberate.

6         So let's turn to first topic that I'm going to cover with

7    you, which is Mr. Shibley's scheme to defraud.  As Judge

8    Coughenour has explained to you, both the wire fraud and the bank

9    fraud counts require that the defendant has engaged in a scheme

10   to defraud.

11        Having a scheme simply means that there was a plan or a

12   course of action, that was designed to -- that was intended to

13   deceive and cheat people.

14        You're now well aware of Mr. Shibley's scheme.  The scheme

15   was to lie to lenders, and lie to the SBA, in order to receive

16   pandemic relief money.  How can you tell it's one big scheme?

17   Because the lies are all similar, across the lies to the SBA and

18   the PPP lenders.

19        You have heard the evidence of the three main lies that

20   Mr. Shibley told the PPP lenders, and that they all mattered.

21   Because if he had told the truth, he would not have received

22   nearly $3 million in COVID relief money.

23        He made up the numbers that he paid in payroll.  He made up

24   the number of employees that he had.  And he lied about having

25   paid payroll taxes on those employees.

1    And then you saw similar lies on Mr. Shibley's EIDL

2  applications, where he made up his gross revenue figures, for the

3  twelve months prior to January 31, 2020.  And then he continued

4  to lie about his number of employees on all of those

5  applications.

6    The numbers on Mr. Shibley's PPP and EIDL applications are,

7  quite simply, made up.  They are pulled from thin air.  And how

8  do you know this?  Because businesses, real businesses, with real

9  employees, leave a paper trail.  A real business has federal tax

10  records.  A real business has state tax records.  A real business

11  has bank records showing activity, paying employees.  And if all

12  else fails, at the very least, the business itself has records.

13    And you have seen that there's no paper trail for any of

14  Mr. Shibley's businesses, because they were not really businesses

15  with real employees.  And they were definitely not the businesses

16  that he told the SBA and the lenders that they were.

17    The first place we looked in our search for Mr. Shibley's

18  businesses, was with the IRS.  And, remember, you heard from Mr.

19  Hernandez, that the IRS had no records of any of the businesses

20  that Mr. Shibley claimed to have.  And Mr. Hernandez walked you

21  through some of the W-3s and the 941s that were filed with these

22  applications.  And he told you that not one of them had been

23  filed with the IRS.  And that means that all of the tax forms

24  that Mr. Shibley submitted with his applications, they were

25  fakes.  Mr. Shibley never paid payroll taxes on his entities,

1    despite his representations to the SBA and the lenders otherwise.

2        You also heard from witnesses from the Washington State

3    Department of Revenue and the Washington Employment Security

4    Department.  Jeff Hillers told you, of the Washington Department

5    of Revenue, told you that most of the Shibley entities never

6    reported any revenue.  Only Mr. Shibley's medical practice had

7    reported some revenue.  But it was so little, that he rarely had

8    to pay any sort of state tax.

9        And Mr. Hillers also told you that DOR had no records for

10   Dituri Construction, SS1, or A Team Holdings.  And also, that

11   there were no contractor's licenses for any of those companies

12   with the state.

13       Then Cynthia Cole, of the Washington Employment Security

14   Department, told you that not one of the Shibley entities had

15   paid state payroll or unemployment taxes in 2019 and 2020.  Not

16   Dituri Construction.  Not SS1.  Not the A Team Holdings.  Not

17   Seattle's Finest Cannabis.  And not ES1 or Shibley Medical.

18       In fact, the only records that the Employment Security

19   Department found in its search of Eric Shibley and the Shibley

20   entities, showed that Mr. Shibley, himself, was receiving

21   pandemic unemployment assistance, or PUA, another CARES Act

22   program at the time.

23       And, again, this tells you that Mr. Shibley was well aware of

24   how to file paperwork and file his taxes, when he, himself, could

25   get money.

1     We then looked for evidence of these businesses in

2  Mr. Shibley's 59 bank accounts.  The bank records for these

3  entities did not show anything supporting the numbers in these

4  loan applications.

5     You heard testimony from Michael Petron, the accountant who

6  reviewed all of the bank records in this case, for the time

7  period right before Mr. Shibley applied for these loans.  And he

8  told you that for the period between October 2019 and March 2020,

9  only -- or, I'm sorry, between January 2019 and March 2020, only

10  $570,000 of new money came into those accounts.  And he showed

11  you how that compared to Mr. Shibley's statements on his loan

12  applications, claiming over $4 million of revenue -- or of

13  payroll, for that same period.

14     It simply doesn't square that a person can pay $1 million of

15  payroll a month, yet there is no record of it in the bank

16  accounts, at all.  You can't pay salaries without revenue or

17  money coming in.  You don't have to be an accountant, like Mr.

18  Petron, to understand that concept.  There's no payroll without

19  revenue.  It's common sense.

20     And remember what Mr. Petron told you about the accounts

21  individually?  You had Dituri Construction, which didn't even

22  have a bank account until it applied for a PPP loan.  You had

23  SS1, which, again, did not have a bank account until after

24  applying for PPP loans.  You had the A Team Holdings, which only

25  had a minimal amount of new money flowing through the accounts,

1  prior to the time of these loan applications.  You had Seattle's

2  Finest Cannabis, with no bank account, yet again.  And then you

3  had ES1 and the medical practice, which did have some money

4  flowing through it.  But, again, not enough to cover the payroll

5  obligations that Mr. Shibley was claiming.

6       And remember also, Mr. Shibley -- or, Mr. Petron did the math

7  on what the annual salary would be for each employee, if

8  Mr. Shibley's loan numbers were actually correct.  And at its

9  lowest, each of his employees would be making $73,000 a year.  At

10 its highest, they would be making over $95,000 a year.  And Mr.

11 Petron concluded, by showing you all of the accounts combined,

12 and he came to a very simple conclusion.  There is nothing in

13 these accounts supporting the payroll numbers that Mr. Shibley

14 stated on his applications.

15      Finally, you saw the stipulation in this case.  In response

16 to a grand jury subpoena for records, all of these entities, all

17 of these alleged small businesses, produced certain records.  And

18 you are going to have the records back there in the jury room

19 with you.  And you should look through them.  You are going to

20 see that there's not a single thing in those records that shows a

21 list of employees, not a single thing in those records that shows

22 payroll being paid, not a single thing to support the ludicrous

23 numbers that Mr. Shibley came up with on these loan applications.

24 That's because those numbers just aren't true.

25      All that Mr. Shibley was able to produce was an e-mail to his

1    accountant, to one of his bookkeepers, Mario Davis, where he

2    tells Mr. Davis that his employees are actually only paid between

3    $8,000 and $12,000 a year.  And even that has nothing supporting

4    it, except Mr. Shibley's own words.

5        And even taking it as true, it's a far cry from the $73,000

6    or $95,000 annually, that Mr. Shibley was claiming to pay his

7    employees on these loan applications.

8        Use your common sense, members of the jury.  A business that

9    is paying $1 million a month in payroll, $12 million a year,

10   annually, in payroll, does not operate without leaving any

11   evidence of it.  It's just not possible.  And that's what we have

12   in this case.  Not a shred of evidence that the businesses are

13   operating as Mr. Shibley claimed they were.

14       And then we can look at the loan applications themselves to

15   see more of the lies.  Remember, the loan applications are

16   littered with inconsistencies.  There were so many lies, that

17   Mr. Shibley couldn't keep up with them.  It's hard to keep track

18   of your lies, when you tell as many as Mr. Shibley did.

19       Just to highlight some of the more egregious examples.  We

20   had Dituri Construction, which had not one, not two, but three

21   different loan applications, with three different numbers.  Look

22   at these when you are back in the jury room.  Take them in.

23       And to top it off, the applications were supported by two

24   different 941s.  They're both signed by Mr. Shibley.  And you are

25   going to see this, with his changing applications, the supporting

1    documentation changed too.

2        For the A Team Holdings, you had an EIDL application and a

3    PPP application that were wildly inconsistent with each other.

4    On March 31st, he applied for an EIDL, claiming to have $180,000

5    in gross revenue and four employees.  And in the two weeks

6    between when he applied for his EIDL and his PPP, somehow his

7    businesses expanded to 48 employees.

8        Mr. Shibley went so far as to change the name of Seattle's

9    Finest Cannabis, after he was denied the PPP and EIDL loans.  But

10   not only that, in his PPP applications, like in Government's

11   Exhibit 2, he has -- claims to have six employees.  And then, by

12   April, and then June, he has between four and six new employees

13   on his EIDL applications.

14       And to top it off, in his EIDL applications, Mr. Shibley's

15   gross revenues more than doubled.  The ES1 applications,

16   Mr. Shibley changed his business type, after being denied as a

17   real estate developer, in Government's Exhibit 33.  But not to be

18   deterred, you see in Government's Exhibit 32, he reapplies and

19   just calls himself a construction contractor now.  Because his

20   business is not actually established.  His business is whatever

21   it needs to be to get him COVID relief money.

22       Special Agent Moran testified extensively, walking you

23   through these loan applications.  You are going to have the

24   summary charts that she showed you, back in the jury room with

25   you, and you are going to be able to see all of these

1    inconsistencies for yourself.

2        And when you look at these inconsistencies, again, take a

3    step back, look at the big picture.  We don't sit here today

4    because of a mistake or a typo.  We sit here today because of the

5    concerted scheme to steal COVID relief money.  Mr. Shibley just

6    didn't lie once, he didn't lie twice, he lied over and over and

7    over again.

8        And then when Mr. Shibley learned that his scheme was about

9    to be uncovered, that the lenders had questions about the loans

10   that had been funded, Mr. Shibley made another desperate attempt

11   to conceal the fact that his businesses had no real employees,

12   that he had lied.  After his loans with Celtic and Harvest were

13   recalled, he provided both lenders with fake and fraudulent

14   employee lists.  And those lists contain more lies, in an attempt

15   to get the PPP money back in his accounts.

16       First, the lists were nearly identical.  By the time he

17   provided names to Harvest, you see three names being added.  But

18   the first seven are the same for both.  And just think about

19   that.  Mr. Shibley is claiming to have two separate businesses

20   with two separate crews.  And they each have over 40 salaried

21   employees.  But in response to our request for employee names and

22   identification, he supplied the two banks, for two different

23   loans, with the exact same names.  This is the best he could come

24   up with, even when pressed for specifics about his employees.

25   This is the best he could come up with, even when motivated to

1   get the money back.

2       But the problems with these lists don't stop at -- or don't

3   stop at the fact that they match.  You saw the records from the

4   Washington State Employment Security Department.  And none of the

5   employees listed by Mr. Shibley worked for him, according to

6   Washington State ESD.

7       Mr. Shibley did not pay state unemployment taxes on any one

8   of these employees.  He did not pay them a salary.  He did not

9   pay payroll taxes on them.  He did not withhold taxes from them.

10  They, quite simply, were not his employees.

11      And you heard even more about two of the names on both of

12  these lists, that do not and could not have ever been employed by

13  Mr. Shibley.  You heard from Ms. Velotta, who told you that she

14  had never heard of and certainly never worked for Mr. Shibley.

15  She also told you how, after she was approached by the FBI, she

16  looked up Mr. Shibley's phone number and gave him a call.  After

17  saying hello and identifying himself, Mr. Shibley quickly hung up

18  on her, after she told him who she was.  He told her to stop

19  bothering him.

20      Think about that.  Mr. Shibley has just used Ms. Velotta 's

21  name in order to get PPP money.  Ms. Velotta spoke to Mr. Shibley

22  and identified herself as one of his supposed employees, and an

23  employee name that he used to apply for loans; and he immediately

24  hung up on her.  That shows you he knew he used a fake name when

25  he sent this e-mail.

1    You also saw the death certificate for Sam Morgan.  Sam

2  Morgan died in 1987.  And you heard from Special Agent Moran that

3  the investigative team only found one Sam Morgan, with the last

4  four digits 3218 of his social security number.  And that Sam

5  Morgan died in Pennsylvania, 30 years ago.

6    Mr. Shibley used Lisa Velotta and Sam Morgan to further his

7  scheme.  He didn't care if they were his employees.  He didn't

8  even care if they were alive.  The submission of these names to

9  Celtic and Harvest was yet another lie in Mr. Shibley's web,

10  another way that he used lies to defraud and to make money for

11  himself.

12    Let's talk a little bit about materiality.  And in Judge

13  Coughenour's instructions, you heard him say "material" a few

14  times.  As Judge Coughenour said, "material" just means that it

15  influenced or was capable of influencing someone's decision.  Did

16  it matter?  Could it have mattered?  That's what you need to ask

17  yourself, when thinking about Mr. Shibley's lies.

18    There's a lot of evidence that Mr. Shibley's lies mattered to

19  the SBA and the lenders.  Starting with the SBA loan application

20  form itself, which is Government's Exhibit 40, the loan

21  application tells you that these statements were material.  And

22  that's also true of the EIDL applications.  We see this

23  certification at the end of every single EIDL application.  And

24  when Mr. Shibley signed the PPP and EIDL applications, he

25  certified that all of the information contained therein was true

1  and correct.  This was so important to the SBA in the PPP and

2  EIDL programs, that these certifications appeared over and over

3  and over again.  And the they also appeared on the loan notes

4  themselves.  You saw these certifications appear.  If we remember

5  the Celtic Bank loan, as an example, in Government's Exhibit 4.

6  And on one of the EIDL loans, in Government's Exhibit 27.

7       And there was a reason that the truthfulness of the

8  applicants was so important in these programs.  Kandace Zelaya

9  and Kathleen Littwin told you about it.  These programs didn't

10  ask for the normal level of documentation.  And that was because

11  the country was in a crisis.  The government was trying to get

12  money out as quickly as possible.

13       And every single lender witness who came in here and

14  testified, told you that the truthfulness of applicants matters.

15  They all told you the same thing.  They would not have loaned PPP

16  money to a business that lied about their payroll.  They would

17  not have loaned PPP money to a business that lied about their

18  number of employees.  They would not have loaned PPP money to

19  businesses that submitted inaccurate or fake supporting

20  documentation.  And they would not have loaned forgivable PPP

21  money to someone who lied about their probation status.

22       All of the lender witnesses told you that this was material.

23  Remember, John Mosier, Adam Seery, Nissen Liddiard, David

24  Haagsma, and then finally Kandace Zelaya, told you that from the

25  SBA's perspective, the truthfulness of the applicants mattered.

1  Everyone is in agreement.  These schemes, these lies, they

2  mattered a lot.

3       And, of course, they did.  It's common sense.  The point of

4  these programs was to help real businesses, real employees, real

5  people suffering from what COVID was doing to small business.  It

6  wasn't to help fake companies, shell entities, or people like

7  Mr. Shibley, who stole names and submitted false documents.

8       Finally, when you consider materiality, look at Mr. Shibley's

9  own actions.  They clearly tell you that this mattered.  If these

10  lies were not material, why did Mr. Shibley lie over and over and

11  over again?  Why not tell the lenders that he didn't have a 155

12  salaried employees?  Why not tell the lenders that the tax forms

13  weren't filed?  Why not tell the lenders that he had an all-cash

14  business, with no records?  Why not tell the lenders that he

15  hadn't paid his taxes?

16       Mr. Shibley didn't tell the lenders any of these things,

17  because if he had, he knew he wouldn't get the money.  He knew it

18  mattered.  He knew he had to submit fake tax forms to get the

19  loan, so he created some.  He knew he had to have employees to

20  get the loan, so he made them up.  He knew he could get more

21  money with the more payroll he claimed, so he came up with

22  preposterous figures.  You know it was material, because of

23  Mr. Shibley's own actions.

24       Let's turn to part two of my presentation, which focuses on

25  the evidence that shows that Eric Shibley knew he was lying to

1    the lenders or that he had fraudulent intent.

2            THE COURT:  Let's take a moment and let the jury stand

3    up and stretch.

4                         (Stretch break.)

5            THE COURT:  Okay.

6            MS. CONNELLY:  Okay.

7        So intent.  Judge Coughenour has instructed you about

8    knowledge, about intent to defraud.  So how do you figure out

9    Eric Shibley's intent?  Well, we can't get inside Eric Shibley's

10   head.  We can look at his words and actions to figure out what

11   his intention was, what his goals were for the scheme.

12       One way to figure out Eric Shibley's intent would be to look

13   at the evidence, and keep an important point in mind.  Guilty

14   people lie.  They cover things up.  And the most compelling

15   evidence of Mr. Shibley's intent are the lies.  And in this case,

16   the lies that Eric Shibley told the lenders and to the SBA were

17   to defraud them of their and taxpayer money.

18       We have already been through so many of the lies, I won't

19   harp on them here.  But when thinking about Mr. Shibley's intent,

20   an important thing to look at is his conduct after he realized

21   that some of the PPP funds had been recalled by the lenders and

22   seized by the government.

23       On May 27th, 2020 -- as of May 27th, 2020, Mr. Shibley knows

24   that people are onto him.  He may not know everything, or

25   understand all the facts, but he knows that his lies are going to

1    be exposed.  And at that point, he decided to push forward.  He

2    chose to double down on his scheme.  He chose to continue lying.

3         And his first move was to provide fake lists of employee

4    names to Celtic and Harvest, which we have already gone through.

5    But he had an insurance policy, if that didn't work out for him.

6    He simultaneously decided to grab as much cash as he could,

7    before the other PPP and EIDL funds were seized.  You saw he

8    heard about the federal case in Government's Exhibit 47.  And

9    then you heard that he ran to Navy Federal Credit Union, the next

10   day, to take out $50,000 in PPP proceeds, in cash.  Why did he do

11   that?  You know, members of the jury.  He did that because he

12   knew the jig was up.

13        You also saw that he applied for two EIDL loans in the name

14   of Dituri and SS1, on June 7th of 2020.  And then they were

15   funded on June 19th of 2020.  And he immediately moved the money

16   to different accounts.  And then on June 22nd, he goes to Verity

17   Credit Union, and tries to take out a good portion of that money

18   in cashier's checks.  Not just one cashier's check.  He got seven

19   different cashier's check, each for $20,000.  You saw this in Mr.

20   Petron's summary charts, in Government's Exhibit 209.

21        This was an effort to move the money and keep it away from

22   law enforcement, who he knew was onto him.  He was not going to

23   make the same mistake twice.  He was not going to let the federal

24   government seize his money again.

25        And you know that at least one of those cashier's checks made

1   its way into a Navy Federal Credit Union account in the name of

2   ES1 LLC.  And you also know that the plan didn't really work out

3   for him.  The government was able to seize most of the money,

4   despite his best efforts.  But think about that behavior, when

5   you start thinking about Mr. Shibley's intent.  As I said before,

6   guilty people lie.  They try to cover up.

7        And someone who legitimately needed and got these loans to

8   keep their employees employed, would be trying to correct the

9   issue at this point.  They would be concerned about their

10  employees.  They wouldn't be engaged in a cash-grab, running from

11  bank to bank in an attempt to hide proceeds from the government.

12       You saw the e-mail to Harvest, noting that the federal

13  government had seized his money.  You saw the bank records

14  showing the cash withdrawals, after this point.  And you heard

15  from Special Agent Moran about how she and other agents were

16  following Mr. Shibley at this point, where he went from bank to

17  bank to bank.

18       That's why it's so important that you use your common sense

19  when you evaluate the evidence in this case.  It's your common

20  sense that will help you determine whether Eric Shibley's

21  conduct, during the course of this scheme, is consistent with

22  someone who is running six legitimate businesses, with a million

23  dollars of payroll a month, to over 150 employees, but was just

24  behind on his taxes, or bad at his paperwork.  Or whether it's

25  consistent with someone who was engaged in a fraudulent

1    cash-grab, and was trying to cover it up.

2         And what your common sense tells you is that Eric Shibley

3    didn't have anywhere close to 150 employees.  He actually had

4    zero employees that he was paying salaries to.  And he had zero

5    employees that he was paying payroll taxes for.  And in order to

6    qualify for one of these forgivable loans, he had to have real

7    employees.  It said it on the form, over and over and over again.

8    It's the reason he was required to submit a 941 with each of the

9    applications.  Your common sense tells you, if he really believed

10   he was entitled to this money, he would have provided real

11   documentation to the SBA and to the lenders.  He would have

12   provided real employee names, when asked.

13        I want to take a few moments and just address Mr. Shibley's

14   testimony.  Mr. Shibley said a lot of things during his testimony

15   yesterday, and today.  Just because Mr. Shibley says something,

16   doesn't make it so.  Evaluate his testimony critically.  The

17   government has presented you with ample evidence of the

18   inconsistencies in the loan documents, the fact that there is no

19   evidence of federal payroll taxes, or state payroll taxes, the

20   fact that there's nothing in the bank accounts to support the

21   numbers that Mr. Shibley provided on these loan applications.

22   And the fact that none of Mr. Shibley's claimed employees

23   actually worked for him, according to the state.

24        Mr. Shibley claims he has 155 employees and over $1 million

25   in payroll, and $1 million in revenue each month.  But there's

1    just no documentary evidence of that.  Mr. Shibley has opened 59

2    different bank accounts, yet he apparently cannot be bothered to

3    use them.  Why, then, does he not have any books or records of

4    these businesses?  You know why.  Because he had these businesses

5    in name only.  He had three properties he was flipping "for

6    cheap," as he said over and over in his testimony.  He was not a

7    real estate mogul paying $1 million a month to 155 employees.

8        And you heard from Mr. Shibley that his workers were

9    primarily homeless and down on their luck.  The term he used for

10   where they lived was "shanties" or "under the bridge."  But

11   remember this chart from Mike Petron.  If we accept Mr. Shibley's

12   loan application numbers as true, he would be paying each

13   employee a minimum of $73,000 a year, or a maximum of $95,000 a

14   year.  How does this square together?  It doesn't.  155 people

15   who are making an average of $95,000 a year, are not all going to

16   be living in shanties.

17       The government presented you evidence of what Mr. Shibley's

18   business really was.  Mr. Shibley had some rental properties and

19   workers at those properties.  David Madrid told you about those

20   properties.  David Madrid told you that he never saw Mr. Shibley

21   give anyone any cash, and Mr. Shibley told David Madrid that he

22   paid his workers in rent and some food to eat.  The fact that

23   Mr. Shibley had some sort of house-flipping business using cheap

24   labor doesn't excuse the fact that he lied to the SBA or the

25   lenders in this case.  He lied to them repeatedly about having

1    real employees, making real salaries and receiving real benefits

2    to obtain forgivable government loans.  Mr. Shibley represented

3    on each loan that he had -- every time he submitted an

4    application saying this, he lied.  Mr. Shibley had some workers

5    for his own properties.  He did not have employees.

6         Turning to the third and final part of my presentation, I'm

7    just going to go through the elements of each count of the

8    indictment and show you how the evidence matches those elements.

9    I'm going to go through one by one and explain how the evidence

10   I've just summarized fits in the elements of the counts.  There's

11   overlap because we have already been through the scheme and

12   intent and materiality in great detail.  The evidence that shows

13   the existence of the scheme and the materiality of the scheme and

14   the defendant's intent is going to be similar from count to

15   count.  But as the judge has instructed you, consider each count

16   separately when you are deliberating.

17        Eric Shibley is charged with wire fraud, bank fraud, and

18   money laundering.  Counts 1 through 7 charge the defendant with

19   wire fraud, which requires four elements.  First, that the

20   defendant knowingly devised a scheme or plan to defraud by means

21   of false or fraudulent pretenses; second, that the statements

22   made or facts omitted as part of the scheme were material; third,

23   that the defendant acted with the intent to defraud; and, fourth,

24   that the defendant used or caused to be used an interstate wire

25   communication to carry out an essential part of the scheme.

1      So turning to Count 1, this relates to the documents we have

2   seen time and time again in Government's Exhibit 1.  It's the

3   electronic transmission of the loan note with false certification

4   to Ready Capital on April 23rd, 2020, in the name of the A Team

5   Holdings.

6      First, the scheme to defraud.  We have already discussed this

7   in great detail, the scheme and the lies involved.  Second, that

8   the lies were material.  Again, we've already discussed this in

9   great detail.  There's plenty of evidence of false statements and

10  concealment in the scheme.  Think about how many false statements

11  we saw in the loan applications about the defendant's employees

12  and payroll and payroll taxes.  Third, that the defendant acted

13  with the intent to defraud.  Again, we have covered it, so I'm

14  not going to cover it again.  And, finally, that the wire

15  traveled in interstate commerce.  You know that Mr. Shibley sent

16  this from his house in Washington State because of the DocuSign

17  certificate that is attached with IP address information.  And,

18  then, John Moshier, the Ready Capital witness, told you that

19  Ready Capital servers were based in New Jersey and that PPP notes

20  would be received in those servers.  And you also know that Eric

21  Shibley was in Washington State for the entirety of the scheme

22  because of the IP address information and the bank records that

23  Special Agent Moran testified to.

24      Turning to Count 2, this relates to the documents that we

25  have looked at in Government's Exhibit 2.  It's the electronic

1 transmission of the fraudulent PPP application to TCF Bank in the

2 name of Seattle's Finest Cannabis.  Again, the scheme to defraud

3 we have covered, as we have also covered the materiality of the

4 lies.  Intent to defraud, we also have covered.  So we're left

5 with that the wire traveled in interstate commerce.  This is,

6 again, easy.  You know that Mr. Shibley was in Washington State

7 for the entirety of his scheme.  And Dave Haagsma of TCF Bank,

8 now Huntington Bank, told you that loan applications would have

9 been received and reviewed by employees in Minnesota, Michigan,

10 or Ohio.  So, again, you have an interstate wire.

11      Moving on to Counts 3 and 4, which I would like to discuss

12 together because they are both Dituri Construction applications

13 that we have looked at in Government's Exhibits 3 and 4, and

14 they're illuminating because of the inconsistencies between the

15 two, which I know that we have discussed at length at this point.

16 Count 3 relates to the documents that we looked at in

17 Government's Exhibit 3, and Count 4 relates to Government's

18 Exhibit 4.  And looking at them, you see that the two loans seek

19 very different amounts and are supported by two entirely

20 different tax forms.  And for both of those counts, we have

21 covered the scheme to defraud, the material lies, and that

22 Mr. Shibley had the intent to defraud when he engaged in the

23 scheme.

24      But for Dituri, also remember that you saw that purchase

25 agreement from May 2020 that Mr. Shibley provided in response to

1    the grand jury subpoena.  Mr. Shibley purchased an ownership

2    interest in Dituri Construction in May of 2020 for $10.  Think

3    about that.  This is a business that was supposedly paying out

4    payroll of over $400,000 a month, yet it was only worth $10?  It

5    just doesn't add up.

6        The last element for both of these counts is, again, that the

7    wires traveled in interstate commerce.  And this is, again, easy

8    because Mr. Shibley was based in Washington State for the

9    entirety of his scheme.  For Count 3, John Mosier told you that

10   Ready Capital didn't have servers in Washington and it would have

11   been received in New Jersey, just as in Count 1.  And for

12   Count 4, Nissen Liddiard told you that Celtic Bank servers were

13   in Utah and that they didn't have servers in Washington.  So for

14   both of these, you again have an interstate wire.

15       Turning to Count 5, which relates to the documents we looked

16   at in Government's Exhibit 5 -- or 5 and 46, it's the electronic

17   transmission of the loan note to Harvest for SS1 on May 5th.  And

18   as with the other counts, we have covered the scheme, we have

19   covered materiality, and we've covered that he had the intent to

20   defraud.  The last element of Count 5 is that the wire traveled

21   in interstate commerce, which is again easy, because Mr. Shibley

22   sent the loan note in an e-mail from Washington State where he

23   was based, and Adam Seery told you that Harvest received e-mails

24   in California where it is based.  So, again, you have the

25   interstate wire.

1    Moving to Count 6, which is related to Government's

2   Exhibit 27, this is the fraudulent EIDL application on June 7th,

3   2020, in the name of Dituri Construction LLC.  And, again, we

4   have covered all the elements here, but on this wire in

5   particular, remember -- actually, I apologize.  But turning to

6   the last element of Count 6, you know that the wire traveled in

7   interstate commerce because Kathleen Littwin told you that this

8   loan application was sent to a server in West Des Moines Iowa.

9   She knew that because of the date of the loan application and the

10   application number.

11    Turning to Count 7, which relates to government's Exhibit 28,

12   this is the fraudulent EIDL application on June 7th, 2020, in the

13   name of SS1.  On the SS1 EIDL application remember that

14   Mr. Shibley submits a second EIDL application, just a week later

15   claiming $200,000 less in gross revenues for the year before.

16   And remember that on this application, which was submitted on the

17   same day as the Dituri application submitted in Count 6, they

18   have the same exact gross revenues and cost of goods.

19    The last element, again, for Count 7 is easy.  You know that

20   the wire traveled in interstate commerce because Kathleen Littwin

21   told you that this would have been received in West Des Moines,

22   Iowa.

23    All of the wires that we have walked through in Counts 1

24   through 7 were used to carry out a part of the scheme.  They were

25   all essential parts of the scheme because the false application

1    or the loan notes that Mr. Shibley submitted were to get money

2    out of the lenders and the SBA.

3        Moving to the bank fraud counts that Mr. Shibley is charged

4    with in Counts 8 through 10, bank fraud requires five elements.

5    First, that the defendant, again, knowingly carried out a scheme

6    or plan to obtain money or property from a financial institution

7    by making false statements or promises; second, that the

8    defendant knew that the false statements or promises were

9    false -- that the statements or promises were false; third, that

10   the statements or promises were material; fourth, that the

11   defendant acted with the intent to defraud; and, fifth, that the

12   financial institution was federally insured.

13       Count 8 is the exact same submission we just looked at in

14   Count 2.  It is the electronic transmission of the fraudulent PPP

15   application to TCF Bank in the name of Seattle's Finest Cannabis.

16   And you know that TCF Bank was federally insured because you saw

17   the FDIC certificate in Government's Exhibit 213 and you heard

18   Mr. Haagsma testify to that.

19       Count 9 is the electronic transmission of the loan note with

20   the false certification to Customers Bank in the name of the A

21   Team Holdings.

22            THE COURT:  Counsel, let's deal with that after lunch.

23            MS. CONNELLY:  Okay.

24            THE COURT:  We will take the noon recess until one

25   o'clock.  Your lunches should be delivered to you shortly, if

1    they're not already in there.  We will be in recess.

2                              (Recessed.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          AFTERNOON SESSION

2          THE COURT:  Are you ready for the jury?

3          MS. CONNELLY:  Yes, Your Honor.

4          THE COURT:  All right.  Bring them in.

5      Please be seated.

6      (The following occurred in the presence of the jury.)

7          THE COURT:  All right.

8          MS. CONNELLY:  So just to orient us to where we were

9   before we had to head to lunch, we have been reviewing the counts

10  of the indictment that you are going to be reviewing when you get

11  back to the jury room.  And we have gone through the wire fraud

12  counts, which is Counts 1 through 7, and we're now at the bank

13  fraud counts, which are Counts 8 through 10.

14      And we left on Count 9, which is the electronic transmission

15  of a loan note with false certifications to Customers Bank, in

16  the name of the A Team Holdings on April 30th of 2020.  And

17  remember that this is the same loan application that was sent to

18  Ready Capital that is the basis of Count 1.

19      John Moshier told that you Ready Capital and Customers Bank

20  had an agreement, namely that Ready Capital would receive and

21  approve the loans, and then Customers Bank would fund the loans.

22  And after Ready Capital approved the loan, it would send the loan

23  note in the name of Customers Bank to the borrowers.  And, again,

24  Customers Bank, as you see on the screen, is FDIC insured.  You

25  saw the FDIC insured certificate in Government's Exhibit 212.

1          Count 10 is the exact same submission, again, that we went

2     through in Count 4.  It, again, related to the documents we

3     looked at in Government's Exhibit 4.  It's the electronic

4     transmission of the PPP application to Celtic Bank in the name of

5     Dituri Construction.  There's no doubt here that Celtic Bank was

6     federally insured.  You saw Nissen Liddiard testify to that fact.

7     Then you also saw the FDIC certificate in Government's 211.

8          As to the final five counts of the indictment, Eric Shibley

9     has been charged with money laundering.  Which you heard from

10    Judge Coughenour to mean that, one, the defendant knowingly

11    engaged or attempted to engage in a monetary transaction; two,

12    the defendant knew the transaction involved criminally derived

13    property; three, that the property had a value of greater than

14    $10,000; four, that the property was, in fact, derived from the

15    wire fraud or bank fraud, that we went through in Counts 1

16    through 10; and five, that the transaction occurred in the United

17    States.

18         The five transactions that Eric Shibley was charged for, for

19    money laundering, are as follows:

20         You have Count 11, which is the transfer of $960,000

21    Customers Bank PPP loan, that was provided to the A Team Holdings

22    from one Wells Fargo account on 5/4, to another Wells Fargo

23    account on 5/4.

24         You have Count 12, which is the transfer of the Celtic Bank

25    loan of $563,500, on May 6th, 2020, between two BECU accounts.

1    Count 13 is the transfer of the $820,000 Harvest PPP loan

2    that was provided to SS1.  Again, from one BECU account to

3    another, on May 19th, of 2020.

4    Count 14 is actually just an extension was Count 11.  It

5    again relates to the $960,000 Customers Bank loan that went into

6    the Wells Fargo accounts.  And then when Mr. Shibley removed the

7    $150,000 in cash on May 26th of 2020.  That is the basis of

8    Count 14.

9    And finally, Count 15 is the deposit of a $20,000 cashier's

10   check, made up of EIDL proceeds, to a Navy Federal Credit Union

11   account in the name of ES1 LLC.

12   The evidence you have seen throughout this trial supports all

13   five of those money laundering charges.  You know that Eric

14   Shibley engaged in these transactions, because you have seen the

15   bank records.  And you can go back and look at the bank records

16   in the jury room.  You have seen he took money out in cash, he

17   moved money between accounts, and he obtained cashier's checks.

18   Furthermore, you know, and Eric Shibley knew, that the money

19   that he was moving was derived from wire and bank fraud proceeds,

20   because you can see it in the bank records.  And you heard from

21   Mr. Petron and Special Agent Moran that these did, in fact, come

22   from PPP and EIDL funds.  And you know that all of these

23   transactions occurred in the United States, because Mr. Shibley

24   was in Washington State for the entirety of his scheme.

25   Thus, each and every element of the money laundering charges

1    has been satisfied.

2        Members of the jury, I'm nearly done, but I wanted to leave

3    you with some parting thoughts before I sit down.  I know there's

4    a lot of evidence and there are a lot of details to go through in

5    this case.  And when I sit down, Mr. Nance is going to have the

6    opportunity to speak to you, and then I'm going to speak to you

7    one last time.  And I ask that you -- as you listen to Mr. Nance

8    with the same attention that you have given me, that you ask

9    yourself, are the things he tells you in evidence?  Do they make

10   sense?  Do they fit in with what the witnesses have told you in

11   this case?

12       Make sure you continue to focus on the evidence.  Because

13   nothing that I say, or nothing that Mr. Nance says, whether in

14   opening statement, or closing arguments, or in the questions to

15   the witnesses, is actually evidence.  The documents, the

16   testimony that you have heard in this case, that's the evidence,

17   and that's what you should be focusing on.

18       But really when it comes down to it, this case is very

19   simple.  If it walks like a duck, if it quacks like a duck, then

20   it's a duck.  And so when you see Eric Shibley submitting loan

21   after loan after loan, containing lie after lie after lie, each

22   with new and different numbers, trust your instinct, trust your

23   judgment, and trust what you see.  Because if it looks like a

24   fraud, and it acts like a fraud, then, members of the jury, it's

25   a fraud.

1      And in this case Eric Shibley, he lied to get money that was

2   not meant for him.  He lied to get money that he was not entitled

3   to.  He took advantage of an unprecedented crisis to line his own

4   pockets.  And he wound up getting $2.8 million in taxpayer money.

5   So find him guilty.  Thank you.

6           THE COURT:  All right.  Mr. Nance.

7           MR. NANCE:  May it please the court, counsel, ladies and

8   gentlemen of the jury.

9      In the opening I told you that this case was about a sloppy,

10   chaotic business with missing payrolls and missing documentation,

11   that the government has mistaken for bank fraud, wire fraud.  I

12   would suggest and submit that the evidence has borne that out.

13      Eric Shibley made a lot of mistakes in how he conducted his

14   business and how he attended to his tax reporting and his

15   obligations and how he applied for loans.  But the evidence has

16   not shown that he intended to defraud anybody.  And you should

17   acquit him of those charges.

18      What it has shown is a proud, ambitious man trying to fit, in

19   his own way, into American culture.  First, as simply a new

20   immigrant to America, struggling to learn English.  Then as a

21   doctor in a very demanding profession.  Finally, as a player, in

22   the hot Seattle housing market.

23      Eric Shibley is an intelligent man on many levels, but not

24   wise to the many ways of the business world.  When the PPP

25   program came along, he jumped at the opportunity without fully

1    appreciating the importance of the paperwork he filed in support

2    of the applications and without a real understanding that the

3    business activities were heavily under-documented.

4         Now, you've seen some of the exhibits that we offered into

5    the case, everything from IDs of folks that worked for him as

6    employees, a number of exhibits pertaining to expenses, and

7    actually some photographs of actual work activity, interior and

8    exterior construction.  And as Mr. Shibley himself told you, this

9    was a tiny, tiny fraction of the total activity.  These were just

10   simply items that we were able to put together to show you.

11        Yes, there is a large underground economy out there, there's

12   no question about that, involving mostly all-cash transactions.

13   It's convenient, oftentimes.  It's economic.  And it affords some

14   privacy.  But there's real drawbacks to it, too.  It's harder,

15   much harder to get credit.  Without a paper trail, it's much

16   harder to prove that you actually paid for something.  And this

17   case has been a big illustration of that point.

18        The government wants to make this case open-and-shut by

19   saying that Mr. Shibley's bank records don't support his claims

20   of dozens of employees and a large payroll.  And, largely, we

21   agree that the bank records don't support that, that proposition.

22   That was the whole thesis of the testimony of Mr. Petron, Michael

23   Petron, the expensive financial consultant who testified on the

24   subject.

25        The bank records do not support his claim of a large payroll.

1   But if he's dealing largely in cash, being paid in cash, paying

2   people in cash, people for expenses in cash, you wouldn't expect

3   the bank records to verify that much.

4       Mr. Petron, actually I asked him directly about some of this,

5   is a very much by-the-book kind of guy; everything is in its

6   place, his forms are filed, probably on time.  He's got heavy

7   documentation.  And he's probably current on his taxes.

8       Eric Shibley is the polar opposite.  He is not a play-

9   by-the-book kind of guy.  Things are out of place.  All the forms

10  aren't filed.  He's behind on his taxes.  It's just the way it

11  is.

12      Now, the elements of the case, of the thing -- Ms. Connelly

13  has been through this, but they're set forth -- the primary

14  charges are wire fraud and bank fraud.  And, of course, the money

15  laundering is based on that.  So if you go back to the elemental

16  charges, the fraud charges, the instructions and elements of

17  those are found in Instructions 15 and 16 in your packet.  Both

18  require a scheme or plan to take money by false statements.  The

19  statements have to be material, in that they have to have a

20  natural tendency to influence someone to part with money.  And

21  the person has to act with the intent to defraud, to deceive and

22  to cheat.

23      The government has not proven all of these elements beyond a

24  reasonable doubt.  Their job has been made more difficult by the

25  circumstances in the way that the PPP program was designed.  It

1  was rushed out the door, in late March 2020, in the wake of the

2  pandemic crisis.  It was widely promoted.  Almost overnight, the

3  business community was hard hit, was flattened by the pandemic.

4  The same community was inundated with offers of seemingly free

5  government money.

6       Almost any business, anywhere in the country, with employees,

7  smaller businesses, less than 500 employees, were eligible.  Most

8  were impacted by the COVID problem, and so virtually any

9  business, every business with employees, was eligible.  They

10  could apply, they could use the money to pay workers.  There were

11  other expenses they could use it for, interest and utilities, and

12  have the loan, under certain conditions, forgiven outright, over

13  time.

14       But for the lenders, it was a gold mine.  The government

15  would pay them a handsome fee, of as much as 5 percent on the

16  face value, face amount of the loan, and guaranteed it.  If the

17  borrower repaid the loan on time, the lender made interest on the

18  loan and kept the fee.  If the borrower defaulted on the loan,

19  the lender was reimbursed by the SBA, and kept the funding fee.

20  If the loan was forgiven, which was the goal by many of the

21  borrowers, the lender was repaid the amount of the loan by the

22  SBA, and guess what, they kept the funding fee.

23       This was a tails-I-win-heads-you-lose sort of situation.  No

24  lose, risk-free opportunity for the lenders.

25       Ms. Zelaya, Kandace Zelaya told us -- of the SBA, told us

1    that the SBA did not participate in the screening of the PPP

2    borrowers, nor did it monitor what the borrowers did with the

3    money, and did not require what the lenders monitor what was done

4    with the money.  Is it any wonder that there was a feeding frenzy

5    by the banks and the lenders to get on this gravy train.

6         John Moshier of Ready Capital acknowledged that, within weeks

7    of the passage of the CARES Act, his lending service had far too

8    many approved PPP loans to even fund them, and he had to farm

9    them out.  Mr. Seery, Adam Seery said his bank, Harvest Bank, had

10   to shut down all other lending at the time to deal with the glut

11   of PPP loans.  He called it a high-volume program.

12        There was another 38 -- let's see if I have this right --

13   there were 5,200 loans, I believe they funded, and 3,800 did not

14   get funded, not because the program ran out of money, not because

15   the applicants were rejected, but because they ran out of time.

16   They couldn't get to them fast enough.  They couldn't process the

17   loans fast enough.

18        Meanwhile, over at Celtic Banking, over half their business

19   was PPP lending, according to Nissen Liddiard, one of the

20   witnesses here.  Mr. Seery, of Harvard Bank -- Harvest Bank, gave

21   us the real reason.  The real reason for the bank stampede was to

22   do this lending.  There was a 5 percent upfront lending fee, paid

23   by the SBA to the lender, on loans up to $350,000; 3 percent on

24   larger loans, up to $2 million; and 1 percent on loans above $2

25   million.

1          From this testimony, the testimony alone from this trial, we

2    know that Harvard -- I keep saying Harvard -- Harvest, Harvest

3    loaned $1.2 billion under the PPP program.  Its average loan size

4    was $200,000, according to the testimony, meaning it fell into

5    the 5 percent fee category.  If you do the math, that's about

6    $60 million in fees that Harvest made, just on this one program,

7    the 5,200 PPP applications.  Celtic Bank loaned over a billion

8    dollars last year.  It would have earned a similar amount.

9    TCF Bank, according to Dave Haagsma, its representative, did

10   twice that business, about $2 billion.  And then the only other

11   figure we got really was from Mr. Moshier, Ready Capital, who

12   said they processed 100,000 -- 100,000 PPP applications.

13         There was no meaningful verification process.  Mr. Moshier

14   told us what is already obvious.  It was far easier to qualify

15   for a PPP loan than it was a traditional loan, a conventional

16   loan; it was self-verifying, subject to less scrutiny, and it was

17   guaranteed.

18         He went further and said that his bank did not verify whether

19   borrowers were delinquent on taxes; it didn't matter to him.  In

20   reality, nothing much mattered to these lenders except processing

21   applications and taking the loan fees.

22         And, of course, all of these bankers were put on the spot.

23   They bring them in and they ask them if it mattered, if it

24   mattered what the applicants put on the applications.  What were

25   they supposed to say?  If they said it really didn't matter, they

1    might be kicked out of the program.

2        Why does it matter in this case?  Well, it matters because it

3    goes to a critical element of a fraud prosecution.  The

4    government has to show that representations in PPP applications

5    were materially false.  They had to have a natural tendency to

6    influence or be capable of influencing a person to part with the

7    money.

8        The materiality and element is for you, the jury, to decide

9    that it has to be proven beyond a reasonable doubt.  But consider

10   that these bankers were motivated not so much by civic concern

11   and wanting do the right thing, as they were to join this gravy

12   train of a funding frenzy.  And in the environment of spring

13   2020, they may not have really cared about the fine print on the

14   funding applications they received.

15       The same is true for the odd language in the SBA form used in

16   the applications that appeared to restrict persons who were on

17   misdemeanor probation.  You will recall some of the early

18   testimony about that.  Even the SBA doesn't think that's material

19   now.  In the face of a lawsuit last year, accusing it of

20   overreaching its authority, it reconsidered its position and

21   agreed to revise the standard form that now allows misdemeanor

22   probationers, people like Mr. Shibley, who apparently was in that

23   position, to apply for loans.

24       The SBA may still say the original question on the form he

25   used concerning his misdemeanor status, probation status, was

1  important; but its actions belie that.  You can bet that none of

2  the bankers gave it a second thought.  In the real-world, in the

3  business world, it wasn't material to them.  You could acquit

4  Mr. Shibley on that basis alone.

5      The other major point, the major element that is in question,

6  is the intent to defraud.  The instructions tell you that intent

7  to defraud is shown if one moves or acts to deceive and cheat.

8  And the evidence is, at best, ambiguous on that.  Mr. Shibley

9  denied it vehemently, of course.  You heard him directly.  He

10  told you his story.  He didn't have to testify, by the way.  He

11  had the right to remain silent.  He had a constitutional right to

12  remain silent.  And he chose to waive that right, subject himself

13  to a full cross-examination, and tell you his story.

14      And he told you about the highs, and some of the lows.  He

15  told you what he did, and he told you why he did it.  You know,

16  there was some chaos in his life, in his business.  I think

17  that's not any big secret.  But that doesn't make it criminal.

18  There's other things he did that cast doubt on any fraudulent

19  intent.

20      You know, a number of times I called up that Form 941 that

21  the government has repeatedly referred to as a part of the

22  applications.  The 941 is just the employer's quarterly report of

23  payroll.  And it was on that that many of these loans, maybe all

24  of them, were based.  But the 941 form itself, in fact all of

25  them that were submitted with his name on it, had a number of

1   employees, a payroll amount, and a tax obligation that was

2   immediately due, or even past due, that was apparently unpaid.

3   Because the deposit area was a big fat zero.

4       So if he's going to -- if he's going to run a fraud, why

5   wouldn't he just say he paid the taxes.  I mean, why openly

6   acknowledge that you owe all of this money?  That's a deterrent

7   to being lent to.

8       The other -- one of the other things that he did, and this

9   was presented through the government's -- one of their witnesses,

10  Mr. Mondala, who talked about the phone call.  There were two

11  phone calls that he had with Mr. Shibley.  And Mr. Shibley, in

12  the phone calls, openly acknowledges:  Yeah, I'm calling about

13  getting this money.  I want to make this cash withdrawal.  And

14  he's asked:  Why do you need all of this cash?  Well, first of

15  all, it's in his name, he's applied for it, it's been granted.

16  So it's his money.

17      And he's quite candid about what he needs it for.  When he's

18  asked about it from Mr. Mondala, he needs the cash, he needs it

19  to pay employees.  Why does he need it to pay the employees?

20  That's what the employees expect.  That's what they want.  Some

21  of them, maybe a lot of them, don't have social security numbers.

22      I asked Mr. Mondala:  Well, what problems would that present?

23  Would a person with no social security number, and not any ID,

24  would that be a problem with cashing a check?  Yeah, of course it

25  would.

1    It's also -- you know, if you're down and out with nothing,

2   no ID, no -- no means of really establishing your identity, and

3   you have to resort to a payday check cashing outfit, they're

4   going to take a big percentage of the money.  So that was what

5   was behind that.

6    The other thing that would have been unusual for a fraudster

7   to talk about was to sort of voluntarily talk about these

8   additional funds coming in.  There's another large PPP loan

9   proceed, $800,000, that's due within days at the same bank.

10  Mr. Shibley tells him:  Yeah, I'm planning to take that out, too,

11  in cash.  Yeah.

12   So I just think if he were -- if he were planning -- if you

13  are really planning a fraud, you don't -- you are not that open,

14  that candid, with a bank security person.

15   Also, Mr. Shibley never hid who he was.  He was always really

16  in the same place.  His phone number is on all of these

17  applications.  He could be found.  Mr. Mondala found him by

18  calling the number on the application.  He's at one location.

19  He's easily found.  He was available.  Nothing prevented folks

20  from coming out to meet him in person, or to going to the work

21  sites.

22   This is -- there's another way to look at this.  Isn't this

23  full set of circumstances also consistent with a man who is maybe

24  trying to find his way?  Maybe he's lost at sea.  You can think

25  of your own metaphor.  But if you flash back on his background,

1    he's a proud individual.  He grew up in a really poor country.

2    And he achieved what, for a lot of folks there, would be an

3    impossible dream.  He made it to medical school.  I mean, that's

4    enormously prestigious.  He gets to medical school.  And then he

5    gets to go to America.  He gets -- that's one in 10,000 over

6    there.  That's very unusual.  He's the pride of his family.

7          And he's probably used to succeeding, at every level.  We

8    heard he was a good student.  I don't doubt it for a second.

9          He comes to America, and suddenly he's at ground zero, again.

10   He doesn't even speak the language.  And so he's got to start

11   there.  He does learn the language.  He apparently becomes a

12   naturalized USA citizen.  Gets back on his feet.  Wants to take a

13   run at doing medicine here.  Gets the credentials.  I'm sure it

14   wasn't easy.  He did it.

15         But then he's into it for a while, and darn if he's not

16   knocked back off his feet again.  He doesn't -- this isn't

17   working for him.  He is -- he's got issues within the profession.

18   You heard some of the problems.  It's bureaucratic, it's

19   overbearing.  He doesn't agree with the philosophy of a lot that

20   he sees in American medicine.  Some of us may agree with that or

21   disagree with that.  But that's the way he perceived it.  He

22   thinks it's too expensive, he thinks it's too directed toward,

23   you know, making money, rather than actually helping people,

24   which is what he thought he was getting into it to do.

25         And so he's withdrawing or trying to kind of put some

1    distance there.  And he, on the side, begins lurching into this
2    other field that he, frankly, doesn't know that much about.  Real
3    estate.  He knows something.  He's smart, but this is a field
4    that he's not really that versed in, and he's using what he has.
5    I mean, the other major supports in his life have kind of fallen
6    away.  He's lurching into real estate.  He's using what he has at
7    his disposal.  He's got an old client base.  He's got lots of
8    contacts.  He knows, obviously the people, the life, the world,
9    that these former patients come from, as a down-and-out world.
10   That's where he goes to, because that's where he feels
11   comfortable working.  And he uses the network.  And he starts
12   doing what he's doing.
13       Now, he may not know the -- know the business, fully.  He
14   probably didn't understand tax issues, tax ramifications, tax
15   obligations.  Probably didn't understand formal payroll
16   operations.  Still probably trying to adjust to the culture,
17   probably doing a somewhat passable job at covering over.  But
18   there's stuff there that is still at issue, I'm sure.
19       Somewhere along the way he starts paying someone, probably to
20   help him get his bookkeeping together.  Frankly, it sounds like a
21   little half baked, like maybe it wasn't fully up to full
22   standards.  He's getting something done, but yet he doesn't
23   really have stuff that he can produce in the moment.  He doesn't
24   have anything that he can actually give to the government.  He
25   doesn't have anything really that he can bring in here and show

1    you.

2         This was a -- yeah, this is simply a chaotic situation.  I

3    mean, he's trying to make it what it -- the best it can be.  But

4    there's no getting around this.  There are no written payroll

5    records that are available.  And there was not a smooth flow of

6    money into and out of accounts that can document the various

7    things that we have been talking about.

8         And then the pandemic hits.  The pandemic hits.  And there's

9    more chaos.  Mr. Shibley is a strong, creative individual, but

10   he's flattened by this as well.  A lot of businesses are.  He

11   sees the PPP as a lifeline.  This is a way that -- this may be

12   something here.  It was an opportunity.  And he acted because he

13   thought he was eligible to act.  He did what he did.  This might

14   be a way to save himself, to save his businesses, and keep the

15   ragtag operation alive and maybe give it new life.  It was not

16   perfect by any means, it's not pretty, but it's not criminal.

17        Eric Shibley is presumed innocent.  All defendants are

18   presumed innocent.  This is a criminal case, and there are very

19   high stakes for him.  The government has charged him with these

20   crimes, these fraud crimes.  Obviously, guilt by accusation,

21   guilt by indictment, is not evidence, it's not the test.  The

22   government easily believes everybody it charges is guilty, but

23   that's not the test.  It doesn't matter what the government

24   thinks; what matters in the end is what you think.

25        The test is whether, at the end of the day, it's proven its

case beyond a reasonable doubt and overcome his presumption of innocence. The presumption of innocence, it's like a shield that protects us all from arbitrary government action and having all the forces of the government array against you. It's how you might feel if you or a member of your family were accused of a crime. You would probably greet that with some degree of skepticism and say that you have got to show me, you have got to prove this. The presumption of innocence remains in full force and effect until it's overcome by proof beyond a reasonable doubt. And even then, it's only overcome when you say it's over. You have got the power to acquit. Mr. Shibley can never be guilty unless and until you say so.

The burden of proof in this case is on the government because of its vast power, its money, its resources. It's chosen to unleash the full federal law enforcement apparatus in this case. In fact, I'm not sure I can remember another case where so many different federal law enforcement agencies have all come down on one man in one case. In this case, I mean, you could just tick them off. There's the FBI, the nation's premier law enforcement agency; there's the IRS; there's the Department of Homeland Security; there's the Office of Inspector General. And they have got different divisions, as I understand it. One works with the Federal Deposit Insurance Corporation that's involved here; of course, the SBA, Small Business Administration, has an Office of Inspector General; and then the Department of HHS, I think that's

1    Health and Human Services, if I'm not mistaken, but it has an

2    investigative wing of that as well.  They have all been involved

3    in this and working on this.  And then, of course, there's two

4    talented AUSAs here, Assistant U.S. Attorneys, Ms. Connelly and

5    Mr. Werner.  So they have really thrown the book at Mr. Shibley.

6        The government has enormous power.  They have summoned law

7    enforcement, they have summoned private citizens -- we have seen

8    it here; Mr. Madrid, David Madrid, was brought in, Lisa Velotta

9    was brought in -- the government's combed through bank records

10   with a fine-tooth comb, and at least, in one instance, it used an

11   undercover police officer to make a deceptive phone call to

12   Mr. Shibley.  Instruction 13 says the law allows that, but we,

13   the defense, can't do that.  We can't do that.  That would be

14   probably a crime for us to do that, to record.  We can be

15   deceptive, I suppose, on the phone, but if we recorded something

16   unbeknownst to the person we're calling, that's criminal in this

17   state.  The defense can't make deceptive phone calls.  We do have

18   subpoena power, but the government not only has that; they have

19   the power to haul people before a grand jury, interrogate them at

20   length under oath, in secrecy, and on threat of contempt if they

21   don't talk.  People usually just agree and talk to them.  The

22   defense can't make people talk to them.  We can't obtain search

23   warrants; the government can.  We can't seize accounts; the

24   government can.  In fact, they did in this case.  We don't have a

25   badge to flash.  We can't haul people -- I think I have said

1   that.  We can't do it.

2       We simply, the defense, can't investigate this case the way

3   the government can and has done, and it impacts the way that we

4   prepare for trial and actually conduct a trial.  If we can't talk

5   to witnesses in advance, it's more difficult for us to anticipate

6   how they might -- how things might play out.  Of course, the

7   government, on the other hand, has the resources, they have got

8   the tools, the police, the labs, the technicians, the forensic

9   experts.  They have got a lot of things that the defense simply

10  does not have.  Eric Shibley has a court-appointed lawyer and a

11  paralegal.  He lacks the resources to investigate and prepare the

12  way the government can and has.

13      So the burden of proof, a very long-winded way of talking

14  about it, but the burden of proof is placed fully on the

15  government because it helps level the playing field just a little

16  bit.

17      Now, the seriousness of the charges are all the more reason

18  that the burden of proof remain with the government because the

19  consequences of Eric Shibley being convicted, they're very

20  serious for him.  The burden of proof is properly on the

21  government's shoulders here.  So if something is missing in the

22  case, ask yourself:  Whose burden has it been to produce it?

23      Then there's reasonable doubt.  Instruction No. 4 talks about

24  reasonable doubt.  Basically, it's based on reason and common

25  sense.  Our own life experiences, though, and common sense, tell

1    us that most things in life are not black and white; there's a

2    gray area in there.  The same is true in criminal law.  It's not

3    all innocence/all guilt.  There's a gray area in between, and

4    it's reasonable doubt.

5        Eric Shibley may well be fully innocent for the reasons I

6    have outlined, but you don't have to make that finding, you don't

7    have to give him a certificate of innocence to fully acquit him.

8    Because in between guilt and innocence, there's reasonable doubt.

9    And because of what's at stake here, Eric Shibley's ability to

10   walk out of this courtroom a free man unless the government

11   extinguishes every single reason to doubt, the gray area is

12   enough to acquit.  And you should acquit for ambiguity, for

13   uncertainty.  Reasonable doubt is any reason to doubt.  It's any

14   doubt with a reason.

15       Mr. Shibley, Eric Shibley, is not guilty of fraud or money

16   laundering because the evidence does not support those charges.

17   He did not intend to cheat anyone of anything; he's not guilty

18   and should be acquitted.

19       Now, you've invested a lot of time hearing this case, but

20   remember that you sit in a very privileged position.  As a

21   criminal juror, you are part of a justice system that is the

22   marvel of the free world.  The criminal jury is one of the

23   greatest protectors of personal liberty ever contrived and it's

24   one of the great cornerstones of our democracy.  It's enshrined

25   in the Bill of Rights, in our Constitution.

1        As the jury, you twelve people represent all the people from

2   whom all legitimate government is derived.  You are the last line

3   of protection against ill-considered and overbearing actions by

4   the government.  And you, the jury, serve as the final check on

5   excessive government power.  You have both an awesome

6   responsibility and a magnificent opportunity to do justice -- to

7   do justice, to do right.  As the jury in your case, you're all

8   that stands between the government with its vast resources and

9   this man on trial for his liberty.  Our system wisely invests

10  you, the jury, with virtually absolute and final authority as the

11  fact finder.  No authority anywhere, not this court, not any

12  appellate court, can ever alter your decision to acquit Eric

13  Shibley and set him forever free.  You, and you alone, hold the

14  key to his liberty and you should use it.

15             THE COURT:  All right.  Rebuttal.

16             MS. CONNELLY:  May it please the court.  The defendant's

17  entire case rests on a fantasy world where he really does have

18  150 employees, he really does have to pay regular wages, he

19  really is a real estate mogul who's developing properties and

20  flipping house after house after house.  And he's just behind on

21  his paperwork, he's just not the most organized, his bookkeepers

22  and site managers couldn't get his records together, they

23  couldn't get the names of the employees together.  And, members

24  of the jury, this is just a fantasy because, if it were true,

25  someone would have found some evidence of the six companies

1   paying a million dollars a month in payroll to over 150

2   employees.  But no one did, not the IRS, not the Washington State

3   agencies, not Mr. Petron, who reviewed bank accounts, and, most

4   importantly, in response to the grand jury subpoenas, not even

5   the businesses themselves could find any records.  They couldn't

6   produce a shred of evidence that they had paid a million dollars

7   a month in payroll to over 150 employees.  They couldn't even

8   produce the names of the bookkeepers that are allegedly running

9   these fantasy books that Mr. Shibley testified actually do exist.

10  They couldn't find the names of the site managers who collect the

11  names of the imaginary employees on these multiple sites that

12  Mr. Shibley is running.  No one saw these fantasy businesses and

13  the businesses didn't produce any records because they are just

14  that, they are a fantasy, and they didn't exist.

15      I want to talk briefly about Mr. Nance's statements about the

16  PPP and EIDL programs and the PPP lenders in particular.  The PPP

17  and EIDL programs may have been imperfect, but remember what they

18  were in response to.  They were in response to a crisis, they

19  were in response to an emergency.  And so maybe, with the benefit

20  of hindsight, we could come up with a better program, we could

21  figure out how to do this differently.  But the CARES Act is not

22  on trial, the SBA is not on trial, the PPP lenders are not on

23  trial, and the marketing department of the PPP lenders are

24  certainly not on trial.  Mr. Shibley is on trial.  He's the one

25  who submitted 39 fraudulent applications, and the fact that the

1   loan process may have been condensed or there wasn't as much

2   documentation required is not a defense to Mr. Shibley's repeated

3   lies to the SBA and to the lenders.

4       The fact that the lenders made a processing fee is not a

5   defense to the fact that Mr. Shibley provided fake tax forms and

6   lied repeatedly when asked about the state of his businesses.

7   Whatever motivation the lenders may have had does not change

8   Mr. Shibley's lies in this case.

9       Mr. Nance also talked to you about reasonable doubt.  And

10  that's an instruction that you can look at, as Mr. Nance noted,

11  and it's Instruction No. 4.  Member of the jury, proof beyond a

12  reasonable doubt is not proof beyond all doubt; it's not complete

13  certainty.  The government embraces its burden in this case, and

14  we submit to you that we have proved beyond a reasonable doubt

15  all of the elements of this case.  We have done that through the

16  testimony of all of the witnesses you have heard and all of the

17  documents that you are going to take back to the jury room with

18  you and review on your own.  But keep in mind that proof beyond a

19  reasonable doubt is not proof beyond all doubt.

20      And also, as you think about this, think about whether the

21  story that Mr. Shibley told you is reasonable.  Let's just

22  explore the scenario that Mr. Shibley has presented us with

23  through his testimony.  He told us that he's running multiple

24  successful construction and real estate businesses where he's

25  taking in both a million dollars a month in revenue and also

1    paying out a million dollars a month in payroll.  And on top of

2    that, he has a 10 percent profit margin, which means he is

3    pocketing $100,000 a month.  By my math, that means he's taking

4    in $1.2 million in profit every year on these companies.  And all

5    of that is apparently operating outside of his 59 bank accounts.

6    None of it can be seen in the bank accounts.  He has 59 bank

7    accounts that have some activity, 59 bank accounts in the names

8    of some of these businesses, or in all of these businesses, but,

9    apparently, the bank accounts aren't actually for his actual

10   businesses.  And they're also not for his profits, because

11   Mr. Petron told you he doesn't see $1.2 million coming into those

12   bank accounts.  So all of this money is flowing through

13   Mr. Shibley's hands in cash.

14        And yet, remember when he testified, he talked about how,

15   when the PPP money came into his checking account, he had to

16   immediately move it over to a saving account, and that was

17   apparently because he testified that the checking account would

18   be too easy to access if he dropped his wallet at one of his

19   construction sites.  And he told you to just imagine the

20   population that he was dealing with to explain why he couldn't

21   have this PPP money in his checking accounts.  But think about

22   that:  Mr. Shibley is apparently walking around all these

23   construction sites, handling a million dollars in cash a month,

24   taking it in, paying it back out with no problem, but a checking

25   account is apparently not secure enough for Mr. Shibley.

1        But even if you believe all of that, that there is this

2   fantasy business operating outside of Mr. Shibley's 59 bank

3   accounts, and in the world where a checking account is not secure

4   but having a million dollars a month in cash is, outside of the

5   bank accounts, it doesn't change the fact that Mr. Shibley

6   repeatedly lied to the SBA.  It doesn't change the fact that

7   every 941 he filed on these applications was not filed with the

8   IRS; it doesn't change the fact that he had never paid payroll

9   taxes; it doesn't change the fact that his applications don't

10  even match; and it doesn't change the fact that he was on

11  probation.

12        Even living in the world that Mr. Shibley has concocted, he

13  has still lied repeatedly to the SBA in order to get forgivable

14  COVID relief loans.  And those lies mattered.  There are no

15  innocent explanations for a scheme involving the submission of 39

16  PPP and EIDL applications containing false statements,

17  misrepresentations, and inconsistencies.  Mr. Shibley made up the

18  numbers for these businesses and he submitted fake 941s, and he

19  did this to engage in a cash-grab at a time of emergency.  There

20  is no evidence that Eric Shibley actually ran six legitimate

21  businesses that were paying over 150 employees over a million

22  dollars a month.

23        What you see is Eric Shibley telling lie after lie.  What you

24  see is Eric Shibley intentionally bilking pandemic relief

25  programs out of millions of dollars.  This is not a simple

1  mistake or a simple misunderstanding.  This is not a case about

2  one or two bad loans.  This is a case about 39 fraudulent loan

3  applications and an attempt to circumvent law enforcement and

4  take the loans out in cash.  There is no mistake.

5      Hold him accountable, members of the jury.  Mr. Shibley is

6  not above the law.  Review the evidence, follow Judge

7  Coughenour's instructions, and find Eric Shibley guilty.

8      Thank you.

9      THE COURT:  All right.  Ladies and gentlemen, I'm going

10  to ask all of you, except Ms. Marek, to retire to the jury room.

11  You can commence your deliberations by selecting your jury

12  foreperson.  The exhibits and jury instructions will be delivered

13  to you shortly.  So you can go on back to the jury room.

14      (The following occurred outside the presence of the jury.)

15      THE COURT:  Ms. Marek, one of the reasons I don't like

16  to use alternate jurors is what I have to do with you right now,

17  and that is to deprive you of the opportunity to do the most

18  interesting part of service as a juror.  I still can't excuse

19  you because if we lose one or more jurors, we may have to call

20  upon you.  So that means that until we call you and tell you that

21  there has been a verdict, you still must not talk about the case

22  or do any research about it, don't let anybody talk to you about

23  it, don't read, listen, or watch anything about it.

24      As soon as there's a verdict, we will call you and let you

25  know, and at that point you will be released.  Thank you so much

1   for your willingness to serve.

2       Counsel, remain available and on short notice, and we will

3   see what happens.  We will be in recess.

4           THE CLERK:  Please rise.  Court is in recess.

5                       (Recessed.)

6       (The following occurred outside the presence of the jury.)

7           THE COURT:  Please be seated.

8       We have a question from the jury that reads as follows, "Your

9   Honor, we would like clarification on the law regarding money

10  laundering.  Is the definition in the packet complete, or may we

11  have a greater definition?" signed Tim or Erin O'Brien.

12      Your thoughts?

13          MR. WERNER:  Your Honor, I believe the jury should be

14  referred to the instructions as they exist.

15          THE COURT:  Mr. Nance?

16          MR. NANCE:  That's my inclination.  Let me just take a

17  look.

18      I mean, this is the standard Ninth Circuit instruction.

19          THE COURT:  Yeah.  I think I have to tell them that they

20  have to rely upon the instruction.

21          MR. NANCE:  I think so too.

22          THE COURT:  Okay.

23      I also propose to tell them, without disclosing how they

24  stand, do they think they are going to need to return tomorrow.

25  Any problem with that?

```
1          MR. NANCE:  I think that's okay.

2      (The following occurred in the presence of the jury.)

3          THE COURT:  Please be seated, folks.

4      So I received your question which reads, "Your Honor, we

5  would like clarification on the law regarding money laundering.

6  Is the definition in the packet complete, or may we have a

7  greater definition?"

8      I'm sorry.  I couldn't read it.  Is it Erin, or Tim O'Brien?

9          JUROR NO. 9:  Erin, yes.

10         THE COURT:  Erin O'Brien.

11     The answer to your question is:  You must rely upon the

12  instructions as delivered to you.

13     I need to ask you another question.  Without disclosing how

14  you stand, do you think you're going to need to return tomorrow?

15         JUROR NO. 9:  I don't believe so, if we have a little

16  leeway for staying past 4:00.

17         THE COURT:  All right.  Go ahead.  You can return to the

18  jury room.

19     (The following occurred outside the presence of the jury.)

20         THE COURT:  We will be in recess.

21                         (Recessed.)

22         THE COURT:  Counsel, the jury has indicated they have a

23  verdict.

24     Let's bring them out.

25         (The following occurred in the presence of the jury.)
```

1        THE COURT:  Please be seated, folks.

2     Will the foreperson of the jury please rise?

3     Has the jury reached a verdict?

4        JUROR NO. 9:  We have.

5        THE COURT:  Will you hand it to the clerk?

6        PROSPECTIVE JUROR NO. 9:  (Complied with the court's

7  request.)

8        THE COURT:  The verdict is proper in form.

9     Will the defendant rise and face the jury?

10    The clerk will read the verdict.

11       THE CLERK:  The United States District Court, Western

12  District of Washington at Seattle, the United States of America,

13  Plaintiff, versus Eric Shibley, Defendant, Case No. CR20-174-JCC,

14  Verdict Form.

15    We, the jury, unanimously find the following:

16    Count 1, wire fraud:  Electronic transmission of A Team

17  Holdings LCC loan note to Ready Capital on or about April 23,

18  2020.

19    As to Count 1, we find the defendant, Eric Shibley, guilty.

20    Count 2, wire fraud:  Electronic transmission of Seattle's

21  Finest Cannabis LLC PPP application to TCF Bank on or about

22  April 25th, 2020.

23    As to Count 2, we find the defendant, Eric Shibley, guilty.

24    Count 3, wire fraud:  Electronic transmission of Dituri

25  Construction LLC PPP application to Ready Capital on or about May

1    2nd, 2020.

2         As to Count 3, we find the defendant, Eric Shibley, guilty.

3         Count 4, wire fraud:  Electronic transmission of Dituri

4    Construction LLC PPP application to Celtic Bank on or about

5    May 4th, 2020.

6         As to Count 4, we find the defendant, Eric Shibley, guilty.

7         Count 5, wire fraud:  Electronic transmission of SS1 LLC loan

8    note to Harvest Small Business Finance on or about May 5, 2020.

9         As to Count 5, we find the defendant, Eric Shibley, guilty.

10        Count 6, wire fraud:  Electronic transmission of Dituri

11   Construction LLC EIDL application to SBA on or about June 7th,

12   2020.

13        As to Count 6, we find the defendant, Eric Shibley, guilty.

14        Count 7, wire fraud:  Electronic transmission of SS1 LLC EIDL

15   application to SBA on or about June 7, 2020.

16        As to Count 7, we find the defendant, Eric Shibley, guilty.

17        Count 8, bank fraud:  Submission of Seattle's Finest Cannabis

18   LLC PPP application to TCF Bank on or about April 25, 2020.

19        As to Count 8, we find the defendant, Eric Shibley, guilty.

20        Count 9, bank fraud:  Submission of A Team Holdings LLC loan

21   note to Customers Bank on or about April 30, 2020.

22        As to Count 9, we find the defendant, Eric Shibley, guilty.

23        Count 10, bank fraud:  Submission of Dituri Construction LLC

24   PPP application to Celtic Bank on or about May 4, 2020.

25        As to Count 10, we find the defendant, Eric Shibley, guilty.

1        Count 11, money laundering:  Transfer of $960,000 from Wells

2   Fargo account ending in 9116 to the name of A Team Holdings

3   LLC -- in the name of A Team Holdings LLC to Wells Fargo account

4   ending in 3536 in the name of A Team Holdings LLC on or about

5   May 4, 2020.

6        As to Count 11, we find the defendant, Eric Shibley, guilty.

7        Count 12, money laundering:  Transfer of $563,500 from BECU

8   account ending in 7277 in the name of Dituri Construction LLC to

9   BECU account ending in 7219 in the name of Dituri Construction

10  LLC on or about May 6th, 2020.

11       As to Count 12, we find the defendant, Eric Shibley, guilty.

12       Count 13, money laundering:  Transfer of $820,000 from BECU

13  account ending in 9724 in the name of SS1 LLC to BECU account

14  ending in 9683 in the name of SS1 LLC on or about May 19, 2020.

15       As to Count 13, we find the defendant, Eric Shibley, guilty.

16       Count 14, money laundering:  Withdrawal of $150,000 from

17  Wells Fargo account ending in 3536 in the name of A Team Holdings

18  LLC on or about May 26th, 2020.

19       As to Count 14, we find the defendant, Eric Shibley, guilty.

20       Count 15, money laundering:  Deposit of $20,000 cashier's

21  check from Verity Credit Union into Navy Federal Credit Union

22  account ending in 4507 in the name of ES1 LLC on or about

23  June 22nd, 2020.

24       As to Count 15, we find the defendant, Eric Shibley, guilty.

25       Dated this 18th day of November 2021, signed "Foreperson of

```
 1    the Jury."
 2           THE COURT:  Counsel, do either of you wish to have the
 3    jury polled?
 4           MR. WERNER:  Not from the government, Your Honor.
 5           MR. NANCE:  We request it, please.
 6           THE COURT:  All right.
 7      Ladies and gentlemen, I'm going to ask each of you two
 8    questions.  The first question will be:  Is this your individual
 9    verdict?  And the answer to that question will be "Yes," if you
10    voted for it in all respects as read by the clerk, and "No," if
11    not.
12      The second question will be:  Is this the verdict of the
13    jury?  The answer to that question will be "Yes," if all twelve
14    of you voted in favor of the verdict as read by the clerk in all
15    respects; "No," if not.
16                              JURY POLLING
17    BY THE COURT:
18    Q   Juror No. 1, is this your individual verdict?
19    A   Yes.
20    Q   Is it the verdict of the jury?
21    A   Yes.
22    Q   Juror No. 2, is this your individual verdict?
23    A   Yes, Your Honor.
24    Q   Is it the verdict of the jury?
25    A   Yes.
```

```
 1   Q   Juror No. 3, is this your individual verdict?

 2   A   Yes, Your Honor.

 3   Q   Is it the verdict of the jury?

 4   A   Yes.

 5   Q   Juror No. 4, is this your individual verdict?

 6   A   Yes.

 7   Q   Is it the verdict of the jury?

 8   A   Yes.

 9   Q   Juror No. 5, is this your individual verdict?

10   A   Yes.

11   Q   Is it the verdict of the jury?

12   A   Yes.

13   Q   Juror No. 6, is this your individual verdict?

14   A   Yes.

15   Q   Is it the verdict of the jury?

16   A   Yes.

17   Q   Juror No. 7, is this your individual verdict?

18   A   Yes.

19   Q   Is it the verdict of the jury?

20   A   Yes.

21   Q   Juror No. 8, is this your individual verdict?

22   A   Yes.

23   Q   Is it the verdict of the jury?

24   A   Yes.

25   Q   Juror No. 9, is this your individual verdict?
```

```
1    A    Yes.

2    Q    Is it the verdict of the jury?

3    A    Yes.

4    Q    Juror No. 10, is this your individual verdict?

5    A    Yes.

6    Q    Is it the verdict of the jury?

7    A    Yes.

8    Q    Juror No. 11, is this your individual verdict?

9    A    Yes.

10   Q    Is it the verdict of the jury?

11   A    Yes.

12   Q    And, Juror No. 12, is this your individual verdict?

13   A    Yes.

14   Q    Is it the verdict of the jury?

15   A    Yes.

16             THE COURT:  Is there any reason I should not discharge

17   the jury?

18             MR. WERNER:  No, Your Honor.

19             MR. NANCE:  No reason.

20             THE COURT:  All right.  Give me a sentencing date and

21   time.

22             THE CLERK:  February the 22nd, 2022, at 9:00 a.m.

23             THE COURT:  All right.  Ladies and gentlemen, you are

24   excused to report to the jury clerk on the first floor.  If you

25   want, you are invited to come back into chambers for a few
```

1   minutes.  You don't have to if you don't want to.  If you want to

2   get on and get home, I will understand, but if you want to come

3   back, I would be happy to chat with you, all right?

4       We will be in recess.

5           THE CLERK:  All rise.  Court is in recess.

6               (Adjourned.)

7

8               C E R T I F I C A T E

9

10      I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

11  United States District Court in the Western District of

12  Washington at Seattle, do certify that the foregoing is a correct

13  transcript, to the best of my ability, from the record of

14  proceedings in the above-entitled matter.

15

16

17              /s/ Nickoline Drury

18              Nickoline Drury

19

20

21

22

23

24

25